**Exhibit B**

**CERTIFIED COPY**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

```
JOSE LUIS NAZARIO, JR., an    )
individual,                   )
                              )
              Plaintiff,      )
                              )   CASE NO.
         vs.                  )   CV 10-01731 VAP (DTBx)
                              )
CITY OF RIVERSIDE; and        )
DOES 1-10,                    )
                              )
              Defendants.     )
_____)
```

VIDEOTAPED DEPOSITION

OF

JOSE LUIS NAZARIO, JR.

LOCATION:                GODES & PREIS LLP
                         8001 Irvine Center Drive
                         Suite 1040
                         Riverside, California

DATE AND TIME:           Monday, August 9, 2010
                         10:01 a.m. - 5:53 p.m.

REPORTED BY:             LYNNE DALTON, CSR, RDR
                         CSR NO. 3544

JOB NO.:                 68294LD

**GILLESPIE**

**GILLESPIE REPORTING AND DOCUMENT MANAGEMENT INC.**
3333 Central Ave., Ste. D· Riverside, CA 92606 • 951-682-5686 • Fax 951-682-4990
Email: grdm@charterinternet.com

REPORTING SERVICES

Exhibit B
Page 18

1       VIDEOGRAPHER:  The court reporter today is

2   Ms. Lynne Dalton with Gillespie Court Reporting in

3   Riverside, California.  The reporter may swear the

4   witness.

5

6           JOSE LUIS NAZARIO, JR.,

7       called as a witness, having been administered

8             an oath, testified as follows:

9

10          E X A M I N A T I O N

11             (BY MR. ROTH)

12

13   Q.    Good morning, Mr. Nazario.  My name is Richard

14   Roth, as you heard.  I'm one of the attorneys for the

15   defendants in this case.

16          Before we started this morning, I asked you to

17   take a look at a document which is entitled "Instruction

18   to Witness Regarding Deposition Procedures," the document

19   which I've marked as Defendant Exhibit 500 for purposes of

20   this case.

21          (Defendants' Exhibit 500 was marked

22                 for identification.)

23   Q.    Did you have an opportunity to review the

24   document?

25   A.    No.

6

1    Q.    Would you take a few minutes, then, to do so.

2  You do not have to sign the second page.

3    A.    (Witness complies.)

4          MR. PREIS:  So you're starting at 500 and going

5  consecutively?

6          MR. ROTH:  Off the record.

7          (Discussion was held off the record.)

8          THE WITNESS:  Okay.

9          MR. ROTH:  Back on the record.

10 BY MR. ROTH:

11   Q.    Mr. Nazario, have you now had an opportunity to

12 review the document "Instruction to Witness Regarding

13 Deposition Procedures" which I marked as Defendants'

14 Exhibit 500?

15   A.    Yes, I have.

16   Q.    Do you have any questions about the procedures

17 that we'll follow today during this deposition?

18   A.    Not at this moment.

19   Q.    Okay.  If you have any questions, I'd ask that

20 you raise them.  And during the course of the deposition,

21 if at any time you don't understand one of my questions or

22 you need it clarified or restated, I'd ask that you let me

23 know.  Okay?

24   A.    Okay.

25   Q.    If I don't hear from you, may I assume that you

7

Exhibit B
Page 20

1    understand the question and can provide an appropriate

2    response?

3        A.      Yes.

4        Q.      Mr. Nazario, you're a former marine.  Correct?

5        A.      Correct.

6        Q.      You enlisted in the Marine Corps on or about

7    October 28, 1996?  Does that sound correct?

8        A.      No.

9        Q.      When did you enlist?

10       A.      In September 9th.

11       Q.      Of 1996?

12       A.      Of 1997.

13       Q.      1997.  And you served in the Marine Corps during

14   what period of time?

15       A.      I served for a little over eight years.

16       Q.      So from September of 1997 until October of 2005?

17       A.      Yeah.

18       Q.      Were you discharged on or about October 11, 2005?

19       A.      Yes, I was.

20       Q.      Okay.  And you received an honorable discharge,

21   did you not?

22       A.      Yes.

23       Q.      And when you were discharged, you were serving in

24   the grade of sergeant?

25       A.      Yes.

8

1    Q.      And that's E5; correct?

2    A.      Correct.

3    Q.      When you were in the Marine Corps, you served as

4    a rifleman?

5    A.      Amongst other things, yes.

6    Q.      Do you recall deploying to Iraq in 2004?

7    A.      Of course.

8    Q.      And at the time you deployed to Iraq, you were a

9    member of what unit?

10   A.      31 Kilo Company.

11   Q.      Is that Third Squad, First Platoon, Kilo Company?

12   A.      It's Third Battalion, First Marines.

13   Q.      Third Battalion, First Marines, Kilo Company.

14   And you were a squad leader?

15   A.      Yes.

16   Q.      Of what squad?

17   A.      Third Squad.

18   Q.      Prior to your deployment to Iraq in 2004, did you

19   receive any briefings with respect to the Law of Armed

20   Conflict?

21   A.      I don't understand the question.

22   Q.      Prior to your deployment to Iraq in 2004 --

23   A.      Uh-huh.

24   Q.      -- did you receive any briefings from the Marine

25   Corps with regard to the Law of Armed Conflict?

9

1    MR. PREIS: Relevance and vague and ambiguous as

2  to "briefings," but if you understand what he's asking

3  you, you can answer it.

4    THE WITNESS: I don't understand the question.

5  BY MR. ROTH:

6    Q.    Did you receive Law of Armed Conflict training

7  during your tour of duty with the United States Marine

8  Corps?

9    MR. PREIS: Same objections.

10    THE WITNESS: Armed conflict. I don't understand

11  if that's the same thing as rules of engagement. I don't

12  understand what you're asking me.

13  BY MR. ROTH:

14    Q.    During the time that you served in the Marine

15  Corps, did you ever hear the term "LOAC"?

16    A.    No.

17    Q.    Do you recall ever receiving any training with

18  regard to the Law of Armed Conflict?

19    MR. PREIS: I'm just going to interpose a running

20  objection as to relevancy so I don't have to say it every

21  time. Are you comfortable with that?

22    MR. ROTH: Absolutely.

23    MR. PREIS: Okay.

24    THE WITNESS: At this time right now I do not

25  know what LOAC is.

10

Exhibit B
Page 23

1   BY MR. ROTH:

2      Q.      During the time that you served in the United

3   States Marine Corps, did you receive any training from the

4   Marine Corps with respect to how marines were to treat

5   combatants in a battlefield context?

6      A.      Well, yeah.

7      Q.      During the time that you served in the United

8   States Marine Corps, did you receive any training from the

9   Marine Corps on how you as a marine were to treat

10  individuals who surrendered?

11     A.      Yes.

12     Q.      During the time that you served in the United

13  States Marine Corps, did you as a marine receive any

14  training from the Marine Corps on how you as a marine were

15  to treat detainees in a combat setting?

16     A.      We received a bunch of classes.  Yes.

17     Q.      And during any of this training, do you recall

18  the term "Law of Armed Conflict" being used?

19     A.      I'm saying I -- I was in the Marine Corps a long

20  time ago.  I don't -- at the time maybe I heard of it.

21  What I'm telling you is I don't remember hearing that

22  right now.

23     Q.      This training that you received during the time

24  that you served in the United States Marine Corps with

25  respect to how you as a marine should treat combatants and

                                                          11

1   individuals who surrendered, did you receive this training

2   on more than one occasion?

3   A.     I'm pretty sure -- I can't remember.

4   Q.     You can't remember how many times you received

5   that training?

6   A.     Yes.

7   Q.     Do you recall receiving that training,

8   specifically how you were to treat combatants and how you

9   were to treat individuals who surrendered, prior to

10  deploying to Iraq in 2004?

11  A.     Are you asking me if I received training on how

12  to treat combatants, people who were shooting at us --

13  Q.     And individuals who surrendered prior to

14  deploying to Iraq in 2004?

15  A.     Yes.

16  Q.     What was your understanding as to your

17  obligations as a marine when an individual surrendered?

18         MR. PREIS:  Well, vague and ambiguous as to

19  "surrender" and "obligation."  But you can answer.

20         THE WITNESS:  I don't understand what you mean by

21  "surrender."

22  BY MR. ROTH:

23  Q.     Well, when I use the term "surrender," what do

24  you think of in a combat setting?

25  A.     Someone who is no longer posing a threat.

12

Exhibit B
Page 25

1    Q.      Could be someone who is then unarmed?

2    A.      What's unarmed?

3    Q.      Not having in one's custody or control weapons.

4    Or explosive devices.

5    A.      I mean, you can use a cell phone as a weapon.

6    You can use a shovel as a weapon.

7    Q.      Okay.  So define for me an individual who has

8    surrendered in a combat environment.

9            MR. PREIS:  Calls for a legal conclusion, expert

10   witness testimony.  To your understanding, you can

11   respond.

12           THE WITNESS:  Can you repeat that question?

13   BY MR. ROTH:

14   Q.      Well, as a marine in a combat setting, what were

15   you trained to do when an individual surrendered?

16   A.      If an individual surrendered, you would strip

17   them of any weapons.  You'd conduct a search on them, make

18   sure he doesn't have any weapons.  You try to safeguard

19   him as much as possible and, depending on what your orders

20   are, send them back to the rear, whatever instructions you

21   received.

22   Q.      And that's how you were trained to handle an

23   individual who surrendered in a combat setting.

24   A.      Yes.

25   Q.      Would you handcuff -- were you trained to

13

Exhibit B
Page 26

1    handcuff the individual?

2    A.     Yes.

3    Q.     And what were you trained to use for cuffs?

4    A.     For cuffs, we used flex cuffs.

5    Q.     Otherwise known as zip ties?

6    A.     Zip ties, flex cuffs.  I think they're two

7    different things, but you can use one or the other.

8    Q.     And was that your understanding as to how you

9    were to treat individuals who surrendered at the time that

10   you deployed to Iraq in 2004?

11   A.     Yes.

12   Q.     Now, while in Iraq in 2004, elements of your unit

13   were deployed to the vicinity of Fallujah on or about

14   September 9, 2004?  Correct?

15   A.     Yeah.  We was in Fallujah.

16   Q.     You were in Fallujah on November 9, 2004?

17   A.     Yes.

18   Q.     And in Fallujah, what was your mission at the

19   time, as you understood it?

20   A.     My mission, as I understood it, was to clear the

21   city of all insurgents.

22   Q.     And what did that mean to you at the time?

23   A.     That means -- I mean, clear the city of all

24   insurgents.  I don't -- I don't understand.

25   Q.     Do you recall the incident for which you were

14

1   tried in federal criminal court in August of 2008?

2     A.     Of co- --

3          MR. PREIS:  Objection as to the form of the

4   question.

5          Do you recall what you were -- are you asking him

6   if he recalls what he was charged for or if he recalls

7   some alleged incident?

8   BY MR. ROTH:

9     Q.     Do you recall the charges for which you were

10   tried in federal criminal court in August of 2008?

11     A.     I recall what I was charged with.

12     Q.     And you were charged with entering a particular

13   house on November 9, 2004.  Correct?

14          MR. PREIS:  Objection as to the word "particular"

15   being vague and ambiguous, but you can respond.

16          THE WITNESS:  We entered many houses.

17   BY MR. ROTH:

18     Q.     During that federal criminal trial, you were

19   present.  Correct?

20     A.     Of course.

21     Q.     You heard testimony with respect to activities

22   that occurred in a particular house where four Iraqi

23   individuals were detained?  Do you recall that testimony?

24     A.     Yes.

25     Q.     In this particular house, do you recall it being

15

1    described as a two-story house?

2      A.      Possibly.

3      Q.      And this was a house where one of the -- your

4    fellow marines, Lance Corporal Garcia, had to apply some

5    explosive devices in an attempt to get through a gate?  Do

6    you recall that testimony?

7            MR. PREIS:  Objection.  You're still asking him

8    if he recalls hearing that testimony at the criminal

9    trial?

10           MR. ROTH:  Right.

11           MR. PREIS:  That's a yes-or-no question.

12           THE WITNESS:  Yes.

13   BY MR. ROTH:

14     Q.      Do you recall being present in that house in

15   Fallujah on November 9, 2004?

16           MR. PREIS:  Objection.  Vague and ambiguous as to

17   "that house."

18           THE WITNESS:  The question -- say the question.

19   BY MR. ROTH:

20     Q.      Do you recall being present in that house, the

21   house that was described in your federal criminal

22   proceeding, in Fallujah on or about November 9, 2004?

23           MR. PREIS:  Same objection.  Assumes facts not in

24   evidence.  You can answer to the extent you understand the

25   question.

16

1   what Nelson allegedly did.  You're asserting a fifth

2   amendment right to that question?

3          MR. PREIS:  I am.

4   BY MR. ROTH:

5    Q.     Do you decline to respond to that question,

6   Mr. Nazario, based on your fifth amendment right to avoid

7   self-incrimination?

8    A.     Yes, I do.

9          MR. PREIS:  And, Rich, I'll explore that

10  completely with you, you know, on or off the record to

11  your satisfaction.  We'll agree to disagree, but --

12         MR. ROTH:  We'll do it off the record.  That's

13  fine.

14  BY MR. ROTH:

15   Q.     During the time that you were deployed to

16  Fallujah on or about November 2004, Mr. Nazario, do you

17  recall what the rules of engagement were with respect to

18  your deployment, the ROE?

19   A.     You're asking me if I recall what they were word

20  for word?

21   Q.     Yes.

22   A.     I don't know what the -- no.  That would be no.

23   Q.     When you deployed, did you receive a card or a

24  document that contained the ROE?

25   A.     Absolutely.

                                                          32

1    Q.    And as the ROE changed from time to time, did you

2    get -- receive another card?

3    A.    I can't remember if we got another card, but I do

4    remember the rules of engagement changing, yes.

5    Q.    And did they change at some point during your

6    deployment in Fallujah?

7    A.    Yes.

8    Q.    So when you initially deployed to Fallujah on or

9    about November 9, 2004, the rules of engagement were one

10   particular set of rules, and then those rules changed

11   sometime during the deployment?

12   A.    Yes, they did.

13   Q.    Do you recall when the rules of engagement

14   changed?

15   A.    I can't recall the specific date, no.

16   Q.    Let me show you a document which I've marked as

17   Defense Exhibit 501.

18              (Defendants' Exhibit 501 was marked

19                   for identification.)

20   Q.    It appears to be a U.S. ROE card, but let me ask

21   you to take a look at it.

22   A.    Okay.  What's your question.

23              MR. ROTH:  Before I start, Counsel, for purposes

24   of this record, I believe all of the documents I'm using

25   also have a Bates stamp number at the bottom, my

33

1   co-counsel just reminded me.   This is a Bates stamp number

2   that to the documents that were produced during

3   defendants' initial disclosure.   The Bates stamp on this

4   Exhibit 501 is 13900.

5   BY MR. ROTH:

6      Q.      Mr. Nazario, have you had an opportunity to

7   review Exhibit 501?

8      A.      Yes.

9      Q.      Do you recognize it?

10     A.      Looks like an ROE card.

11     Q.      Do you recognize it as the ROE card that you had

12  when you initially deployed to Fallujah on or about

13  November 9, 2004?

14     A.      Yeah.   Looks the same.

15     Q.      And was it your understanding at the time that

16  you deployed into Fallujah on or about November 9, 2004,

17  that you were not to engage anyone who had surrendered?

18     A.      Repeat the question.

19     Q.      Did you understand it to be that when you

20  deployed into Fallujah initially on or about November 9,

21  2004, that the rules of engagement prohibited you from

22  engaging anyone who had surrendered?

23     A.      What do you mean by "engaging"?

24     Q.      Well, look at Item 1-B on Exhibit 501.

25     A.      Okay.   1-B.   Okay.

34

1   Q.      Do you recall that to be the rule that applied to

2   individuals who surrendered at the time that you initially

3   deployed into Fallujah on or about November 9, 2004?

4   A.      It sounds right.

5   Q.      And look at paragraph 2 on Exhibit 501.  Was it

6   your understanding that, in fact, you were authorized to

7   use force to protect enemy prisoners of war and detainees?

8   A.      You may use force to protect enemy prisoners of

9   war.

10   Q.      And detainees?  Did you understand that to be the

11   rule when you initially deployed into Fallujah on or about

12   November 9, 2004?

13   A.      Protect them from who?

14   Q.      From hostile acts of others.

15   A.      Who's others?

16   Q.      Did you understand at the time that you deployed

17   into Fallujah on or about November 9, 2004, that as a

18   United States marine, you had an obligation to protect

19   enemy prisoners of war or detainees in your custody?

20   A.      Yes.

21   Q.      Now, during the operations in Iraq and

22   specifically the operations in Fallujah in November of

23   2004, did you and the members of your squad have occasion

24   to detain Iraqi civilians?

25          MR. PREIS:  I'm sorry.  This might just be an

35

1    objection as to scope.  You're asking about Fallujah

2    specifically?

3              MR. ROTH:  Yes.

4              MR. PREIS:  Okay.

5              THE WITNESS:  Say the question again.

6    BY MR. ROTH:

7      Q.     During the time that -- I'll rephrase it.

8              During the time that you were deployed to

9    Fallujah in or about November of 2004 --

10     A.     Uh-huh.

11     Q.     -- did you and the other members of your squad

12    have an occasion, one or more occasions, to detain Iraqis?

13             MR. PREIS:  Vague and ambiguous as in "detain."

14    You can answer.

15             THE WITNESS:  Did we detain anybody in November?

16    BY MR. ROTH:

17     Q.     When you were in Fallujah.

18     A.     My squad -- my squad, we didn't have any

19    detainees in Fallujah.

20     Q.     Did you encounter civilians when you were

21    searching houses in Fallujah in November of 2004?

22             MR. PREIS:  Objection.  Vague and ambiguous as to

23    "civilians."  May call for a legal conclusion.  You can

24    answer.

25             MR. ROTH:  And I'll clarify that.

                                                        36

1    BY MR. ROTH:

2        Q.      Mr. Nazario, when I use the word "civilians," I

3    understand that you were -- there were insurgents in

4    Fallujah that were not in uniform.   It was tough to tell

5    whether you had a true civilian or somebody who was an

6    insurgent.   That's the context of my question.

7            Do you understand that?

8        A.      You're telling me that it's hard -- you're saying

9    that it was hard for me to tell if someone is an insurgent

10   or someone is a civilian?

11       Q.      Well, I'll make that a question.   Was it in

12   Fallujah in November of 2004?

13       A.      Is it hard to tell between an insurgent and

14   civilian.

15       Q.      Was it in Fallujah in 2004 hard to tell between

16   an insurgent and a civilian not associated with the

17   insurgent force?

18       A.      Insurgents and civilians look the same.

19       Q.      Okay.   Well, while you were in Fallujah in

20   November of 2004, did you and the other members of your

21   squad have occasion to detain insurgents and/or civilians?

22       A.      I feel like you're asking me the same question.

23       Q.      Well, answer that one, and we'll go back.

24           THE WITNESS:   Can I take a break?

25           MR. ROTH:   Sure.   Off the record.

1          VIDEOGRAPHER:  The time is 10:45.  We're off the

2    record.

3                    (Brief recess was taken.)

4          VIDEOGRAPHER:  The time is 11:02.  We're on the

5    record.

6          MR. ROTH:  Back on the record.

7          Madam Court Reporter, would you read the last

8    question, please.

9                    (The record was read as requested.)

10         MR. PREIS:  Objection.  Calls for speculation as

11   to the "other members of his squad," but you can answer

12   the question.

13         THE WITNESS:  My squad didn't have the chance to

14   come across any detainees in Fallujah.

15   BY MR. ROTH:

16    Q.    Well, earlier in the deposition you mentioned

17   that you were in a lot of houses with a lot of -- I think

18   you used the word "civilians," probably because I did --

19   but you mentioned that you were in a lot of houses with

20   individuals in it, three, four, five.  Do you remember

21   that testimony?

22    A.    Yes.

23    Q.    What did you do with those individuals?

24         MR. PREIS:  Objection.  Implicates my client's

25   fifth amendment rights against self-incrimination,

1   instruct him not to respond.

2   BY MR. ROTH:

3     Q.     Are you going to not respond to the question on

4   the basis of your fifth amendment rights, Mr. Nazario?

5     A.     Yes.

6     Q.     Did you take any of those civilians that you

7   encountered in the houses that you referenced during your

8   previous testimony into custody?

9            MR. PREIS:  Well, objection.  Asked and answered,

10   and with respect to the term "civilian," misstates prior

11   testimony.

12   BY MR. ROTH:

13     Q.     The individuals that you found in those houses

14   that you testified to earlier in this deposition,

15   Mr. Nazario, did you cuff them and send them back to the

16   rear?

17            MR. PREIS:  Same objection, same instruction.

18            MR. ROTH:  That's with respect to the fifth

19   amendment?

20            MR. PREIS:  Correct.  I'm sorry.  I could say it

21   every time.

22            MR. ROTH:  No.  That's okay.  I just need to make

23   sure I understand.

24   BY MR. ROTH:

25     Q.     So I ask the question, are you declining to

39

1    respond to the question, Mr. Nazario, on the basis of your

2    fifth amendment right?

3         A.      Yes.

4         Q.      When did the ROE change during your deployment to

5    Fallujah in 2004?

6         A.      I can't remember a specific date.

7         Q.      But it was sometime after November 9, 2004?

8         A.      Yes.

9         Q.      What was the change in the ROE?

10        A.      The change in the ROE was we no longer needed

11   what was called hostile intent or a hostile act to be

12   shown.

13        Q.      In order to do what?

14        A.      Oh, best way to explain it would be these new

15   rules of engagement that was put in place, because we were

16   taking so many casualties -- best way to explain the new

17   rules of engagement was we were allowed to try to draw

18   enemy fire, meaning we were allowed to shoot into

19   buildings and houses, any kind of structures, without

20   having to know who was in it.

21              The reason for that would be if we fire into

22   those dwellings and we receive fire, then that eliminates

23   any of us having to go in the kill zone.

24        Q.      So you didn't have to be fired upon in order to

25   shoot.

40

1  A.      Correct.

2  Q.      Under the new rules of engagement, did you --

3  were you required to determine whether your opponent was

4  armed or not before shooting?

5          MR. PREIS:  Objection.  To your understanding.

6  BY MR. ROTH:

7  Q.      Absolutely.

8  A.      To my understanding, no.  I don't understand.

9          What I said was we were able to engage buildings

10  not knowing who was inside the buildings.

11  Q.      Go ahead.

12  A.      Because we took so many casualties.  That's what

13  loosened up our rules of engagement.

14  Q.      And when you engaged a building, what happened?

15  During the time that you were deployed to Fallujah in

16  2004.

17          MR. PREIS:  Well, objection.  Assumes facts not

18  in evidence as to whether or not that occurred.  So are

19  you asking him whether or not he did that and then what

20  happened?

21          MR. ROTH:  Well, let me -- I'll clarify it.

22          MR. PREIS:  All right.

23  BY MR. ROTH:

24  Q.      Mr. Nazario, after the rules of engagement

25  changed, did you engage buildings during the time that you

41

Exhibit B
Page 39

1    were deployed to Fallujah in 2004?

2          MR. PREIS:  Objection.  Fifth amendment.

3    Objection.  Fifth amendment instruction.

4    BY MR. ROTH:

5      Q.    Are you declining to respond to that question,

6    Mr. Nazario, on the basis of your attorney's instruction

7    and your fifth amendment right?

8      A.    Yes.

9      Q.    Well, with respect to the change in the ROE that

10   occurred during your deployment to Fallujah in 2004, did

11   you understand that the changed ROE allowed you to engage

12   a building and shoot occupants of the building?

13         MR. PREIS:  He's asking you if that's your

14   understanding of what you were allowed to do.

15         THE WITNESS:  Yes.

16   BY MR. ROTH:

17     Q.    And was it your understanding at the time that

18   you were allowed to do that without and before you'd come

19   under fire yourself from that building?

20     A.    You're asking me if we were allowed to shoot a

21   building before we were actually shot at ourselves.

22     Q.    Yes.

23     A.    Yes.

24     Q.    Now, going back to November 9 of 2004, do you

25   recall losing a member of your squad on that day?

42

1    A.      Yes, I do.

2    Q.      And the individual's name?

3    A.      Juan Segura.

4    Q.      Juan Segura.   When Segura was shot, do you recall

5    shortly after that engaging a house?

6            MR. PREIS:   Same objection, same instruction with

7    respect to that question.

8    BY MR. ROTH:

9    Q.      Are you declining to respond to that question,

10   Mr. Nazario, on the basis of your fifth amendment right?

11   A.      Yes.

12   Q.      Earlier you mentioned that you'd spoken to your

13   former squad member Nelson.   Do you recall that testimony?

14   A.      Yes.

15   Q.      When did you speak to Nelson?   Do you recall?

16   A.      Sometime before I was fired.

17   Q.      You were discharged from the Marine Corps on

18   October 11, 2005.   Correct?

19   A.      Yes.

20   Q.      And you applied for employment with the Riverside

21   Police Department as a police officer trainee?

22   A.      Yes.

23   Q.      And my records reflect that you applied on or

24   about June 18, 2005.   Does that refresh your recollection?

25   A.      That sounds right.

43

1    Q.    During the course of this application process, I

2    gather you were required to fill out an application for

3    employment.  Correct?

4    A.    Yes.

5    Q.    And also, you filled out certain personal history

6    questionnaire documents?

7    A.    Yes.

8    Q.    And as part of completing these documents, did

9    you disclose the fact that you'd served in the United

10   States Marine Corps from 1997 to 2005?

11   A.    Yes, I did.

12   Q.    And as part of the application process and these

13   documents, did you describe your service in the Marine

14   Corps, what you did?

15   A.    Yes.

16   Q.    And as part of the application process, were

17   there a series of interviews that you were subjected to, I

18   guess, prior to employment?

19   A.    Yes.

20   Q.    And during these interviews, were they with

21   representatives of the City of Riverside Police

22   Department?

23         MR. PREIS:  Calls for speculation.  If you know,

24   answer.

25         THE WITNESS:  I don't -- I don't know.

44

1    BY MR. ROTH:

2        Q.      Do you recall who interviewed you?

3        A.      Some police officers.  I don't know if all were

4    police officers.

5        Q.      Were they police officers with the Riverside

6    Police Department?

7        A.      The ones I recognized, yes.

8        Q.      And during this interview process, did you

9    discuss your service in the United States Marine Corps?

10       A.      Yes.

11       Q.      And did they ask you questions about your

12   service?

13       A.      Yes, they did.

14       Q.      Okay.  And after this application process and

15   these interviews, you were, in fact, hired by the

16   Riverside Police Department as a police officer trainee on

17   or about November 14, 2005.  Correct?

18       A.      Yes.

19       Q.      And did you then attend the Riverside Sheriff's

20   Department police academy?

21       A.      Yes, I did.

22       Q.      And you started -- after you completed that

23   academy, you started as a police officer, entry level

24   police officer, with the Riverside Police Department on or

25   about April 25, 2006.  Does that sound right?

45

Exhibit B
Page 43

1   A.      That sounds right.

2   Q.      Okay.  And was it your understanding that you

3   were serving as a probationary police officer at that

4   point?

5   A.      Yes.

6   Q.      And the length of your probationary term was 18

7   months?

8   A.      Yes.

9   Q.      Now, when I asked you when you spoke to Sergeant

10  Nelson, you indicated that it was after you were employed

11  with the Riverside Police Department?

12          MR. PREIS:  Objection.  Misstates testimony.  I

13  believe the witness indicated it was before he was fired.

14  BY MR. ROTH:

15  Q.      It was before you were terminated by the

16  Riverside Police Department?

17  A.      Yes.

18  Q.      And was it during the time that you were employed

19  by the Riverside Police Department that you spoke with

20  Sergeant Nelson?

21  A.      Yes.

22  Q.      And were those conversations in person or over

23  the telephone?

24  A.      Over the phone.

25  Q.      How long had you known Sergeant Nelson at that

46

1    Riverside Police Department prior to August 7, 2007, other

2    than those you just testified to.

3            MR. PREIS:  Other than -- okay.

4            THE WITNESS:  I can't think of any.

5    BY MR. ROTH:

6        Q.    Let's talk about August 7, 2007.  Do you recall

7    that date?

8        A.    It was two days before we went to Fallujah.

9        Q.    August 7, 2007.

10       A.    Oh, I'm sorry.

11       Q.    Do you recall that date?

12       A.    Yes.

13       Q.    That was the date that you were arrested by NCIS

14   Agent Mark Fox.  Correct?

15           MR. PREIS:  Objection as to the arresting officer

16   and the arresting agency.

17           MR. ROTH:  Well, I'll get him to testify.

18   BY MR. ROTH:

19       Q.    What happened on August 7, 2007, Mr. Nazario?

20       A.    August 7, 2007, I was working the graveyard shift

21   for Riverside Police Department.  I can't remember what

22   call I was on, but I received a message from my superior,

23   my sergeant, Sergeant McCoy.  And he informed me that I

24   was to return to the Magnolia Avenue station immediately

25   so I could sign an evaluation report.

1    Q.      What happened next?  Did you do so?

2    A.      After I was finished taking my call, yes, I did.

3    Q.      And what happened when you arrived at the

4  Magnolia Center station?

5    A.      I arrived at the Magnolia station and went

6  straight to the sergeants room.  It's a particular room

7  where all the sergeants have their cubicles in it.

8  Usually the room's empty except for one sergeant,

9  whichever sergeant is working that shift.

10          And I approached Sergeant McCoy's cubicle.  And I

11  was under the impression that the room was empty.  So I

12  get to Sergeant McCoy's desk, and Sergeant McCoy has me

13  read this evaluation report.  And as I'm reading it, I

14  feel two sets of hands grabbing my arms, and as I look up,

15  I'm being taken into custody, being arrested.

16    Q.      Okay.  And what happened?

17    A.      I was arrested and . . .

18    Q.      What happened, physically happened, at that

19  point?  You felt two hands?

20    A.      I felt two hands.  A bunch of -- approximately

21  10 -- 10 or more officers appeared in the room.  They

22  could have been hiding in the empty -- in the cubicles

23  that I thought was empty, or they could have been waiting

24  in the hallway, but all of a sudden, the room was filled

25  with police officers.

66

1    They stripped me of my weapon.  They handcuffed

2  me.  They sat me down on a chair, told me I was fired,

3  told me I was under arrest.  After that --

4    Q.    Well, let's stop there.  And let me get a little

5  detail, and then I'll let you continue if you wish to do

6  so.

7    You indicated that the room filled with people.

8    A.    Uh-huh.

9    Q.    Who was present in terms of people you remember?

10    A.    The first person was Sergeant McCoy, who was my

11  sergeant.  He was -- he's the one who told me to come in.

12  The next person I recognized was Captain Blakely.  Other

13  person I recognized was Sergeant Mason.  And I didn't

14  recognize any of the other police officers that were

15  there.

16    Q.    So that's three.  How many other individuals did

17  you indicate were in the room?

18    A.    There could have been maybe seven more.

19    Q.    Do you recall specifically how many other

20  individuals were in the room?

21    A.    No.

22    Q.    Do you recall what Sergeant McCoy's position was

23  at the time at the Riverside Police Department in terms of

24  his assignment?

25    A.    He was the shift sergeant.

67

Exhibit B

```
 1      Q.      And you were graveyard?

 2      A.      Yes.

 3      Q.      So McCoy was the graveyard shift sergeant?

 4      A.      Yes.

 5      Q.      Captain Blakely, at the time he was in charge of

 6   support services and personnel?

 7      A.      Yes.  I believe so.

 8      Q.      Sergeant Mason, do you recall what his assignment

 9   was at the time?

10      A.      No, I do not.  Since he was a sergeant --

11              MR. PREIS:  You've answered the question.

12   BY MR. ROTH:

13      Q.      Who spoke to you, if anyone?

14      A.      Spoke to me when?

15      Q.      After you were in the room.  Did anyone say

16   anything to you?

17      A.      Yes.

18      Q.      Who said something to you first?

19      A.      Captain Blakely.

20      Q.      Okay.  What did Captain Blakely say to you?

21      A.      Captain Blakely told me that I was being

22   arrested, that because I was being arrested, I was fired.

23   And he said that if these charges clear up, if I'm

24   acquitted of all these charges, then they will hire me

25   back.  He told me he felt sorry for me in my position and
```

68

1    that he knows I'm a good guy and that he's -- he gave me

2    the impression he was in my -- you know, on my side.  And

3    he just kept -- kept insuring me that when this is all

4    over, he's going to give me my back -- I'll have my job

5    back in no time.

6        Q.     Did Captain Blakely tell you that you were going

7    to be arrested by Mark Fox?

8        A.     Captain Blakely -- I was arrested by the

9    Riverside Police Department.

10       Q.     Well, I'm just asking you what Captain Blakely

11   told you.  Did Captain Blakely tell you that Mark Fox was

12   there to arrest you?

13       A.     He told me that Mark Fox was in another room

14   waiting for me.

15       Q.     Did he tell you what Mark Fox was in the other

16   room waiting for you for?

17       A.     I can't -- I can't remember what words he used,

18   if he -- if he even asked me that.

19       Q.     Did Captain Blakely tell you that Mark Fox was

20   there in the other room waiting to take you into custody?

21       A.     That sounds right.

22       Q.     And Blake- -- Captain Blakely told you that

23   because you were being arrested, that you were going to

24   be -- you were being fired?  Terminated?

25       A.     Yes.

69

1    Q.      Did he use the word "fired"?

2    A.      I believe he did.  I don't -- fired, terminated.

3    I think they're the same thing.

4    Q.      Do you recall what word or words Captain Blakely

5    used when he spoke to you regarding the termination of

6    your employment?

7    A.      It was either "fired" or "terminated."

8    Q.      Did Captain Blakely present you with any

9    document, a notice of separation from employment?

10   A.      He provided me with a document.

11   Q.      Let me show you a document which I've marked as

12   Defendants' Exhibit 503.  It appears to be a letter from

13   the chief of police to you, Mr. Nazario, dated August 7,

14   2007, subject:  Notice of separation.

15                   (Defendants' Exhibit 503 was marked

16                        for identification.)

17   Q.      Let me ask you to take a look at it.

18   A.      (Witness complies.)  Okay.

19   Q.      Do you recognize Defense Exhibit 503,

20   Mr. Nazario?

21   A.      I recognize my signature on it.

22   Q.      Do you recognize this as the document that you

23   were presented by Captain Blakely on August 7, 2007, at

24   the Magnolia station?

25   A.      I was crying.  It could have been.

1    Q.      So do you recognize Defense Exhibit 503,

2    Mr. Nazario?

3              MR. PREIS:  Objection.  Asked and answered.

4              MR. ROTH:  Well, I don't know what the answer

5    was, Counsel, and I'd like to get it again, if I could.

6    Maybe I misunderstood.

7    BY MR. ROTH:

8    Q.      Do you recognize Exhibit 503, Mr. Nazario, the

9    document?

10   A.      Do I recognize it.  It says "Notice of

11   Separation."

12   Q.      Well, let me ask the question a different way.

13   A.      Uh-huh.

14   Q.      Have you seen Defense Exhibit 503 before?

15   A.      Yes.

16   Q.      Do you recall seeing it on August 7, 2007, at the

17   time you were taken into custody by Agent Fox?

18             MR. PREIS:  Well, misstates testimony, assumes

19   facts not in evidence, asked and answered.

20             Were you able to see this document when it was

21   put in front of you, or were you crying?

22             THE WITNESS:  I was crying.

23   BY MR. ROTH:

24   Q.      Did you look at the document, Mr. Nazario?

25   A.      Well, Captain Blakely asked me to sign a piece of

71

1   paper and -- basically saying that I'm fired and that, "If

2   you sign this, you'll be able to receive unemployment."

3      Q.      And you did sign the document, Defense

4   Exhibit 503?

5      A.      I signed the document that he put in front of me.

6      Q.      Is that your signature on Defense Exhibit 503?

7      A.      That looks like my signature.

8      Q.      Did you get a copy of this document at the time?

9      A.      I can't remember.

10      Q.      You can't remember whether Captain Blakely or any

11   other representative of the Riverside Police Department

12   provided you with a copy of Defense Exhibit 503 on

13   August 7, 2007?

14      A.      I was in handcuffs.  I was crying.  I was being

15   drug out the police station.  I can't remember if someone

16   gave me a copy of this, no.

17      Q.      Okay.  Did you ever receive a copy of Defense

18   Exhibit 503?

19      A.      Did I ever receive a copy of this.  I can't say I

20   have.  I don't remember.

21      Q.      Well, at some point you remember the document,

22   seeing the document.  Correct?

23      A.      Correct.

24      Q.      Do you remember when that sometime was?

25      A.      I seen this document in my attorney's office.

1  Q.     Okay.  So at the time that Captain Blakely was

2  talking to you, the testimony you provided a few minutes

3  ago, had you already been cuffed?

4  A.     Yes.

5  Q.     And had you relinquished your weapon to Captain

6  Blakely and the other officers there?

7  A.     That's the --

8         MR. PREIS:  Vague and ambiguous as to

9  "relinquished," but you can answer.

10  BY MR. ROTH:

11  Q.     Did you give up your weapon to the Riverside

12  Police Department officials there?

13         MR. PREIS:  Same objection, but you can answer.

14         THE WITNESS:  I complied with the arrest.

15  BY MR. ROTH:

16  Q.     Did they ask to you relinquish your weapon?

17  A.     No, they didn't.  They physically removed it from

18  me.

19  Q.     Okay.  And also your back-up weapon?

20  A.     I was not carrying a back-up weapon.

21  Q.     Okay.  And after Captain Blakely had this

22  conversation with you that you've just testified to, what

23  happened next on August 7, 2007, at the Magnolia station?

24  A.     I remember begging Captain Blakely to let me keep

25  my job.  I remember telling him how -- "Whatever this is

1   about, I'm innocent, and if you would just give it a" --

2   give me some time, give it a chance so that he can see

3   that I'm innocent.  I told him how I had a mortgage.  I

4   had a wife.  I had a -- I believe my son was one years old

5   at the time.  I was telling him how I'm the sole

6   breadwinner in my family and that whatever is going on,

7   there can't be any evidence of me doing any wrongdoing, so

8   if he could just resist firing me for the moment until the

9   situation get -- got cleared up.  That's -- that's all the

10  words I was telling Captain Blakely.

11      Q.      And did Captain Blakely respond?

12      A.      Captain -- Captain Blakely didn't change his

13  mind.  He kept instilling in my head that as soon as I go

14  to court and if I get acquitted, I'll have my job back.

15      Q.      Did Captain Blakely say anything else to you?

16      A.      He -- he constantly kept saying that over and

17  over every time I begged for -- to keep my job.

18      Q.      Other than that, do you recall Captain Blakely

19  saying anything else to you?

20      A.      Kind of said I was a good police officer.

21      Q.      Anything else?

22      A.      Said I was a good police officer, said, you know,

23  he's with me.  He wishes me well.  He hopes everything

24  turns out good.  He's sorry this had to happen.  I mean,

25  he was trying to comfort me.

74

1    Q.      Do you recall Captain Blakely saying anything

2    else other than what you just testified to?

3    A.      At this moment, no.

4    Q.      Is there anything that you can think of as we sit

5    here today that would refresh your recollection on your

6    conversation with Captain Blakely?

7    A.      If -- if I seen video of what he said, yes.

8    Q.      Other than that?

9    A.      If I heard tape of what he said.

10    Q.      Other than that?

11    A.      My memory -- my recollection is pretty clear.

12    That's what he told me.

13    Q.      So there's nothing that would refresh you as to

14    anything else he may or may not have said to you --

15    A.      At this --

16    Q.      -- other than the video and the tape, if those

17    exist.

18    A.      Correct.

19    Q.      Do you know whether or not a video or a tape

20    recording of your meeting with Captain Blakely exists?

21    A.      I would hope it would.

22    Q.      Do you know?

23    A.      The police station has cameras in it.  I would --

24    there has to be cameras in the police sergeants --

25             MR. PREIS:  Other than what you may or may not

1    RPD parking lot at Orange Street station since it was

2    right next to the courthouse.  And every time I parked my

3    vehicle there, I'd always see officers because that's

4    where they all parked their police cars.

5            So every time I parked my vehicle there, you

6    know, I'd come across other police officers, and they

7    would ask me how I'm doing.  How am I doing?  And so I

8    know there was at least one or two times in person where

9    I've spoke with Captain Blakely.  It wasn't a scheduled

10   meeting, but it was an exchange of words in person.

11   Q.     And this was in the parking lot of the Orange

12   Street station.

13   A.     Yes.

14   Q.     Do you recall anything else that Captain Blakely

15   said to you on these occasions other than what you've just

16   testified to?

17   A.     I don't remember anything else, no.

18   Q.     Is there anything that you can think of as you

19   sit here today that would refresh your recollection on

20   that point?

21       MR. PREIS:  Vague and overbroad.  You can

22   respond.

23       THE WITNESS:  I can't think of anything.

24   BY MR. ROTH:

25   Q.     After the completion of your federal criminal

1    trial, Mr. Nazario, did you contact representatives of the

2    City of Riverside Police Department to regain your

3    employment with the department?

4      A.     As soon as I was acquitted, I walked straight to

5    the Orange Street station to obtain my job back like I was

6    promised.

7      Q.     And did you speak with any representatives of the

8    Riverside Police Department on that day?

9      A.     Yes, I did.

10      Q.     And this was August 28, 2008.  Correct?

11      A.     I believe so, yes.

12      Q.     Who did you speak to at the department?

13      A.     Captain Blakely.  Captain Blakely, Assistant

14    Chief De La Rosa.

15      Q.     Anyone else?

16      A.     I wanted to talk to the police chief, but he --

17    he left before I can see him.

18      Q.     So he was not in the building when you arrived at

19    the department?

20      A.     I believe he was leaving the building as I was

21    walking over there.

22      Q.     Okay.  So you didn't see Chief Russ Leach in the

23    building when you were at the Orange Street station.

24      A.     No.

25      Q.     So when you were at the Orange Street station on

1    August 28, 2008, did you meet with Captain Mike Blakely

2    and Assistant Chief John De La Rosa together?

3         A.    No.  They were separate, different rooms.

4         Q.    Okay.  Who did you speak with first?

5         A.    Well, first I went -- I believe I went into

6    Captain Blakely's office, and he was on a phone call.  And

7    he just asked me to wait.  So I waited a few minutes for

8    him to get off the phone.  So I believe I spoke with

9    Captain Blakely first.

10        Q.    So you waited for Captain Blakely.  Did he

11   subsequently conclude his conversation, telephone

12   conversation, and did you then speak to him?

13        A.    I believe while he was still on the phone, the

14   Assistant Chief called me into his office and basically

15   told me congratulations.  He said it was -- you know, what

16   happened shouldn't have happened.  He's glad that I was

17   acquitted.  And he looks forward to seeing me back on the

18   job.

19        Q.    Did Assistant Chief De La Rosa say anything else

20   to you?

21        A.    I -- we spoke for a while, as long as Captain

22   Blakely was on the phone.  I'm sure he probably said some

23   other stuff to me, but I can't recall at this time.

24        Q.    Do you recall what you said to him?

25        A.    Something to the effect of "I told you guys I was

1   going to be found not guilty.  I just want my job back as

2   soon as possible like you promised."

3     Q.     Do you recall saying anything else to De La Rosa?

4     A.     Actually, I -- at that time, no.  But I do

5   remember speaking with De La Rosa prior to that.

6     Q.     And with respect to that particular meeting with

7   Assistant Chief De La Rosa on August 28, you can't recall

8   whether or not he said anything else to you other than

9   what you've testified to.  Correct?

10    A.     Correct.

11    Q.     Is there anything that you could think of as you

12   sit here today that would refresh your recollection on

13   that point?

14            MR. PREIS:  Vague and overbroad.  You can

15   respond.

16            THE WITNESS:  I can't think of anything, no.

17   BY MR. ROTH:

18    Q.     You mentioned you had a prior meeting with

19   Assistant Chief De La Rosa?

20    A.     Yes.

21    Q.     When was that meeting?

22    A.     It wasn't actually a meeting.  It was actually

23   the day of my arrest.

24    Q.     That was August 7, 2007?

25    A.     Yes.

1    Q.    And where did this conversation with Assistant

2  Chief De La Rosa occur?

3    A.    This was in the front of the Magnolia police

4  station as I was retrieving my vehicle.

5    Q.    This is after you'd been down to the U.S.

6  Marshal's detention center.

7    A.    Yes.

8    Q.    Okay.  And what transpired?  What happened?

9    A.    When I returned -- when Mark Fox returned me to

10  the police station and some officer, you know, got my

11  vehicle, Deputy Chief or Assistant Chief De La Rosa was

12  there and basically telling me, you know, the same -- same

13  thing.  "I hope, you know, everything works out.  As soon

14  as you get acquitted, you'll get your job back."

15    Q.    Did Assistant Chief De La Rosa say anything else

16  to you?

17    A.    I'm sure he said more because we had to wait for

18  my car, but I can't recall what else he said.

19    Q.    Is there anything --

20    A.    But it was words to the same effect as that.

21    Q.    Is there anything that you can think of as you're

22  sitting here today that would refresh your recollection as

23  to the conversation with De La Rosa?

24        MR. PREIS:  Vague and overbroad.

25        THE WITNESS:  I can't remember anything else he

1  might have said.

2  BY MR. ROTH:

3    Q.     And there's nothing that would refresh your

4  recollection on that point that you can think of today?

5        MR. PREIS:  Same objections.

6        THE WITNESS:  I can't think of anything right

7  now.

8  BY MR. ROTH:

9    Q.     After you spoke with Assistant Chief De La Rosa

10  on August 28, 2008, did you return to Captain Blakely's

11  office?

12    A.     Yes.

13    Q.     What happened then?

14    A.     Captain Blakely -- I'm sorry.  Captain Blakely

15  told me that he was, you know, glad that I was acquitted.

16  He's happy for me.  He said words to the effect of "Now we

17  just got to work on getting you back in uniform and

18  getting you back to work."

19    Q.     Did Captain Blakely say anything else to you?

20    A.     Some -- he said words to the effect of "You'll be

21  working in no time."

22    Q.     Did Captain Blakely say anything else to you?

23    A.     I'm sure he did.  I can't recall any more words

24  that he said to me at this time.

25    Q.     Did you say anything to him?

1      A.      I was thanking him.

2      Q.      So you thanked him?

3      A.      I thanked him for what I believed he was doing,

4   honoring his word in giving -- you know, letting me return

5   to work as promised if I received an acquittal.

6      Q.      Did you say anything else to Blakely during that

7   meeting?

8      A.      I just told him thank you many times.

9      Q.      Is there anything that you can think of as you

10   sit here today that would further refresh your

11   recollection on your conversation with Captain Blakely in

12   the Orange Street station on August 28, 2008?

13              MR. PREIS:  Vague, overbroad.

14              THE WITNESS:  I think I asked him, "When will I

15   be hired?"  If I asked him anything, it was, you know, on

16   the topic of "How soon can I start working?"

17   BY MR. ROTH:

18      Q.      Do you recall whether or not Captain Blakely

19   responded to you?

20      A.      I can't recall what he said, but the words that

21   still echo in my head are "You'll be back to work in no

22   time."

23      Q.      Is there anything that you can think of as you

24   sit here today that would further refresh your

25   recollection on the content of your meeting with Captain

1    Blakely on August 28, 2008?

2              MR. PREIS:  Vague and overbroad.

3              THE WITNESS:  I can't think of any right now, no.

4    BY MR. ROTH:

5      Q.     Did Captain Blakely talk to you about what the

6    process would be for your rejoining the force?

7      A.     Yes.

8      Q.     What did Captain Blakely say about the process?

9      A.     He basically said that I had to apply all over

10   again, but that it would be done expeditedly, very, very

11   quickly, since they already had all my information.  They

12   knew my residences.  They knew my past work histories.

13   They pretty much had all my information already.  So he

14   said it should be done very quickly.

15     Q.     Did Captain Blakely say anything else to you on

16   that subject during your meeting with him on August 28,

17   2008?

18     A.     I can't remember anything else at this time, no.

19     Q.     Did Captain Blakely tell you that there would be

20   a supplemental background investigation covering the

21   period of time that you were not employed by the Riverside

22   Police Department?

23     A.     I believe he mentioned something to that effect.

24   If it wasn't him -- actually, I believe it was Lisa

25   Johnson, another officer who worked for Personnel and

1    Training.  Captain Blakely pretty much assigned me to her.

2    So she was basically my point of contact for getting me

3    hired.

4        Q.    So Captain Blakely assigned you to Lisa Johnson?

5        A.    Correct.

6        Q.    Is she an officer with the Riverside Police

     Department?

8        A.    I don't know if she still is.  She was when I was

9    told I was going to get my job back.

10       Q.    And Lisa Johnson was the officer working your

11   supplemental background investigation?

12       A.    I believe she was my background investigator.

13       Q.    And did you submit the application for employment

14   to the City of Riverside?

15       A.    Lisa Johnson gave me a copy of my old -- my old

16   application, and she pretty much said, "Rewrite this and

17   just add your address you was living in New York,"

18   something to that effect.  "So just add everything to the

19   day that you were terminated."

20       Q.    In other words, bring it up to date covering the

21   period when you were not working at the police department?

22       A.    Correct.

23       Q.    And did you subsequently do that?  In other

24   words, take the application and update it?

25       A.    That's what she told me to do, yes.

1      Q.      And is that what you did?

2      A.      Yes.

3      Q.      Let me show you a document which I've marked as

4   Defense Exhibit 504.   It appears to be a City of Riverside

5   application for employment.

6                   (Defendants' Exhibit 504 was marked

7                        for identification.)

8   BY MR. ROTH:

9      Q.      Do you recognize Exhibit 504, Mr. Nazario?

10                  THE REPORTER:   My screen disappeared.   Just one

11   second.

12                  MR. ROTH:   It's no problem.   We're off the

13   record.

14                  VIDEOGRAPHER:   Off the record.   The time is 2:13.

15   We're off the record.

16                       (Brief recess was taken.)

17                  VIDEOGRAPHER:   The time is 2:23.   We're on the

18   record.

19   BY MR. ROTH:

20      Q.      Mr. Nazario, looking at Defendants' Exhibit 504,

21   which appears to be an application for employment,

22   reemployment, with the City of Riverside which appears to

23   be yours, do you recognize the document?

24      A.      I recognize it as an application for employment,

25   yes.

1          (The record was read as requested.)

2          THE WITNESS:  No.  No one at that time.

3          MR. ROTH:  Let me show you a document, a series

4    of e-mails that I've marked as Defendants' Exhibit 508

5    Bates-stamped 13482 to 13487.

6          (Defendants' Exhibit 508 was marked

7                    for identification.)

8     Q.     Let me ask you to take a look at it.

9     A.     (Witness complies.)  Okay.

10    Q.     Mr. Nazario, do you -- looking at page Bates

11   stamped 13484 of Exhibit 508, which is essentially the

12   second page of the document, do you see the e-mail from

13   Lisa Johnson dated 18 September 2008 to joseand -- how do

14   I pronounce your former wife's name?

15    A.     Diette.

16    Q.     Diette15@msn.com.  Do you see that e-mail?

17    A.     Yes.

18    Q.     Was that your e-mail address at the time,

19   September of 2008?

20    A.     I believe it was.

21    Q.     Do you recall receiving this e-mail from Lisa

22   Johnson?

23    A.     Lisa Johnson asked for a couple of things.  This

24   is probably one of the things she asked for.

25    Q.     You recall receiving this e-mail from Lisa

133

1    Johnson?

2        A.      I can't remember the individual e-mails that she

3    sent me, but she did send me e-mails that I responded to.

4    We communicated via e-mail a lot.

5        Q.      And you were living in New York at the time that

6    this supplemental background investigation was going on?

7        A.      Yes.

8        Q.      Now, looking at this 18 September 2008 e-mail, it

9    appears to be a reminder from Lisa to you, Lisa Johnson to

10   you, that she still needed updated car insurance and

11   registration for your vehicles.   Do you see that?

12       A.      Yes.

13       Q.      Do you recall her telling you that?

14       A.      I -- I don't recall individual e-mails that we've

15   had.  I just remember that we communicated via e-mail a

16   lot.

17       Q.      And looking at the September 22, 2008 e-mail to

18   Lisa Johnson, which appears to be one from you, on page

19   Bates 13483.   Do you see that e-mail?

20       A.      Where?

21       Q.      Bottom of page Bates stamped 13483.

22       A.      One dated 24th of September?

23       Q.      The one below that.

24       A.      At the bottom of the page where it says --

25       Q.      "Hey Lisa"?

1    A.    Okay.

2    Q.    And continuing on Bates stamped 13484?   Do you

3    see that?

4    A.    Yes.

5    Q.    "Hey Lisa, I just sent you a fax with my tax

6    return and vehicle information."

7         Was that an e-mail from you to Lisa Johnson

8    regarding the supplemental investigation?

9    A.    It looks like she asked me for my tax return and

10   vehicle information, and that's what I -- I must have sent

11   it already, and I e-mailed her telling her that I sent it

12   out.

13   Q.    So this e-mail from Diette Nazario dated

14   September 22, 2008, to Lisa Johnson re background

15   investigation was, in fact, an e-mail from you to Lisa

16   Johnson regarding the supplemental investigation.

17   A.    I'm sorry.   I'm getting confused on the dates

18   here.

19   Q.    Well, do you see the e-mail dated September 22,

20   2008?

21   A.    Yes.

22   Q.    Okay.   It says from Diette Nazario.   That's your

23   former spouse.   Correct?

24   A.    Yes.

25   Q.    Was this an e-mail that you sent to Lisa Johnson

1    regarding your background investigation?

2       A.      I can't remember because me and my wife, we

3    shared the same e-mail address.

4       Q.      Well, do you recall your wife sending Lisa

5    Johnson a fax with tax return and vehicle information?

6       A.      She could have.  I could have.  I don't remember.

7       Q.      Do you recall receiving the e-mail on top of that

8    dated 24 September 2008 from Lisa Johnson?  Do you see

9    that e-mail?

10      A.      The 24th of September, 2008.

11      Q.      Do you see that e-mail?

12      A.      At 10:55?

13      Q.      Yes.

14      A.      Yes.

15      Q.      Do you recall Lisa Johnson telling you that she

16   wanted to get everything done as quickly as possible?

17      A.      I mean, it's something she could have said.  I

18   don't remember her telling me that.

19      Q.      Do you recall receiving this e-mail?

20      A.      It was a long time ago.  I don't remember

21   individual e-mails that she sent me.

22      Q.      But this particular e-mail indicates that it went

23   to joseanddiette15@msn.com.  Correct?

24      A.      Correct.

25      Q.      And that was an e-mail address that you shared

BY MR. ROTH:

1

2    Q.    Did you contact Lisa Johnson, for example?

3    A.    I'm sure I contacted her, yes.  I don't know if

4    it was immediately after, but I definitely contacted her

5    after.

6    Q.    Do you remember contacting Lisa Johnson regarding

7    this allegation of physical abuse by your wife Diette?

8    A.    Yes.

9    Q.    Do you remember how you contacted Lisa Johnson?

10   A.    I believe it was both through e-mail and cell

11   phone.

12   Q.    Did you reach Lisa Johnson when you attempted to

13   contact her by cell phone?

14   A.    I can't remember.  I can't remember if -- I did

15   speak to her.  I just can't remember if she returned my

16   call or if she actually picked up the phone when I called

17   her.

18   Q.    Let me show you an e-mail to Lisa Johnson dated

19   October 7, 2008, at 8:16 a.m.  I've marked it as Defense

20   Exhibit 509.

21          (Defendants' Exhibit 509 was marked

22                for identification.)

23   A.    Okay.

24   Q.    Looking at Defense Exhibit 509, Mr. Nazario, is

25   this an e-mail that you sent to Lisa Johnson on or about

1   October 7, 2008, at 8:16 a.m.?

2      A.      It looks like something I would have sent, yes.

3      Q.      Do you recognize this as an e-mail you did send?

4      A.      I can't remember if I used all these words, but I

5   definitely sent her a message that would have this same

6   effect.

7      Q.      Well, you see the words, "Hey Lisa.  As you know,

8   my wife and I are in the first stages of a divorce" and

9   then more language.  And then down at the bottom, "Jose"

10  in capital letters.

11     A.      Okay.

12     Q.      Does that refresh your recollection as to whether

13  you sent this e-mail?

14     A.      It looks like an e-mail I would have sent.

15     Q.      Now, where you say, "She called the police on me

16  last night.  I believe it was the Sullivan County

17  Sheriff's Department" --

18     A.      What line are you on?

19     Q.      Line 3.

20     A.      Okay.  I see it.

21     Q.      Do you see that?

22     A.      Yes, sir.

23     Q.      What happened that night?  That was the evening

24  of October 6, early morning of October 7, 2008?

25     A.      Uh-huh.

146

1    Q.    Is that yes?

2    A.    I believe so.

3    Q.    You have to --

4    A.    It was the day prior.  So October -- this was

5    sent on October 7, so yes.  This would have been

6    October 6.

7    Q.    So the incident occurred right around midnight,

8    before or after, on October 6, 2008?

9    A.    Sometime the night of October 6.

10   Q.    What happened?

11   A.    Well, my wife and I, we were arguing.  Since I

12   lost my job, we've been arguing more and more.  And we

13   started heading down the, you know, path of divorce.  We

14   were just devastated since, you know, she wasn't working

15   and I was the only one working.

16         And since we were talking about divorce, she

17   wanted full custody of my son, and I wanted, you know,

18   joint custody, you know, split custody.  I still wanted to

19   be in my kid's life.  She did not like that.  She felt she

20   wanted to have him -- well, she felt she should have him

21   all to herself, and I did not agree with her.

22         She started making threats, even prior to that

23   day.  Because, I mean, this was something that we argued

24   about.  We discussed divorce all the time once it got to

25   October, by October.  We discussed divorce all the time,

1    and she would always tell me how she wants full custody of

2    the kid.  I would always say no.

3              And she would threaten to call Lisa Johnson and

4    say, "Hey, I know you're" -- well, she would tell me,

5    "Hey, I'm going to call Lisa Johnson and tell her you're

6    physically abusive to me if, you know, you don't let me

7    have my son."

8              And that's what we would argue about.  That's

9    what we argued about the night on October 6.

10   Q.    Well, what happened that night?

11   A.    We were arguing about custody, and police showed

12   up to our house.  She -- this is after she told me, "I'm

13   going to call the police and tell them you're beating me

14   up," which I told her, "Go ahead.  Call them."

15             So police come over to the house.  And I believe

16   I was laying upstairs in the bedroom.  Police observed the

17   house.  They see -- doesn't look like there was a fight

18   here.  They observed myself and my wife at the time.  No

19   bruises, no marks.  They -- I mean, so far it's just --

20   gosh, what do you call it?  It's not -- they can't

21   consider it domestic violence.  They can't see any

22   violence that had been done.

23   Q.    Prior to the time the police officers arrived at

24   your Rock Hill residence on or about October 6, 2008, had

25   you touched your wife?

1          MR. PREIS:  No.  Vague and ambiguous as to

2     "touched."

3          MR. ROTH:  Well, I'll clarify it.

4          MR. PREIS:  And time frame.

5     BY MR. ROTH:

6     Q.     Prior to the time the police officers arrived at

7     your residence on or about October 6, 2008, during this

8     argument that you'd had with your wife, did you touch her?

9     A.     No.

10    Q.     At no time did you touch your wife?

11    A.     Are you asking at no time did I --

12    Q.     On October 6 at no time did you touch your wife

13    during the course of the argument over custody of your

14    son?

15         MR. PREIS:  Same objection as to "touch."

16         THE WITNESS:  "Touch," what do you mean "touch"?

17         MR. PREIS:  You can answer.

18         THE WITNESS:  I don't understand what you mean by

19    "touch."

20    BY MR. ROTH:

21    Q.     During the argument that you've just testified

22    that you had with your wife on October 6, 2008, prior to

23    the time that the law enforcement officers arrived at your

24    Rock Hill residence, did you touch your wife?

25         MR. PREIS:  Vague and ambiguous as to "touch" and

1   irrelevant to the subject matter of the litigation as to

2   that term.  But you can answer if you understand it.

3          THE WITNESS:  I don't understand what you mean by

4   "touch."

5   BY MR. ROTH:

6   Q.     Well, what don't you understand about the word

7   "touch," Mr. Nazario?

8   A.     Do you mean touch as in rub shoulders against

9   her?  Do you mean touch as in she stepped on my foot?  Do

10  you mean touch as in did I physically abuse my wife?  Do

11  you mean touch as in I gave her a hug?

12  Q.     During the course of the argument that you've

13  just testified to --

14  A.     Right.

15  Q.     -- that you had with your wife over the custody

16  of your son on or about October 6, 2008, prior to the time

17  that the law enforcement officers arrived --

18  A.     Prior to that time.

19  Q.     -- did you put your hand on your wife during the

20  course of that argument?

21  A.     No.

22  Q.     At no time.

23  A.     No.

24  Q.     Now, looking at Defendants' Exhibit 509, what did

25  you mean by the statement in the e-mail, "She knows that

150

1   you cannot be a police officer with domestic violence

2   charges"?

3       A.      Oh.   I would always tell her about my days, you

4   know.   We'd speak over the phone about how my day went.

5   And she has a master's degree in criminal justice, so she

6   knows that if you want to apply for law enforcement, you

7   can't have any kind of domestic violence in your history.

8       Q.      Was that your understanding at the time as well?

9       A.      I knew that.   She confirmed it with me.   I knew

10  that by going to the police academy.   They taught us that

11  if you have domestic violence, you cannot be a police

12  officer.   And she knew that because she had a master's

13  degree in criminal justice and she worked for, I believe,

14  the corrections department in San Diego at one time in her

15  life.

16      Q.      Well, after you sent this e-mail to Lisa Johnson

17  that I've marked as Defendants' 509, did you have any

18  subsequent contact from Lisa Johnson or with her?

19      A.      I'm sure me and Lisa spoke more after this.

20      Q.      Do you recall Lisa Johnson telephoning you about

21  the incident with your wife?

22      A.      No.   I called her and informed her.

23      Q.      Did you provide Lisa Johnson with a copy of the

24  Sullivan County, I guess the sheriff's department,

25  police -- or sheriff's department report regarding the

1    October 6, 2008 incident?

2      A.      Yes.

3      Q.      And did you do so on or about October 14, 2008?

4      A.      No.  It wasn't the 14th.

5      Q.      Do you recall when you provided it to -- the

6    report to Lisa Johnson?

7      A.      It could have been the 14th.  I think, to my

8    knowledge, it was sometime after the incident.  Could have

9    been the next day, the day after that.  But it was

10   relatively soon.

11     Q.      Do you recognize Defendants' Exhibit 510 as a

12   copy of the report that you provided to Lisa Johnson?

13                  (Defendants' Exhibit 510 was marked

14                        for identification.)

15     A.      What's that?

16     Q.      Do you recognize Exhibit 510 as a copy of the

17   report that you subsequently provided to Lisa Johnson

18   regarding the October 6, 2008 incident with your wife?

19     A.      Yes.  This looks correct.

20     Q.      So this is a copy of the document you

21   subsequently provided to Lisa Johnson some time in October

22   of 2008?

23     A.      I'm -- it looks like it, but I'm a little unsure

24   about -- I don't know what's this blacked out at the top.

25     Q.      Well, I don't either because that's the copy that

1    I have.

2      A.    I don't know what that blacked-out portion up at

3    the top is.  Or at the bottom.

4      Q.    I have no idea either.

5            Do you recall whether the document that you

6    provided to Lisa Johnson was blacked out?

7      A.    I don't recall it was.

8      Q.    Did you retain a copy for yourself?

9      A.    I did, but I believe I lost that copy, and I went

10   and obtained another one.

11     Q.    Do you presently have a copy yourself of

12   Defendants' Exhibit 510, which is the law enforcement

13   report regarding the October 6, 2008 incident involving

14   your wife?

15     A.    Do I have a copy of this on my person right now?

16     Q.    Well, somewhere.

17     A.    To my knowledge right now, no.

18     Q.    What did you do with the copy that you obtained

19   after you obtained -- after you lost the first copy?

20     A.    After I lost the first copy, what did I do with

21   the second copy?

22     Q.    Yes.

23     A.    I gave it to my attorneys.

24     Q.    Okay.  Do you know whether or not your copy has

25   blacked-out marks on the top and the bottom?

153

1   A.      It seems like a different format report.  It

2   doesn't look like the same report.  This looks like a

3   different layout than the other report that I picked up

4   from the Sullivan County police.

5   Q.      Well, looking at Defendants' Exhibit 510, it

6   certainly appears to reference an incident that occurred

7   on October 6, 2008, at approximately 2330 hours.  Correct?

8   A.      Yes.

9   Q.      And it appears to reference an incident that

10  occurred between you and your former spouse, Diette

11  Nazario.  Correct?

12  A.      Yes.

13  Q.      And do you see the description down toward the

14  bottom of the page, "Both parties are divorcing, agreement

15  escalated into a physical"?

16  A.      Yes.

17  Q.      Do you recall that being on the copy that you

18  obtained from the Sullivan County law enforcement folks?

19  A.      It could have been.

20  Q.      But you do recall providing Lisa Johnson with a

21  copy of the law enforcement report.  Correct?

22  A.      Yes.

23  Q.      Okay.  Let me show you a document which I've

24  marked as Defense Exhibit 511.

25  ///

154

```
 1              (Defendants' Exhibit 511 was marked

 2                    for identification.)

 3     Q.      This appears to be an order to show cause and

 4   related documents in the matter of Diette Sonya Nazario

 5   against Jose Luis Nazario, Jr.  Let me ask you to take a

 6   look at it.

 7     A.      (Witness complies.)  Okay.

 8     Q.      Mr. Nazario, were you served with a copy of the

 9   order to show cause and petition contained in Defendants'

10   Exhibit 511?

11              MR. PREIS:  Vague and ambiguous as to "served."

12   You can answer the question.

13   BY MR. ROTH:

14     Q.      Well, you're a law enforcement officer; right,

15   Mr. Nazario?

16     A.      I was served.

17     Q.      You were served.

18              And I gather you were served with a copy of the

19   order to show cause.  Right?

20     A.      I believe I was served with this order right

21   here.

22     Q.      And if you turn the page, were you also served

23   with the temporary restraining order, which is the next

24   document?

25     A.      I'm sorry.  Say again?
```

1    Q.      Were you also served with the temporary

2  restraining order, which is the next document?

3    A.      I believe that's what I agreed the first time.  I

4  was served with a temporary restraining order.

5    Q.      And you understood that effective October 7,

6  2008, and continuing to December 31, 2008, you were

7  ordered to stay away from Diette Nazario --

8    A.      Yes.

9    Q.      -- and your son?

10   A.      Yes.

11   Q.      And you were also ordered to stay away from

12  Diette Nazario's place of employment?

13   A.      Yes.

14   Q.      When you were served, did you also receive a copy

15  of the family offense petition?  If you turn the page.

16   A.      Page 3?

17   Q.      One more page, Bates-stamped 13372.

18   A.      You're asking me if I received this, a copy of

19  this?

20   Q.      Yes, when you were served.

21   A.      I probably did.

22   Q.      If you turn to Bates-stamped page 13375, do you

23  recognize the signature next to the printed name Diette

24  Nazario as your wife's signature?

25   A.      It looks like it, yes.

156

1    Q.    If you turn to Bates-stamped page 13376, do you

2  see the document entitled "Victim's Statement"?

3    A.    Yes.

4    Q.    I assume this was attached to the petition that

5  you received.

6    A.    Could have been, yes.

7    Q.    Do you recall?

8    A.    I can't remember if it was or wasn't.

9    Q.    Do you recall reading this document that's

10  contained on Bates-stamped pages 13376 and 13377?

11    A.    I remember reading something like this.  If it

12  was word for word, this actual statement, I don't know.

13  But I did receive something to this effect right here.

14    Q.    Okay.  Let me borrow your copy because I think

15  that's the one that I highlighted.  I'm happy to give it

16  back to you so we can operate on the highlighted version.

17  Well, I don't need to do that.

18        Do you see the first paragraph?  It seems to

19  state in this victim's statement that on October 5,

20  2008 -- do you see the date on the first line?

21    A.    Yes.

22    Q.    And if you move down one, two, three, four, five

23  lines, it says, "The respondent grabbed petitioner in a

24  choke hold.  Petitioner states she was unable to breathe

25  and began to scratch and try to bite respondent's arm so

157

1    he would let petitioner go."

2           Petitioner in this case is your wife Diette.

3    Correct?

4    A.     Correct.

5    Q.     Do you recall engaging in that behavior on or

6    about October 5, 2008, as your former wife, Diette

7    Nazario, states in this statement?

8    A.     No.

9    Q.     Continuing on in that same first paragraph on

10   Bates-stamped page 13376, do you recall grabbing your then

11   wife Diette with one hand around her throat, lifting her

12   off the floor with the other hand on her torso, and

13   slamming her down onto the ground?

14   A.     No.

15   Q.     Did that happen?

16   A.     No.

17   Q.     Did you grab her in a choke hold on October 5,

18   2008?

19           MR. PREIS:   Asked and answered.

20   BY MR. ROTH:

21   Q.     You may respond.

22   A.     No.

23   Q.     Looking at the next paragraph, on October 6,

24   2008, on or about, did you push Diette Nazario out of the

25   car and say, "Get out of the car, bitch," or words to that

158

1   effect?

2      A.      Of course not.

3      Q.      On that same day, as Diette Nazario was sitting

4   in a chair, did you flip the chair in which she was

5   sitting as she was holding your son?

6      A.      No, I did not.

7      Q.      Did you engage in any conduct similar to that on

8   October 6 or October 5, 2008?

9      A.      No.

10     Q.      Turning to page Bates-stamped 13377, in the

11  middle of the paragraph at the top of this page, it says,

12  "but is not looking for a job here in Sullivan County and

13  blames petitioner for their money problems."

14          At the time of this petition, specifically on or

15  about October 7, 2008, were you looking for employment in

16  Sullivan County?

17     A.      I'm sorry.  What line are you on?

18     Q.      You see the phrase "is not looking for a job here

19  in Sullivan County and blames petitioner for their money

20  problems"?

21     A.      Yes.  I see it.

22     Q.      At the time of this petition on or about

23  October 7, 2008, were you looking for employment in

24  Sullivan County?

25     A.      I believe I was looking for employment back with

1    the police department, Riverside Police Department.

2    Q.    Other than seeking reemployment with the

3    Riverside Police Department, were you looking for any

4    other employment in Sullivan County or otherwise at the

5    time of the filing of this petition on or about October 7,

6    2008?

7    A.    I can't remember if I was seeking employment at

8    that time.  I was under the impression I was getting my

9    job back.

10   Q.    Did you appear in family court for the State of

11   New York on October 10, 2008, in the matter of *Diette S.*

12   *Nazario against Jose L. Nazario, Jr.*, regarding this

13   petition?

14   A.    On what date?

15   Q.    October 10, 2008.

16   A.    I believe so, yes.

17   Q.    And you were present in court?

18   A.    Yes.

19   Q.    And was your spouse, Diette Nazario, also

20   present?

21   A.    Yes.

22   Q.    Did you have an opportunity to speak to the judge

23   about the petition?

24   A.    Yes.

25   Q.    And did you do so?

1    A.    Yes.

2    Q.    After your court appearance -- or during your

3    court appearance, did the judge issue a restraining order

4    against you with respect to Diette Nazario and your son

5    Gabriel?

6    A.    I don't -- are you asking -- are you asking me

7    if -- why the judge ordered or if he ordered a restraining

8    order?

9    Q.    On October 10, 2008, after you had an opportunity

10   to speak to the judge --

11   A.    Uh-huh.

12   Q.    -- did the judge issue an order of protection

13   restraining you from contacting Diette Nazario or your son

14   Gabriel Nazario?

15   A.    I later found out he did.

16   Q.    And if you look at documents Bates-stamped 13395

17   and 13396 -- do you see those documents?

18   A.    Yes.

19   Q.    And 13397, which is the final page in this

20   exhibit, Defense Exhibit 511 --

21   A.    Okay.

22   Q.    -- did you receive a copy of this order of

23   protection?

24   A.    I believe I did.

25   Q.    In fact, you received it before you left the

161

1  courthouse.  Correct?

2      A.      They probably would have given it before I left

3  the courthouse, yes.

4      Q.      Take a look at the final page on this exhibit.

5  Do you see the box checked "Order personally served in

6  court upon party against whom order was issued"?

7      A.      Yes.

8      Q.      So you received a copy of this order of

9  protection before you left the courthouse on October 10,

10  2008.  Correct?

11      A.      Before I left the courthouse, yes.

12      Q.      And was it your understanding as a result of that

13  court appearance that you were restrained -- the

14  restraining order was in effect with regard to your spouse

15  Diette and your son G█████ up to and including

16  October 10, 2010?

17      A.      That's too long.  I'm sorry.

18      Q.      Was it your understanding as a result of your

19  court appearance on October 10, 2008, and your receipt of

20  this order of protection that a restraining order had been

21  issued against you with respect to your spouse Diette and

22  your son G████, and it would remain in effect up to and

23  including October 10, 2010?

24      A.      No.  What it --

25      Q.      Take a look at the exhibit, if you would.

162

1    A.      You asked me if a restraining order was extended

2   because of my court appearance on that date.  That's what

3   you asked me.

4           MR. ROTH:  Could I have the question read back.

5   To be honest, I don't remember what I asked you.

6           (The record was read as requested.)

7    A.      No.  It was my understanding that it wasn't

8   because of this court appearance that the restraining

9   order would have been extended to 2010.  It was because I

10  informed the judge that I had to go back to California and

11  get my job back, and I would not be able to keep my later

12  court appearance, which was approximately a month later.

13  I told him, "I have to leave New York because I'm in the

14  middle of getting my job back with Riverside Police

15  Department, and I won't be able to make this appointment

16  next month."

17   Q.      So was it your understanding as a result, that a

18  restraining order issued against you that was to remain in

19  effect until October 10 of 2010?

20   A.      It was done without me knowing.  I was under the

21  impression that --

22   Q.      Well, let's take a look at --

23   A.      Uh-huh.

24   Q.      Let's take a look at Exhibit 511 and

25  Bates-stamped page 13396.

                                                        163

GILLESPIE REPORTING & DOCUMENT MANAGEMENT, INC.

1      A.      Okay.

2      Q.      Right above the judge's signature and the date,

3   October 10, 2008, do you see the statement, "It is further

4   ordered that this order of protection shall remain in

5   effect up to and including October 10, 2010"?

6      A.      Right.  This is after --

7              MR. PREIS:  Wait.  He asked you if you see that

8   on there.

9              THE WITNESS:  I see that.

10             MR. PREIS:  Okay.

11  BY MR. ROTH:

12     Q.      And this was a document that was served on you

13  during the time that you were in the courtroom.  Correct?

14     A.      Yes.

15     Q.      Did you appeal this order of protection?

16     A.      I didn't see that portion right there that said

17  until 2010.  It was my understanding that she had a

18  temporary restraining order on me that was set to expire

19  in a month.  I -- my priority was getting my job back at

20  the police department.  So instead of staying in New York

21  for another month unemployed, I told the judge that I

22  wouldn't be able to make that date.

23             The judge took it upon himself -- he must have

24  misunderstood me or I misunderstood the way things -- the

25  way things happen.  I was under the impression that it was

                                                          164

1   a temporary restraining order and eventually would just

2   expire.  I did not know that me telling the judge, "I

3   can't make it next month" would result in him just turning

4   it into a permanent restraining order until 2010.

5      Q.      Did you file any appeal from the order of

6   protection?

7      A.      Did I file an appeal.

8      Q.      Did you appeal the judge's order?

9      A.      Later.  Later down the road, yes.  Yes, I did.

10     Q.      When did you appeal the judge's order?

11     A.      My wife at the time, Diette, she appealed it.

12  She actually came to the courthouse and removed the order

13  of protection herself.

14     Q.      And when was that?

15     A.      This was maybe over a year ago.  Around a year

16  ago.  I can't remember the specific date.

17     Q.      So what month would that have been?

18     A.      I can't remember the specific date.

19     Q.      It was after you were disqualified from further

20  employment with the City of Riverside Police Department?

21          MR. PREIS:  Well, objection.  That calls for

22  speculation.

23          THE WITNESS:  I don't know.

24  BY MR. ROTH:

25     Q.      Well, did you ever get a copy of any order

1   shortening the temporary restraining order?

2      A.      Yes.

3      Q.      Did you provide it to anyone at the Riverside

4   Police Department?

5      A.      I can't remember.

6      Q.      Is there anything that you can think of that

7   would refresh your recollection on that point as you sit

8   here today?

9      A.      No.

10     Q.      When were you divorced from Diette?

11     A.      Very recently.  Maybe a few weeks to a month.

12     Q.      So I gather that the -- is the restraining order

13   in effect now?

14     A.      No.

15     Q.      I gather -- was the restraining order terminated

16   in the course of issuing the divorce decree as part of the

17   divorce decree?

18     A.      No.  She took it upon herself to drop the

19   restraining order.

20     Q.      Was that sometime in 2010?

21          MR. PREIS:  If you know.  Don't guess.

22          THE WITNESS:  I don't know.

23   BY MR. ROTH:

24     Q.      Do you have a copy of the court order in your

25   possession?

1    A.    At this moment, at this time, no.

2    Q.    You don't have a copy of the court order.

3    A.    I have a copy, but not on my person.

4    Q.    Well, in your possession, which is the broad

5    term.  In your house, in your apartment, in your car, in

6    your office, do you have a copy of the court order --

7    A.    I believe --

8    Q.    -- shortening the temporary restraining order?

9    A.    I believe I do.

10   MR. ROTH:  Okay.  Counsel, maybe we could be

11   informed when you get a copy of that.

12   BY MR. ROTH:

13   Q.    And you don't recall whether or not that

14   restraining order was terminated prior to the time that

15   you were disqualified from your employment with the

16   City -- further employment with the City of Riverside

17   Police Department?

18   MR. PREIS:  Asked and answered.  You can answer

19   it again.

20   THE WITNESS:  I can't remember.

21   BY MR. ROTH:

22   Q.    And you don't remember whether you provided a

23   copy of that order shortening or terminating the

24   restraining order to Lisa Johnson or any other Riverside

25   Police Department representatives?

1          MR. PREIS:  Same objections.

2          THE WITNESS:  I can't remember.

3          MR. ROTH:  Off the record.

4          VIDEOGRAPHER:  This is the end of Disk 2, and

5   we're off the record at 3:37.

6               (Discussion was held off the record.)

7          VIDEOGRAPHER:  We're on the record at 4:01.  This

8   is the beginning of Disk 3.

9   BY MR. ROTH:

10   Q.     Mr. Nazario, referring back to Defendants'

11   Exhibit 511 -- that's the order to show cause -- and you

12   will remember looking at the victim's statement that we

13   reviewed in that exhibit?  You recall?

14   A.     I just need it in front of me.  Okay.

15   Q.     With respect to the victim's statement and the

16   alleged events that are contained in the -- that are

17   referenced in the victim's statement, on any of those

18   occasions did you verbally threaten your then spouse,

19   Diette Nazario?

20   A.     No, I did not.

21   Q.     Now, after you provided Lisa Johnson with a copy

22   of the Sullivan County law enforcement report, which we've

23   marked as Defendants' Exhibit 510, did you tell

24   Ms. Johnson that you had filed for a restraining order

25   against your spouse Diette?

1    A.    I could have.  I could have.

2    Q.    Do you recall telling Ms. Johnson that?

3    A.    I don't recall telling her that, no.

4    Q.    Did you file for a restraining order against your

5    wife Diette Nazario at any time?

6    A.    It's a yes-or-no question.  I think I went to the

7    courthouse with the intent on doing that, but never

8    actually went through with it.

9    Q.    So you never filed a petition seeking a

10   restraining order against Diette Nazario?

11   A.    I never had a restraining order against Diette

12   Nazario.

13   Q.    Did you ever file a petition asking for a

14   restraining order against Diette Nazario?

15   A.    I can't -- I don't know how far I got, if I

16   actually filed a petition or not.

17   Q.    Do you recall filing such a petition?

18   A.    I had intent to file a petition.  I don't know if

19   I actually did that or not.

20   Q.    So you don't recall whether or not you filed such

21   a petition.

22   A.    Correct.

23   Q.    Is there anything that you could think of as we

24   sit here today that would refresh your recollection on

25   that point?

1    A.    No.

2    Q.    Do you recall Ms. Johnson asking you for a copy

3    of the restraining order against Diette Nazario?

4    A.    Are you asking me if she ever asked me for a copy

5    of the restraining order?

6    Q.    Yes.

7    A.    No.  She didn't have to.  I gave it to her.

8    Q.    No.  Do you recall Ms. Johnson asking you for a

9    copy of the restraining order -- your restraining order

10   against Diette Nazario?

11   A.    I don't remember, no.

12   Q.    Is there anything that you could think of as you

13   sit here today that would refresh your recollection on

14   that point?

15        MR. PREIS:  Vague, overbroad.  You can respond.

16        THE WITNESS:  No.  I can't think of anything.

17   BY MR. ROTH:

18   Q.    Now, at the break, your counsel was kind enough

19   to provide me with a copy of a document which appears to

20   be a summons in the matter of a family offense proceeding,

21   *Diette Sonia Nazario, Petitioner, against Jose Luis*

22   *Nazario, Jr., Respondent.*  I'm going to mark this

23   multipage document as Defense Exhibit 12.

24        MR. BROWN:  512.

25        MR. ROTH:  512.  Excuse me.  And this exhibit

1  includes a petition for modification of order -- of

2  permanent order of protection.

3              (Defendants' Exhibit 512 was marked

4                  for identification.)

5  Q.      Do you recognize the document, Mr. Nazario?

6  A.      Yes.

7  Q.      This document specifies a hearing on November 17,

8  2009, at 2 p.m. with respect to the petition for

9  modification of the permanent order of protection.  Do you

10  see that on the first page?

11  A.      Yes.

12  Q.      Was such a hearing held on November 17, 2009, at

13  approximately 2 p.m. on Diette Nazario's petition?

14  A.      Yes.

15  Q.      Were you present?

16  A.      Yes, I was.

17  Q.      And was the petition granted?

18  A.      Yes.  The petition was granted.

19  Q.      And did the order that resulted from the

20  November 17, 2009 hearing lift the restraining order

21  against you with respect to Diette Nazario and G██████

22  ██████, your son?

23  A.      Yes.

24  Q.      And that order issued on or about -- or on or

25  after November 17, 2009?

1     A.      Yes.

2     Q.      Did your then spouse, Diette Nazario, tell you

3     why she filed the petition to modify the restraining

4     order?

5     A.      Yes, she did.

6     Q.      Was it so that you would have visitation rights

7     with your son?

8     A.      No, it was not.

9     Q.      What was the reason?

10     A.      You asked -- I'm sorry.  Repeat the question.

11     Q.      Did your then spouse, Diette Nazario, tell you

12     why she filed the petition to modify the restraining

13     order?

14     A.      She told me it was in the best interest of our

15     child.

16     Q.      And with respect to your divorce, has there been

17     a custody order issued?

18     A.      She still has custody.

19     Q.      Full custody?

20     A.      The restraining order was dropped.  The custody

21     order was never dropped.

22     Q.      So your wife has full custody, not joint custody.

23     A.      At this moment, yes.

24     Q.      And now as you sit here looking at Defense

25     Exhibit 512, did you provide a copy of this summons and

                                                          172

1   any order that resulted from the summons and petition for

2   modification of order of permanent -- order of protection

3   to Lisa Johnson or any other representative at the

4   Riverside Police Department?

5       A.      Yes, sir.

6       Q.      You did.

7       A.      Yes.

8       Q.      When did you provide a copy of Defendants' 512 to

9   representatives of the Riverside Police Department?

10      A.      I can't remember the day, but must have been

11  shortly after obtaining it myself.

12      Q.      Who did you send Defendants' Exhibit 512 to?

13      A.      To Lisa Johnson.

14      Q.      Did you do so by e-mail or by mail or personal

15  delivery?

16      A.      I can't remember.

17      Q.      Did you receive any acknowledgment of receipt

18  from Officer Johnson?

19      A.      I can't remember.

20      Q.      Is there anything that would refresh your

21  recollection on that point that you can think of as you

22  sit here today?

23          MR. PREIS:   Vague, overbroad.   You can answer.

24          THE WITNESS:   No.

25  ///

173

1    BY MR. ROTH:

2       Q.      Mr. Nazario, at some point in 2008, did you apply

3    for employment with the Riverside Sheriff's Department?

4       A.      I believe I did, yes.

5       Q.      And when did you do so?

6               MR. PREIS:  Running objection on relevance

7    grounds, but you can respond.  Also, Rich, do you mind if,

8    for the court reporter's copy, I'll go ahead and write

9    "Defendant 512" at the bottom here?

10              MR. ROTH:  Perfect.

11   BY MR. ROTH:

12      Q.      When did you do so, Mr. Nazario?

13      A.      I did so when I felt Riverside -- Riverside PD

14   was giving me the run-around and it was a sufficient

15   amount of time for them to have given me my job back, and

16   they have not done that.  So I applied elsewhere.

17      Q.      Did you apply with the Riverside Sheriff's

18   Department on or about November 13, 2008?

19      A.      That sounds -- I don't know the date

20   specifically, but I did apply with the sheriff's

21   department.

22      Q.      You indicate you felt that the Riverside Police

23   Department was giving you the run-around with respect to

24   reemploying you.  What caused you to believe that?

25      A.      Because I was acquitted of all my charges, and I

                                                          174

GILLESPIE REPORTING & DOCUMENT MANAGEMENT, INC.

1   still wasn't working.  And it was months later after my

2   acquittal.

3     Q.      Do you know what actions Lisa Johnson was doing

4   with respect to your supplemental background investigation

5   after you provided Officer Johnson with a copy of the

6   Sullivan County law enforcement report?

7             MR. PREIS:  Calls for speculation.  You can

8   answer.

9             THE WITNESS:  I don't know.

10  BY MR. ROTH:

11    Q.      You don't know what she was doing with respect to

12  your supplemental background investigation?

13    A.      Correct.  I don't know what she was doing with

14  it.

15    Q.      Did you tell Lisa Johnson or any other Riverside

16  Police Department representative that you had applied for

17  employment with the Riverside Sheriff's Department on or

18  about November 13, 2008?

19    A.      I don't think so.

20    Q.      Did you make any effort to update the application

21  and personal history forms that you previously submitted

22  to Lisa Johnson and the Riverside Police Department to

23  reflect that application with the Riverside Sheriff's

24  Department?

25    A.      You're asking me if I tried to change my

175

1    A.    No, they did not.

2    Q.    Do you know whether or not your disqualification

3    with -- for employment with the Riverside Sheriff's

4    Department had anything to do with the domestic violence

5    restraining order issued against you in the State of New

6    York?

7          MR. PREIS:  Objection.  That calls for

8    speculation.

9          THE WITNESS:  I don't know what they think.

10   You're asking me if I --

11         MR. ROTH:  Let's have the question reread.  I

12   think it's a little simpler than that.

13             (The record was read as requested.)

14         MR. PREIS:  Same objection and asked and

15   answered.

16         THE WITNESS:  I don't know why it was

17   disqualified.

18   BY MR. ROTH:

19   Q.    Did you subsequently learn that you were

20   disqualified from further employment with the City of

21   Riverside Police Department?

22   A.    I'm sorry?

23   Q.    Did you subsequently learn that you were

24   disqualified from further employment with the City of

25   Riverside Police Department?

181

1    A.    Yes.

2    Q.    When?

3    A.    I believe it was December of 2009, I believe.  It

4    was a letter in the mail.

5    Q.    Let me show you a document I've marked as Defense

6    Exhibit 514.  It appears to be a City of Riverside Police

7    Department letter dated Monday, January 26, 2009,

8    addressed to you at 8220 Magnolia Avenue, No. 23,

9    Riverside, California 92504, re application for employment

10   for police officer.

11              (Defendants' Exhibit 514 was marked

12                   for identification.)

13   Q.    And the second page of the exhibit Bates-stamped

14   14025 bears the stamp "Return to Sender."

15              I gather you never received Defense Exhibit 514,

16   Mr. Nazario; is that correct?

17   A.    Correct.

18   Q.    This address, ██████████████████████ do

19   you recognize it?

20   A.    I believe that's my address when I lived on

21   Magnolia Avenue.

22   Q.    Just with respect to these addresses, I'd like --

23   I realize you don't recall exactly when you purchased the

24   house in Rock Hill, New York, but at some point in time

25   during your employment with the City of Riverside Police

182

1   Department, did you reside with your wife and son in

2   Murrieta?

3       A.      While I was -- did I reside in Murrieta while I

4   was working for the police department?

5       Q.      Yes.

6       A.      Yes.

7       Q.      And at some point during your employment with the

8   City of Riverside Police Department, you moved from

9   Murrieta to Rock Hill, New York, after you purchased a

10  house in New York.  Correct?

11      A.      Wrong.

12      Q.      At some point during your employment with the

13  City of Riverside Police Department, you moved your spouse

14  and son from Murrieta to a home you purchased in Rock

15  Hill, New York?

16      A.      Yes.

17      Q.      And you continued to reside in Southern

18  California.  Correct?

19      A.      Correct.

20      Q.      Is that when you moved into the apartment located

21  at ███ Magnolia Avenue?

22      A.      Yes.

23      Q.      And when you did so, did you notify police

24  department representatives, including the personnel

25  office, of your new address on Magnolia Avenue?

1    A.      Yes.

2    Q.      Now, at some point -- did you continue to reside

3    while you were in Southern California at ▮▮▮ Magnolia

4    Avenue, No. 23, up to and through the point of your

5    termination from employment on August 7, 2007?

6    A.      Yes.

7    Q.      And then at some point after your employment with

8    the City of Riverside terminated on August 7 -- if I

9    didn't say August, I meant August 7 -- 2007, your lease

10   expired on the apartment located at ▮▮▮ Magnolia Avenue?

11   A.      Yes.

12   Q.      And my recollection of your earlier testimony is

13   you don't exactly recall when that lease expired.  Right?

14   A.      Correct.

15   Q.      And when that lease expired on your apartment

16   located at ▮▮▮ Magnolia Avenue sometime between the time

17   of your termination of employment August 7, 2007, and the

18   time of your federal criminal trial in August of 2008, you

19   moved into the residence of the Bucys.  Correct?

20   A.      I'm getting confused with your dates.

21   Q.      Well, sometime after your termination and prior

22   to the time of your federal criminal trial --

23   A.      Uh-huh.

24   Q.      -- your lease on Magnolia Avenue, ▮▮▮ Magnolia

25   Avenue, terminated?

184

1   A.      Right.

2   Q.      And at that point you moved in with the Bucys.

3   Correct?

4   A.      Wrong.  Once my lease expired on Magnolia Avenue,

5   I moved in with my wife and my son in Rock Hill, New York.

6   Q.      Okay.  Between December 31, 2008, and December

7   2009, did you have any contact with Lisa Johnson or George

8   Anderson, Officer George Anderson, or any other

9   representative of the Riverside Police Department

10   regarding your employment?

11   A.      Yes.

12   Q.      What sort of contact and when was the first

13   contact?

14   A.      I had contact in a bar somewhere in Riverside.

15   Can't remember which bar it was.  But the president of the

16   POA was there.  His name was Lanzillo, Chris Lanzillo.

17   And I can't remember who the associate -- who the vice-

18   president of the POA was.  But --

19   Q.      Was the vice-president also there?

20   A.      Yes.  And I asked them what was taking it so long

21   for me to get hired again?

22   Q.      Did Chris Lanzillo or the vice-president of the

23   RPOA provide a response?

24   A.      Yes.

25   Q.      Who responded?

185

Exhibit B
Page 105

1    A.      I believe both.

2    Q.      What were you told?

3    A.      I was told that they were -- the City of

4  Riverside and the police department were waiting for the

5  outcomes of two other trials in connection with mine.

6    Q.      Did Lanzillo and the vice-president tell you how

7  they obtained their information?

8    A.      They just told me it was word of mouth.

9    Q.      I gather this was sometime after January 26,

10  2009?

11    A.      I can't remember.

12    Q.      You can't remember whether the conversation that

13  you had with Chris Lanzillo and the vice-president of RPOA

14  was -- occurred before or after Monday, January 26, 2009?

15    A.      I just remember that that was the last

16  conversation I had with either of the two.

17    Q.      Okay.  After December 31, 2008, did you attempt

18  to contact Lisa Johnson to check on the status of your

19  supplemental background investigation and your

20  reemployment with the police department?

21    A.      You're asking me if I called her back after I

22  sent her my information about the restraining order being

23  dropped?

24    Q.      What I asked you was after December 31, 2008, did

25  you attempt to contact, whether by phone, e-mail, or

186

1   otherwise, Lisa Johnson regarding the status of your

2   supplemental background investigation and reemployment

3   with the City of Riverside Police Department?

4       A.      I believe I did, yes.

5       Q.      When?

6       A.      I can't remember the dates.  Some time went by,

7   and I hadn't heard anything yet.

8       Q.      So you can't recall the date that you attempted

9   to contact Lisa Johnson?

10      A.      Yes.

11      Q.      Did you reach Lisa Johnson?

12      A.      No, I did not.

13      Q.      How did you attempt to contact her?

14      A.      I still had her -- it was the number for the

15  department she was working in, Personnel and Training.  I

16  attempted contacting Personnel and Training and see --

17  make sure they received my package.

18      Q.      Did you -- what package?

19      A.      Not necessarily package.  If they received my

20  copy of the restraining order being dropped.

21      Q.      So that was sometime after November of 2009?

22      A.      I don't know.  I'm getting confused with all

23  these dates.  It would have been after I received the

24  paperwork stating that the restraining order was dropped.

25      Q.      Let me show you a document which I've marked as

187

1    Defendants' Exhibit 515.

2              (Defendants' Exhibit 515 was marked

3                   for identification.)

4    A.      Okay.

5    Q.      Do you recall contacting representatives of the

6    Personnel and Training Division sometime during the week

7    of November 23, 2009, regarding your -- the status of your

8    reemployment?

9    A.      I'm sure I called a couple of times wondering

10   what my reemployment status was.

11   Q.      Did you speak to a Monica Aguirre?

12   A.      I know who Monica is.

13   Q.      Do you recall speaking to Monica?

14   A.      I know she works there.  I don't recall speaking

15   with her.  I could have.  I don't remember the

16   conversation we had.

17   Q.      Did you speak with anybody as opposed to leaving

18   a message?

19   A.      I can't remember if I spoke with someone or left

20   a message or both.

21   Q.      Is there anything that you can think of as you

22   sit here today that would refresh your recollection on

23   that point?

24              MR. PREIS:  Vague and overbroad.  You can

25   respond.

```
 1            THE WITNESS:  I can't.

 2   BY MR. ROTH:

 3     Q.      Excuse me?

 4     A.      I can't think of any.

 5     Q.      Is this the first time since December 31, 2008,

 6   that you attempted to contact any representatives of the

 7   Riverside Police Department regarding the status of your

 8   reemployment?

 9            MR. PREIS:  Objection.  Asked and answered.  You

10   can answer to the extent you understand it.

11            THE WITNESS:  I don't understand.  I'm getting

12   confused with all these dates.

13   BY MR. ROTH:

14     Q.      I'm sorry.  I don't mean to confuse you,

15   Mr. Nazario.

16            You indicate that sometime during the week of

17   November 23 of 2009, you either left a message or spoke to

18   someone -- you can't recall -- about the status of your

19   reemployment with the Riverside Police Department.  Do you

20   recall that testimony?

21     A.      Yes.

22     Q.      Okay.  Prior to that contact the week of November

23   23, 2009, did you have any other contact with any

24   representatives of the City of Riverside Police Department

25   regarding your reemployment?
```

189

1          MR. PREIS:  Other than what he's already

2     testified to?

3          MR. ROTH:  Counsel, if you can tell me what that

4     is, I'm happy to include that in the question.

5          MR. PREIS:  I think he testified that he

6     contacted them following giving them the family law stuff.

7     I think he testified that he contacted them after January

8     of '09.  I think he testified that he contacted them

9     various times, but he couldn't recall the dates.

10         MR. ROTH:  I need to thin this down, so bear with

11    me.

12         MR. PREIS:  Absolutely.

13    BY MR. ROTH:

14    Q.     After December 31, 2008, and up to the week of

15    November 23, 2009, Mr. Nazario, do you recall having any

16    contact with representatives of the Riverside Police

17    Department with respect to your reemployment with the

18    department?

19    A.     I can't recall any conversations.  But I probably

20    did call or have contact.

21    Q.     Do you specifically recall any contacts with

22    representatives of the Riverside Police Department

23    regarding the status of your reemployment other than the

24    contact referenced in Defendants' Exhibit 515?

25         MR. PREIS:  Not to interrupt, but would Lanzillo

                                                          190

1   be included in your question as a Riverside

2   representative?

3            MR. ROTH:  No.  I'm excluding the union

4   representatives.

5            THE WITNESS:  I'm getting lost.  I'm sorry.

6   BY MR. ROTH:

7    Q.      Well, I'll try to -- I'll try to help.

8            My understanding is and recollection from your

9   testimony is you don't recall when your conversation with

10  Chris Lanzillo and the vice-president of the RPOA

11  occurred.  Correct?

12   A.      Correct.

13   Q.      And you don't recall whether it occurred prior to

14  or after January 26, 2009.  Correct?

15            MR. PREIS:  Misstates prior testimony.

16            MR. ROTH:  My notes reflect "don't recall if

17  before or after January 26, 2009."

18  BY MR. ROTH:

19   Q.      Do you recall that testimony?

20   A.      I could probably understand it better if, instead

21  of giving a date -- because, I mean, there's hundreds of

22  dates here.  Or a bunch of dates here -- if you relate it

23  to actual actions that took place.

24   Q.      Well, I just need your best recollection,

25  Mr. Nazario.

Exhibit B
Page 111

1          So do you recall whether the conversation that

2   you previously testified to with RPOA president Chris

3   Lanzillo and the vice-president of the RPOA occurred

4   before or after January 1, 2009, New Year's?

5          MR. PREIS:  That's, I believe, been asked and

6   answered, but you can respond.

7          THE WITNESS:  I can't remember.

8   BY MR. ROTH:

9     Q.     You can't recall.

10    A.     I can't recall.

11    Q.     Is there anything that you could think of as you

12  sit here today that would refresh your recollection as to

13  the date of that conversation?

14         MR. PREIS:  Vague and overbroad.  You can

15  respond.

16         THE WITNESS:  No, I can't.

17  BY MR. ROTH:

18    Q.     Okay.  Now, other than the possible conversation

19  with RPOA Chris Lanzillo and vice-president of the RPOA,

20  did you have any conversations with any Riverside Police

21  Department representatives regarding your reemployment and

22  the status of that reemployment prior to the week of

23  November 23, 2009?

24         MR. PREIS:  Argumentative as to the term

25  "possible."  I think he testified that that conversation

192

1    did occur, but with that in mind, you can respond to the

2    question.

3            THE WITNESS:  I'm not sure about the dates, but I

4    did have another contact with a Sergeant Mason.

5    BY MR. ROTH:

6      Q.    And you don't know the date of this contact with

7    Sergeant Mason?

8      A.    I do not.

9      Q.    Do you know Sergeant Mason's job title at the

10   time?

11     A.    I believe he's president of the RPOA right now.

12     Q.    What was he at the time?

13     A.    At the time of what?

14     Q.    At the time that you had contact with him.

15     A.    I believe he was a sergeant, but I could be

16   wrong.

17     Q.    Do you recall his duty title at the time that you

18   had contact with him?

19     A.    Such as?

20            MR. PREIS:  Well, it's a yes-or-no question.

21   BY MR. ROTH:

22     Q.    You served in the Riverside Police Department;

23   correct?

24     A.    Right.

25     Q.    I assume officers and sergeants in the police

193

```
 1              R E P O R T E R ' S   C E R T I F I C A T E

 2

 3              I, LYNNE DALTON, a certified shorthand reporter,

 4     No. 3544, for the State of California do hereby certify:

 5              That prior to being examined, the witness named

 6     in the foregoing deposition was sworn by me to testify to

 7     the truth, the whole truth, and nothing but the truth;

 8              That the said deposition was taken down by me in

 9     stenotype at the time and place therein stated and was

10     thereafter reduced to printing under my direction.

11              I further certify that I am not of counsel or

12     attorney for either of the parties hereto or in any way

13     interested in the event of this cause, and that I am not

14     related to either of the parties hereto.

15              In witness whereof, I have hereunto subscribed my

16     name this 16th day of August, 2010.

17

18                          _____

19                          LYNNE DALTON, CSR No. 3544

20

21

22

23

24

25
```

 **CJTF-7 U.S. ROE CARD** 

# NOTHING ON THIS CARD PREVENTS YOU FROM USING DEADLY FORCE TO DEFEND YOURSELF

**1. Enemy military and paramilitary forces may be attacked subject to the following instructions:**
  a. <u>Positive Identification (PID) is required prior to engagement.</u> PID is "reasonable certainty" that your target is a legitimate military target. If no PID, contact your next higher commander for decision.
  b. Do not engage anyone who has surrendered or cannot fight due to sickness or wounds.
  c. Do not target or strike any of the following except in self-defense to protect yourself, your unit, friendly forces, and designated persons and property under your control:
  • Civilians
  • Hospitals, mosques, churches, shrines, schools, museums, national monuments, and any other historical and cultural sites
  d. Do not fire into civilian populated areas or buildings unless the hostile force is using them for hostile purposes or if necessary for self-defense.
  e. Minimize collateral damage.

**2. You may use force, including deadly force, to defend yourself from persons who commit or are about to commit hostile acts against you. You may use the same level of force to protect the following:**
  • Your unit, and other friendly forces (including Iraqi police and security forces)
  • Enemy prisoners or war and detainees
  • Civilians from crimes that are likely to cause death or serious bodily harm, such as murder or rape
  • Designated organizations and/or property, such as personnel of the Red Cross/Red Crescent, UN, and US/UN supported organizations.
  <u>Warning before firing</u>
  You may, time permitting, give a warning in a loud clear voice:
       **KIFF – ARMICK (Stop or I'll shoot)**
       **ERMY SE-LA-HAK (Drop your weapon)**

**3. You may detain civilians if they interfere with mission accomplishment, possess important information, or if required for self-defense.**
  • Treat all persons and their property with dignity.
  • Iraqi security forces and police are authorized to carry weapons.

**4. Necessary force, including deadly force, is authorized for the protection of some types of property including the following:**
  • Public utilities
  • Hospitals and public health facilities
  • Electric and oil infrastructure
  • Coalition and captured enemy weapons and ammunition
  • Financial institutions
  • Other mission essential property designated by your commander

**REMEMBER**
  • Attack only hostile forces and military targets.
  • Avoid fratricide—be aware of nearby units and Iraqi police and security forces.
  • Spare civilians and civilian property, if possible.
  • Do not loot or steal.
  • Conduct yourself with dignity and honor.
  • Comply with the Law of War. If you see a violation, report it.
  • **YOU ALWAYS HAVE THE RIGHT TO USE NECESSARY FORCE, INCLUDING DEADLY FORCE, TO PROTECT YOURSELF AND OTHERS.**

These ROE will remain in effect until your commander orders you to transition to different ROE.



Exhibit B
Page 115 > 1



Page 1 of 1

## Johnson, Lisa K.

**From:** diette Nazario [joseanddiette15@msn.com]
**Sent:** Tuesday, October 07, 2008 8:16 AM
**To:** Johnson, Lisa K.

Hey Lisa,
As you know, my wife and I are in the first stages of a divorce. We agree on everything except on the custody issue. I want equal custody, and she wants full custody. Just because she doesn't love me anymore she feels this is the best way to hurt me. She called the police on me last night, I believe it was the Sullivan County Sheriffs Department. They arrived and she made up this whole story how been beating her, which she threatened she would do. She knows that you can not be a police officer with domestic violence charges. So she called them and basically lied to them. I spoke to one of the deputies alone and told him to look for any signs on her to indicate that I beat her, they found none. Nothing in the house indicated a fight whatsoever. I responded to calls like this and know the best thing to do in this situation is to leave the house and stay somewhere else for the night, so that's what I did. The house is in both of our names, and there were not any signs of abuse, so I had the legal right to stay there. I left to avoid later drama. She does not want me to get my job back in california because she knows I was happy there. She knows you email address since we share the same email account. I'm sure she will send you an email, if she has not done so already, to try and stop the process of me getting my job back. I know you probably wont take my word for it as to what went down, so feel free to contact her and get an incident report # from her. I don't have the number but I will try and obtain it today. My cell phone is off, because she hid the charger so that I cant speak to anyone when I left, so I am off to get a new one. You can still leave a message on my voicemail, and I will check it using a house phone or when It is charged again. I just hope that you don't automatically believe her until you get a copy of that report. She is bitter and wants full custody, that's why this is happening. In the meantime I will be attempting to stay elsewhere, and await your response. JOSE.

---

Want to do more with Windows Live? Learn "10 hidden secrets" from Jamie. <u>Learn Now</u>



Exhibit B
Page 116

10/14/2008  15:08  7182398979                    E S BUSINESS                                    PAGE  01

| Agency | ORI | | (NYC) | Incident # | PAGE 01 |
|---|---|---|---|---|---|

**Agency:** SCSO  **ORI:** NYO52000I

| Month | Day | Year | Time (24 Hrs) | Address of Occurrence | APT # | Precinct over CTY | Aided # (NYC) | Complaint # |
|---|---|---|---|---|---|---|---|---|
| 10 | 08 08 | | 2330 | | | | | |
| 10 | 07 08 | | 0000 | How can we safely contact you? (e.g. Name, Phone) | | | | |

○ Officer-Initiated  ○ Radio Run  ○ Walk-In

**VICTIM/PARTY 1**

Name Last, First, M.I. (Include aliases): NAZARIO  Dietk S

| Injured? ○No ○ Yes | Removed to Hospital? ○No ○ Yes If yes, what hospital? | ○ White ○ Black ○ Asian ○ Native American ○ Other | ○ Hispanic ○ Non-Hispanic ○ Unknown | DOB | Age 51 | ○ Male ○ Female |
|---|---|---|---|---|---|---|

If non-English, language: ○ Spanish ○ Chinese ○ Other:

Describe: _____

**SUSPECT/P2 / PARTY 2**

Name Last, First, M.I. (Include aliases): NAZARIO  Jose L JR

| Injured? ○ No ○ Yes | Removed to Hospital? ○No ○ Yes If yes, what hospital? | ○ White ○ Black ○ Asian ○ Native American ○ Other | ○ Hispanic ○ Non-Hispanic ○ Unknown | DOB | Age 28 | ○ Male ○ Female |
|---|---|---|---|---|---|---|

If non-English, language: ○ Spanish ○ Chinese ○ Other:

Describe: scratches on arm

| Prior DV History? | ○ Yes ○ No |
|---|---|
| Prior DV police report? | ○ Yes ○ No |
| Victim fearful? | ○ Yes ○ No |
| Access to weapons? | ○ Yes ○ No |
| Suspect: Drug/Alc History? | ○ Yes ○ No |
| Suspect: Hx. suicide threat? | ○ Yes ○ No |
| Suspect: Probation/Parole? | ○ Yes ○ No |

**LIVING SITUATION**

| | | |
|---|---|---|
| SUSPECT/P2 present? ○ Yes ○ No | Do parties currently live together? ○ Yes ○ No | RELATIONSHIP: (SUSPECT / P2 to VICTIM / P1) |
| | IF NO, have they lived together in the past? ○ Yes ○ No | ○ Married  ○ Formerly Married |
| | | ○ Intimate Partner/Dating  ○ Former Intimate/Dating |
| | Do the parties have a child-in-common? ○ Yes ○ No | ○ Child of victim/party 1  ○ Parent of victim/party 1 |
| | | ○ Relative:  ○ Other: |

**ASSOCIATED PERSONS**

| | Phone | Relationship to victim / P1 |
|---|---|---|
| | | Son |

**SUSPECT ACTIONS** (Check all that apply)

| | | |
|---|---|---|
| ○ Biting | ○ Impaired Alcohol/Drugs | ○ Pushing |
| ○ Destroyed Property (Furnished) | ○ Injury to Child | ○ Sexual Assault |
| ○ Forced Entry | ○ Injury to Other Persons | ○ Shooting |
| ○ Forcible Restraint | ○ Injury to Pet/Animal | ○ Slapping |
| ○ Hair Pulling | ○ Interference with Phone | ○ Slamming Body |
| ○ Homicide | ○ Intimidation/Coercion | ○ Stabbing |
| | ○ Kicking | ○ Strangulation/"Choking" |
| | ○ Punching | ○ Suicide or Attempt |

| ○ Threw Items | ○ Threats (specify) | ○ Threat with weapon |
|---|---|---|
| ○ Unwanted Contact | ○ Injure/Kill Persons | ○ Weapons used: (specify) |
| ○ Verbal Abuse | ○ Injure/Kill Self | ○ Blunt Object |
| ○ Violated Visitation/Custody Conditions | ○ Injure/Kill Pet/Animal | ○ Gun |
| ○ OTHER Suspect Actions: | ○ Take Child | ○ Motor Vehicle |
| | ○ Destroy/Take Property | ○ Sharp Instrument |
| | | ○ Other: |

**ARREST**

| Arrest Made? ○ Yes ○ No | Reasons arrest not made on-scene: ○ No Offense Committed ○ No Probable Cause ○ Suspect Off-Scene |
|---|---|
| | ○ Warrant/Criminal Summons to be requested  ○ Violation level: not in police presence (no citizen's arrest)  ○ Other: |

**OFFENSES & OP**

| Offenses | Law (e.g. PL) | Section (Sub) | Offenses Involved: (check if they apply) ○ Felony |
|---|---|---|---|
| Harassment 2nd | PL | 240.26 | ○ Misdemeanor  ○ Violation  ○ Other ( specify ) |

| Registry Checked? ○ Yes ○ No | OP Court Name: |
|---|---|
| Order of Protection? ○ Yes ○ No | ○ Family ○ Criminal ○ Supreme |
| Stay Away Order? ○ Yes ○ No | ○ Out of State ○ Tribal |
| Order Violated? ○ Yes ○ No | Expiration Date  Month  Day  Year |
| Any PRIOR orders? ○ Yes ○ No | |

**STOP!**

| Photos Taken? | IF YES, photos taken of: ○ Victim Injuries ○ Suspect Injuries | Other evidence collected? ○ Yes ○ No |
|---|---|---|
| ○ Yes ○ No | ○ Scene ○ Damaged Property ○ Other: | IF YES, describe: |

**INVESTIGATION**

Results of investigation and basis of action taken: (Were excited utterances, spontaneous admissions or spontaneous statements made? ○ Yes ○ No) (Complete 710.30 or other form when applicable)

Both parties are divorcing, argument escalated into a physical. no injuries requiring medical attention. P2 has scratches on his arm. no injuries visible on P1. Parties separated for the night. P2 leaving residence. Referred to family court.

BY: ____

_____ 2008          ____ OCT ____ 2008

**Exhibit:** 510
**Date:** 8-9-10
**Depo of:** Nazario
Lynne Dalton, CSR

**IRROVADED**

**OTHER AGENCIES** involved with the parties or incident (e.g. advocates, hospital, probation): _____

| Is there reasonable cause to suspect a child may be the victim of abuse, neglect, maltreatment or endangerment? ○ YES ○ NO  IF YES, officer must contact the NYS CHILD ABUSE HOTLINE REGISTRY AT 1-800-635-1522 | ○ Guns in House ○ Guns Seized ○ Has Permit ○ Permit Seized  Issuing County: |
|---|---|
| | Permit #(s): _____  Name on Permit(s): _____ |

**CONTACTS INITIATED BY POLICE:** ○ Adult Protective Services ○ Child Protective Services (or ACS) ○ Domestic Violence Services ○ Firearms Licensing  ○ Mental Health ○ Police ○ Probation ○ Rape Crisis ○ Other Agency: _____  Date: _____  Who was notified? _____  Notified by (initial): _____

| Officer's Signature (& Rank) | (PRINT and SIGN) | I.D. | Month | Day | Year | Was DIR given to the victim at the scene? ○ Yes ○ No | Page |
|---|---|---|---|---|---|---|---|
| | R.A. Costa | 350 | 10 | 08 | 00 | Was Victim Rights Notice given to victim? ○ Yes ○ No | 1 |

FAMILY COURT
STATE OF NEW YORK
COUNTY OF SULLIVAN

------------------------------------------------x

In the Matter of a Proceeding under
Article _____ of the Family Court Act

_Diette Sonya Nazario_ ,
                                    Petitioner,

                                                          **ORDER TO SHOW**
                                                          **CAUSE**

-against-

_Jose Luis Nazario, Jr._ ,
                                    Respondent(s).

------------------------------------------------x

**NOTICE:**     **YOUR FAILURE TO APPEAR IN COURT MAY RESULT IN YOUR IMMEDIATE ARREST. YOU HAVE THE RIGHT BE REPRESENTED BY A LAWYER. IF YOU CANNOT AFFORD A PRIVATE LAWYER, YOU HAVE THE RIGHT TO ASK THE JUDGE TO ASSIGN A LAWYER. IF, AFTER HEARING THE JUDGE FINDS THAT YOU WILLFULLY FAILED TO OBEY THE ORDER, YOU MAY BE IMPRISONED FOR A TERM NOT TO EXCEED SIX MONTHS, FOR CONTEMPT OF COURT.**

        Upon the petition(s) of _Diette Sonya Nazario_ , verified the _7th_ day of _October_ , 20 _08_ , annexed hereto, it is

        **ORDERED,** that the above-named Respondent(s) show cause before the New York State Family Court, held in and for the County of Sullivan, Sullivan County Government Center Annex, 100 North Street, Monticello, New York, before the Hon. **Mark M. Meddaugh** on the _5th_ day of _November_ , 20 _08_ at _10:30 am_ in the (after)(fore)noon of that day or as soon thereafter as the parties can be heard, why an order should not be made granting Petitioner the relief sought in the attached petition(s)  and why such other and further relief should not be granted as the Court may determine; and it is further

        **ORDERED,** that _____

_____

_____

_____

_____; and it is further

        **ORDERED,** that service by **PERSONAL SERVICE** of a copy of this Order together with the papers upon which it is granted upon above named Respondent(s) on or before the _31st_ day of _October_ , 20 _0_ be deemed sufficient service.

Dated: _10-7-08_

                              **ENTER**

                              _Mark M. Meddaugh_
                              HON. MARK M. MEDDAUGH
                              Family Court Judge

Exhibit _511_
Date _8-9-10_
Depo of _Nazario_
Lynne Dalton, CSR

_1 of 13_

Exhibit B
Page 118        _511_

09/29/2008   00:17   8457965821          DIETTE                        PAGE  03

GF5 2002

F.C.A §§ 430, 550, 655, 828, 1029

ORI No: NY052023J
Order No: 2008-000482
NYSID No: _____

At a term of the Family Court of the State of New York, held in and for the County of Sullivan, at Government Center 100 North St., Monticello, NY 12701, on October 07, 2008

PRESENT: Honorable Mark M. Meddaugh

In the Matter of a FAMILY OFFENSE Proceeding

File #      13198
Docket#   O-02197-08

Diette S Nazario (DOB: ▉▉▉▉),
                        Petitioner,

- against -

Jose L Nazario Jr (DOB: ▉▉▉▉),
                        Respondent.

Temporary Order Of Protection

Ex Parte

**NOTICE: YOUR FAILURE TO OBEY THIS ORDER MAY SUBJECT YOU TO MANDATORY ARREST AND CRIMINAL PROSECUTION, WHICH MAY RESULT IN YOUR INCARCERATION FOR UP TO SEVEN YEARS FOR CRIMINAL CONTEMPT, AND/OR MAY SUBJECT YOU TO FAMILY COURT PROSECUTION AND INCARCERATION FOR UP TO SIX MONTHS FOR CONTEMPT OF COURT. IF YOU FAIL TO APPEAR IN COURT WHEN YOU ARE REQUIRED TO DO SO, THIS ORDER MAY BE EXTENDED IN YOUR ABSENCE AND CONTINUE IN EFFECT UNTIL YOU APPEAR IN COURT.**

A petition under Article 8 of the Family Court Act, having been filed on October 07, 2008 in this Court and good cause having been shown, and Jose L Nazario Jr having not been present in Court,

Now, therefore, it is hereby ordered  that Jose L Nazario Jr (DOB: ▉▉▉▉) observe the following conditions of behavior:

[01] Stay away from:

- [A]  Diette S Nazario (DOB: ▉▉▉▉) and G▉▉▉ Nazario (DOB: ▉▉▉▉);
- [B]  the home of Diette S Nazario (DOB: ▉▉▉▉) and G▉▉▉ N▉▉▉ (DOB: ▉▉▉▉) and stay away from the child's day care;
- [E]  the place of employment of Diette S Nazario (DOB: ▉▉▉▉);

[14]  Refrain from communication or any other contact by mail, telephone, e-mail, voice-mail or other means with Diette S Nazario (DOB: ▉▉▉▉) and G▉▉▉ N▉▉▉ (DOB: ▉▉▉▉);

511-2
Exhibit B
Page 119

Page: 2
Docket No: O-02197-08
GF5 2002

[02]    Refrain from assault, stalking, harassment, aggravated harassment, menacing, reckless endangerment, disorderly conduct, intimidation, criminal mischief, threats or any criminal offense against Diette S Nazario (DOB: ▇▇▇) and G▇▇▇ N▇▇ (DOB: ▇▇▇);

[11]    Permit Jose L Nazario Jr (DOB: ▇▇▇) to enter the residence at ▇▇▇ Rock Hill, NY 12775 during: respondent may enter the residence with police assistance to remove personal belongings not in issue in litigation: personal belongings;

[07]    Temporary Custody of G▇▇▇ (DOB: ▇▇▇) shall be awarded to Diette S Nazario (DOB: ▇▇▇) under the following terms and conditions: pending further court order and all visitation between respondent and the child is suspended pending further order;

[99]    Observe such other conditions as are necessary to further the purposes of protection: any police agency shall assist in removing respondent from the residence;

It is further ordered that this Temporary Order Of Protection shall remain in effect up to and including December 31, 2008;

The Family Court Act provides that presentation of a copy of this order of protection to any police officer or peace officer acting pursuant to his or her special duties shall authorize, and sometimes requires, such officer to arrest a person who is alleged to have violated its terms and to bring him or her before the court to face penalties authorized by law.

Federal law requires that this order must be honored and enforced by state and tribal courts, including courts of a state, the District of Columbia, a commonwealth, territory or possession of the United States, if the person against whom the order is sought is an intimate partner of the protected party and has or will be afforded reasonable notice and opportunity to be heard in accordance with state law sufficient to protect that person's rights (18 U.S.C. §§2265, 2266).

It is a federal offense to: cross state lines to violate an order of protection; cross state lines to engage in stalking, harassment or domestic violence against an intimate partner or family member; possess, purchase, ship, transfer or receive a handgun, rifle, shotgun, or other firearm or ammunition following a conviction of a domestic violence misdemeanor involving the use or attempted use of physical force or a deadly weapon; or (except for military or law enforcement officers while on duty) possess, purchase, ship, transfer or receive a handgun, rifle, shotgun or other firearm or ammunition while an order of protection, issued after notice and an opportunity to be heard, that protects an intimate partner against assault, harassment, threatening and/or stalking, remains in effect (18 U.S.C. §§922(g)(8), 922(g)(9), 2261, 2261A, 2262).

09/29/2008  00:17   8457965821          DIETTE                        PAGE  05

Page 3
Docket No: O-02197-08
GFS 2002

PURSUANT TO SECTION 1113 OF THE FAMILY COURT ACT, AN APPEAL FROM THIS ORDER MUST BE TAKEN WITHIN 30 DAYS OF RECEIPT OF THE ORDER BY APPELLANT IN COURT, 35 DAYS FROM THE DATE OF MAILING OF THE ORDER TO APPELLANT BY THE CLERK OF COURT, OR 30 DAYS AFTER SERVICE BY A PARTY OR THE LAW GUARDIAN UPON THE APPELLANT, WHICHEVER IS EARLIEST.

Dated:     October 07, 2008                              ENTER


_____
Honorable Mark M. Meddaugh

Next Appearance Date: 11/05/2008 at 10:30 AM - Honorable Mark M. Meddaugh, Part 1

**Check Applicable Box(es):**

[ ]     Party against whom order was issued was advised in Court of issuance and contents of Order

[ ]     Order personally served in Court upon party against whom order was issued

[X]     Service directed by Police Service

[ ]     [Modifications or extensions only]: Order mailed on [specify date and to whom mailed]:_____

[ ]     Warrant issued for party against whom order was issued [specify date]:_____

511-4

Exhibit B
Page 121

09/29/2008   00:17   8457965821                DIETTE                          PAGE   06

F.C.A. §§ 812, 818, 821                                    Form 8-2
                                                           (Family Offense Petition)
                                                           (7/2008)

FAMILY COURT OF THE STATE OF NEW YORK
COUNTY OF
...................
...                                                        FF# 13198

               Petitioner  *Diette Sonya Nazario*  Docket No. *O-02197-08*

    -against                                     FAMILY OFFENSE
                                                 PETITION

*Jose Luis Nazario Jr*    Respondent

TO THE FAMILY COURT:

          The undersigned Petitioner respectfully states that: :

          1. a. I reside at [specify address unless
          confidential]:[1] b. The Respondent resides at
          [specify]:

                                                          1 2 775

          2. a. ☐ The Respondent and I are related as follows [check applicable box(es)]:
          ☐ we are married                              ☐ we were married
          ☑ we have a child in common                  ☐ we are parent & child ☐
          we are related by blood or marriage [specify how]:
          ☐ other intimate relationship (NOT casual social or business acquaintances)
          [describe]:

          b. ☐ I am a peace officer.

          3. The Respondent committed the following family offense(s) against me and/or
my children, which constitute ☐ attempted assault ☑ assault ☐ aggravated harassment
☑ harassment ☑ disorderly conduct ☑ menacing ☐ reckless endangerment ☐ stalking
☐ criminal mischief ☐ other [specify]: *endangering welfare of a child*
[State date, time and place of most recent incident, specify if anyone was injured (how
seriously) and if any weapons were used. If there were earlier incidents as well, describe
them in additional paragraphs. Use additional sheets where necessary]:

          *See attached hereof made a part herein*

[1]
          If your health, safety or liberty or that of your child or children would be put at risk by disclosure of
your address or other identifying information, you may apply to the Court for an address confidentiality
order by submitting General Form GF-21. This form is available on-line at www.nycourts.gov .

511-5

4. I ☐have ☑have not  filed a criminal complaint concerning these incident(s) [If so, please indicate status].

5. [Delete if inapplicable]:  The Respondent has acted in a way I consider dangerous or threatening to me, my children or any member of your family, in addition to the incident described in question 3, as follows [describe]: *See attached Perez management Tenn*

6. [Delete if inapplicable]: The Respondent was found to have  violated an Order of Protection issued on behalf of me or members of my family or household as follows [describe]: *NO*

7. [Delete if inapplicable]: The Respondent owns or has access to guns as follows [describe]: *NO*

8. [Delete if inapplicable]:
   a. The Respondent has a gun license or pistol permit for the following gun(s) as follows [describe]: *NO*

   b. The Respondent has a gun license or permit application pending as follows [describe]: *I don't Know*
   c. The Respondent carries a gun on his or her job as follows [describe]:

9. [Delete if inapplicable]:
   a. The Respondent threatened ☐me ☐my child or children [specify]: ☐ a member or members of my household [specify]: *NO*
   with a gun or dangerous instrument or object as follows [specify]:

   b. There is a substantial risk that Respondent would use or threaten to use a firearm or dangerous instrument or object against me, my child(ren) or member of your household on the basis of the following facts and for the following reasons [describe]: *I don't Know*

10. [Delete if inapplicable]: The following court cases are pending between me and the Respondent [specify court, docket or index number, nature of action and status, if known]: *NO*

11. [Delete if inapplicable]: The Respondent has the following any criminal convictions [specify, including date, crime, sentence and court, if known]:

*511-6*

Exhibit B
Page 123

09/29/2008  00:17  8457965821                    DIETTE                           PAGE  08

12. [Delete if inapplicable]:
　　a.  The following children live in my household:.

<u>NAME</u>     <u>DATE OF BIRTH</u>  <u>LIVES WITH</u> <u>RELATION TO  ME</u>    <u>RELATION TO RESPONDENT</u>

6⬛⬛⬛⬛     10⬛⬛⬛⬛    me Diette SNazaric Biological

　　b. The Respondent committed family offenses against the following child or children  *mother*

*Se attached hereof made a part hew*

3

as follows [describe including name(s) of child or children, nature of offense(s) and date(s)] [2]

13. [Delete if inapplicable]:
　　a. The following pets live in my house [specify name(s) and type(s)]:  *NO*

　　b.  The Respondent  injured or tried or threatened to injure pets in my household
　　　　as follows [describe]:

14.  I have not made any previous application to any court or judge for the relief requested in this petition, [except [specify the relief, if any, granted and the date of such relief; delete if inapplicable]:  *NO*

WHEREFORE, Petitioner respectfully requests this Court to:

　　a. adjudge  the Respondent to have committed the family offense(s) alleged;
　　b. enter an order of protection, specifying conditions of behavior to be observed by the Respondent in accordance with Section 842 of the Family Court Act;
　　c. enter a finding of aggravated circumstances [delete if inapplicable];
　　d. enter a temporary order of child support in accordance with Family Court Act §828(4) [delete if inapplicable];
　　e.211` order such other and further relief as to the Court seems just and proper.

Dated: *10/07/08*

---

[2]
　　Family offenses include the crimes of  assault or attempted assault,  aggravated harassment or harassment,  disorderly conduct, menacing, reckless endangerment, stalking or criminal mischief.

*S11-7*

Diette S. Nazario
_____
Petitioner ( print or type name)  /  Signature

_____
Petitioner's Attorney, if any ( print or type name)/   Signature

_____
Address and telephone number of Attorney, if any

## VERIFICATION

STATE OF NEW YORK            )
                                          :ss.:
COUNTY OF) Sullivan

Diette Nazario

being duly sworn, says that (he)(she) is the Petitioner(s) in the above-named proceeding and that the foregoing petition is true to (his)(her) own knowledge, except as to matters stated to be alleged

Form  8-2   Page 4

on information and belief and as to those matters (he)(she) believe(s) them to be true.

Diette Nazario
_____
Petitioner: type or print name  /   Signature

Sworn to before me
this  day of  October, 2008

_____
(Deputy)Clerk of the Court
Notary Public

511-8

## Victim Statement

Upon information and belief, on October 5, 2008, at the shared residence, the Respondent committed an act or acts, which constitute disorderly conduct, harassment in the second degree, menacing in the third degree, assault in the third degree and endangering the welfare of a child towards Diette Nazario who is the spouse of said Respondent, in that a verbal altercation with Petitioner which turned into a physical altercation in that the Respondent grabbed Petitioner in a choke hold Petitioner states she was unable to breath and began to scratch and try to bite Respondent's arm so he would let Petitioner go.  Petitioner states their son ████ who is 2 ½ yrs old began to cry and scream **"Mommy, Mommy no"**! Petitioner states Respondent let her go and Petitioner grabbed the child ran upstairs to her bedroom and called her girlfriend to defuse the Respondents behavior.  Petitioner states Respondent chased Petitioner into the bedroom noticed she was already on the telephone and went back downstairs.  Petitioner states when she was finished w/the telephone call she went downstairs into the kitchen in which the physical altercation continued in which the Respondent grabbed Petitioner with one hand around her throat lifting Petitioner off the floor and with the other hand on her torso and slammed Petitioner down onto the ground causing Petitioner to have bruises and a small gash in her right knee and a few small scratches on her right arm, hip and upper lip all on her right side.  Petitioner states she is finding it hard to swallow and continuously has to clear her throat.

Petitioner states on October 6, 2008 a verbal altercation began which turned physical in which Respondent open hand pushed Petitioner out of the car by Petitioner's forehead and stated to Petitioner **"Get out of the car bitch"**! Petitioner states Respondent went to pick up Petitioner after her shift from work and take her to get her car at the repair station at 11:14pm.  Petitioner states both parties were arguing back and forth in reference to who was going to drive the other vehicle when Respondent got out of his vehicle ran over to Petitioner's truck grabbed the keys out of the ignition of the truck when Petitioner was getting their son out of the car seat of Respondent's vehicle.  Respondent just drove off with the keys.  Petitioner states she began to scream at Respondent asking him if he was going to just leave their son and her stranded in the cold and in a dark parking lot she was calling the police in which Respondent drove back and threw the truck keys in the air.  Petitioner states she was able to locate the keys and in route to home called the police in fear of what Respondent may do next.  Petitioner states when she arrived at home she was going onto the computer to transfer financial funds over to separate accounts since both parties are beginning the process of a divorce in which the Respondent still heated proceeded to flip the chair in which Petitioner was sitting on holding their son.  Petitioner states she once again called 911 in which the Sheriff's Department arrived spoke to the Respondent and Respondent agreed to leave for the night.  Petitioner gave her statement and was issued a DIR report (attached).  Petitioner states when she woke up the Respondent were sleeping on the couch.

5H-9

Petitioner states that there is an extensive history of abuse by the Respondent that stretches throughout their 7 and ½ yr marriage, and takes place in front of the child. Petitioner states Respondent is getting worse since the conversation of getting a divorce and him loosing his employment as a Police Officer in California.   Petitioner states Respondent was accused of a War Crime while he was stationed in Iraq and states he has been acquitted of this crime but is not looking for a job here in Sullivan County and blames Petitioner for their money problems.   Petitioner states Respondent has thrown food at her on many occasions as well as various small household items.   Petitioner states the physical abuse began while she was pregnant and even slept in the garage several times due to chemical fumes which made Petitioner sick and was told by her doctor not to be inhaling.   Petitioner states the Respondent was aware of this and would not stop using the chemicals in the residence.

Petitioner is requesting an order of protection with a removal of the Respondent from the residence with the following stipulations:

- **Stay away from Petitioner and her children**
- **Stay away from Petitioner's residence**
- **Stay away from place of employment, children's school, and place of day care**
- **Refrain from communication**
- **Refrain from harassment or any act which constitute a violation of the penal law**
- **Temporary custody awarded to Petitioner with visitation suspended until further order of the court.**

$11-10$

Exhibit B
Page 127

01/03/2005  07:37    8457965821              DIETTE                        PAGE  02

GF5a 2002

F.C.A §§ 446, 551, 656, 842 & 1056

ORI No: NY052023J
Order No: 2008-000486
NYSID No: _____

At a term of the Family Court of the State of New York, held in and for the County of Sullivan, at Government Center 100 North St., Monticello, NY 12701, on October 10, 2008

PRESENT: Honorable Mark M. Meddaugh

In the Matter of a **FAMILY OFFENSE** Proceeding

Diette S Nazario (DOB: ▓▓▓▓),
          Petitioner,

     - against -

Jose L Nazario Jr (DOB: ▓▓▓▓,
          Respondent.

File #    13198
Docket#   O-02197-08

**Order Of Protection**

Both parties present in court

**NOTICE: YOUR WILLFUL FAILURE TO OBEY THIS ORDER MAY SUBJECT YOU TO MANDATORY ARREST AND CRIMINAL PROSECUTION, WHICH MAY RESULT IN YOUR INCARCERATION FOR UP TO SEVEN YEARS FOR CRIMINAL CONTEMPT, AND/OR MAY SUBJECT YOU TO FAMILY COURT PROSECUTION AND INCARCERATION FOR UP TO SIX MONTHS FOR CONTEMPT OF COURT.**

A petition under Article 8 of the Family Court Act, having been filed on October 07, 2008 in this Court and on consent, and Jose L Nazario Jr having been present in Court and advised of the issuance and contents of this Order,

Now, therefore, it is hereby ordered  that Jose L Nazario Jr (DOB: ▓▓▓▓) observe the following conditions of behavior:

[01] Stay away from:
     [A]    Diette S Nazario (DOB: ▓▓▓▓);
     [B]    the home of Diette S Nazario (DOB: ▓▓▓▓);
     [E]    the place of employment of Diette S Nazario (DOB: ▓▓▓▓);

[14]    Refrain from communication or any other contact by mail, telephone, e-mail, voice-mail or other means with Diette S Nazario (DOB: ▓▓▓▓) except for the purpose of discussing the health, safety, and well being of the child G▓▓▓ N▓▓▓, dob ▓▓▓▓, and any issues dealing with marital bills, or starting divorce proceedings;

611-11

Exhibit B
Page 128

01/03/2005  07:37   8457965821                    DIETTE                          PAGE   03

Page: 2
Docket No: O-02197-08
GF5a

[02]   Refrain from assault, stalking, harassment, aggravated harassment, menacing, reckless endangerment, disorderly conduct, intimidation, criminal mischief, threats or any criminal offense against Diette S Nazario (DOB: ████) and G███ N███ (DOB: ████);

[11]   Permit Jose L Nazario Jr (DOB: ████) to enter the residence at ████████ Rock Hill, NY 12775 during: respondent may enter the residence with police assistance to remove personal belongings not in issue in litigation: personal belongings;

[99]   Observe such other conditions as are necessary to further the purposes of protection: Diette S. Nazario Jose L Nazario Jr (DOB: ████) will agree to foward any mail;

**It is further ordered** that this Order Of Protection shall remain in effect up to and including October 10, 2010;

Dated:      October 10, 2008                      **ENTER**

_____
Honorable Mark M. Meddaugh

The **Family Court Act** provides that presentation of a copy of this order of protection to any police officer or peace officer acting pursuant to his or her special duties shall authorize, and sometimes requires, such officer to arrest a person who is alleged to have violated its terms and to bring him or her before the court to face penalties authorized by law.

**Federal law** requires that this order must be honored and enforced by state and tribal courts, including courts of a state, the District of Columbia, a commonwealth, territory or possession of the United States, if the person against whom the order is sought is an intimate partner of the protected party and has or will be afforded reasonable notice and opportunity to be heard in accordance with state law sufficient to protect that person's rights (18 U.S.C. §§2265, 2266).

It is a **federal offense to:** cross state lines to violate an order of protection; cross state lines to engage in stalking, harassment or domestic violence against an intimate partner or family member; possess, purchase, ship, transfer or receive a handgun, rifle, shotgun, or other firearm or ammunition following a conviction of a domestic violence misdemeanor involving the use or attempted use of physical force or a deadly weapon; or (except for military or law enforcement officers while on duty) possess, purchase, ship, transfer or receive a handgun, rifle, shotgun or other firearm or ammunition while an order of protection, issued after notice and an opportunity to be heard, that protects an intimate partner against assault, harassment, threatening and/or stalking, remains in effect (18 U.S.C. §§922(g)(8), 922(g)(9), 2261, 2261A, 2262).

PURSUANT TO SECTION 1113 OF THE FAMILY COURT ACT, AN APPEAL FROM THIS ORDER MUST BE TAKEN WITHIN 30 DAYS OF RECEIPT OF THE ORDER BY APPELLANT IN COURT, 35 DAYS FROM THE DATE OF MAILING OF THE ORDER TO APPELLANT BY THE CLERK OF COURT, OR 30 DAYS AFTER SERVICE BY A PARTY OR THE LAW GUARDIAN UPON THE APPELLANT, WHICHEVER IS EARLIEST.

511-12

01/03/2005  07:37   8457965821        DIETTE                        PAGE  04

Page: 3
Docket No: O-02197-08
GPSa

**Check Applicable Box(es):**

[X]   Party against whom order was issued was advised in Court of issuance and contents of Order

[X]   Order personally served in Court upon party against whom order was issued

[ ]   Service directed by other means [specify]: _____

[ ]   [Modifications or extensions only]: Order mailed on [specify date and to whom mailed]:_____

[ ]   Warrant issued for party against whom order was issued [specify date]:_____

511-13

Exhibit B
Page 130