**Exhibit C**

Exhibit C
Page 130A

**Original Transcript**

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

JOSE LUIS NAZARIO, JR., an
individual

        Plaintiff(s),

    vs.

CITY OF RIVERSIDE, et al.

        Defendant(s).

No. CV 10-01731 VAP

**VIDEOTAPED DEPOSITION OF**

**MARK FOX**

October 14, 2010
9:30 a.m.

Residence Inn Waukegan
1440 South White Oak Drive
Waukegan, Illinois

JOANNE H. RICHTER, No. 84-2082



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Exhibit C
Page 131

MARK FOX

October 14, 2010

1

IN THE UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOSE LUIS NAZARIO, JR., an )
individual,                    )
                Plaintiff,     )
        vs.                    )   No. CV 10-01731 VAP
CITY OF RIVERSIDE, et al.,     )   (DTBx)
                Defendants.    )

The videotaped deposition of MARK FOX, called by the Defendant for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions, taken before JOANNE H. RICHTER, a Notary Public within and for the County of Cook, State of Illinois, and a Certified Shorthand Reporter of said state, No. 84-2082, at Residence Inn Waukegan, 1440 South White Oak Drive, Waukegan, Illinois, on the 14th day of October, A.D. 2010, at 9:30 a.m.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 132

MARK FOX                                          October 14, 2010

2

1    PRESENT:

2

3         LAW OFFICES OF KEVIN BARRY McDERMOTT

4         (8001 Irvine Center Drive, #1040

5         Irvine, California  92618

6         949.596.0102), by:

7         MR. KEVIN BARRY McDERMOTT

8

9              -and-

10

11        GODES & PREIS LLP

12        (8001 Irvine Center Drive, Suite 1040

13        Irvine, California  92618

14        947.468.0051), by:

15        MR. JOSEPH M. PREIS,

16             appeared on behalf of the Plaintiff;

17

18

19

20

21

22

23

24



Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 133

MARK FOX                                        October 14, 2010

3

1     PRESENT:   (Continued)

2

3         ROTH  CARNEY  KNUDSEN  LLP

4         (3850 Vine Street, Suite 240

5         Riverside, California  92507

6         951.682.6500), by:

7     MR.  RICHARD D.  ROTH,

8

9              -and-

10

11        CITY OF RIVERSIDE

12        (3900 Main Street

13        Riverside, California  92522

14        951.826.5567), by:

15    MR.  JAMES E.  BROWN,

16         appeared on behalf of the Defendant.

17

18  ALSO PRESENT:

19     MR.  SCOTT JOHNSON, Legal Videographer

20     Esquire Solutions.

21

22

23  REPORTED BY:   JOANNE H.  RICHTER,

24              C.S.R. No.  84-2082.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com
Exhibit C
Page 134

4

1          (WHEREUPON, said document was marked

2          Defendant Deposition Exhibit No. 518

3          for identification, as of 10/14/10.)

4     THE VIDEOGRAPHER:  This is Tape No. 1 to the

5   videotape deposition of Mark Fox being taken in the

6   matter of Jose Luis Nazario, Jr., versus City of

7   Riverside, et al., Case No. CV 10-01731 VAP.

8          This deposition is being held at

9   1440 South White Oak Drive, in Waukegan, Illinois.

10   Today's date is October 14th, 2010.  Time is

11   9:30 a.m.

12          My name is Scott Johnson.  I am a

13   videographer.  Court reporter today is Joanne

14   Richter.  Will counsel please state their names for

15   the record.

16     MR. ROTH:  Richard Roth, representing the

17   Defendant City of Riverside.

18     MR. BROWN:  Jeb Brown, Riverside City

19   Attorneys Office, representing City of Riverside.

20     MR. McDERMOTT:  Kevin McDermott on behalf of

21   Mr. Nazario.

22     MR. PREIS:  Joe Preis on behalf of Nazario.

23     THE VIDEOGRAPHER:  Will the court reporter

24   swear in the witness.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 135

MARK FOX                                             October 14, 2010

5

1          (WHEREUPON, the witness was duly

2          sworn.)

3                MARK FOX,

4    called as a witness herein, having been first duly

5    sworn, was examined and testified as follows:

6                EXAMINATION

7    BY MR. ROTH:

8          Q.    Mr. Fox, thank you for joining us here

9    today.  As you heard, my name is Richard Roth and

10   I am one of the attorneys representing the

11   Defendant City of Riverside in this case.

12                Before we started this morning, I asked

13   you to take a look at a document that is entitled

14   "Instruction to Witness Regarding Deposition

15   Procedures," a document that I have marked as

16   Defendant's Exhibit 518 in this case.

17                Did you have an opportunity review the

18   document?

19         A.    Yes, I did.

20         Q.    Do you have any questions regarding the

21   procedures to be followed today in this deposition?

22         A.    No, I don't.

23         Q.    I would ask that if you don't understand

24   one of my questions, or need it clarified, that you



Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com
Exhibit C
Page 136

6

1    let me know.  Is that okay?

2         A.    Yes, sir.

3         Q.    And you will do so?

4         A.    Yes, sir.

5         Q.    If I don't hear from you, may I assume

6    you understand my question and can provide an

7    appropriate response?

8         A.    Yes.

9         Q.    Mr. Fox, you are employed by what

10   agency?

11        A.    The Naval Criminal Investigative

12   Service, NCIS.

13        Q.    Your position?

14        A.    I am a special agent.

15        Q.    How long have you been employed by NCIS?

16        A.    Since 5 April 1982.

17        Q.    What does NCIS do as a government

18   agency?

19        A.    We are responsible for the felony

20   criminal investigative mission and

21   counterintelligence mission for the Department of

22   the Navy.

23        Q.    And with respect to NCIS and your

24   position as a special agent, what are your duties?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 137

MARK FOX                                          October 14, 2010

7

1      A.      To conduct felony criminal
2   investigations.
3      Q.      What sort of training did you receive in
4   conjunction with your position as a special agent
5   with NCIS?
6      A.      I received my basic agent training at
7   the federal law enforcement training center at the
8   onset of my employment and throughout the years,
9   I have attended various courses and seminars in
10  service training.
11     Q.      Were you assigned to conduct an
12  investigation into the activities of Jose Nazario
13  in or about 2006 or 2007?
14     A.      Yes, I was.
15     Q.      How did you come to be assigned to
16  conduct such an investigation?
17     A.      On 16 October 2006, I was notified by my
18  supervisor and, subsequently, my headquarters and
19  instructed to initiate an investigation pursuant to
20  an allegation, or, pursuant to an admission a
21  sergeant or former Marine sergeant named Ryan
22  Weemer had made during the course of a Secret
23  Service pre-employment polygraph examination.
24     Q.      What sort of admission?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 138

MARK FOX                                              October 14, 2010

8

1      A.      Sergeant Weemer stated that he had shot

2   and killed an unarmed --

3      MR. McDERMOTT:   I object as hearsay at this

4   point.

5   BY MR. ROTH:

6      Q.      Continue.

7      A.      -- an unarmed Iraqi male in Fallujah,

8   Iraq.

9      Q.      When did your investigation commence?

10     A.      On 16 October.

11     Q.      What did your investigation consist of?

12     A.      Obtaining the transcript and recording

13  of Sergeant Weemer's interview with Secret Service,

14  followed by my interview of Sergeant Weemer and,

15  subsequently, interviews of his platoon members

16  that he had identified and that subsequent

17  interviewees identified.

18     Q.      At some point, did you -- during this

19  investigation, did you speak to Jose Nazario?

20     A.      Yes, I did.

21     Q.      Do you recall when?

22     A.      My first contact with Mr. Nazario was on

23  10 January 2007.

24     Q.      Did you have more than one such contact



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 139

MARK FOX                                          October 14, 2010

9

1   with Nazario?

2        A.    Yes, I did.

3        Q.    What was the nature of your first

4   contact?

5        A.    I was attempting to interview him.

6   I had contacted a lieutenant from the Riverside

7   Police Department and asked that Officer --

8   at-that-time Officer Nazario contact me, so that

9   I could hopefully interview him later that day.

10       Later in the day, Mr. Nazario contacted

11  me, told me that he would not participate in the

12  interview.

13       On my next contact -- he stated that he

14  would not contact -- would not participate in the

15  interview without legal representation.

16       I later contacted him on 1 March 2007,

17  and asked him if he had obtained representation.

18  He stated he had not.  And that was my last contact

19  with Mr. Nazario.

20       Q.    The two contacts that you had with

21  Mr. Nazario, one on 10 January 2007 and the second

22  contact on 1 March 2007, what was the nature of the

23  contact in terms of telephone, versus in-person?

24       A.    Sorry, both were telephonic.  I am



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 140

MARK FOX                                                      October 14, 2010

10

1    sorry, I neglected to mention a third contact on

2    7 August 2007.

3         Q.    What was the nature of that third

4    contact on 7 August 2007?

5         A.    It was to arrest him.

6         Q.    At some point during your investigation,

7    did a Mr. Jermaine Nelson agree to assist you with

8    your investigation?

9         A.    Yes, he did.

10        Q.    And who was Jermaine Nelson?

11        A.    Jermaine Nelson was a weapons platoon

12   Marine assigned to 3rd Battalion 1st Marine

13   Regiment, who had been assigned -- during the

14   battle of Fallujah had been assigned to Sergeant

15   Nazario's squad.

16        Q.    When did -- describe for me the

17   circumstances under which Jermaine Nelson agreed to

18   assist you with your investigation?

19        MR. McDERMOTT:   Before we step in much

20   further, just running objection as to relevancy as

21   to Jermaine Nelson.   I will let it go at that right

22   now.

23   BY MR. ROTH:

24        Q.    Okay.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 141

MARK FOX                                          October 14, 2010

11

1    A.    Sorry, sir.  Could you repeat the
2  question?
3    Q.    Under what circumstances did
4  Mr. Jermaine Nelson agree to assist you in the
5  investigation, in your investigation?
6    A.    Sergeant Nelson had been identified as
7  having been in the house where the alleged
8  shootings occurred.
9         I interviewed him.  During the course of
10 the interview, I felt that he might implicate
11 himself, so the interview turned into an
12 interrogation after rights advisement.
13        He implicated himself, Sergeant Weemer
14 and Sergeant Nelson --
15    MR. McDERMOTT:  Again, at this point hearsay
16 objections, please.
17 BY MR. ROTH:
18    Q.    Yes.
19    A.    -- and Sergeant Nazario in shooting
20 these four unarmed males.
21        After the interrogation, I asked him if
22 he would assist me in placing some pretext
23 telephone calls to Mr. Nazario, who at that time
24 was an officer with the Riverside Police



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 142

MARK FOX                                                    October 14, 2010

12

1    Department.

2         Q.    Did you make any threats or promises to

3    Sergeant Nelson to -- in an attempt to persuade him

4    to assist you in the investigation?

5         A.    No, I didn't.

6         Q.    I gather, based on your prior testimony,

7    that as an NCIS agent, it was part of your regular

8    duty to conduct this sort of investigation, the

9    type that you were conducting with respect to

10   Mr. Nazario?

11        A.    Yes, sir.

12        Q.    As part of your regular practice of

13   conducting investigations, was it also your regular

14   practice to engage in wire intercepts where

15   appropriate?

16        A.    Where appropriate, yes.

17        Q.    Was it your understanding and belief

18   that in participating in assisting you in the

19   investigation that Nelson's conduct was consensual?

20        A.    Yes, it was.

21        Q.    Now, how did you arrange for these wire

22   intercepts to occur?

23        A.    My interview of Sergeant Nelson was on

24   6 December 2006.  I told him that I would contact



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 143

MARK FOX                                          October 14, 2010

13

1    him later in the month, which I did, and asked if

2    he would be willing to meet with me in early

3    January.

4          As the date got closer, we agreed on

5    meeting on 4 January, 2007 at a supermarket parking

6    lot in close proximity to his home.

7          Q.    What occurred at the supermarket parking

8    lot?

9          A.    On the 4th, I talked to Sergeant Nelson.

10   I instructed him on the telephone call that we were

11   to make, and that when we were able to locate

12   Officer Nazario, that -- at the time, I was told

13   that Officer Nazario was a police officer in

14   Riverside, but the specific department wasn't

15   identified.

16         So that when we were able to reach him,

17   or when Sergeant Nelson was able to reach him, that

18   the conversation would center around the pretext

19   that Sergeant Nelson was interested in getting out

20   of the Marine Corps, going into law enforcement,

21   and was to ask Officer Nazario about what life in

22   law enforcement was like, what the screening

23   procedures or the application procedures entailed,

24   and, specifically, about a polygraph examination.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 144

MARK FOX                                          October 14, 2010

14

1        The idea being that Sergeant Nelson was

2   to ask -- bring up the subject of the shootings of

3   these four individuals in Fallujah in 2004 and ask

4   him, "Who gave us that command?"

5        Q.    When was the wire intercept to occur?

6        A.    Initially, on the 4th, however, I wasn't

7   able to locate which department Officer Nazario

8   worked for.

9             Subsequently on the 5th, I learned that

10  he was an officer with the Riverside Police

11  Department, so that was when Sergeant Nelson

12  initiated his attempts to make contact with

13  Officer Nazario.

14       Q.    Other than speaking to Sergeant Nelson

15  about his role in the wire intercepts, were you

16  required to cover any other preliminary

17  requirements prior to initiating the wire intercept

18  on this particular occasion?

19       A.    Yes.   There was a preprinted form that

20  Sergeant Nelson signed that stated he had consented

21  to participate in the wire intercept.

22             I was also required to seek approval

23  from the Director of NCIS to conduct the intercept.

24       Q.    And did you do so?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 145

MARK FOX

October 14, 2010

15

1     A.     I did.

2     Q.     And did that approval cover all of the

3  intercepts that occurred during your investigation?

4     A.     Yes, it did.

5     Q.     At the time of the intercepts that we

6  will discuss during this deposition, is it your

7  assigned duty, then, to conduct these wire

8  intercepts with Jose Nazario?

9     A.     Yes, it was.

10    Q.     In terms of the physical process of

11 accomplishing the wire intercept, equipment

12 utilized, and so forth, how did that work?

13    A.     I was equipped with an Olympus micro --

14 not micro cassette -- digital recorder, that had a

15 fixture or a microphone that I attached to

16 Sergeant Nelson's cellular telephone, or, actually,

17 a cellular telephone I had purchased prior to the

18 calls, that Sergeant Nelson would make the calls

19 on.

20    Q.     We will be covering several wire

21 intercepts during this deposition, and there were

22 several others conducted during the course of your

23 investigation.

24         Were all of the wire intercepts



ESQUIRE

an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 146

MARK FOX                                        October 14, 2010

16

1   conducted in the same fashion using the cell phone

2   you purchased and the Olympus digital recorder with

3   microphone to record the content of the

4   conversations?

5        A.    Yes, they were.

6        Q.    At the time, specifically, on 5 January

7   2007, did you know Mr. Nazario's telephone number?

8        A.    No, I did not.

9        Q.    Did you know the telephone number for

10  the Riverside Police Department?

11       A.    Yes, I did.

12       Q.    Prior to initiating the first wire

13  intercept, did you test the cellular telephone and

14  digital recording device with respect to its

15  ability to record conversations?

16       A.    I did.  I found that it was functioning.

17       Q.    Did you do so prior to each of the wire

18  intercepts in which you participated?

19       A.    Yes, I did.

20       Q.    During these wire intercepts that we

21  will be talking about, who operated the digital

22  recording equipment?

23       A.    I did.

24       Q.    Had you utilized this sort of digital



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 147

MARK FOX                                                     October 14, 2010

24

1    identify himself during those contacts as Jose

2    Nazario or acknowledge that he was Jose Nazario in

3    response to questions by you?

4         A.    I know that I addressed him by his name.

5    He never said, "This is not Jose Nazario," but I do

6    not recall ever asking him, "Is this Jose Nazario?"

7         Q.    On 7 August 2007, subsequent to this

8    7 January 2007 telephone message, I gather you

9    positively identified the individual as

10   Jose Nazario that you were with on 7 August?

11        A.    Yes, I did.

12        Q.    And based on that contact, you

13   recognized Mr. Nazario's voice on the tape that you

14   just heard?

15        A.    Yes, sir.

16        Q.    Let me play for you another apparent

17   wire intercept received from NCIS by CD.

18        MR. McDERMOTT:   Again, same relevancy

19   objection.

20             (WHEREUPON, the recorded proceedings

21             were played as follows:)

22             "This is Special Agent Mark Fox.

23   Today's date is 8 January 2007.  The time is

24   approximately 12:19.  The following will be a



Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 148

MARK FOX                                        October 14, 2010

25

1   telephone call between Sergeant Jermaine Nelson,

2   United States Marine Corps and former Marine, now

3   police officer, Jose Nazario:

4               "What's up, New York?

5               "Yo, what's the deal, son?

6               "Man, where've you been?

7               "Dog, hanging out, son.

8               "You came back safe in one piece, huh?

9               "Yeah, you know how it is, nigger.

10              "No shit, man.

11              "It was crazy this time, son.

12              "I know, I was watching that shit on the

13   news and, what's his name, Woodrich got fucked up.

14              "What?

15              "Yeah, they got murder charges on his

16   ass, man."

17              "No."

18              (WHEREUPON, the recorded proceedings

19              were stopped.)

20   BY MR. ROTH:

21              Mr. Fox, listening to this tape, can you

22   identify the voices on the tape for purposes of the

23   record and the court reporter?

24        A.    Yes, sir, they are Sergeant Jermaine



Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com
Exhibit C
Page 149

MARK FOX                                                    October 14, 2010

                                                                        26

1    Nelson and Mr. Jose Nazario.

2        Q.     The voice that was just speaking, do you

3    recognize that voice:

4                    (WHEREUPON, the recorded proceedings

5                    were played as follows:)

6             "I was looking at the newspaper, like,

7    last week."

8    BY THE WITNESS:

9        A.     Yes, sir, that's Mr. Nazario.

10       MR. ROTH:   We will continue with the tape.

11                   (WHEREUPON, the recorded proceedings

12                   were played as follows:)

13            "Hell, no, you know they don't let us

14   look at that shit.

15            "Yeah, Woodrich, he was there.  He was

16   my replacement, like, as soon as we came back from

17   OIF2.

18            "Yeah.

19            "Woodrich, he was, like -- remember that

20   white boy who came from the 3rd Platoon, he -- it

21   was, like, him and some other sergeant, some

22   other --

23            "Yeah, yeah, yeah, I remember that,

24   nigger.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 150

MARK FOX                                                    October 14, 2010

27

1          "Yeah, man, what happened was -- what
2     was his name? (INAUDIBLE)  He got shot up and --
3     I can't believe I can't remember this dude's name.
4          "Was it a Spanish guy?
5          "(INAUDIBLE) I don't even -- he got hit
6     with a bomb, like, an IAD or some shit.  So they
7     went in and they fucking started shooting
8     everybody.  That's the shit you are supposed to do,
9     right?
10         "Yeah.
11         "So now they have him on murder charges,
12    son.
13         "Get out of hear, son.
14         "Yeah, man.  So I'm like, yeah, I'm glad
15    I got the fuck out when I did, 'cause that was
16    my -- (INAUDIBLE), you know what I am saying, shit.
17         "Yeah.
18         "Man, we are all fucking -- anybody got
19    fucked up (INAUDIBLE).
20         "No, we all made it back, man.  I mean,
21    you got something like scratches and scrapes, but
22    nothing, dog, nobody died, nobody lose no limbs, no
23    nothing, son.
24         "No shit.  Who are you (INAUDIBLE) --



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 151

MARK FOX                                          October 14, 2010

28

1    you staying -- (INAUDIBLE) right?

2              "I stayed (INAUDIBLE).

3              "All right, cool.  SO all (INAUDIBLE) is

4    PJ.

5              "Yeah.

6              "(INAUDIBLE).  All right.  Yeah, man,

7    all the commanders got, like, replaced or leave or

8    some shit from what I heard.

9              "Yeah.

10             "What they was saying from the

11   newspaper.

12             "Yeah, we had to do another Change of

13   Command Ceremony and shit, man.  They wouldn't tell

14   us what it was for, but we all knew.

15             "Are you still in or what?

16             "Yeah, I'm still -- I went with the MPs

17   now.

18             "You're with the MPs?

19             "Yeah.

20             "All right.  (INAUDIBLE) a bunch of them

21   motherfuckers got in trouble.  It ain't just him.

22   It's, like, like, three of them facing murder

23   charges.

24             "Damn, son.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 152

MARK FOX                                                    October 14, 2010

29

1          "Yeah.

2          (INAUDIBLE) -- get out here?

3          "(INAUDIBLE) took a whole bunch of shit

4   happened.   Let me see.   I got a kid.

5          "Congratulations.

6          "He's turning 1 years old ███████████.

7          "What?

8          "Finally, man, got me a little son.

9          "That's (INAUDIBLE).

10         "I got that.   I'm working out here in

11  Riverside RPD making bank, man.   I'm making, like,

12  in overtime, like, 75 Gs, 80 Gs a year.

13         "What?   On the force?

14         "Yeah.

15         "Damn, that's a lot of money, son.

16         "I'm making bank, man.   I just bought me

17  a new Chrysler 300.   I put rims on that bitch.

18         "(INAUDIBLE) Chrysler 300.   (INAUDIBLE)

19  over here living it up, man.

20         "I am making bank.

21         "I should have got out (INAUDIBLE).

22         "It's all good, man.

23         "So how do you like the force, nigger?

24         "Fucking easy, man.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C

MARK FOX                                    October 14, 2010

30

1       "Is it like Cops, are you fucking on
2    foot patrols, and fucking chasing (INAUDIBLE) and
3    shit?
4           "Yeah, dog, you ride around in your car,
5    right?
6           "Yeah.
7           "And (INAUDIBLE) respond to calls coming
8    from your computer from different calls, like, you
9    know, motherfuckers fighting in their house, you
10   coming in there and fucking separate them, and if
11   you got to beat somebody's ass 'cause they're
12   drunk, you beat somebody's ass --
13          "You take anybody down yet, son?
14          "Fuck, yeah, dog, we're (UNAUDIBLE),
15   man.  We don't roll to calls by ourselves.  So,
16   like, if I hear my boys going up to -- you know,
17   some dude beat up his wife.
18          "Yeah.
19          "I am listening to it on the radio, too,
20   I'm going to show up, like, three other guys are
21   going to show up, we go into somebody's house,
22   like, five, six, seven deep and beat the shit out
23   of this motherfucker and find a reason to take him
24   to jail.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 154

MARK FOX                                        October 14, 2010

31

1       "That's good as shit, nigger.  How did

2  you -- I thought you was going to go back to New

3  York and do that.  How did you get hooked up with

4  that?

5       "Yeah, this is my little secret, Homey.

6  I'm still going to go back to New York.  I am just

7  putting in some work over here until, like, the job

8  is ready for me out there.

9       "Oh, so you're just -- you're just

10  putting in time until it is time to go back to

11  New York.  That's smart.

12       "Yeah, 'cause I don't -- like I don't

13  take my transfer until March.

14       "Yeah.

15       "That's for New York.  But not the city,

16  the state.  I already bought me a house out there,

17  too.

18       "Damn, nigger.  How did you get put up

19  there, like, who fucking moved you up?  How did you

20  hear about that shit?

21       "You just look it up on the -- where the

22  fuck did I find it?  (INAUDIBLE) they had Riverside

23  police, Oceanside police, fucking Sheriff's

24  department, everywhere, and I just went on the web



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 155

MARK FOX                                          October 14, 2010

32

1   site.  I was like, yeah, where do I want to work?

2   And I was like, okay, (INAUDIBLE) pays the most

3   money.

4           "Okay.

5           "And so I just went there.  They do a

6   background check on you.

7           "They do a background check?

8           "Yeah, you say you're from the military,

9   they, like, okay, at least we know this dude ain't,

10  you know, (INAUDIBLE) like that for, like, the past

11  eight years.  He got military experience, he passed

12  boot camp, so police academy is going to

13  (INAUDIBLE) --

14          "So, what else did you have -- did you

15  have to take like fucking math tests and all that

16  shit?

17          "Oh, fuck, no, man.

18          "You didn't?

19          "Hell, no.  You take this test -- one

20  test and just to make -- basically to make sure you

21  can read.

22          "Yeah.

23          "(INAUDIBLE) like --

24          "Just like the kids games we do.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 156

MARK FOX                                          October 14, 2010

33

1       "Yeah, exactly like that.  You turn the

2   page when they say turn, and there's like a robbery

3   in progress.  They got the big old picture.  They

4   want to see how many shit you memorize, like, how

5   many guys are in the bank, how many of them got

6   automatic weapons, how many of them got pistols,

7   how many of them are black, how many of them are

8   white, how many kids are there, how many getaway

9   cars are outside.  Look at the clock on the wall,

10  what time is it, shit like that.

11      "(INAUDIBLE) shit.  I was looking on the

12  internet -- I was looking on for some of them, but

13  there was, like, you have to take math tests and

14  all this other shit.  And then they were talking

15  about taking, like, polygraph tests, nigger, and

16  I got like -- I don't know (INAUDIBLE) polygraphs

17  test be.  Did you have to take one?

18      "Hold on a second, dog.

19      "(INAUDIBLE) I don't know, man.

20  Somebody -- I am talking to somebody else.

21  (INAUDIBLE)  I got my boy from New York on the

22  line, man.  Bye. (INAUDIBLE)

23      "Yeah, you take your written test, and

24  then you take the little physical test.  You got to



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 157

MARK FOX                                      October 14, 2010

34

1    run like a mile and half.

2              "What?

3              "And that's it, mile and half, dog.

4              "You didn't have to do no polygraphs

5    test, son?  Because I was reading about that.

6              "Yeah, you do a polygraph test,

7    (INAUDIBLE) shit like that, but --

8              "Dog, I (INAUDIBLE) I don't know about

9    that polygraph test, though, son.

10             "I could -- you don't know how to lie

11   through a polygraph?

12             "No, nigger.  All right.  All right.

13   What if we go to the polygraph test, right?

14             "Oh, you (INAUDIBLE), dog, I got to

15   school you.  I got to tell you how to pass that

16   shit.

17             "Yeah.  If these (INAUDIBLE) was, like,

18   all right, what's the worst thing you ever done,

19   you know what I am saying?  What if they ask me if

20   I ever killed somebody, nigger?  What do I say?

21             "I told them, yeah, I killed (INAUDIBLE)

22   people in Iraq.  They don't care.

23             "Yeah?"

24             "Yeah.  That's combat.  That's not



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 158

MARK FOX

1    murder, man.  That's combat.  They understand that

2    shit.

3            "What if they ask if I ever done, like,

4    fucking anything, like, real illegal, nigger?

5            "Like, what, like, stealing cars and

6    shit?

7            "Yeah, you know how we used to do.

8            "Yeah, you just admit to it.

9            "You just fucking -- Tony said that they

10   were going to fucking -- they gave him a polygraph

11   test and they was asking all sorts of shit, nigger,

12   like, he ever fucking shoot anybody or fucking did

13   any other shit, man, and I was just fucking

14   thinking, dog.

15           "Yeah, 'cause like -- this is how the

16   polygraph test works.  First, it's a written test.

17   All right?

18           "Yeah.

19           "All the questions they're going to ask

20   you, they're going to write it down first, and

21   they're going to want you to write down your

22   answer.  And this is before they put, like, that

23   shit on you.

24           So they'll ask you something, like, have



Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 159

36

1  you ever committed a felony since the age of 18.

2  All right?  I write down -- I write down, no, on

3  the paper.  And then they ask me something, like,

4  have I -- how many times have I smoked weed when

5  I was a minor, or whatever.  You know, I put down,

6  like, 50 times, and I write that shit.

7            "Yo, this is my main concern, nigger.

8  This can't go anywhere between me and you.  All

9  right?

10            "Yeah.

11            "What if they ask if you ever murdered

12  somebody, nigger?

13            "If you murdered somebody?  Just be,

14  like, yeah, I was in combat.  And they waive all

15  that shit.  Cause, like, a lot of the shit that

16  they put on that polygraph --

17            "Yeah.

18            " -- you did a lot of that shit in

19  combat.  Like, they ask you, have you ever stole

20  somebody's car.  And I was, like, yeah, dog, we

21  fucking stole cars all the time in Iraq.  They was,

22  like, okay, fucking -- and they move onto the next

23  shit.

24            "So that murder shit, that's probably --



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 160

MARK FOX                                              October 14, 2010

37

1    they ain't going to ask me anything like that

2    nigger, you're sure?

3              "Well, no, they're going to ask you have

4    you ever freaking killed somebody.

5              "Yeah.

6              "I was, yeah, I killed a lot of people.

7              "But that's what I am saying.  Okay.

8    Remember that, remember that, you remember that

9    time, nigger?  Remember that time?

10             "Yeah, man, yeah, I (INAUDIBLE).

11             "(INAUDIBLE) those four niggers?

12             "Yeah, I told them.

13             "That's not murder, though, is it?

14   I mean, we had the right orders, didn't we?

15             "Yeah.

16             "Who gave us the orders, though, nigger?

17             "I did.

18             "You did?

19             "Yeah.

20             "So it was a legit order? (INAUDIBLE) so

21   it's not even lying.  It's combat.

22             "Yeah, you don't got to explain.  All

23   you got to say is it's combat related.  Yeah,

24   I broke down doors, it was combat related.  Yeah,


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 161

MARK FOX                                                    October 14, 2010

38

1   I broke into people's houses, it was combat
2   related.
3              "Yeah.
4              "Did I kill people -- they don't ask you
5   details.  They're, like, oh, it's combat.  Yeah,
6   they don't ask you details.
7              "All right.  If they -- if they say that
8   shit and they're, like, fucking, who gave you the
9   order?  I ain't going to say your name.  Who gave
10  you the order?
11             "The shit came from my fucking
12  lieutenant.
13             "Lieutenant.  Okay.  What was his --
14  Grapes?
15             "Yeah, but they're not going -- yeah,
16  they're not going to ask names.  Not even Grapes,
17  man.  That shit is coming from the (INAUDIBLE)
18  commanders.  We got to get from point A to point B,
19  and we ain't got time to throw motherfuckers off
20  the truck 'cause we moving.
21             "Okay.  So, but if anything, I can
22  fucking just be, like, yeah, it was combat, and
23  that's it.  They ain't going to even ask no more
24  questions?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 162

MARK FOX                                          October 14, 2010

39

1          "That's, that's it, they don't get in to

2     it.

3          "I hope they don't bring that shit up,

4     nigger.

5          "They're not, man.  I was nervous about

6     it, too.  I was like, yo, am I going to have to

7     give details?  But they don't -- they want to know

8     shit that's illegal.

9          "Okay.

10          "What we did, what we did wasn't

11     illegal.

12          "Yeah.

13          "It was, you know, a decision we made

14     because it was the outcome that's the best.  So it

15     was -- it was a decision.  You can't play Monday

16     morning quarterback, bro.

17          "Nigger, let me tell -- thank you for

18     fucking talking to me, nigger, 'cause I -- that's

19     the only thing I was scared of.

20          "Yeah.

21          "So now, if I come up to that Riverside

22     joint, hey, is there any way, like -- if I say,

23     hey, you know, I got up there and take the test and

24     be like, hey, my man Nazario hit me up, do they



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 163

MARK FOX                                              October 14, 2010

40

1   give you, like, a bonus, nigger?  'Cause if so,
2   nigger, we can do this.
3               "Yeah.
4               "Because I get off in about six months,
5   though, nigger.  You know what I'm saying?  I'm
6   trying to make this shit come true.
7               "Take your test now --
8               "Yeah.
9               "And they ask you, do you have any
10  friends or anybody --
11              "I can put you down?
12              "(INAUDIBLE) Yeah, put me down, bro.
13  Let's see, what else?  After you take the polygraph
14  and the physical, you're going to go to the
15  academy.  You got two different academies.
16              "Oh, there's two different academies?
17              "Yeah, there's -- well, you're going to
18  go to one of the two 'cause there's two different
19  places, and wherever they got room for you.  It is,
20  like, six months, but you go home every day.  You
21  go home every night.
22              "Okay.
23              "You still get your holidays and shit
24  off.  One is in Van Buren, in Riverside.



Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 164

MARK FOX                                                      October 14, 2010

41

1          "Yeah.

2          "And the other one is San Bernardino

3    County.  I don't know where the fuck that is.

4          "(INAUDIBLE) that's far.  Riverside is

5    good.  Do you know the area around there?  Do they

6    give you maps, or how do you know if they -- let's

7    say, they have a domestic disturbance, nigger.  I

8    don't know anything about Riverside, son, so do

9    they --

10         "(INAUDIBLE) I got (INAUDIBLE) and like

11   two other motherfuckers from New York that are

12   there, and we all had hard times learning the

13   streets.  You have navigation in your car.

14         "But they're patient with you, though,

15   right?  You know what I mean?

16         "Yeah, yeah.

17         "It ain't, like, fucking, you know how

18   they do in the Marines, they ain't fucking --

19         "(INAUDIBLE) I still don't know -- I

20   don't know the whole city out here.  That's why

21   I use my navigation in the car.  You have, like,

22   this map book for navigation.

23         "Okay.

24         "So we got this electronic -- everybody



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 165

MARK FOX                                                    October 14, 2010

42

1   gets to have a computer in their car and, you know,

2   that's what gets me from point A to point B.

3              "I am mad jealous right now, son. How

4   come you ain't tell me you was planning to do that?

5   We could have made moves together, son.

6              "Well, shit, I didn't -- I don't want to

7   bring nobody with me 'cause I didn't know if it was

8   good idea or not.

9              "Nigger, it's better than what the fuck

10  we're doing now, son.

11             "Yeah, but back then when I was, like,

12  taking my polygraph, I was, like, what the fuck am

13  I getting into, man. I don't know shit about

14  Riverside. I was, like, okay, let me get in, and

15  if it's good, I'll keep my foot in the door if

16  somebody else want to come through. (INAUDIBLE)

17  I'm telling, you're going to be making mad money.

18  I mean, mad money.

19             "(INAUDIBLE) make loot, nigger.

20  (INAUDIBLE).

21             "You're going to be making loot, and you

22  are going to be fucking doing fun shit, man. Doing

23  fun shit. You can fuck around with people, too.

24  You talk to them all you want, like, like,



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 166

MARK FOX                                                    October 14, 2010

43

1    (INAUDIBLE) you're just driving around.  You don't
2    have a quota to meet.  You don't got to -- you
3    don't got to do shit.  You don't got to give
4    somebody a ticket if you pull them over.
5             "Oh, you don't?
6             "No.
7             "You don't got to make no quota?  So
8    you're just -- you're basically patrolling, but in
9    a safe area, then?
10             "Yeah.  That's all we do.  We're
11   patrolling and then we got, like, let me see, like,
12   two bad neighborhoods in Riverside.  And when I say
13   bad neighborhood, it's bad for California.  It
14   ain't bad for, like (INAUDIBLE) --
15             "(INAUDIBLE) back in Brooklyn and shit.
16             "Yeah.  I was, like, okay, you got this
17   one street out here, (INAUDIBLE) Street, where you
18   got some people drinking beers outside and, you
19   know, you got some (INAUDIBLE) and shit out there,
20   (INAUDIBLE) dope and shit.  I was, like, okay,
21   everybody's scared of this block.  I was, like,
22   this (INAUDIBLE) ain't shit, man?  I was born --
23   I was born living in this shit.
24             "Hell, yeah, tell them niggers to go



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 167

MARK FOX                                    October 14, 2010

44

1    (INAUDIBLE) and see how they like that shit.

2              "Yeah, and then like Casablanca, that's,

3    like, a Spanish neighborhood.  They shot down,

4    like, a police helicopter, like, a few years back

5    or something, so they're still scared of this

6    place.  Like (INAUDIBLE) automatic weapons and

7    shit.  I'm like, yo, fucking, that's what I am used

8    to, man.  That's how it is.

9              "Hold on.

10             "What?  What?  Go back on the gate, son.

11   These nigger's is -- somebody's fucking -- they

12   don't know how to write tickets and shit.  I got to

13   go back to work, nigger.  Hey, what time do you got

14   to go to work so I can call you?

15             "I work swing shifts.  I work from

16   3 o'clock in the afternoon to 1 o'clock in the

17   morning.  I only work four days a week.  We always

18   get three-day weekends.

19             "So if I call you, like, this time

20   tomorrow, you'll be good?

21             "Yeah, I'll be good.

22             "All right, my nigger.  Yo, thanks for

23   the fucking -- you are a lifesaver, son.

24             "Yeah, man, I'll look out for you, man.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 168

MARK FOX                                                    October 14, 2010

45

1    Give me a call.
2           "No doubt, my nigger.
3           "What I want you to do, like, take a --
4    do a ride along.  Do you know what a ride along is?
5           "Yeah, yeah, a ride along.
6           "Yeah, just -- go to one of the stations
7    and, like, yeah, I want to fucking ride.  Come to
8    my station, man.  Just tell them you want to ride
9    with me.  We'll fucking cruise, throw some
10   motherfuckers in jail and shit.
11          "All right, my nigger.  Yo, don't forget
12   about me, son.
13          "Oh, no, I got your number.
14          "All right, my nigger.
15          "All right.  Call me.
16          "All right."
17          (WHEREUPON, the recorded proceedings
18          were stopped.)
19   BY MR. ROTH.
20     Q.     Mr. Fox, do you recognize the tape
21   recording that we just listened to?
22     A.     Yes, I do.
23     Q.     What is it?
24     A.     It is a recording of the call between


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 169

MARK FOX                                          October 14, 2010

46

1    Sergeant Jermaine Nelson and Officer Jose Nazario

2    on 8 January 2007.

3         Q.    Describe the circumstances under which

4    this particular call was made and recorded.

5         A.    After Officer Nazario had called the

6    undercover phone the day before, left the message

7    with his telephone number.

8              I had Sergeant Nelson call

9    Officer Nazario back and I recorded the call.

10        Q.    Where were you at the time?

11        A.    I was sitting in the vehicle next to

12   Sergeant Nelson.

13        Q.    And do you recall where the vehicle was

14   located at the time?

15        A.    Yes.   It was a fast food stop.   I want

16   to say maybe a Hardee's restaurant off of the I-5,

17   north of -- I am not sure if it was Los Polgus

18   Gate, Camp Pendleton.   Whatever the northernmost

19   gate is, Basilone Gate, perhaps.

20        Q.    What phone was used to make the

21   telephone call that we have just listened to?

22        A.    The undercover cell phone that I had

23   purchased.

24        Q.    And how was the call recorded?



Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Exhibit C
Page 170

47

1       A.      On the same Olympus digital recorder.

2       Q.      And who actually operated the recorder?

3       A.      I did.

4       Q.      On the tape that we just listened to,

5  that you have identified as 8 January 2007 wire

6  intercept, did you recognize Sergeant Nelson's

7  voice?

8       A.      Yes, I did.

9       Q.      Were you able to recognize whether or

10 not Mr. Nazario was participating in the telephone

11 conversation?  Did you recognize Nazario's voice?

12      A.      I recognized it as the same voice that

13 had left the message, who had identified himself as

14 Nazario.  And later, during my personal contact

15 with him, came to recognize it.

16      Q.      As you sit here today, based on the

17 contact that you had with Mr. Nazario that you have

18 previously testified to today, are you able to

19 indicate whether or not Mr. Nazario's voice was

20 depicted on the recording we just listened to?

21      A.      Yes, it was.

22      Q.      And are you able to recognize

23 Mr. Nazario's voice?

24      A.      Yes, sir.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 171

MARK FOX                                        October 14, 2010

48

1      Q.      Listening to the tape recording that you

2   have just done, was Sergeant Nelson's voice

3   depicted on the tape as you recall hearing it as

4   you sat in the car in the parking lot?

5      A.      Yes, it was.

6      Q.      After you made the recording of this

7   particular wire intercept on 8 January 2007, as you

8   indicated that you did, did you listen to the tape

9   recording that you made?

10     A.      Yes, I did.

11     Q.      Did it appear to be an accurate and

12   correct rendition of the telephone contact between

13   Nelson and Nazario?

14     A.      Yes, it was.

15     Q.      With respect to the other two tape

16   recording wire intercepts that you have reviewed

17   and testified to today, did you also listen to

18   those recordings?

19     A.      Yes, I did.

20     Q.      And did they appear to be accurate and

21   correct, as well?

22     A.      Yes, they were.

23     Q.      What action did you take to safeguard

24   the tapes of the wire intercepts on 5 January,



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 172

MARK FOX                                          October 14, 2010

49

1   7 January and 8 January 2007, if any?

2        A.    I downloaded the recorded files to

3   CD-ROMs, which I entered into the NCIS Camp

4   Pendleton evidence system.

5        Q.    Did you make any changes, additions, or

6   deletions to the tape recordings?

7        A.    No.

8        Q.    Any of them?

9        A.    No.

10       Q.    To your knowledge, how has that -- how

11  have those tape recordings been maintained?

12       A.    They were maintained in the Camp

13  Pendleton -- NCIS Camp Pendleton evidence vault,

14  until removed sometime within the last -- I am not

15  certain when they were removed.  It was, I imagine,

16  in 2010, sometime this year.

17       Q.    And upon removal, do you know what

18  happened to the recordings?

19       A.    Yes, they were just recently forwarded

20  to me -- actually, forwarded to the NCIS office at

21  Pensacola, where I was previously assigned, and

22  subsequently forwarded to me at my current duty

23  station in Great Lakes, Illinois.

24       Q.    At some point, did you have a transcript



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 173

50

1    of the tape recorded wire intercepts, the three

2    that you have testified to, made?

3         A.    Yes, I did.

4         Q.    And when did you have the transcripts

5    made?

6         A.    I don't recall exactly when.  The -- in

7    addition to the downloaded recorded conversations

8    that were put onto the CD-ROM and entered into

9    evidence, I also made a working copy.

10              That working copy, I forwarded to my

11   headquarters in Washington, D.C., and they

12   contracted a stenographic agency,

13   I believe, in Baltimore, to perform the

14   transcriptions.

15        Q.    And by "working copy," you are talking

16   about a working copy of the CD containing the

17   recorded wire intercepts?

18        A.    Yes, sir.

19        Q.    Did you subsequently receive written

20   transcripts from headquarters NCIS?

21        A.    I did.

22        Q.    At any time, did you compare the written

23   transcripts received from NCIS headquarters to the

24   actual recorded wire intercepts of 5 January,



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 174

MARK FOX                                                    October 14, 2010

51

1   7 January and 8 January 2007?

2        A.    Yes, I did.

3        Q.    When you compared the written

4   transcripts to the actual recorded wire intercepts,

5   did they generally appear to be accurate, the

6   transcripts?

7        A.    There were some typographical errors on

8   the transcripts.  The review was actually conducted

9   by myself, Assistant U.S. Attorneys Jerry Behnke,

10  B-e-h-n-k-e, and Charles Kovats, K-o-v-a-t-s.

11       Those changes, the errors that were

12  found, were entered into -- or, the transcript was

13  modified to include those changes.

14       MR. ROTH:  We will, for purposes of the

15  deposition, we will make the NCIS CD Defendant's

16  Exhibit 519.

17                      (WHEREUPON, said document was marked

18                      Defendant Deposition Exhibit No. 519

19                      for identification, as of 10/14/10.)

20                      (WHEREUPON, a document was marked

21                      Defendant Deposition Exhibit No. 520

22                      for identification, as of 10/14/10.)

23  BY MR. ROTH:

24       Q.    Let me show you Defendant's Exhibit 520



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 175

52

1   and ask you to take a look at it.

2        MR. McDERMOTT:  Again, same running objections

3   as to relevancy.

4        MR. ROTH:  Of course.

5        MR. PREIS:  Is 519 all three recordings?

6   I was going to simply --

7        MR. ROTH:  Yes, it is one CD.  It may contain

8   other wire intercepts on it, but the three that we

9   played -- It doesn't?  Okay.

10       MR. PREIS:  Okay.  Thanks.

11       MR. BROWN:  Just for clarification,

12  Defendant's Exhibit 519 is also Bates stamped as

13  City 0015002.

14       MR. PREIS:  That CD has been produced to us

15  with just those recordings on it?

16       MR. BROWN:  No.

17       MR. PREIS:  The whole thing?

18       MR. BROWN:  The whole thing, but on the CD

19  that you have, it is numbered with that -- those

20  three recordings are designated 15002 A, B and C,

21  to try to keep all of this together.

22       MR. CAMPBELL:  Are you asking Special Agent

23  Fox to look over the entire transcript and verify

24  it, or simply whether he recognizes it?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 176

MARK FOX                                        October 14, 2010

53

1        MR. ROTH:   Just whether he recognizes the

2   document.

3   BY THE WITNESS:

4        A.    Yes, I do.

5   BY MR. ROTH:

6        Q.    What is it, Mr. Fox?

7        A.    It is a transcript of the 5 January 2007

8   call by Sergeant Nelson to the Riverside Police

9   Department, the recording he left, the 7 January

10  message left by Mr. Nazario on the undercover

11  cellular telephone that I recorded, the 8 January

12  telephone call between Sergeant Nelson and

13  Mr. Nazario.

14       Q.    That you have also listened to today?

15       A.    Yes, sir.

16       Q.    Now, the document appears to contain

17  transcripts of other wire intercepts.

18       A.    Yes, sir.

19       Q.    Were these the transcripts that you

20  indicated you received from NCIS headquarters after

21  sending a copy of the CD with the recorded wire

22  intercepts to headquarters?

23       A.    Yes.

24       Q.    With respect to the other transcripts of



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 177

MARK FOX                                          October 14, 2010

54

1    wire intercepts, these were other wire intercepts

2    that were conducted during your investigation of

3    Mr. Nazario?

4         A.     That's correct.

5         Q.     Did you participate in any of the other

6    wire intercepts?

7         A.     Yes, I did.

8         Q.     Which ones, do you recall, looking at

9    the transcripts?

10        A.     Sorry, the transcripts in --

11        Q.     In Exhibit 520.

12        A.     Yes, I participated in a call from

13   Sergeant Nelson to Mr. Nazario on 10 January 2007.

14        Q.     Any others?

15        A.     I believe that was the last one, but let

16   me look through these documents.

17               There were no other calls that I made.

18        Q.     The other wire intercepts were conducted

19   by whom?

20        MR. McDERMOTT:   Objection, speculation and

21   hearsay.

22   BY MR. ROTH:

23        Q.     Do you know who participated in other

24   wire intercepts?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 178

MARK FOX                                    October 14, 2010

55

1        A.      Special Agent Amy Balle.   Special Agent

2    Amy Balle and Special Agent Zimmerman on one of the

3    telephone calls.

4        MR. ROTH:   How do I spell "Balle"?   I assume

5    it is in the transcript.   I can find that.

6        THE WITNESS:   Yes, sir.   It was an unusual

7    spelling.   I want to say B-a-l-l-e.

8        MR. ROTH:   Thank you.

9    BY THE WITNESS:

10       A.      And Sergeant Nelson himself.

11   BY MR. ROTH:

12       Q.      At the time of these wire intercepts and

13   this investigation, were you required by statute or

14   naval regulation to prepare and maintain a report

15   of investigation which included these recorded wire

16   intercepts?

17       A.      Yes, I was.

18       Q.      And did you do so?

19       A.      I did.

20       Q.      And with respect to the completed report

21   of investigation, how was that maintained?

22       A.      The completed report of investigation is

23   maintained at my headquarters.

24       Q.      So you did the report and then you



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 179

56

1    forwarded up the chain to headquarters NCIS in

2    Washington, D.C.?

3          A.    Yes, sir.

4          Q.    And is it your understanding that

5    headquarters NCIS currently maintains your report

6    of investigation with the recorded wire intercept

7    data?

8          A.    Yes, they do.

9          Q.    After the wire intercepts that you have

10   just testified to, did your investigation continue?

11         A.    Yes, it did.

12         Q.    What did it consist of, generally?

13         A.    Attempts to collect evidence relative to

14   the activities of 9 November 2004 in Fallujah,

15   Iraq.

16         Q.    Did you have contact with

17   representatives of the City of Riverside Police

18   Department during the course of your investigation?

19         A.    Yes, I did.

20         Q.    What was the nature of those contacts?

21         A.    To notify them of the initiation of my

22   investigation, to obtain information from them

23   relative to Mr. Nazario's work schedule, to inform

24   them of the status of the investigation and the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 180

MARK FOX                                              October 14, 2010

57

1    intentions or -- the intentions of the U.S.

2    Attorneys Office and me in connection with contacts

3    with Mr. Nazario and, ultimately, to arrest

4    Officer Nazario.

5         Q.     At any time prior to the arrest of

6    Mr. Nazario, did you provide representatives of the

7    Riverside Police Department with the tape recorded

8    wire intercepts?

9         A.     No, I did not.

10        Q.     At any time prior to the arrest of

11   Mr. Nazario, did you provide representatives of the

12   City of Riverside Police Department with all or any

13   portion of your report of investigation?

14        A.     One exhibit, which was the complaint,

15   the arrest warrant, that I had filed in district

16   court, I provided on 6 August 2007.

17        Q.     So immediately prior to the actual

18   arrest of Mr. Nazario?

19        A.     Yes, sir.

20        Q.     Other than that document, did you

21   provide any other documents associated with your

22   investigation into the activities of Mr. Jose

23   Nazario to representatives of the City of Riverside

24   Police Department prior to the arrest of



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 181

1    Mr. Nazario on 7 August 2007?

2         A.    No, I didn't.

3         Q.    Now, you mentioned earlier during your

4    deposition this morning that you had contact with a

5    lieutenant from the City of Riverside Police

6    Department.

7               Do you recall the lieutenant's name?

8         A.    Yes, sir, it was Lieutenant Blevins,

9    B-l-e-v-i-n-s.

10        Q.    He was your initial contact?

11        A.    No, sir.  My initial contact was -- was

12   identified to me as a chief, but I, actually,

13   believe he was a deputy chief.

14              I don't recall the gentleman's name,

15   although it was a Hispanic last name.

16        Q.    And did the gentleman with the Hispanic

17   last name simply refer you to Lieutenant Blevins?

18        A.    Yes, sir, he did.

19        Q.    And, I guess, it was -- I gather, it was

20   to Lieutenant Blevins that you provided the

21   notification of your investigation of Mr. Nazario?

22        A.    Both to Deputy Chief and Lieutenant

23   Blevins.

24        Q.    You indicate that you obtained



Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Exhibit C
Page 182

MARK FOX                                        October 14, 2010

59

1    information regarding Mr. Nazario's work schedule.

2              From whom did you obtain that

3    information, if you recall?

4         A.    Lieutenant Blevins.

5         Q.    You indicate that you informed them of

6    the status of the investigation.

7              What, specifically, did you tell

8    representatives of the Riverside Police Department

9    regarding your investigation, if you recall?

10        A.    I remember conversations with Lieutenant

11   Blevins.  The Assistant U.S. Attorneys handling the

12   prosecution wanted me to speak with Mr. Nazario,

13   ask him to retain legal counsel, and to arrange a

14   meeting with him and his legal counsel and them.

15             I contacted -- I repeatedly attempted to

16   contact Mr. Nazario on his cell -- telephone, left

17   messages, which he didn't return, and at one point

18   contacted Lieutenant Blevins to find out if his

19   telephone number had changed.

20        Q.    What did Lieutenant Blevins say?

21        MR. McDERMOTT:   Objection, hearsay.

22   BY THE WITNESS:

23        A.    I believe, after he conducted his

24   inquiries, he told me that it was the same



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 183

MARK FOX                                    October 14, 2010

60

1    telephone number, which I had.

2    BY MR. ROTH:

3        Q.     You indicate that you had contact with

4    representatives of the City of Riverside Police

5    Department to discuss the intentions of the U.S.

6    Attorneys Office and you with respect to Nazario.

7            Do you recall when those contacts

8    occurred?

9        A.     Yes, sir, and also if I could digress.

10   The one other individual I just recall having

11   conversations with was Sergeant Dan Taulli,

12   T-a-o-u-l-e, I believe, who was Lieutenant Blevins'

13   Second in Command.

14       Q.     That was within the Internal Affairs

15   Department of the Riverside Police Department?

16       A.     Yes, sir.  I am sorry, could you restate

17   your other question?

18       Q.     With respect to contact that you had

19   with City of Riverside Police Department

20   representatives regarding the intentions of the

21   U.S. Attorneys Office and you with respect to

22   Nazario, did these contacts occur in or about

23   July of 2007?

24       A.     They did.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 184

MARK FOX                                    October 14, 2010

61

Q.     Was there some telephonic briefing by representatives of the U.S. Attorneys Office to representatives of the Riverside Police Department regarding your investigation?

A.     I don't know.

Q.     Did you participate in any telephone conference with an Assistant U.S. Attorney by the name of Tom O'Brien and representatives of the Riverside Police Department?

A.     I recall a telephone conversation between -- a conference call between Mr. O'Brien, Mr. Behnke, Mr. Kovats and myself.

I don't know who else may have been present.

Q.     At some point in time, did you inform representatives of the Riverside Police Department that it was your intent to arrest Mr. Nazario?

A.     Yes, I did.

Q.     Do you recall when that occurred?

A.     Yes, it was late July 2007.  I believe sometime after 25 July.

Q.     Do you recall who you spoke to?

A.     Lieutenant Blevins.

Q.     During your conversation with Lieutenant



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 185

MARK FOX                                    October 14, 2010

62

1    Blevins, did you discuss the procedure for

2    affecting Nazario's arrest?

3         A.    Yes.

4         Q.    What did you tell Lieutenant Blevins?

5         A.    I told the lieutenant that we would like

6    to make the arrest at a time when Officer Nazario

7    was unarmed, preferably, in a controlled

8    environment.  I didn't want to approach him at his

9    home, out on the street.

10             We discussed it, collaborated that the

11   Riverside Police Department would probably be the

12   safest location to make the arrest.

13        Q.    Did you make arrangements at that time

14   to meet Mr. Nazario at the Riverside Police

15   Department to make your arrest?

16        A.    Yes, I did.

17        Q.    When was that arrest to occur?

18        A.    The morning of 7 January, 2007 -- sorry,

19   7 August 2007.

20             (WHEREUPON, a document was marked

21             Defendant Deposition Exhibit No. 521

22             for identification, as of 10/14/10.)

23   BY MR. ROTH:

24        Q.    I will show you a document, which I have



Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 186

MARK FOX                                                    October 14, 2010

63

1    marked as Defendant's Exhibit 521.

2        MR. McDERMOTT:   Same continuing objection as

3    to relevancy.

4        MR. ROTH:   Certainly.

5    BY MR. ROTH:

6        Q.    Do you recognize Exhibit 521, Mr. Fox?

7        A.    Yes, I do.

8        Q.    What is it?

9        A.    It is the complaint that I filed in

10   Central District Court, State of California, for

11   the arrest of Mr. Nazario.

12       Q.    I see a date of August 6, 2007 appearing

13   on this particular document.

14             Do you recall that as being the date in

15   which you swore out the complaint against

16   Mr. Nazario?

17       A.    Yes, it is.

18       Q.    What happened on August 7, 2007, with

19   respect to your arrest of Mr. Nazario?

20       A.    I executed the warrant at the Riverside

21   Police Department.

22       Q.    Do you recall how that transpired on

23   August 7?

24       A.    Yes.   Myself and two other NCIS agents



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 187

MARK FOX                                          October 14, 2010

64

1    from our Camp Pendleton office arrived at the

2    Riverside Police Department, I believe, at

3    about 0530.

4            We met with Sergeant Taulli, I believe

5    Lieutenant Blevins, and two or three other officers

6    who I believed were also Internal Affairs.

7            We were taken to a conference room,

8    which was off of a large squad bay, and asked to

9    wait there.  We were told that Officer Nazario

10   would be brought to us, which he was.

11           When he arrived, he was unarmed, still

12   in uniform.  I advised him that he was under

13   arrest.

14           Riverside -- one of the Riverside

15   officers who was present went and obtained some

16   civilian clothes for them -- or, for Mr. Nazario,

17   so that he didn't have to wear his uniform.

18           And the NCIS -- I asked Mr. Nazario if

19   he would waive his magistrate hearing.  He said he

20   wouldn't sign anything without first talking to an

21   attorney.

22           So the agents and I then left the

23   Riverside Police Department with Mr. Nazario.

24   I contacted Mr. Kovats and Mr. Behnke at the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 188

MARK FOX                                      October 14, 2010

65

1   U.S. Attorneys Office.   I explained that
2   Mr. Nazario wouldn't waive his magistrate's
3   hearing.   They asked me to sit tight, that they
4   were going to make some telephone calls.
5              We took Mr. Nazario to a Hardee's
6   restaurant near the Riverside courthouse, district
7   courthouse, offered him breakfast, allowed him to
8   make telephone calls on his cell phone.
9              Sometime later, Mr. Behnke or Mr. Kovats
10  called me back, told me that they had contacted the
11  Federal Public Defenders Office and that the head
12  Public Defender had agreed to meet with
13  Mr. Nazario.
14             When their office opened, we drove
15  Mr. Nazario to the Federal Public Defenders Office
16  in Riverside.   He met with the head Public Defender
17  behind closed doors.
18             When they were finished, which was a
19  couple of hours later, we took Mr. Nazario -- he
20  did waive his magistrate's hearing.
21             We took Mr. Nazario to the U.S.
22  Marshal's Office at the Riverside courthouse.   Went
23  through the intake procedure, after which we drove
24  Mr. Nazario back to the Riverside Police Department



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 189

MARK FOX                                                    October 14, 2010

66

1    and released him -- released him there.  That's
2    where his vehicle was parked.
3         Q.    Now, at the Riverside Police Department,
4    at or about the time you effected the arrest of
5    Mr. Nazario, did you show Defendant's Exhibit 521
6    to any of the Riverside police officers present?
7         A.    No, I didn't.
8         Q.    Do you recall meeting with a Captain
9    Mike Blakely at the Riverside Police Department?
10        A.    I can't recall.
11        Q.    Did the two other NCIS agents
12   accompanying you remain outside of the building at
13   the time that you effected the arrest of
14   Mr. Nazario?
15        A.    No, sir, they were present with me.
16        Q.    When Mr. Nazario was brought to you by
17   the Riverside Police Department representatives in
18   uniform, was he handcuffed?
19        A.    After he was arrested, yes.  At the time
20   he entered the room, no, he was not handcuffed.
21        Q.    At the time that you effected
22   Mr. Nazario's arrest, did you inform him,
23   generally, of the charges that he was being
24   arrested for?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 190

MARK FOX                                                    October 14, 2010

67

1          A.     Yes, sir, I did.

2          Q.     After Mr. Nazario's federal criminal

3     trial in August of 2008, did you receive a request

4     from Riverside Police Department background

5     investigators for copies of your NCIS report of

6     investigation, including the wire intercept

7     transcripts we have previously discussed?

8          A.     Yes, I did.

9          Q.     Did you comply with that request by

10    providing the background investigators with copies

11    of those documents?

12         A.     I provided exhibits to reports of

13    investigation.  I referred him, just because of the

14    voluminous amount of material involved, to my

15    headquarters if he wanted complete reports of

16    investigation.

17         Q.     Did you provide copies of the

18    transcripts of the wire intercepts that we have

19    discussed this morning?

20         A.     Yes, I did.

21    MR. ROTH:  Why don't we take a break.

22    MR. BROWN:  Off the record.

23    THE VIDEOGRAPHER:  Off the record at

24    10:50 a.m.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 191

MARK FOX                                          October 14, 2010

139

1    A.    That's correct.

2    Q.    And also, again, have you ever heard

3  that term "lethal cover"?

4    A.    No, I don't think that I have.

5    Q.    Because I believe the testimony was --

6  Were you concerned about arresting Mr. Nazario

7  while he was armed?

8    A.    Yes.

9    Q.    And was there anything in the course of

10  your investigation that led you to believe that

11  Mr. Nazario would use his service revolver if he

12  was being arrested?

13    A.    The fact that he was involved in a --

14  I suspected he was involved in a homicide in which

15  firearm was used, gave me concern.

16    Q.    Did you convey that concerns to

17  Riverside P.D.?

18    A.    No.

19    Q.    Do you have any understanding of the

20  concept of what they mean by "arrest team"?

21    A.    Well, I know what an arrest team is.  It

22  is, typically, officers that are assigned the

23  responsibility of making an arrest.

24    Q.    That's right.  In this particular



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 192

MARK FOX                                    October 14, 2010

209

1    STATE OF ILLINOIS      )
2                           )   SS:
3    COUNTY OF C O O K      )

4

5        MR. McDERMOTT:  JOANNE H. RICHTER, a Notary
6    Public within and for the County of Cook, State of
7    Illinois, and a Certified Shorthand Reporter of
8    said state, do hereby certify:
9            That previous to the commencement of the
10   examination of the witness, the witness was duly
11   sworn to testify the whole truth concerning the
12   matters herein;
13           That the foregoing deposition transcript
14   was reported stenographically by me, was thereafter
15   reduced to typewriting under my personal direction
16   and constitutes a true record of the testimony
17   given and the proceedings had;
18           That the said deposition was taken
19   before me at the time and place specified;
20           That I am not a relative or employee or
21   attorney or counsel, nor a relative or employee of
22   such attorney or counsel for any of the parties
23   hereto, nor interested directly or indirectly in
24   the outcome of this action.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 193

MARK FOX                                           October 14, 2010

210

1          IN WITNESS WHEREOF, I do hereunto set my

2    hand and affix my seal of office at Chicago,

3    Illinois, this 22nd day of October, 2010.

5                    *Joanne H Richter*

7          Notary Public, Cook County, Illinois.

8          Commission expires November 12, 2013.

11   C.S.R. Certificate No. 84-2082.

14                    OFFICIAL SEAL
                      JOANNE H RICHTER
15              NOTARY PUBLIC - STATE OF ILLINOIS
                MY COMMISSION EXPIRES:11/12/13



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 194

MARK FOX                                          October 14, 2010

213

1              DEPOSITION ERRATA SHEET

2

3    Assignment No. 170169

4    Jose Luis Nazario, Jr., vs.

5    City of Riverside, Et Al.

6

7           DECLARATION UNDER PENALTY OF PERJURY

8

9         I declare under penalty of perjury that

10   I have read the entire transcript of my deposition

11   taken in the captioned matter or the same has been

12   read to me, and the same is true and accurate, save

13   and except for changes and/or corrections, if any,

14   as indicated by me on the DEPOSITION ERRATA SHEET

15   hereof, with the understanding that I offer these

16   changes as if still under oath.

17

18                Signed on the  _5th_  day of

19                _December_ , 20_10_ .

20   

21                MARK FOX

22

23

24

**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 195

MARK FOX                                                    October 14, 2010

214

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

SIGNATURE:_____ DATE:_____

MARK FOX



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 951.784.9520

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 196

MARK FOX                                          October 14, 2010

215

1        DEPOSITION ERRATA SHEET

2    Page No. 78    Line No. 4    Change to: 3/1 VICE 31,

3    WHICH INDICATES 3RD BATTALION, 1ST MARINE REGIMENT

4    Reason for change: 3/1 IS THE COMMAND'S CORRECT IDENTIFIER

5    Page No. 99    Line No. 18    Change to: SHOULD READ

6    "e-mail" VICE "investigation" — I MISSPOKE

7    Reason for change: I MISSPOKE AND MEANT TO SAY "e-mail."

8    Page No. 124    Line No. 16    Change to: SHOULD READ

9    "TRUE BILL" VICE "TRUANT BILL"

10   Reason for change: TRANSCRIPTION ERROR

11   Page No. 152    Line No. 19    Change to: "NCOs" VICE

12   "FCOs."

13   Reason for change: REFERRED TO "NCOs" (NON-COMMISSIONED OFFICERS)

14   Page No. 159    Line No. 15    Change to: "SJA"(STAFF JUDGE

15   ADVOCATE) VICE "SGA".

16   Reason for change: TRANSCRIPTION ERROR

17   Page No. _____ Line No. _____ Change to: _____

18   _____

19   Reason for change: _____

20   Page No. _____ Line No. _____ Change to: _____

21   _____

22   Reason for change: _____

23   SIGNATURE: _____            DATE: 12-5-10

24        MARK FOX



Toll Free: 800.300.1214
Facsimile: 951.784.9520

ESQUIRE
an Alexander Gallo Company

Suite 640
3801 University Avenue
Riverside, CA 92501
www.esquiresolutions.com

Exhibit C
Page 197

# U.S. NAVAL CRIMINAL INVESTIGATIVE SERVICE

INVESTIGATIVE ACTION                                    16JUL07

                CONTROL:   16OCT06-GCPF-0165-7HMA

S/WEEMER, RYAN GENE/CIV



TRANSCRIPTION OF WIRE INTERCEPTS

1.  As previously reported, between 05-12Jan07, a series of twelve
telephone calls were placed between NCISRA Pensacola Source GCPF-0130
and X/NAZARIO.  One of the calls was placed by the Source to the
Magnolia Street Station of the Riverside (CA) Police Department, and
the remaining calls were all placed to or from X/NAZARIO's cellular
telephone, number (951) 719-9555.  Each of the calls was the subject
of a one-party consensual wire intercept.  Transcriptions of the
calls are appended as Enclosures (A) through (L).

ENCLOSURES
(A) Transcript/05Jan07
(B) Transcript/08Jan07
(C) Transcript/08Jan07
(D) Transcript/12Jan07
(E) Transcript/10Jan07
(F) Transcript/10Jan07
(G) Transcript/10Jan07
(H) Transcript/11Jan07
(I) Transcript/11Jan07
(J) Transcript/12Jan07
(K) Transcript/11Jan07
(L) Transcript/12Jan07

REPORTED BY:  Mark O. Fox, Special Agent
OFFICE:       NCISRA Pensacola, FL

EXHIBIT (50)

**WARNING**
THIS DOCUMENT IS THE PROPERTY OF THE NAVAL CRIMINAL INVESTIGATIVE SERVICE
CONTENTS MAY BE DISCLOSED ONLY TO PERSONS WHOSE OFFICIAL DUTIES REQUIRE ACCESS
HERETO. CONTENTS MAY NOT BE DISCLOSED TO THE PARTY(S) CONCERNED WITHOUT SPECIFIC
AUTHORIZATION FROM THE NAVAL CRIMINAL INVESTIGATIVE SERVICE.

Exhibit C
Page 198

# ENCLOSURE (A) TRANSCRIPT/05JAN07

# AND

# ENCLOSURE (B) TRANSCRIPT/08JAN07

# INTENTIONALLY OMITTED

Exhibit C
Page 199

NAVAL CRIMINAL INVESTIGATIVE SERVICE

PHONE CALLS, DISK 1, PHONE CALL 1

January 8, 2007

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

ENCLOSURE ( C )
TO EXHIBIT ( 50 )
Exhibit C
Page 200

1                    P R O C E E D I N G S

2              SPECIAL AGENT FOX:  This is Special Agent Mark

3     Fox.  Today's date is 8 January, 2007.  The time is

4     approximately 12:19.  The following will be a telephone

5     call between [Source GCPF-0130] and former Marine, now

6     police officer, Jose Nazario.

7     (dialing)

8              MR. NAZARIO:  What's up, New York?

9              [SOURCE]:  Yo, what's the deal, son?

10             MR. NAZARIO:  Hey, man, where you've been?

11             [SOURCE]:  Dog, hanging out, son.

12             MR. NAZARIO:  You came back safe in one piece,

13    huh?

14             [SOURCE]:  Yeah, you know how it is nigger.  You

15    know, it was crazy this time, son.

16             MR. NAZARIO:  I know, I was watching that shit on

17    the news and, what's his name, Woodrich (Phonetic Sp.) got

18    fucked up.

19             [SOURCE]:  What?

20             MR. NAZARIO:  Yeah, they got murder charges on his

21    ass.

22             [SOURCE]:  No.

23             MR. NAZARIO:  You ain't been watching that shit?

24    I was looking at the newspaper like last week.

25             [SOURCE]:  Hell no, you know they don't let us

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Exhibit C
Page 201

1  I look at that shit.

2       MR. NAZARIO:  Yeah, Woodrich, he was there.  He

3  was my replacement, like as soon as we came back from OIF2

4  (Phonetic Sp.) --

5       [SOURCE]:  Yeah.

6       MR. NAZARIO:  Woodrich, he was like -- remember

7  that white boy who came from 3rd Platoon, he -- it was like

8  him and some other sergeant, some other --

9       [SOURCE]:  Yeah, yeah, yeah, I remember that name.

10       MR. NAZARIO:  Yeah, man, what happened was -- what

11  was this dude's name.  (INAUDIBLE) he got shot up and -- I

12  can't believe I can't remember this dude's name.

13       [SOURCE]:  Was it a Spanish guy?

14       MR. NAZARIO:  Yeah.

15       [SOURCE]:  I know -- (INAUDIBLE)

16       MR. NAZARIO:  Yeah, (INAUDIBLE).  He got hit with

17  a bomb, like an IED or some shit.  So they went in and they

18  fucking started shooting everybody.  That's the shit you're

19  supposed to do, right?

20       [SOURCE]:  Yeah.

21       MR. NAZARIO:  So now they got him on murder

22  charges, son.

23       [SOURCE]:  Get out of here, son.

24       MR. NAZARIO:  Yeah, man.  So I'm like, yeah, I'm

25  glad I got the fuck out when I did, 'cause that was

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Exhibit C
Page 202

1    (INAUDIBLE) shit.

2         [SOURCE]:  Yeah.

3         MR. NAZARIO:  So.  Man, we're all fucking --

4    anybody got fucked up (INAUDIBLE)

5         [SOURCE]:  No, we all made it back, man.  I mean,

6    you got something like scratches and scrapes, but nothing,

7    Dog, nobody ain't died, nobody lose no limbs, no nothing,

8    son.

9         MR. NAZARIO:  Who was you with?  You stayed with

10   (INAUDIBLE), right?

11        [SOURCE]:  I stayed with them.

12        MR. NAZARIO:  All right, cool.  So (INAUDIBLE) was

13   P.J. (Phonetic Sp.).

14        [SOURCE]:  Yeah.

15        MR. NAZARIO:  (INAUDIBLE).  All right.  Yeah, man,

16   all the commanders got like replaced or leave or some shit,

17   from what I heard.

18        [SOURCE]:  Yeah.

19        MR. NAZARIO:  They was saying on the -- from the

20   newspaper.

21        [SOURCE]:  Yeah, we had to do another Change of

22   Command Ceremony and shit, man.  They wouldn't tell us what

23   it was for, but we all knew.

24        MR. NAZARIO:  Are you still in or what?

25        [SOURCE]:  Yeah, I'm still -- I'm with the MP's

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Exhibit C
Page 203

1    now.

2              MR. NAZARIO:  You're with the MP's?

3              [SOURCE]:  Yeah.

4              MR. NAZARIO:  All right.  Yeah, man, look that

5    shit up, man.  A bunch of them motherfuckers got in

6    trouble, it ain't just him.  It's like, like three of them

7    facing murder charges.

8              [SOURCE]:  Damn, son.

9              MR. NAZARIO:  Yeah.

10             [SOURCE]:  Yeah, what --

11             MR. NAZARIO:  (INAUDIBLE)

12             [SOURCE]:  Yeah, when did you get out here?

13             MR. NAZARIO:  (INAUDIBLE) a whole bunch of shit

14   happen.  Let me see.  I got a kid, he's --

15             [SOURCE]:  Congratulations.

16             MR. NAZARIO:  -- turning 1.  Yeah, dog.  He's

17   turning 1 years old ████████████████.

18             [SOURCE]:  What?

19             MR. NAZARIO:  Finally, man.  Yeah, I got me a

20   little son.

21             [SOURCE]:  That's (INAUDIBLE)

22             MR. NAZARIO:  I got that.  I'm working out here in

23   Riverside P.D. making bank, man, I'm making like -- in

24   overtime, like 76 G's, 80 G's a year.

25             [SOURCE]:  What?  On the force?

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Exhibit C
Page 204

1          MR. NAZARIO:  Yeah.

2          [SOURCE]:  Damn, that's a lot of money, son.

3          MR. NAZARIO:  I'm making bank, man.  I just bought

4    me a new Chrysler (Phonetic Sp.) 300.  I'm might put rims

5    on that bitch.

6          [SOURCE]:  You bought a Chrysler 300 (INAUDIBLE)

7          MR. NAZARIO:  (INAUDIBLE)

8          [SOURCE]:  (INAUDIBLE) over here living it up,

9    man.

10         MR. NAZARIO:  I'm telling you, man, I'm making

11   bank.

12         [SOURCE]:  I should have got out (INAUDIBLE)

13         MR. NAZARIO:  It's all good, man.

14         [SOURCE]:  So how do you like the force, nigger?

15         MR. NAZARIO:  It's fucking easy, man.

16         [SOURCE]:  Is it just like *Cops*, are you fucking

17   on foot patrols and fucking chasing these (INAUDIBLE) and

18   shit?

19         MR. NAZARIO:  Yeah, Dog, you ride around in your

20   car, right?

21         [SOURCE]:  Yeah.

22         MR. NAZARIO:  And (INAUDIBLE) respond to calls

23   coming from your computer from different calls like, you

24   know, mother fuckers fighting in their house, you coming in

25   there and fucking separate them, and if you got to beat

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Exhibit C
Page 205

1  somebody's ass 'cause they're drunk, you beat somebody's

2  ass --

3          [SOURCE]:  You take anybody down yet, son?

4          MR. NAZARIO:  Fuck yeah, Dog, we're on beat, man,

5  we don't roll to calls by ourselves.  So like if I hear my

6  boys go up to -- you know, some dude beat up his wife?

7          [SOURCE]:  Yeah.

8          MR. NAZARIO:  I'm listening to it on the radio

9  too, I'm going to show up, like three other guys are going

10 to show up, and we just go in somebody's house like five,

11 six, seven deep and beat the shit out of this motherfucker

12 and find a reason to take him to jail.

13         [SOURCE]:  That's good as shit, nigger.  How did

14 you -- I thought you was going to go back to New York and

15 do that.  How did you get hooked up with that?

16         MR. NAZARIO:  Yeah, no, this is my little secret,

17 Homey.  I'm still going to go back to New York, I'm just

18 like putting in some work over here until, like the job is

19 ready for me out there.

20         [SOURCE]:  Oh, so you're just -- you're just

21 putting in time until it's time to go back to New York.

22 That's smart.

23         MR. NAZARIO:  Yeah, 'cause I don't -- like I don't

24 take my transfer till March.

25         [SOURCE]:  Yeah.

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Exhibit C
Page 206

1          MR. NAZARIO:  That's for New York.  But not the

2    city, the state.  I already bought me a house out there

3    too.

4          [SOURCE]:  Damn, nigger.  How did you get put up

5    up there though, like, who fucking moved you up?  How did

6    you hear about that shit?

7          MR. NAZARIO:  You just look it up on the -- where

8    the fuck did I find it?  (INAUDIBLE) they had Riverside

9    Police, (INAUDIBLE) Police, fucking Sheriff's Department,

10   everywhere, and I just went on the web-site, I was like,

11   yeah, where do I want to work?  And I was like, okay,

12   (INAUDIBLE) the most money.

13         [SOURCE]:  Okay.

14         MR. NAZARIO:  And so I just went there.  They do a

15   background check on you.

16         [SOURCE]:  They do a background check?

17         MR. NAZARIO:  Yeah.  You say you're from the

18   military, they're like, okay, at least we know this dude

19   ain't, you know, (INAUDIBLE) like that for like the past 8

20   years.  He got military experience, he passed boot camp, so

21   police academy is going to (INAUDIBLE)

22         [SOURCE]:  So, what else did you have -- did you

23   have to take like fucking like math tests and all that

24   shit?

25         MR. NAZARIO:  Oh, fuck no, man.

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Exhibit C
Page 207

[SOURCE]:  You didn't C.

2      MR. NAZARIO:  Hell no.  You take this, you take

3  this test -- one test, and just to make -- basically to

4  make sure you can read.

5      [SOURCE]:  Yeah.

6      MR. NAZARIO:  (INAUDIBLE) like --

7      [SOURCE]:  Just like the (INAUDIBLE) games that we

8  do.

9      MR. NAZARIO:  Yeah, exactly like that.  You turn

10  the page when they say turn, and it's like a robbery in

11  progress.  They got the big old picture.  They want to see

12  how many shit you memorize, like how many guys are in the

13  bank, how many of them got automatic weapons, how many of

14  them got pistols, how many of them are black, how many of

15  them are white, how many kids are in there, how many

16  getaway cars are outside.  Look at the clock on the wall,

17  what time is it.  Just shit like that, man.

18      [SOURCE]:  (INAUDIBLE) shit.  (INAUDIBLE) I was

19  looking on the internet -- I was looking for some of them,

20  but there was like, you had to take math tests (INAUDIBLE)

21  shit, and then they were talking about taking like

22  polygraph tests, nigger, and I got like -- I don't know

23  (INAUDIBLE) polygraphs tests be.  Did you have to take one?

24      [SOURCE]:  Hold on a second, Dog.

25      (INAUDIBLE) I don't know, man.  Somebody -- I'm

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Exhibit C
Page 208

1   *talking to somebody else.   (INAUDIBLE)   (INAUDIBLE)*

2   *today.   Where are you going?   All right, man.   (INAUDIBLE)*

3   *I got my boy from New York on the line, man, I get*

4   *(INAUDIBLE)*

5   Yeah, you take the written test --

6   [SOURCE]:  Yeah.

7   MR. NAZARIO:  And then you take the little

8   physical test.  You got to run like a mile-and-a-half,

9   and --

10   [SOURCE]:  What?

11   MR. NAZARIO:  -- and -- that's it, a mile-and-a-

12   half, Dog.

13   [SOURCE]:  You didn't have to do no polygraph

14   test, son?  I was reading about that.

15   MR. NAZARIO:  Yeah, you do a polygraph test,

16   (INAUDIBLE) shit like that, but --

17   [SOURCE]:  Dog, I (INAUDIBLE) I don't know about

18   that polygraph test though, son.

19   MR. NAZARIO:  I could -- you don't know how to lie

20   through a polygraph?

21   [SOURCE]:  No, nigger, all right.  All right, what

22   if we go to the polygraph test, right?

23   MR. NAZARIO:  Oh, you (INAUDIBLE) Dog, I got to

24   school you.  I got to tell you how to pass that shit.

25   [SOURCE]:  Yeah.  If these (INAUDIBLE) was like,

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Exhibit C
Page 209

1  all right, what's the worse thing you've ever done, you

2  know what I'm saying?  What if they ask me if I ever killed

3  somebody, nigger, what do I say?

4          MR. NAZARIO:  I told them yeah, I told them I

5  killed (INAUDIBLE) people in Iraq.  They don't care.

6          [SOURCE]:  Yeah?

7          MR. NAZARIO:  Yeah.  That's combat, that's not

8  murder, man, that's combat.  They understand that shit.

9          [SOURCE]:  What if they ask if I ever done like,

10  fucking, anything like real illegal, nigger.

11          MR. NAZARIO:  Like what, like stealing cars and

12  shit?

13          [SOURCE]:  Yeah, you know how we used to do.

14          MR. NAZARIO:  Yeah, you just admit to it.

15          [SOURCE]:  You just fucking -- Tony said that they

16  was going to fucking -- they gave him a polygraph test and

17  they was asking all sorts of shit, nigger, like, he ever

18  fucking shoot anybody or fucking did any other shit, man,

19  and I was just fucking thinking, Dog.

20          MR. NAZARIO:  Yeah, 'cause like -- this is how the

21  polygraph test works.  First it's a written test, all

22  right?

23          [SOURCE]:  Yeah.

24          MR. NAZARIO:  All the questions they're going to

25  ask you, they're going to write it down first, and they

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Exhibit C
Page 210

1    want you to write down your answer.  And this is before

2    they put like that shit on you.  So they'll ask you

3    something like, have you ever committed a felony since the

4    age of 18, all right?  I write down, I write down, no, on

5    the paper.  And then they ask me something like, have I --

6    how many times have I smoked weed when I was a minor, or

7    whatever.  You know, I put down like, fifty times, and I

8    write that shit.

9              [SOURCE]:  Yo, this is my main concern, nigger.

10    This can't go anywhere between me and you, all right?

11              MR. NAZARIO:  Yeah.

12              [SOURCE]:  Yo, what if they ask if you ever

13    murdered somebody, nigger?

14              MR. NAZARIO:  If you murdered somebody?  Just be

15    like, yeah, I was in combat.  And they waive all that shit.

16    'Cause like a lot of the shit that they put on that

17    polygraph --

18              [SOURCE]:  Yeah.

19              MR. NAZARIO:  -- you do a lot of that shit in

20    combat.  Like they ask you, have you ever stole somebody's

21    car?  And I was like, yeah, Dog, we fucking stole cars all

22    the time in Iraq.  They was like, okay, fucking -- and they

23    move onto the next shit.

24              [SOURCE]:  So that murder shit, that's probably --

25    they ain't going to ask me nothing like that, nigger,

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Exhibit C
Page 211

1   you're sure?

2         MR. NAZARIO:  Well, no, they're going to ask you

3   have you ever freaking killed somebody.

4         [SOURCE]:  Yeah.

5         MR. NAZARIO:  I was, yeah, I killed a lot of

6   people.

7         [SOURCE]:  But that's what I'm saying -- okay,

8   remember that, remember that, you remember that time,

9   nigger?  Remember that time?

10         MR. NAZARIO:  Yeah, man, yeah, I (INAUDIBLE)

11         [SOURCE]:  (INAUDIBLE) those four niggers?

12         MR. NAZARIO:  Yeah, I told them.

13         [SOURCE]:  That's not murder though, is it?  I

14   mean, we had the right orders, didn't we?

15         MR. NAZARIO:  Yeah.

16         [SOURCE]:  Who gave us the orders though, nigger?

17         MR. NAZARIO:  I did.

18         [SOURCE]:  You did?

19         MR. NAZARIO:  Yeah.

20         [SOURCE]:  So it was a legit order?

21         MR. NAZARIO:  (INAUDIBLE)

22         [SOURCE]:  So it's not even lying, it's combat?

23         MR. NAZARIO:  Yeah.  You don't got to explain.

24   All you got to say is it's combat related.  Yeah, I broke

25   down doors, it was combat related.  Yeah, I broke into

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Exhibit C
Page 212

1    people's houses, it was combat related.

2         [SOURCE]:  So did --

3         MR. NAZARIO:  Did I kill people -- they don't ask

4    you details, they're like, oh, it's combat.  Yeah, they

5    don't ask you details.

6         [SOURCE]:  All right.  If they, if they say that

7    shit, and they're like fucking, who gave you the order?  I

8    ain't going to say your name.  Who gave you the order?

9         MR. NAZARIO:  The shit came from my fucking

10   lieutenant.

11        [SOURCE]:  Lieutenant?  What was his -- Grapes?

12        MR. NAZARIO:  Yeah.  But they're not going --

13   yeah.  They're not going to ask names.  Not even Grapes,

14   man.  That shit is coming from the (INAUDIBLE) Commanders.

15   We got to get from point A to point Barreto and we ain't

16   got time to throw motherfuckers on the truck 'cause we

17   moving.

18        [SOURCE]:  Okay.  So, but, if anything, I can

19   fucking just be like, yeah, it was combat, and then that's

20   it, they ain't even going to ask no more questions?

21        MR. NAZARIO:  That's, that's it, they don't get in

22   to it.

23        [SOURCE]:  I hope they don't bring that shit up,

24   nigger..

25        MR. NAZARIO:  They're not, man.  I was nervous

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Exhibit C
Page 213

1   about, like, you can't -- you are going to have to give

2   details?  But they don't -- they want to know shit that's

3   illegal.

4           [SOURCE]:  Okay.

5           MR. NAZARIO:  What we did, what we did wasn't

6   illegal.

7           [SOURCE]:  Yeah.

8           MR. NAZARIO:  It was, you know, a decision we made

9   because it was the outcome that's the best.  So it was, it

10  was a decision.  You can't play Monday morning quarterback,

11  bro.

12          [SOURCE]:  Nigger, let me tell -- thank you for

13  fucking talking to me, nigger, 'cause I -- that's the only

14  thing I was scared of.

15          MR. NAZARIO:  Yeah.

16          [SOURCE]:  So now, if I come up to that Riverside

17  joint, hey, is there any way like -- if I say, hey, you

18  know, I go up there and take the test and be like, hey, my

19  man, you know, my man, Nazario hit me up, do they give you

20  like a bonus, nigger?  'Cause if so, nigger, we can do

21  this.

22          MR. NAZARIO:  Yeah, I --

23          [SOURCE]:  Because I get off in about 6 months

24  though, nigger.  You know what I'm saying?  I'm trying to

25  make this shit come true.

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Exhibit C
Page 214

1        MR. NAZARIO: Take your test now --

2        [SOURCE]:  Yeah.

3        MR. NAZARIO:  And they ask you, do you have any

4    friends or anybody --

5        [SOURCE]:  I could put you down?

6        MR. NAZARIO:  (INAUDIBLE) -- yeah, put me down,

7    bro.  Let me see, what else?  After you take the polygraph

8    and the physical, you're going to go to the academy.  You

9    got two different academies.

10        [SOURCE]:  Oh, there's two different academies?

11        MR. NAZARIO:  Yeah, there's -- well, you're going

12    to go to one of the two 'case there's two different places

13    and wherever they got room for you.  It's like 6 months,

14    but you go home every day.  You go home every night.

15        [SOURCE]:  Okay.

16        MR. NAZARIO:  You still get your holidays and shit

17    off.  One is in Van Buren, in Riverside.

18        [SOURCE]:  Yeah.

19        MR. NAZARIO:  And the other one is in San

20    Bernardino County.  I don't know where the fuck that is.

21        [SOURCE]:  (INAUDIBLE) but Riverside is -- you

22    know, I don't even -- do you know the area around there?

23    Do they give you like maps, or how do you know if they --

24    they say they got a domestic disturbance, nigger.  I don't

25    know anything about Riverside, son, so do they --

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Exhibit C
Page 215

MR. NAZARIO: (INAUDIBLE) I got (INAUDIBLE) and

2  like two other motherfuckers from New York that are there,

3  and we all had hard times learning the streets.  You have

4  navigation in the car.

5       [SOURCE]:  But they're patient with you though,

6  right?  You know what I mean?

7       MR. NAZARIO:  Yeah, yeah, yeah.

8       [SOURCE]:  It ain't like, fucking, you know how

9  they do in the Marines, they ain't fucking --

10      MR. NAZARIO:  (INAUDIBLE) I still don't know -- I

11  don't know the whole city out here.  That's why I use my

12  navigation in the car.  You have like this map book for

13  navigation.

14      [SOURCE]:  Okay.

15      MR. NAZARIO:  So we got this electronic --

16  everybody gets to have a computer in their car and, you

17  know, that's what gets me from point A to point Barreto.

18      [SOURCE]:  Damn, I'm fucking mad, jealous right

19  now, son.  How come you ain't tell me you was planning to

20  do that?  We could have made moves together, son.

21      MR. NAZARIO:  Well, shit, I didn't -- I don't want

22  to bring nobody with me 'cause I didn't know if it was a

23  good idea or not.

24      [SOURCE]:  Nigger, it's better than what the fuck

25  we're doing now, son.

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Exhibit C
Page 216

1   MR. NAZARIO: Yeah, but back then when I was

2   like taking my polygraph, I was like, what the fuck am I

3   getting into, man, I don't know shit about Riverside.  I

4   was like, okay, let me get in, and if it's good, I'll keep

5   my foot in the door if somebody else wants to come through.

6          [SOURCE]:  (INAUDIBLE)

7          MR. NAZARIO:  I'm telling you, you're going to be

8   making mad money.  I mean mad money.

9          [SOURCE]:  (INAUDIBLE) making loot (Phonetic Sp.).

10         MR. NAZARIO:  You're going to be making loot, and

11  you're going to be fucking doing fun shit, man.  Doing fun

12  shit.  You can fuck around with people too.  You talk to

13  them how you want, like, like (INAUDIBLE) you're just

14  driving around.  You don't have a quota to meet, you don't

15  got to, you don't got to do shit.  You don't got to give

16  somebody a ticket if you pull them over.

17         [SOURCE]:  Oh, you don't?

18         MR. NAZARIO:  No.

19         [SOURCE]:  You don't got to make like no quota?

20  So you're just -- you're just basically patrolling, but in

21  a safe area then?

22         MR. NAZARIO:  Yeah, that's all we do.  We're

23  patrolling, and then we got like -- let me see, like two

24  bad neighborhoods in Riverside, and when I say bad

25  neighborhoods, it's bad for California.  It ain't bad for

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Exhibit C
Page 217

2          [SOURCE]:   (INAUDIBLE) back in Brooklyn and shit.

3          MR. NAZARIO:  Yeah.  I was like, okay, you got

4    this one street out here, (INAUDIBLE) Street, where you got

5    some people drinking beers outside and, you know, you got

6    some (INAUDIBLE) and shit out there (INAUDIBLE) dope and

7    shit.  I was like, okay, everybody's scared of this block.

8    I was like, this (INAUDIBLE) ain't shit, man, I was born, I

9    was born living in this shit --

10          [SOURCE]:  Hell, yeah, tell them niggers to go to

11   (INAUDIBLE) and see how they like that shit.

12          MR. NAZARIO:  Yeah.  And then like Casablanca,

13   that's like a Spanish neighborhood.  They shot down like a

14   police helicopter like a few years back or something.  So

15   they're still scared of this place.  Like (INAUDIBLE)

16   automatic weapons and shit.  I'm like, yo, fucking, that's

17   what I'm used to, man.  That's how it is.

18          [SOURCE]:  Hold on.

19          *What?  What?  Go back on the gate (Phonetic Sp.),*

20   *son.*

21          These nigger's is -- somebody's fucking -- they

22   don't know how to write tickets and shit.  I got to go back

23   to work, nigger.  Hey, what time do you got to go to work

24   so I can call you?

25          MR. NAZARIO:  I work swing shifts. I work from 3

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Exhibit C
Page 218

1   o'clock in the afternoon to 1 o'clock in the morning.  I

2   only work four days a week, we always get three day

3   weekends.

4          [SOURCE]:  So if I call you like this time

5   tomorrow, you'll be good?

6          MR. NAZARIO:  Yeah, I'll be good.

7          [SOURCE]:  All right, my nigger.  Yo, thanks for

8   the fucking -- you're a lifesaver, son.

9          MR. NAZARIO:  Yeah, man, I'll look out for you,

10  man.  Give me a call.

11         [SOURCE]:  No doubt, my nigger.

12         MR. NAZARIO:  What I want you to do, like, take a

13  -- do a ride along.  You know what a ride along is?

14         [SOURCE]:  Yeah, yeah, a ride along.

15         MR. NAZARIO:  Yeah, just -- go to one of the

16  stations and like, yeah, I want to fucking ride.  Come to

17  my station, man.  Just tell them you want to ride with me.

18  We'll fucking cruise, throw some motherfuckers in jail and

19  shit.

20         [SOURCE]:  All right, my nigger.  Yo, don't forget

21  about me, son.

22         MR. NAZARIO:  Oh, no, I got your number.

23         [SOURCE]:  All right, my nigger.

24         MR. NAZARIO:  All right, call me.

25         [SOURCE]:  All right.

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Exhibit C
Page 219

2        (Whereupon, the phone call ended.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Exhibit C
Page 220

CERTIFICATE

1

2          I hereby certify that the foregoing is a true and

3    accurate transcription, to the best of my skill and

4    ability, from a CD.

5

6                              /S/
                    _____

7                    Debbie Serio, Transcriber

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FREE STATE REPORTING, INC.
Court Reporting   Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Exhibit C
Page 221

**ENCLOSURE (D) TRANSCRIPT/12JAN07,
ENCLOSURE (E) TRANSCRIPT/10JAN07,
ENCLOSURE (F) TRANSCRIPT/10JAN07,
ENCLOSURE (G) TRANSCRIPT/10JAN07,
ENCLOSURE (H) TRANSCRIPT/11JAN07,
ENCLOSURE (I) TRANSCRIPT/11JAN07,
ENCLOSURE (J) TRANSCRIPT/12JAN07,
ENCLOSURE (K) TRANSCRIPT/11JAN07,
AND
ENCLOSURE (L) TRANSCRIPT/12JAN07**

**INTENTIONALLY OMITTED**

Exhibit C
Page 222

UNITED STATES DISTRICT COURT          CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA<br>v.<br>JOSE LUIS NAZARIO, JR. | DOCKET NO.<br>ED07-0244M |
| | MAGISTRATE'S CASE NO.<br>RIVERSIDE |

Complaint for violation of Title 18, United States Code, Sections 1112, 3231 and 3261(a)(2).

FILED
CLERK, U.S. DISTRICT COURT
6 2007
CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUT

| NAME OF MAGISTRATE JUDGE<br>HONORABLE JOHN C. RAYBURN, JR. | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>RIVERSIDE, CA |
| DATE OF OFFENSE<br>NOVEMBER 9, 2004 | PLACE OF OFFENSE<br>FALLUJAH, IRAQ | ADDRESS OF ACCUSED (IF KNOWN) |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

On or about November 9, 2004, in Fallujah, Iraq, defendant JOSE LUIS NAZARIO, JR., in heat of passion caused by adequate provocation, unlawfully and intentionally killed two unarmed male human beings, without malice.

It is further alleged that, at the time of the offense, defendant JOSE LUIS NAZARIO, JR. was a member of the Armed Forces subject to chapter 47 of Title 10. Namely, defendant JOSE LUIS NAZARIO, JR., a United States citizen not ordinarily resident in Iraq, was enlisted in the service of the United States Marine Corps in Iraq at the time of the alleged offense.

It is further alleged that the current residence of defendant JOSE LUIS NAZARIO, JR. within the United States is located in the city of Riverside in Riverside County, California, within the Central District of California.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:
(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>MARK O. FOX |
| | OFFICIAL TITLE<br>SPECIAL AGENT<br>NAVAL CRIMINAL INVESTIGATION SERVICE |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1)<br>JOHN C. RAYBURN, JR. | DATE<br>AUGUST 6, 2007 |

) See Federal Rules of Criminal Procedure rules 3 and 54.
CJK:cp REC:Bond

## A F F I D A V I T

I, Mark O. Fox, being duly sworn, hereby depose and say:

1.    I am a Special Agent with the Naval Criminal Investigative Service.  I have been so employed since April 1982. I have earned a Bachelor of Arts degree in Political Science, and I am a graduate of the Federal Law Enforcement Training Center at Glynco, Georgia.

2.    This affidavit is submitted in support of an arrest warrant and a criminal complaint charging JOSE LUIS NAZARIO, JR. ("NAZARIO") with a violation of Title 18, United States Code, Section 1112, Voluntary Manslaughter, with jurisdiction arising under Title 18, United States Code, Sections 3238 and 3261(a)(2). Specifically, there is probable cause to believe that NAZARIO, while enlisted on active duty in the service of the United States Marine Corps in Iraq, and who presently resides in Riverside County, in the Central District of California, on or about November 9, 2004, in Fallujah, Iraq, while in the heat of passion caused by adequate provocation, did commit voluntary manslaughter by unlawfully and intentionally killing two unarmed male human beings, without malice.

3.    The facts and information set forth in this affidavit are based on my personal observations, my training and experience, and, as specifically attributed below, information obtained from law enforcement officers, reports, and witnesses. To the extent that any information in the affidavit is not within

Exhibit C
Page 224

my personal knowledge, it has been made available to me through reliable law enforcement sources, and I believe such information to be true.   This affidavit is made for the sole purpose of demonstrating probable cause for the issuance of the requested complaint and arrest warrant, and does not purport to set forth all of my knowledge of, or investigation into, this matter.

<u>FACTS SUPPORTING PROBABLE CAUSE</u>

4.   On November 9, 2004, United States and Iraqi military forces were engaged in combat operations in city of Fallujah, Iraq, in an effort to remove insurgents from the city.   Among the forces engaged in the combat operation were the members of 3rd Squad, 3rd Platoon, K Company, 3rd Battalion, 1st Marine Regiment, 1st Marine Division ("3rd Squad").   At that time, NAZARIO was an enlisted member of the United States Marine Corps and was assigned as the Squad Leader of 3rd Squad.

5.   On November 9, 2006, I interviewed former United States Marine Corps Corporal Ryan Gene Weemer ("Weemer").   From this interview, I learned the following information:

a.   Weemer participated in the killing of several unarmed males while on active duty and deployed with the United States Marine Corps in Fallujah, Iraq, in 2004.   Weemer identified his position at the time of the killings as that of a "Fire Team Leader" with 3rd Squad.   Weemer identified NAZARIO as

2

Exhibit C
Page 225

Weemer's squad leader and immediate supervisor on November 9, 2004.

b.   On November 9, 2004, while searching a house, Weemer, NAZARIO, and fellow Marines assigned to the 3rd Squad encountered and detained three to five males.   NAZARIO told Weemer they needed to "take care of them" so they could move with the rest of their advancing unit.

c.   Weemer grabbed one of the males, drew his pistol, and shot the male twice in the chest.   Weemer did not examine the male after he shot him, but assumed he was dead.

d.   Weemer identified United States Marine Lance Corporal James L. Prentice, a member of his Fire Team, as a possible witness.

6.   On December 5, 2006, I interviewed United States Marine Corps Lance Corporal James L. Prentice ("Prentice").   Prentice acknowledged that he was present with Weemer and NAZARIO when they encountered four unarmed males in an unknown house in Fallujah, Iraq on November 9, 2004.   From my interview with Prentice, I learned the following:

a.   On November 9, 2004, Prentice was assigned to 3rd Squad.   On that date, 3rd Squad's objective was to move to the center of the city, clearing the city of insurgents as they advanced.   Early on November 9, 2004, 3rd Squad came under enemy fire and a member of 3rd Squad was killed.   Later, 3rd Squad began

3

Exhibit C
Page 226

taking fire from a nearby house and, after the fire was suppressed, Prentice and other Marines were assigned to search the house.

b.   Inside the house, the Marines encountered four males.   After detaining the four males, Prentice and other Marines searched the house and found AK-47 rifles and ammunition. NAZARIO then placed a call on his radio to an unknown Marine. Prentice heard NAZARIO say something to the effect that they had detained four military-age males, they had found weapons and ammunition, and they had just taken fire from the house.   After ending his radio conversation, NAZARIO said that he was asked, "Are they dead yet?" to which NAZARIO responded "Negative." NAZARIO said he was told to "Make it happen."   NAZARIO then grabbed one of the two youngest males and instructed Weemer to grab the other and take him into another room.

c.   Next, Prentice heard a gunshot coming from the room where Weemer had taken his prisoner.   He related that seconds later, he heard the sound of a gunshot coming from one of the home's bedrooms.   According to Prentice, when he turned toward the sound of the second gunshot, he observed NAZARIO lowering his rifle from an "aimed-in" position to a "low-ready" position and saw one of the four detained males on the floor in front of NAZARIO, lying on his back.   Prentice concluded that the detained male had been shot dead by NAZARIO.

4

Exhibit C
Page 227

d.   After NAZARIO shot the detained male, he exited the room and asked, "Who else wants to kill these guys, because I don't want to do it all myself."

e.   Prentice then observed NAZARIO motion to two other Marines in the house to bring the remaining two males to him. According to Prentice, one of the males entered the room occupied by NAZARIO while the second waited at the doorway.   At this point, Prentice turned to exit the house.   As he turned, he heard a gunshot, followed by about a twenty-second pause and a second gunshot.   Prentice believed NAZARIO shot and killed the two remaining males.

f.   Prentice stated that United States Marine Corps Sergeant Jermaine Nelson was present in the house when the shootings occurred.   At the time of the shootings, Nelson held the rank of Corporal.

6.   On December 6, 2006, I interviewed United States Marine Corps Sergeant Jermaine A. Nelson ("Nelson").   From my interview with Nelson, I learned the following information:

a.   Nelson was present with NAZARIO in an unknown house in Fallujah, Iraq, on November 9, 2004, when United States Marines killed four unarmed males.

b.   Someone saw movement from a nearby house and Nelson, NAZARIO, Weemer and other Marines were ordered to search the house.   When they entered the house, they encountered and

5

Exhibit C
Page 228

detained four males.  After detaining the four males within the house, NAZARIO told other Marines to search the house.  The Marines found AK-47s and ammunition.  NAZARIO then called an unknown individual on his issued radio and told him/her that four males had been found in the house.

c.   Following the radio transmission, NAZARIO told both Weemer and Nelson he had been asked, "Are they dead yet?" NAZARIO then indicated to Weemer and Nelson that they had to go, using words to the effect of "We can't be here all day."  NAZARIO then said, "You know what has to be done."

d.   NAZARIO then grabbed one of the four detained males and led him into a room, believed by Nelson to be a kitchen.  Shortly thereafter, Nelson heard a gunshot come from the direction of the kitchen.  When Nelson looked into the kitchen, he observed NAZARIO standing above the male, who was laying on the floor.  From his observations, Nelson believed that NAZARIO had shot the male in the head.  Based on the large pool of blood on the floor surrounding the male's head, Nelson concluded that the male was dead.

e.   NAZARIO then ordered both Nelson and Weemer to each kill one of the three remaining detained males.  NAZARIO stated that he would kill the last male himself.

f.   NAZARIO then shot a second detained male in the head with his rifle.  After doing so, Nelson noticed brain matter

6

Exhibit C
Page 229

and blood on the muzzle of NAZARIO's rifle and all over NAZARIO's boots.

  g. Nelson then observed Weemer shoot the detained male under his (Weemer's) control with his pistol.

  h. Next, NAZARIO asked Nelson "Yo, are you done yet? We have to go." Nelson then took the detained male under his (Nelson's) control and shot him in the back of the head.

 7. Based on my investigation, I have also learned that NAZARIO has been discharged from the Marine Corps and now resides in the city of Riverside, Riverside County, within the Central District of California. He is currently employed as a sworn Police Officer with the Riverside Police Department, Riverside, California.

CONCLUSION

 8. Based on the above information, I believe there is probable cause to believe that NAZARIO, while enlisted on active duty in the service of the United States Marine Corps in Iraq, and who presently resides in Riverside County, in the Central District of California, on or about November 9, 2004, in Fallujah, Iraq, while in the heat of passion caused by adequate provocation, did commit voluntary manslaughter by unlawfully and intentionally killing two unarmed male human beings, without malice, in violation of Title 18, United States Code, Section

7

Exhibit C
Page 230

1112, Voluntary Manslaughter, with jurisdiction arising under

Title 18, United States Code, Sections 3238 and 3261(a)(2).


_____

Mark O. Fox
Special Agent
Naval Criminal Investigative Service


SWORN AND SUBSCRIBED TO BEFORE ME
THIS _____6_____ DAY OF AUGUST, 2007

JOHN C. RAYBURN, JR.

_____
HONORABLE JOHN C. RAYBURN, JR.
UNITED STATES MAGISTRATE JUDGE

8

Exhibit C
Page 231