**Exhibit D**

COPY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

-------------------------------------------x

JOSE LUIS NAZARIO, JR., an individual,

                              Plaintiff,

     - against -            CASE NO. CV 10-01731 VAP

                            (DTBx)


CITY OF RIVERSIDE, et al.,


                              Defendants.


-------------------------------------------x


                    Saturday,

                    October 23, 2010

                    1:15 p.m.




        VIDEOTAPED EXAMINATION BEFORE TRIAL OF

     Witness, DIETTE NAZARIO, held at the

     offices of Rockland & Orange Reporting,

     20 South Main Street, New City, New

     York, on the above date and time before

     a Notary Public of the State of New York.




          ROCKLAND & ORANGE REPORTING

             20 South Main Street

          New City, New York 10956

               (845) 634-4200

```
 1   A P P E A R A N C E S:
 2
 3
 4   GODES & PREIS, ESQS.
          Attorneys for the Plaintiff
 5        8001 Irvine Center Drive
          Suite 1040
 6        Irvine, California 92618
     BY:  JOSEPH M. PREIS, ESQ.
 7
 8
 9   ROTH CARNEY KNUDSEN, LLP
          Attorneys for the Defendant
10        City of Riverside
          3850 Vine Street
11        Suite 240
          Riverside, California 92507
12   BY:  RICHARD D. ROTH, ESQ.
13
14
     GREGORY P. PRIAMOS, City Attorney, #136766
15        Attorneys for the Defendant
          City of Riverside
16        City Hall
          3900 Main Street
17        Riverside, California 92522
     BY:  JAMES E. BROWN, ESQ.,
18        Supervising Deputy City Attorney, #162579
19
20
     GREINES, MARTIN, STEIN & RICHLAND, LLP
21        Attorneys for the Defendant
          City of Riverside
22        5900 Wilshire Boulevard
          12th Floor
23        Los Angeles, California 90036
          (NOT PRESENT)
24
25   Also Present:  Jose Luis Nazario, Jr.
```

3

1           Diette Nazario

2           (Defendant's Exhibit 531,

3      Instruction To Witness Regarding

4      Deposition Procedures, was marked for

5      identification.)

6           (Document submitted.)

7           THE VIDEO OPERATOR:  My name is John

8      Schoenberger, videotape operator.  I am

9      employed by Legal Video Services, of

10     Goshen, New York.

11          We are retained by the City of

12     Riverside to videotape the sworn testimony

13     of Diette Nazario in the matter of Jose

14     Luis Nazario, Junior, an individual,

15     against City of Riverside, et al.

16          We are located at 20 South Main

17     Street in New City, New York.  Today is

18     October 23rd, 2010.  The time is 1:15 p.m.

19          And Counsel will now introduce

20     themselves.

21          MR. ROTH:  Richard Roth of Roth

22     Carney Knudsen, attorneys for the

23     Defendant, City of Riverside.

24          MR. BROWN:  Jim Brown, representing

25     City Attorney's office, also defen --

Exhibit D
Page 234

4

1                      Diette Nazario

2          representing Defendant, City of Riverside.

3              MR. PREIS:    Joseph Preis, Godes and

4          Preis, representing Jose Nazario.

5              THE VIDEO OPERATOR:   And will the

6          Court Reporter please swear in the

7          witness.

8              THE COURT REPORTER:   Please raise

9          your right hand.

10   D I E T T E     N A Z A R I O,

11          the Witness herein, having been

12          first duly sworn by Jacqueline

13          Padilla, a Notary Public of the State

14          of New York, was examined and

15          testified as follows:

16              (The Witness nods her head.)

17              THE COURT REPORTER:    Please state

18          your name and residence address.

19              THE WITNESS:  Diette Nazario,

20          ███████████████████████, New York.

21              MR. PREIS:    Could -- could I just

22          interpose a -- a quick objection.

23              When the witness was sworn in, she

24          shook her head, in which appeared to be

25          saying yes, as opposed to verbalizing the

5

Diette Nazario

1
2      response.

3            Could we get a verbal response.

4            THE COURT REPORTER:  Can you raise

5      your right hand.

6  D I E T T E     N A Z A R I O,

7            the Witness herein, having been

8            resworn by Jacqueline

9            Padilla, a Notary Public of the State

10           of New York, was examined and

11           testified as follows:

12           THE WITNESS:  Yes.

13           THE COURT REPORTER:  Thank you.

14           MR. PREIS:  Thank you.

15  EXAMINATION BY

16  MR. ROTH:

17        Q.   Good afternoon, Ms. Nazario.  As you

18  heard, my name is Richard Roth, and I represent

19  the Defendant, City of Riverside, in this case.

20            And this is a deposition, your

21  deposition.  And before we started the deposition

22  I asked you to take a look at a document which is

23  marked Instruction To Witness Regarding

24  Deposition Procedures.  It's a document which

25  I've marked as Defendant's 531 for purposes of

6

1                    Diette Nazario

2    this deposition.

3              Did you have an opportunity to

4    review the --

5         A.   I --

6         Q.   -- the instruction sheet?

7         A.   -- I did glance through it, yeah.

8         Q.   Do you need more time to review

9    the -- the procedures?

10        A.   No, I definitely have the gist of

11   it.

12        Q.   Do you have any questions about the

13   procedures that we will follow today?

14        A.   No.

15        Q.   One of the ground rules, as Counsel

16   sort of indicated just a minute or so ago, is

17   that when --when a question's asked, if it calls

18   for a yes or a no answer, you need to -- to

19   verbalize the yes or no out loud, so the Court

20   Reporter knows what response to put down in the

21   record, because, as you noted from the

22   instruction sheet, the Court Reporter is taking

23   down everything we say, and she'll be preparing a

24   transcript of your testimony; my questions,

25   Mr. Preis's questions, and she will provide that

7

Diette Nazario

1

2    transcript to me, and I'll, in turn, provide it

3    to you at the end of the deposition sometime

4    after, for you to read, review, correct and sign.

5              Okay?

6         A.   Yes.

7         Q.   If during this deposition if you

8    need me to clarify a question, you don't

9    understand it or you need me to restate it or say

10   it again, I'd ask that you let me know.

11             Is that okay?

12        A.   Yes.

13        Q.   And if I don't hear from you, may I

14   assume that you understand my question or

15   Mr. Preis's question, and you can provide an

16   appropriate response?

17        A.   Yes.

18        Q.   Great.

19             Ms. Nazario, at some point in time

20   were you married to Mr. Jose Nazario?

21        A.   Yes.

22        Q.   During what period of time;

23   approximately?

24        A.   2001 until June of this year, 2010.

25        Q.   Do you have any children?

8

                          Diette Nazario

1

2      A.    Yes, we do.

3      Q.    How many?

4      A.    One.

5      Q.    And what is your child's name?

6      A.    G██████████████ N██████.

7      Q.    And how old is G██████?

8      A.    He's ████.

9      Q.    And his date -- his date of birth?

10     A.    ██████████████████████.

11     Q.    Now, was Mr. Nazario -- or it's my

12  understanding Mr. Nazario was in the Marine

13  Corps, United States Marine Corps, during some

14  period of time.

15     A.    Yes.

16     Q.    Were you married to Mr. Nazario

17  during his service in the Marine Corps?

18     A.    Yes.  Partial of the service in the

19  Marine Corps, yes.

20     Q.    Do you recall your date of marriage?

21     A.    We got married May 11th, 2001.

22     Q.    After you were married to

23  Mr. Nazario, where did you live?

24     A.    When we initially got married, I was

25  still living in New York, and he was stationed in

9

Diette Nazario

1
2    North Carolina.  And then, I think about two or
3    three months later, I -- we -- we moved together
4    North Carolina for a short period of time.
5         Q.   And at some point did you relocate
6    to Southern California?
7         A.   Yes, we did.
8         Q.   And where did you move in Southern
9    California?
10        A.   We lived several places in
11   California.
12        Q.   Okay.  At some point did Mr. Nazario
13   separate or leave the United -- separate from or
14   leave the United States Marine Corps?
15        A.   Yes, he did.
16        Q.   Do you recall approximately when?
17        A.   See, it was before our son was born.
18   2005, I would assume.  I -- I believe.
19        Q.   Sometime in the fall of 2005, does
20   that sound right?
21        A.   I'm -- I'm sorry, it's very long
22   time ago.  Yeah.  Yeah, probably in the fall, I
23   would -- I would -- I believe.
24        Q.   Where were you living at the time
25   that Mr. Nazario separated from the Marine Corps?

10

Diette Nazario

1

2      A.   We owned a town house in Murrieta,

3  California, and we were -- we resided there.

4      Q.   Were you employed during the time

5  that you lived in California?

6      A.   Yes, I was.

7      Q.   Where -- where were you employed?

8      A.   My last job, or the jobs previously?

9  I was a Jack of All Trades.

10     Q.   How about your last job?

11     A.   I was employed for the Correctional

12  Department in Kearny Mesa.

13     Q.   Were you a correctional officer?

14     A.   Yes, I was.

15     Q.   Was that a correctional officer for

16  San Diego County?

17     A.   Yes.

18     Q.   And that's San Diego County,

19  California; right?

20     A.   Correct.

21     Q.   How long were you a correctional

22  officer for San Diego County?

23     A.   I want to say two years.  Let me

24  just think.  Six, five.  G████ was born in ████.

25  So I -- I believe about two years, ap --

11

Diette Nazario

1

2      Q.   Do you recall when you left your

3 position as a correctional officer for San Diego

4 County?

5      A.   I left after giving birth to our

6 son, so 2006 sometime.  I -- I believe maybe --

7 May, June.  Probably June.

8      Q.   June of 2006?

9      A.   June or July, yeah.

10      Q.   Do you recall at some point

11 Mr. Nazario became employed by the Riverside

12 Police Department; correct?

13      A.   Correct.

14      Q.   Do you recall approximately when

15 that occurred?

16      A.   It -- it was 2005.

17      Q.   And you were living in Murrieta,

18 California at the time?

19      A.   Yes.

20      Q.   At some point did you move to New

21 York State?

22      A.   Yes.

23      Q.   When did you move to New York State?

24      A.   My son and I moved in 2006.

25      Q.   Do you recall approximately when?

12

Diette Nazario

1

2    A.    We were waiting for our house to get

3  built, so June.  Between June, July.

4    Q.    Of 2006?

5    A.    Uh-huh.

6    Q.    Is that yes?

7    A.    Yes.

8    Q.    And why did you move to New York

9  State?

10 * * *

11    MR. PREIS:  Objection on relevance.

12    May also invoke the marital privilege.

13    You may respond.

14    MR. ROTH:   Go ahead.

15    THE WITNESS:  I -- I didn't even

16    hear what he said.

17    MR. ROTH:   He -- and during a

18    deposition, Ms. Nazario, from time-to-time

19    one lawyer or the other may state an

20    objection to a question, to the form of

21    the question or for some other reason

22    object to the question as being asked.

23    That doesn't interfere with your ability

24    or obligation to answer the question under

25    these circumstances.

23

Diette Nazario

1

2      A.    I -- I -- I don't know if I put it

3  or -- or he put it.  We -- we shared an e-mail

4  address.  We --we shared e-mail addresses, so, I

5  mean...

6      Q.    So -- so you would -- you would send

7  e-mail from your computer, and Mr. Nazario would

8  send e-mail from your computer, and the e-mail

9  would appear to come from Jose and Diette 15 at

10 msn.com?

11     A.    Yeah, we had an e-mail address

12 together.

13     Q.    Okay.

14     A.    But, I mean, I -- I  -- I could have

15 put this.  It --

16     Q.    You just don't recall?

17     A.    Yeah.  I mean...  I do things

18 everyday that I don't recall.

19         (Defendant's Exhibit 534, e-mail,

20         dated Monday, October 6, 2008 to Lisa

21         Johnson from Diette Nazario, Bates

22         City 0013482 through 0013483, was marked

23         for identification.)

24     Q.    Let me show you a document that I've

25 marked as Defendant's Exhibit 534.

24

Diette Nazario

1

2          (Document submitted.)

3          Q.    It's a three page document

4    consisting of City Bates stamp numbers 0013482,

5    13483 and 13484.  And let me ask you to take a

6    look at it.

7          A.    I did send this, and it has my

8    e-mail address.

9          Q.    Do you recognize Exhibit 534,

10   Ms. Nazario, as an e-mail that you sent to -- at

11   least part of it an e-mail that you sent to Lisa

12   Johnson?

13         A.    I'm sorry?

14         Q.    Do you recognize at least one or

15   more of the e-mail exchanges on Defendant's

16   Exhibit 534 as e-mail that you sent to Lisa

17   Johnson?

18         A.    This one I sent to Lisa, the top

19   one.

20         Q.    Let's focus on the e-mail, the --

21   the date's a little difficult to read on this

22   copy, but it appears to be dated Tuesday, 7

23   October, 2008 at 24 minutes after midnight.  And

24   it starts, Dear Lisa.

25              Do you see that e-mail?

25

Diette Nazario

1
2       (Indicating)

3              A.    Yes.

4                    MR. PREIS:   Starts, Hello, Lisa.

5              Q.    Hello Lisa.

6              A.    Hello Lisa, yeah.   Okay.

7              Q.    I'm writing you this letter to let

8       you know...

9              A.    Yes.

10             Q.    Did you send that e-mail to Lisa

11      Johnson?

12             A.    I did send her that e-mail that

13      night.

14             Q.    And why did you send her that

15      e-mail?

16             A.    I just thought that things had

17      gotten out of hand.   The police just left our

18      house.   And I thought it was something that she

19      needed to know.

20                   THE COURT REPORTER:   Ms. Nazario,

21             could you please sit back.   I have to be

22             able to hear you.   Just talk forward.

23                   THE WITNESS:   I'm sorry.

24                   (Defendant's Exhibit 535, Family

25             Offense Petition, City Bates stamped

26

Diette Nazario

1

2          0013372 through 0013377, was marked for

3          identification.)

4          Q.   Ms. Nazario, let me show you another

5    document which I've marked as Defendant's

6    Exhibit 535.  It appears to be a Family Offense

7    Petition.  Petitioner Diette Sonya Nazario

8    against Jose Luis Nazario, Junior.  It is a six

9    page document.  I'm not sure that I can read the

10   City Bates stamp numbers on the bottom.  I

11   apologize.  Let me ask you to take a look at it.

12          (Document submitted.)

13          A.   This is the document that I had

14   filed in Court.

15          Q.   Okay.  Let me -- I'll ask some

16   questions on it, if you'll allow me.

17          In identifying the document, I

18   gather you recognize it?

19          A.   Yes.

20          Q.   And this is a Family Offense

21   Petition that you prepared?

22          A.   Yes.

23          Q.   Did you have any assistance in

24   preparing the petition, Ms. Nazario?

25          A.   No.  I had a counselor there who

27

Diette Nazario

1
2    told me what papers I needed to fill out, but no
3    assistance. It was just pretty much, you read it
4    and you -- I put the applicable information.
5         Q.   And did you fill out this petition
6    on or about October 7, 2008?
7         A.   Yes.
8         Q.   And is this your handwriting on the
9    document?
10        A.   Yes, it is.
11        Q.   And you filed this Petition with the
12   Family Court of the State of New York?
13        A.   Yeah, in Sullivan County.
14        Q.   In Sullivan County.
15             And looking at Page 4 of the
16   exhibit, is that your signature on the back of
17   the document?
18        A.   Yes.
19        Q.   Now let's turn to I believe it's
20   Page 5 of the exhibit.
21             MR. ROTH:  Counsel, as the witness
22             is looking at the statement, the exhibit,
23             my colleague has indicated that it's City
24             Bates stamped 0013372 as the first number
25             and numbered consecutively through the six

28

Diette Nazario

1

2          pages of the document as City Bates

3          numbers.

4                MR. PREIS:   Okay.

5          A.    This is my statement that I had

6     given to the counselor.

7          Q.    Now, we're looking at the document

8     the page is num -- entitled, Victim Statement.

9     It's Pages 5 and 6 of Defendant's Exhibit 535.

10               Is that what you're talking about?

11         A.    I'm sorry?

12         Q.    We're looking at the document --

13         A.    Yes.

14         Q.    -- entitled, Victim Statement, Pages

15    5 and 6 of Defendants Exhibit 535?

16         A.    Yes.  I guess I didn't see the

17    five or the si -- I see ten and eleven.

18         Q.    That's right, ma'am.  That's my

19    fault.

20               Now, how was this Victim Statement

21    prepared?

22         A.    Well, I had -- I wanted to see how I

23    can go about getting some help on the violence

24    that was going in the home, so I went -- it was

25    like a help center, in the courthouse, and I -- I

29

Diette Nazario

1 
2 told her my story, and she prepared it, and she

3 told me my options and things that I could -- you

4 know, how to move forward, to -- to get my son

5 and I help, and -- and I gave her the

6 information.  She prepared it up and we went to

7 Court.

8          Q.   And was this a domestic services

9 counselor --

10         A.   Yes.

11         Q.   -- in the -- in the Family Court of

12 Sullivan County?

13         A.   Yes.

14         Q.   And -- and you spoke to her about

15 your story?

16         A.   Yes, I did.

17         Q.   And was -- did the counselor type

18 this statement?

19         A.   She did.

20         Q.   Okay.

21              THE WITNESS:  I'm sorry, could I

22         just have once second.  My son is --

23              MR. ROTH:  Off the record.

24              THE VIDEO OPERATOR:  Off the record

25         at 1:41.

30

1                          Diette Nazario

2              (Whereupon, there was a recess

3         taken.)

4              THE VIDEO OPERATOR:  We are back on

5         the record at 1:47.

6              (Defendant's Exhibit 536, Custody

7         Petition, City Bates number 0013468

8         through City 0013474, was marked for

9         identification.)

10             (Document submitted.)

11        Q.   Ms. Nazario, let me show you another

12   document which I've marked as Defendant's

13   Exhibit 536.  It's entitled, Petition Custody.

14             MR. ROTH:  For Counsel's benefit,

15        it's City Bates number 0013468 through

16        City 0013474.

17             (Document submitted.)

18        Q.   Let me ask you to take a look at

19   this.

20             Do you recognize Defendant's

21   Exhibit 536, Ms. Nazario?

22        A.   Yes.

23        Q.   Is this a -- a Petition for Cust --

24   Custody that you filed on or about October 7,

25   2008 with the Family Court for Sullivan County,

31

Diette Nazario

1
2      New York?

3          A.   Yes.

4          Q.   Now, the document, whose handwriting

5      is on the document?

6          A.   This is my handwriting.

7          Q.   So the -- the four -- first four

8      pages of the document, to the extent it's not

9      typed, the handwriting is yours?

10         A.   That is correct.

11         Q.   Do you recognize the signature on

12     the fourth page of the document?

13         A.   That's my signature.

14         Q.   Did the Sullivan County Domestic

15     Violence Services Counselor also assist you in

16     preparing this Custody Petition?

17         A.   She gave me the forms that I needed

18     to fill out, and I filled them out.  She wasn't

19     like, put this, put that, for example.  She gave

20     me the forms I needed.  I read them.  I filled

21     them out.

22         Q.   And the Victim Statement that's --

23     that's attached at Pages 5 and 6 of Defendant's

24     Exhibit 536 is, once again, the Victim Statement

25     that was typed by the Sullivan County Domestic

32

1                     Diette Nazario

2    Violence Services Counselor?

3          A.    Yes, this is the only thing she

4    assisted me with.  She was more there for, like,

5    support.  So this is -- this is what she typed up

6    on my behalf.

7          Q.    And the seventh page of Defendant's

8    Exhibit 536, Bates stamped City 0013474, you

9    recognize that document?  (Indicating)

10         A.    This is when the police officer came

11   in that night.  This is -- this is the statement

12   she got from Jose.

13         Q.    The seventh page of Defendant's

14   Exhibit 536, was that the -- a copy of the

15   Domestic Incident Report that the Sullivan County

16   Sheriff's Office representatives provided to you

17   on or about October 7, 2008 at your house?

18         A.    Uh-huh.

19         Q.    Is that yes?

20         A.    Yes.

21         Q.    Ms. Nazario, tell me what -- what

22   prompted you to file the Family Offense Petition,

23   Defendant's Exhibit 535, and the Petition for

24   Custody, which we've marked as Defendant's

25   Exhibit 536?

33

1                         Diette Nazario

2    ***

3             MR. PREIS:   Objection, relevance.

4        A.   Since Jose was back, we were -- we

5    were getting in a lot of arguments, and a lot of

6    them were turning physical.

7             What prompted the situation at hand

8    that night is when I was holding G██████, we had

9    gotten into an altercation, and G██████ got hurt

10   in the process.

11       Q.   What -- what night are you referring

12   to; the --the late evening hours of October 6,

13   2008, early morning hours of October 7, 2008?

14       A.   Correct.

15       Q.   What happened on that particular

16   evening, late in the evening, on October 6, 2008?

17   ***

18            MR. PREIS:   Same objection.

19       A.   Let's see, we were supposed to -- he

20   was supposed to pick me up from work.  We were

21   having problems with one of the vehicles.  We had

22   got into a verbal argument  there.  A lot of

23   cursing and swearing and name calling back and

24   forth.

25       Q.   Where was -- where was there?

34

Diette Nazario

1

2    A.    I'm sorry, I -- I was -- I had

3 worked at a particular position where I -- where

4 I had got off late at night, like 11:00, and he

5 was supposed to pick me up, because we was having

6 problems with one -- with one of our vehicles.

7    Q.    And did he pick you up?

8    A.    He did pick me up.  He -- the plan

9 was we would drop off the vehicle and get it

10 serviced, and then he would pick me up, and then

11 we would go home.

12 ***

13    MR. PREIS:  I'm just going to

14    interpose a rolling relevance objection,

15    without having to say it every time.

16    MR. ROTH:  So noted.

17    MR. PREIS:  Thank you.

18    Q.    So the -- the plan was earlier in

19 the day you were going to drop off a vehicle

20 together, to get it serviced; correct?

21    A.    It was that night, yeah.

22    Q.    That night.  And that he was going

23 to pick you up after work, sometime around

24 11:00 p.m. or thereafter, --

25    A.    (The witness nods her head).

35

Diette Nazario

1   Q.    -- so you both could go to the

2   garage to pickup the vehicle?

3   A.    So we could both go to the garage to

4   drop off the vehicle.

5   Q.    To drop off the vehicle?

6   A.    Yes.

7   Q.    And did Mr. Nazario pick you up that

8   evening, on October 6th, 2008?

9   A.    Yes.

10  Q.    And did you go to the garage?

11  A.    We did.

12  Q.    And were you going to the garage to

13  pickup a vehicle or take a vehicle?

14  A.    I -- I think we were -- we were

15  going to the garage, I'm sorry, to pickup the

16  vehicle.

17  Q.    Okay.  So the garage(sic) had been

18  dropped off earlier that day for service?

19  A.    The car.

20  Q.    The car, rather.

21  A.    Yes.

22  Q.    Sorry.

23  A.    It's okay.

24  Q.    The car had been dropped off earlier

36

                    Diette Nazario

1

2    that day for service, and you were going to the

3    garage together to pickup the car --

4         A.    That's correct.

5         Q.    -- that had been serviced?

6               And this was sometime after

7    11:00 p.m. on October 6th, 2008?

8         A.    Right.  He was very late that night.

9         Q.    So what happened when he, when

10   Mr. Nazario, took you to the garage?

11        A.    I'm not really quite sure how the

12   argument had started, but we wound up arguing.  I

13   don't know what it was about, and it just kind of

14   escalated.  And then I wound up -- I just

15   remember taking my son out of the vehicle and put

16   him into the vehicle that we were pick -- that we

17   were picking up, or that I was supposed to

18   pickup, and just driving back home.  I just

19   remember it was -- something happened where we

20   had gotten physical, and then I just remember

21   driving home with -- with G████.  I wanted to

22   get there before he did, so I could lock him out

23   the house.  And I remember calling the police,

24   asking for assistance.  (Indicating).

25        Q.    Why did you call the police?

Exhibit D
Page 257

37

Diette Nazario

1

2      A.      'Cause as -- as the days were

3  progressing our altercations were getting more

4  and more violent and there was just a lot of

5  shouting and screaming and physicality, and it

6  was just too much.  I -- I was just at my -- I

7  was -- I was kind of over it.

8      Q.      So you telephoned the police as you

9  were driving to your residence?

10      A.      Right.  I wanted them to meet me

11  there, so they could tell him to go away.

12  (Indicating).

13      Q.      And this was the home on ███████

14  ███ in Rock Hill, New York?

15      A.      Yeah.

16      Q.      So I gather Mr. Nazario was driving

17  to that particular residence in a separate

18  vehicle?

19      A.      Correct.

20      Q.      Do you recall what happened at the

21  garage to cause you to call the police on the way

22  home?

23      A.      It -- I -- I just remembered some

24  how it --it got physical and we were fighting,

25  and I just -- I just remember grabbing G███████,

38

                    Diette Nazario

1

2  putting him in the car and just racing off.

3       Q.   Do you remember anything having to

4  do with keys?

5       A.   Keys?  Well, I -- I needed the key

6  to get into the car.

7       Q.   I'm just trying to explore whether

8  or not you recall anything specific about the

9  nature of the disagreement that you had with

10 Mr. Nazario that evening at the garage.

11      A.   I know we were fighting about

12 something.  We -- we were always fighting about

13 something, but I -- I just remember -- I just

14 remember my glasses getting broken, 'cause he

15 stepped on 'em.  I remember -- I remember me

16 wanting to get something from him, and -- and --

17 and couldn't.  I don't -- I don't know if that

18 was the keys, but I -- I don't remember.

19      Q.   You indicate that your glasses were

20 broken at the garage?

21      A.   Yeah.  He stepped on 'em.

22      Q.   Was this in the parking lot --

23      A.   Yes.

24      Q.   -- there at the garage?

25      A.   I don't know if he was -- I don't

39

Diette Nazario

1  know what was going on.  Oh, I was trying -- I

2  don't know if I was trying to get my stuff out of

3  the car, of the other vehicle, to -- to put my

4  stuff in -- in -- in my vehicle, I -- but

5  something happened where my stuff wounded up on

6  the floor, and I don't know if he tossed 'em out

7  or -- or what.

8       Q.   By the floor, you mean the floor of

9  the vehicle or --

10      A.   The ground.

11      Q.   The ground.

12           So after you telephoned the police,

13  you're talking about the Sullivan County

14  Sheriff's Department?

15      A.   Right.  I had -- I had telephoned

16  them on my way home.  (Indicating).

17      Q.   After you did so and you arrived at

18  your residence on ███████████, were the

19  Sheriff's Department representatives there

20  waiting?

21      A.   No.

22      Q.   What did you do when you first

23  arrived at your home on ███████████?

24      A.   Well, I -- I locked the door.  But

40

Diette Nazario

1    that didn't really do anything, 'cause we had an
2    alarm, and he had the key, so it was --
3        Q.    Did you go in immediately?
4        A.    Oh, yeah.  Absolutely.
5        Q.    And you locked the door?
6        A.    Yeah, and I remember trying to just,
7    you know, settle my son down.  I was still
8    nursing him at that point, and I wanted to, you
9    know, get him into bed and just figure out what I
10   needed to do, because I was waiting for the
11   police to come, so I can say, hey, you know, I
12   wanted to tell  'em the situation and what was
13   going on and what led up to this point.  And I --
14   I remember wanting to do that, but I wanted to
15   get G████ down in the process, but he wasn't going
16   down.  Down in terms of going to sleep.
17       Q.    So did you hold him?
18       A.    Right, 'cause I was nursing him,
19   so...  (indicating).
20       Q.    And so at some point in time did
21   you -- did you do anything else to try to get the
22   police to respond?
23       A.    When -- when Jose had got home at
24   that point, I just remember sitting in the chair

41

                    Diette Nazario

1   with G█████, and I remember calling them, and --

2   and he had knocked me out of the chair, and G███

3   and I we fell back together.  It was -- we were

4   in the liberry(sic).

5        Q.    By he, you're talking about

6   Mr. Nazario?

7        A.    Yes.

8        Q.    What did you do after he knocked you

9   and your son G█████ out of the chair?

10       A.    I don't know if I was calling the

11  police when I had, you know, like my son in my

12  hand, (indicating), and the phone or somehow we

13  were all in the -- the liberry, and I don't know

14  if it was prior, during or after, but somehow

15  they -- they -- you know, I had called them in

16  that transition, and I remember them showing up

17  immediately, 'cause I'm like, he's right here,

18  and they could hear us arguing on the phone

19  and -- and everything.  I'm like, you need to get

20  over right now, because it's turning badly.  And

21  then maybe I fell out thereafter.  He knocked me

22  and -- and G█████ out of the chair thereafter.

23       Q.    But at some point once you arrived

24  at your residence, I gather then there was a

42

1                     Diette Nazario

2    second call that you made to the Sullivan County

3    Sheriff's Department?

4         A.    Right.   'Cause when I got there,

5    they weren't there.   And on my way home they said

6    that they would meet me there, but they --they

7    wasn't there.   Which was kind of typical for

8    them, because every time you called them, they

9    never showed up when they were supposed to.

10        Q.    So you called them a second time?

11        A.    Right, when I got home.

12        Q.    And -- and at some point after you

13   called the Sullivan County Sheriff's Department,

14   what did you do next?

15        A.    They -- they had showed up.   Jose

16   went upstairs, and he was saying, I'm unarmed.

17   And, you know, I'm -- I'm not a threat.   And one

18   officer went upstairs, and the other officer

19   stayed downstairs with my -- with myself and my

20   son.

21        Q.    The two deputies who showed up, was

22   one a male and one a female?

23        A.    Yes.

24        Q.    Did the male deputy go upstairs with

25   Mr. Nazario?

43

Diette Nazario

1

2      A.    Yeah.  At one point they were kind

3  of both upstairs with him, and then one came

4  downstairs with me, and that was the woman.

5      Q.    Do you recall whether or not you

6  were upset?

7      A.    I was very upset, 'cause G███████ got

8  hurt in the process.  I was very upset.

9  That's -- that's what created the -- that's kind

10 of what prompted everything.  That -- that's why

11 I went to the Court the next day, 'cause I was

12 like, no more.

13     Q.    During the time that the Sullivan

14 County Sheriff's Deputies were present in your

15 house, did either deputy speak to you directly?

16     A.    The woman officer came downstairs

17 and was like -- she was like, well, we listened

18 to what Jose had to say.  And I remember her

19 saying, you know, what's going on?  And I

20 remember telling her -- you know, pretty much

21 giving her the gist of it.  And she was like, you

22 need to go to Family Court and -- and get

23 yourself some help.  And she actually told me

24 where to go.  And she was like that I can file

25 for -- for protection and things of that nature.

44

Diette Nazario

1   And that's -- that's what happened; I took her

2   advice and I went.

3        Q.   Did she give you what's called a

4   Victim's Rights Notice, piece of paper?

5        A.   She gave me some information.  I

6   don't know if it was a Victim Right's Notice.  I

7   just remember her writing down the courthouse I

8   can go to, the department I needed to -- to go

9   to.  I don't know if she gave me a number either,

10  but I -- I remember her writing down all the

11  information, telling me what I needed to do to

12  get myself some help.

13       Q.   And what were you interested in --

14  in getting help with?

15       A.   I -- I wanted to keep Jose away from

16  G████ and I.  I was just sick and tired of it.

17  And I wanted to know what I could do to -- to

18  protect us.

19       Q.   Did either of the Sullivan County

20  Sheriff's Office Deputies ask you whether you

21  wanted to file a criminal complaint against

22  Mr. Nazario; do you recall?

23       A.   I don't -- I don't remember that.

24  She -- I remember her saying that he's gonna

45

Diette Nazario

1
2  leave the house, you know, so everybody can, you
3  know, kind of calm down.  And, you know, they led
4  me to believe that he'd be gone for 24 to
5  48 hours.  And they -- they waited for him to
6  leave.

7          I asked them for um -- um -- you
8  know, she -- she said that he was gonna go to a
9  hotel or something.  And that was pretty much it.

10         And then the next morning I was
11  gonna go to the courthouse and -- and get some
12  help.

13     Q.   Do you know whether or not
14  Mr. Nazario went to the hotel that evening?

15     A.   I don't know, because that -- that
16  morning, when I had woke up very early to go to
17  the courthouse, he was sleeping downstairs on the
18  couch.

19     Q.   This was the morning of October 7,
20  2008?

21     A.   Right.  And I was like, how did he
22  get in?  But the alarm, he knows the code.

23     Q.   After Mr. Nazario left the house
24  that evening or, rather, that morning, early
25  morning of 7 October, 2008, did the two Sullivan

46

Diette Nazario

1   County Sheriff's Deputies then leave?

2   A.   Yeah, they -- they left with him.

3   They waited for him to leave first, and then

4   they -- they left out.  And, to my knowledge, he

5   was gonna stay gone within the time frame that

6   she had told me.

7   Q.   After the two Sheriff's Deputies

8   left, shortly after that did you receive a

9   telephone call from one of the Deputies; do you

10  recall?

11  A.   I don't --  I don't recall -- I

12  don't remember receiving a telephone call.  I do

13  remember seeing the same female officer that

14  morning at the courthouse, and her and I had

15  chatted.

16  Q.   Did either of the Sheriff's Deputies

17  telephone you and advise you to change the pass

18  code on your security system or deactivate the

19  garage door openers?

20  ***

21  MR. PREIS:  Objection, leading.

22  A.   You know, that -- that -- that

23  could -- that could have been what happened.  I

24  was given a lot of information that night.

47

Diette Nazario

1

2    Q.    Do you recall whether or not in the

3  early morning of October 7, 2008 you made any

4  changes to the pass code in your security system?

5    A.    Well, I remember --

6  ***

7           MR. PREIS:    Objection, relevance.

8    A.    -- I -- I just remember -- I just

9  remember getting up that morning, it was very

10 early.   I was gonna have my neighbor watch

11 G▓▓▓▓▓ while I went to the Courthouse, but,

12 again, when I came downstairs, I was shocked that

13 he was even there.   And I remember him saying,

14 good morning, baby.   How you doing?   And I'm

15 like, utto.   So I ran upstairs.   I -- I just -- I

16 grabbed a jacket for G▓▓▓▓▓, and I took him out

17 and I left.

18    Q.    So you don't recall whether or not

19 you made any changes to your security system or

20 your garage door openers in the early morning of

21 October 7, 2008?

22    A.    I -- I don't remember.   I -- I could

23 have or -- I'm -- I'm not sure.   I -- I

24 remember -- I remember changing the locks.   I

25 remember, you know, the very next day I remember

48

1                        Diette Nazario

2    changing the locks and everything like that,

3    but -- but then that night, that time frame, I

4    don't remember.

5             Q.   Was this the first time that you had

6    had any problem with domestic violence with

7    Mr. Nazario?

8    ***

9             MR. PREIS:   Objection, relevance,

10           vague and ambiguous as to problem.

11           A.   No, it wasn't the first time.

12   Where -- where the police was involved?

13           Q.   No.

14           A.   No, that was the only time when the

15   police were involved.

16           Q.   The previous day, October 5, 2008,

17   did you have any issues with Mr. Nazario?

18   ***

19           MR. PREIS:   Same objection.

20           A.   We -- we were fighting all that

21   week.

22           Q.   In looking at Defendant's

23   Exhibit 535, in the Victim Statement that's

24   attached, could you take a look at that for me,

25   ma'am.  This one.  (Indicating.)

49

Diette Nazario

1
2      A.    Did you want me to read?

3      Q.    No.  I'd like -- well, to yourself

4  I'd like you to take a look at the first

5  paragraph of the Victim Statement that's part of

6  Defendant's Exhibit 535.

7      A.    Yup, I remember this.

8      G█████ N█████:  Mommy.

9      THE WITNESS:  Yes.

10     MR. ROTH:  Off the record.

11     THE VIDEO OPERATOR:  Off the record

12      at 2:09.

13      (Whereupon, there was a recess

14      taken.)

15      THE VIDEO OPERATOR:  We are back on

16      the record at 2:18.

17     Q.    Ms. Nazario, before we took our

18  short break I asked you to take a look at the

19  first paragraph of the Victim Statement that's

20  part of Defendant's Exhibit 535.  And you -- have

21  you had an opportunity to take a look at that

22  paragraph?

23     A.    Yes.

24     Q.    And, again, this was the statement

25  that was prepared by the Domestic Violence

50

Diette Nazario

1   Services Counselor during your interview?

2   A.   Uh-huh.

3   Q.   Is that yes?

4   A.   Yes.

5   Q.   Was there an earlier incident, an

6   earlier altercation or dispute, with Mr. Nazario

7   that you had on or about October 5, 2008?

8   A.   Yes.

9   Q.   What -- what happened on that date;

10  do you recall?

11  A.   Well, basically, I was on the phone

12  with my girlfriend, Tammy.  She lives in

13  California, as well.  And she was just pretty

14  much giving me some options as to what I could

15  do, you know, in terms of us divorcing and things

16  of that nature.  You know, she was -- she was

17  telling me what she went through with her

18  divorce, and just kind of giving me some -- some

19  guidance, if you will.

20  Q.   And what happened?

21  A.   Jose was listening to the

22  conversation, and he's assumed that --

23  ***

24

25  MR. PREIS:  Objection, calls for

51

Diette Nazario

1    speculation.

2        Q.    Go ahead.

3        A.    Well, he was listening to the
4    conversation.  He was outside the door.  I wasn't
5    aware of it, because when I had got off the phone
6    with Jose, he basically regurgitated to me back
7    everything that he heard myself and Tammy talking
8    about, and he thought I was after his money, but
9    we didn't have any.

10       Q.    And what happened next?

11       A.    Um, it kind of escalated.  We began
12   shouting, and then it got physical.  I remember
13   him grabbing me by my throat.  You know, I was
14   scratching him to get him off.  He slammed me
15   down on the floor.  He banged my head on the
16   floor.  I remember calling Tammy back to let her
17   know, you know, to kind of tell him what we were
18   talking about, so she could kind of diffuse it,
19   because he was very upset, obviously.  And, you
20   know, he didn't want to talk to her or anything
21   like that.

22       Q.    Did you attempt to put Mr. Nazario
23   on the phone with your girlfriend?

24       A.    Right.  He didn't want to talk to

52

                          Diette Nazario

1

2    her.

3              Q.    Is that what he said?

4              A.    Well, he didn't want her involved.

5    He walked away.  He -- 'cause I was upstairs, and

6    then he -- he went back downstairs.

7              Q.    And what happened next?

8              A.    We got into -- we -- we continued to

9    argue, and it escalated.  It wasn't -- it was

10   definitely not a -- a good situation.  Um, I just

11   remember grabbing G███████ and going to a room and

12   locking him out.  You know, I remember him

13   banging on the door.

14             Q.    By him, you're talking about

15   Mr. Nazario?

16             A.    Right.  Banging on the door.  G████

17   and I were both scared.  I remember just --

18   ***

19             MR. PREIS:  I have an objection as

20        to the extent that that response was

21        speculation.

22             A.    Well, we were scared.  I remember

23   nursing G███████, to get him to go to sleep.  Jose

24   was banging on the door.  He started playing loud

25   music.  Telling me to open the door.  And that I

53

Diette Nazario

1

2   was keeping him away from our son.   And, you

3   know, he was calling me names from B-I-T-C-H, to

4   C-U-N-T, to -- you know, just every name you

5   could think of, I was called it that night.

6           And I remember calling my Mom, so

7   she could listen to -- to the things that he was

8   saying, because there was music in the

9   background, as well.   We -- we had a really big

10  house at that time, and the music he was playing

11  was in G███████'s play room, but I was in our

12  master room.

13          Q.   After he walked downstairs, did you

14  go back downstairs after your phone conversation

15  with your girlfriend?

16          A.   From the first time when I got off

17  the phone --

18          Q.   Yes.

19          A.   -- because we -- we were -- yeah.

20  And because he had came in, and he was like --

21  the -- I guess he got the impression based on the

22  conversation that -- 'cause Tammy was telling me,

23  you know, her trials and tribulations in her

24  divorce, and what she did.   And -- and I guess --

25  I guess what happened with her situation.   And I

54

Diette Nazario

1  don't know if he took that as an indication that

2  I wanted us to go through the same scenario, what

3  they -- they -- they went through, but it was

4  just girlfriend talk.  She was giving me her

5  input, and I was listening.

6  

7        Q.    And, again, did you return back

8  downstairs in the house?

9        A.    Right, 'cause I was explaining it to

10 him.  You know, what was going on.  And that

11 wasn't true.  And then I wound up calling her

12 again.

13       Q.    And did he touch you again?

14       A.    Yeah.

15       Q.    In what way?

16       A.    We -- we were -- we were always

17 fighting.  You know, whether it was grabbing

18 or -- or physical or hitting or pushing, it was

19 always something.

20       Q.    Now, on this particular day;

21 October 5, 2008, do you recall what time this

22 incident occurred; approximately?

23       A.    It was always late at night, because

24 I worked from 2:30 to 11:00, and I would get home

25 about 11:20.

55

                              Diette Nazario

1

2       Q.   And that's 11:20 p.m.?

3       A.   Yes.

4       Q.   So you worked from 2:30 p.m. to

5   11:20 p.m.?

6       A.   To 11:00 at night.

7       Q.   11:00?

8       A.   And it was only a 20 --  15, 20

9   minute drive.

10      Q.   Now, you did not call the Sullivan

11  County Sheriff's Office on October 5, 2008?

12      A.   No.  I called them the next day.

13      Q.   Why didn't you call them on

14  October 5?

15      A.   Well, the -- the -- the plan was

16  that he was eventually gonna be leaving, because

17  he was gonna be getting his job back to

18  Riverside, so I just wanted him to leave.  And I

19  didn't want to jeopardize anything, 'cause I just

20  wanted him out.  If he want to go, go.  That was

21  pretty much the situation.

22           But the very next day it got so bad,

23  and -- and G████ got hurt in the process, I was

24  just over it.  Whether he got his job back or

25  not, I didn't care.  I was just sick of fighting

56

Diette Nazario

1   everyday, arguing everyday.  You know, my son

2   seeing, you know, mommy get hurt by daddy

3   everyday.  It was just too much.

4

5       Q.   Now, if you'll look at the second

6   paragraph of the Victim Statement on Defendant's

7   Exhibit 535, it appears to describe an incident

8   on October 6th, 2008, an incident I believe you

9   testified to, at least in part, previously.

10          Would you take a look at that second

11  paragraph for me.

12          Ms. Nazario, have -- have you had an

13  opportunity to review -- review the second

14  paragraph on the first page of the Victim

15  Statement, which is part of Defendant's

16  Exhibit 535?

17      A.   Yes.

18      Q.   Does this refresh your recollection

19  at all as to what happened during the evening of

20  October 6, 2008 with respect to picking up the

21  car at the garage?

22      A.   Um, pretty much.  Um, we were --

23  he -- he had showed up late picking me up, and we

24  got into a argument.  Our son was in -- in the

25  back, in the car seat.  And when we got to the --

57

Diette Nazario

1    it was the Aamco, we had dropped the -- we

2    were -- he was taking me to the Aamco so we could

3    pickup our other car.  And we -- we were arguing.

4    And I remember him saying, you know, get out of

5    the car "B".   And him like --

6         Q.   Get out of the car what?

7         A.   Get out of the car  "B", as in

8    B-I-T-C-H.

9         Q.   Okay.

10        A.   Because my son's in the other room,

11   I don't want him to hear me swear.

12             And, you know, I -- you know, kind

13   of like pushed me out of the car.  And I wanted

14   to get G███ in the back.  And when I grabbed G███

15   he did -- he did drive off.  And I'm like, you

16   can't just leave us here, referring to my son and

17   I.  And he threw the keys at -- he -- he gave me

18   the other keys, and he threw them at me.  And it

19   was in the dark, but there was like -- he had the

20   street lighting.  And I found the keys, and

21   picked them off the floor, put G███ and I in the

22   car.  And I needed to get the rest of my things

23   out of the car, which was probably how everything

24   landed on the floor, because he -- he took --

Exhibit D
Page 278

58

Diette Nazario

1

2  'cause I was in the driver's side -- I'm sorry,

3  the passenger's side.  He took all my stuff and

4  threw it out on the floor.

5       Q.   By the floor, you're talking about

6  the ground?

7       A.   Yeah, the ground floor.

8       Q.   Okay.

9       A.   Which is how my glasses had got

10  stepped on.  He stepped on them.

11       Q.   Okay.  And, again, this is the

12  ground outside the Aamco --

13       A.   Right.

14       Q.   -- Service Center?

15       A.   Right.

16       Q.   Okay.  And then I gather you got in

17  your car, and that's when you telephoned

18  initially the Sullivan County Sheriff's Office --

19       A.   Correct.

20       Q.   -- personnel?

21            If you'll look at the second page of

22  the Victim Statement, Ms. Nazario.  It's attached

23  to Defendant's Exhibit 535.  The first sentence

24  reads, Petitioner states that there is an

25  extensive history of abuse by the Respondent that

59

Diette Nazario

1  stretches throughout their seven and one half

2  year marriage and takes place in front of the

3  child.

4       Is this something that you told to

5  the Domestic Violence Services Counselor at the

6  time that she helped you fill out the paperwork?

7       A.   That is correct.

8       Q.   What sort of abuse were you talking

9  about?

10      A.   I was just basically giving her --

11 thank you.  I was just basically -- she asked me

12 questions, and I kind of gave her, you know, what

13 it was like throughout our marriage.

14      When we -- when we initially got

15 married we were very happy, a whole -- I thought

16 Jose had some issues because he would hit himself

17 or he would punch things.  And I just remember

18 telling my mom, oh, he kind of hits himself or he

19 punching things.  She was like, well, hopefully

20 -- she's like and, you know, eventually he's

21 gonna not wanna hit himself and punch things.

22 He's gonna wind up hitting you.  I was like, oh,

23 no, he'll never hit me, because we love each

24 other.

60

Diette Nazario

1          And then, you know, throughout the
2  marriage, especially like during the pregnancy I
3  saw some things -- you know, it -- it didn't
4  get -- things didn't really get physical, where
5  it was, you know, hands on, on me, in terms of
6  that happened when he returned from Iraq, where I
7  noticed like he would throw things at me.  You
8  know, he would -- he would yell at me or kind of
9  go off on me.  I remember when I was pregnant
10  with G████ he threw a sandwich at me.  I -- I
11  was craving something, and -- and I asked him to
12  go get it, but something happened where he got
13  upset, and when he came in he threw the bag at
14  me.  And I'm like, okay.  You know, that -- that
15  one instant.  But it was always something.  But
16  it wasn't -- you know, before he went to Iraq, he
17  was -- you know, he would just -- if he would get
18  upset, you know, it was either punch the wall
19  or -- or punch something or hit himself.  It
20  wasn't toward me, but then when he returned there
21  was like a -- in my opinion, a switch where he
22  just -- he just changed.
23          I mean, we argued and everything
24  throughout our marriage when we didn't agree and
25

61

Diette Nazario

1  things of that -- that nature, but it just seemed

2  like he was just -- he had changed when he came

3  back.

4          Q.   Did the physical aggression or

5  physical issues between you and Mr. Nazario start

6  after your initial interview with Lisa Johnson?

7          A.   What do you mean?

8          Q.   The physical aggression.

9          G█████ N█████:  Mommy.  Mommy.

10         A.   Well, it -- it was prior to me

11  talking to her.  You mean that -- that day when

12  she had -- when she had called?

13         Q.   Yes.

14         A.   And  -- and, yeah, it was -- it

15  was -- yeah.  This -- I'm sorry.

16         G█████ N█████:  Mommy.

17         MR. PREIS:  Let's go off the record.

18         MR. ROTH:  Off the record.

19         THE VIDEO OPERATOR:  Off the record

20     at 2:32.

21         (Whereupon, there was a recess

22     taken.)

23         THE VIDEO OPERATOR:  Back on the

24     record at 2:35.

62

Diette Nazario

1

2      Q.  Ms. Nazario, when you were initially

3  interviewed by Lisa Johnson and when you

4  submitted the Personal Reference Inquiry

5  Questionnaire on or about September 12, 2008,

6  that we've marked as Defendant's Exhibit 532, you

7  didn't tell Lisa Johnson about Mr. Nazario's

8  abusive conduct.

9      Why not?

10      A.  Well, I wanted -- I knew he wanted

11  to get his job back, and I didn't want to

12  jeopardize that.  And I thought it would be

13  beneficial not to tell her.  It was -- it was

14  part of our divorce.  We knew we were divorcing.

15  It was -- it was our business.  It was no one

16  else's business.

17      Q.  Now, on -- I'm going to show you a

18  document which I've marked as Defendant's

19  Exhibit 537.

20          (Defendant's Exhibit 537, Temporary

21          Order of Protection, Bates City 0013369

22          through 0013371, was marked for

23          identification.)

24          (Document submitted.)

25      Q.  As part of the contact with the

63

Diette Nazario

1
2  Sullivan County Domestic Violence Services
3  personnel did you obtain a Temporary Order of
4  Protection restraining Mr. Nazario on October 7,
5  2008 from the Sullivan County Court?
6          A.    Yes.
7          Q.    Is this a copy of the document that
8  you obtained?
9          A.    Yes.
10         Q.    Did you have contact with Riverside
11 Police Department Representative Lisa Johnson on
12 or about October 8, after you obtained the Order
13 of Protection?
14         A.    Yeah.   She -- she asked me to send
15 her the documents.
16         Q.    So did you send Ms. -- Ms. Johnson
17 the -- the Domestic Offense Petition that we've
18 previously marked as Defendant's Exhibit --
19 Family Offense Petition we previously marked as
20 Defendant's Exhibit 535?  Did you send that to --
21         A.    I sent her all the -- the
22 documentation that she asked for.
23         Q.    So you sent this exhibit to her,
24 Ms. Johnson, with the Victim Statement?
25         A.    I believe I did, yeah.

64

1                          Diette Nazario

2          Q.    And did you send Ms. Johnson the

3    copy of the Temporary Order of Protection that

4    I've marked as Defendant's Exhibit 537?

5          A.    I did.

6          Q.    And did you also send her a copy of

7    the Petition for Custody, which we previously

8    marked as Defense Exhibit 536?

9          A.    Yes.

10         Q.    At the time that you sent the   --

11   the documents to Ms. Johnson, at any time did you

12   indicate that any of the information in those

13   exhibits was incorrect?

14         A.    No.   They were all correct.

15         Q.    Ms. Nazario, at any time did anyone

16   ever tell you that Mr. Nazario claimed that you

17   made the story up about Mr. Nazario beating you?

18         A.    I'm sorry, what?

19         Q.    Well, let me show you a document

20   that I -- I will mark as Defend -- Defendant's

21   Exhibit 538.  Let me ask you to take a look at

22   it.

23              (Defendant's Exhibit 538, e-mail,

24         dated Tuesday, October 7, 2008 to Lisa

25         Johnson from Diette Nazario, Bates

65

                        Diette Nazario

1                 City 0013478, was marked for

2                 identification.)

3                      (Document submitted.)

4                 G_____ N_____:  Mommy.  Mommy.

5                 MR. PREIS:  Why don't we go off the

6                 record, Rich.

7                 MR. ROTH:  Off the record.

8                 THE VIDEO OPERATOR:  Off the record

9                 off at 2:39.

10                     (Whereupon, there was a recess

11                 taken.)

12                     THE VIDEO OPERATOR:   We are back on

13                 the record at 2:49.

14                Q.   Ms. Nazario, before our break I

15           asked you to take a look at a document, a single

16           page e-mail, that I marked as Defense

17           Exhibit 538.

18                     Ms. Nazario, have you had an

19           opportunity to review Defendant's Exhibit 538?

20                A.   Uh-huh.

21                Q.   Is that yes?

22                A.   Yes.

23                Q.   Was this an e-mail that you sent to

24           Lisa Johnson?

66

Diette Nazario

1   A.   I didn't send this e-mail to Lisa

2   Johnson.

3        Q.   Do you know who did?

4        A.   This is a e-mail Jose sent.

5   ***

6        MR. PREIS:   Objection, calls for

7        speculation.

8        Q.   In any event, the word Jose is -- is

9   the last word on the paragraph; correct?

10  ***

11       MR. PREIS:   Objection, document --

12  A.   Correct.

13       MR. PREIS:   -- speaks for itself.

14       Please wait for me to finish my

15       objections before you respond.

16       Thank you.

17       Q.   Now, Ms. Nazario, did you ever learn

18  that Jose claimed that you made up the

19  allegations of domestic violence on October 6 and

20  October 7?

21       A.   Lisa did tell me that he wrote an

22  e-mail indicating that I was fabricating, but I

23  told her that wasn't true.

24       Why would I make this up?

67

Diette Nazario

1

2    \* \* \*

3         MR. PREIS:  Move to strike as

4       nonresponsive.

5         Q.   Did you threaten Mr. Nazario,

6    threaten to cause him to not be re-employed by

7    the Riverside Police Department at any time?

8         A.   No.  I wanted him to get his job

9    back, so he could go away, and, you know, and --

10   and -- and do whatever he wanted to do.

11        Even when we were before the Judge,

12   he -- he told the Judge, you know, she can have

13   the kid.  I just want to go back to California

14   and get my life back.

15        Q.   This was the Judge --

16   \* \* \*

17        MR. PREIS:  Objection, move to

18       strike everything after no as being

19       nonresponsive to the question.

20        Q.    This was the Judge of the Family

21   Court of Sullivan County when your Family Offense

22   Petition and Petition For Custody was heard?

23        A.   Right.  Correct.

24        Q.   Did you ever learn that Mr. Nazario

25   filed or attempted to file a Family Offense

68

1                      Diette Nazario

2    Petition against you?

3          A.    Yes.   I was served.   But he had

4    dropped his case.

5          Q.   Let me show you a document which

6    I've marked --

7    ***

8                MR. PREIS:   Just let me interpose an

9          objection, Rich, if you would.

10               Move to strike the -- the witness's

11         last statement as nonresponsive.

12         Q.   Let me show you a document which I

13   marked as Defense Exhibit 539.

14               (Defendant's Exhibit 539, Family

15         Offense Petition, PLTF 033 through

16         PLTF 036, was marked for identification.)

17               (Document submitted.)

18               MR. ROTH:   And for purposes of the

19         record, it appears to be Plaintiff's Bates

20         stamped documents 033 through 036.

21         Q.   Do you recognize Exhibit 539,

22   Ms. Nazario?

23         A.   I do.

24         Q.    Looking at Page 2 of the exhibit, do

25   you recognize the handwriting on Page 2?

69

Diette Nazario

1

2      A.   It's Jose's handwriting.

3      Q.   Have you had an opportunity to read

4   this and review this handwritten paragraph on

5   Bates Stamp Page 334 of Defendant's Exhibit 539?

6      A.   Yes.

7      Q.   Is any of the information contained

8   in this paragraph true?

9      A.   No, it's not.

10      Q.   Did you ever attempt to snatch

11   G██████ N████████ from Mr. Nazario's arms?

12      A.   No.

13      Q.   Did you ever become physically

14   aggressive towards Mr. Nazario?

15   ***

16           MR. PREIS:   Objection, vague and

17       ambiguous to physically aggressive.

18      Q.   Do you understand the question,

19   Ms. Nazario?

20      A.   I do.  I -- when I -- when I was

21   physical toward him, it was me defending myself.

22   In terms of, you know, if he hits me, I hit him.

23           But I didn't have any epiphanies,

24   like, oh, I think today I want to hit you.  It

25   was nothing like that.

70

Diette Nazario

1

2     Q.   Now, after you filed your initial

3 Family Offense Petition and Petition For Custody

4 and obtained the Temporary Order of Protection

5 that we've -- you've previously looked at today,

6 and you -- you provided those to Lisa Johnson of

7 the Riverside Police Department; correct?

8     A.  Yes.

9     Q.   And did you have a -- a subsequent

10 telephone conversation with Lisa Johnson about

11 those documents?

12     A.   I did.

13     Q.   And was that the first time that you

14 discussed Mr. Nazario's aggression towards you

15 and abuse?

16     A.   That is correct.  He was out of the

17 house, and I felt like I could talk freely.

18 ***

19     MR. PREIS:  Objection, move to

20     strike everything after, that is correct,

21     being nonresponsive to the question.

22     Q.   During the time that you spoke with

23 Ms. Johnson, was Mr. Nazario present?

24     A.   I'm sorry?

25     Q.   During the time you spoke with

71

                    Diette Nazario

1

2   Ms. Johnson, was Mr. Nazario present?

3        A.   That initial time that we had spoke,

4   Jose was there, yeah.  He was in the house.

5        Q.   That was the initial time when you

6   first interviewed with Lisa Johnson in September

7   of 2000; right?

8        A.   Yes.

9        Q.   That was after you submitted the

10  initial background questionnaire?

11       A.   Correct.

12       Q.   The second time that you spoke with

13  Ms. Johnson, over the phone on or about

14  October 8, 2008, was Mr. Nazario present?

15       A.   No.  He was out of the house.

16       Q.   And during that telephone

17  conversation with Lisa Johnson, did you tell Lisa

18  Johnson about the incident on October 5, 2008,

19  that's described in your Victim Statement

20  attached to Defendant's Exhibit 535?

21       A.   Well, yes.  She asked me about it.

22  She asked me about the documentation that I sent

23  her.

24       Q.   And did you also tell her about the

25  incident that occurred in the evening of

72

Diette Nazario

1

2     October 6 and early morning of October 7, that's

3     also described in Defense Exhibit 2 -- 535?

4         A.    Yes.

5         Q.    And during that telephone con --

6     conversation with Lisa Johnson, did you indicate

7     in any way that any of the information in any of

8     the documentation provided to her by you was

9     inaccurate?

10        A.    No.  I told her it was all correct.

11              (Defendant's Exhibit 540, Order of

12              Custody, City Bates 0013361 through

13              0013362, was marked for identification.)

14              (Document submitted.)

15        Q.    Ms. Nazario, let me show you a

16    document which I've marked as Defendant's

17    Exhibit 540.  It appears to be an Order of

18    Custody issued by the Family Court of the State

19    of New York, County of Sullivan, on or about

20    October 10, 2008, by Judge Mark M. Meddaugh.

21              Do you recognize the exhibit,

22    Ms. Nazario?

23        A.    I do.

24        Q.    And were you in Court, in the Family

25    Court, of the State of New York, Sullivan County

73

Diette Nazario

1

2   on October 10, 2008?

3       A.   Yes.

4       Q.   And at that time were you awarded

5   sole custody of your son, G███████ N███████?

6       A.   Right.  We appeared before a Judge.

7           (Defendant's Exhibit 541, Order of

8           Protection, City Bates 0013358 through

9           0013360, was marked for identification.)

10         (Document submitted.)

11       Q.   And, do you recall, did you provide

12   a copy of this Order of Custody to Lisa Johnson?

13       A.   Yes, I think so.  I believe so, yes.

14       Q.   Let me show -- show you a document

15   which I've marked as Defendant's Exhibit 541.  It

16   appears to be an Order of Protection, issued by

17   the Family Court of the State of New York,

18   Sullivan County, on October 10, 2008, by Judge

19   Mark M. Meddaugh.

20         (Document submitted.)

21       A.   Yes.

22       Q.   Do you recognize the document,

23   Ms. Nazario?

24       A.   I do.

25       Q.   Is this an Order of Protection

Exhibit D
Page 294

74

Diette Nazario

1

2    issued by the Court, on October 10, 2008,

3    restraining Mr. Nazario from contact with you and

4    your son, G████ N█████?

5         A.   Yes.

6         Q.   Did you provide a copy of this Order

7    of Protection to Lisa Johnson?

8         A.   Yes.

9         Q.   Now, it appears that this Order of

10   Protection was to remain in effect up to and

11   including October 10, 2010.

12              Do you see that on the second page?

13        A.   Yes.

14        Q.   Was that the duration of the Order

15   of Protection, as you understood it to be at the

16   time?

17        A.   Yes.

18             (Defendant's Exhibit 542, e-mail,

19             dated Monday, October 13, 2008, from Lisa

20             Johnson to Diette Nazario, Bates

21             City 0013357, was marked for

22             identification.)

23             (Document submitted.)

24        A.   Well, it was 2010.  Did you say

25   2008?

75

Diette Nazario

1

2   Q.   I meant to say October 10, 2010, If

3   I didn't.

4   A.   Yeah.  Yeah,  it's 2010.

5   Q.   Was that your understanding of the

6   duration of the Order of Protection?

7   A.   Yes.

8   Q.   Ms. Nazario, let me show you an

9   e-mail exchange, which appears to be an e-mail

10  exchange between you and Lisa Johnson.  I've

11  marked it as Defendant's Exhibit 542.

12         Let me ask you to take a look at it.

13         (Document submitted.)

14  A.   Yes, she did ask me for said

15  paperwork.  And I provided it to her.

16  Q.   Well, let me just ask a few

17  preliminary questions.

18         Do you recognize Exhibit 542?

19  A.   Yes.

20  Q.   Is this an e-mail exchange that you

21  had with Lisa Johnson on or about October 11 and

22  October 13, 2008?

23  A.   Yes.

24  Q.   And on October 11 it appears that

25  you were corresponding with Lisa Johnson

76

Diette Nazario

1  

2   regarding the Court hearing that you and

3   Mr. Nazario had on October 10, 2008.

4           Do you see that?

5       A.   Yes.

6       Q.   And did Ms. Johnson ask you to

7   forward to her the -- the Final Order of

8   Protection and related Court documents that you

9   obtained on October 10, 2008?

10       A.   Yes.

11       Q.   And did you do so?

12       A.   Yes.

13       Q.   At that time did you indicate to

14   Ms. Johnson that any of the information contained

15   in the Victim Statement, the Domes -- the

16   Petition for Custody or the Family Offense

17   Petition was inaccurate in any way?

18       A.   No, I -- I -- I told her it was

19   correct.

20           (Defendant's Exhibit 543, e-mail,

21         dated Saturday, December 20, 2008, to Lisa

22         Johnson from Jose, Bates City 0013492, was

23         marked for identification.)

24           (Document submitted.)

25       Q.   Let me show you another document

77

Diette Nazario

1
2  which I've marked as Defendant's Exhibit 543.  It
3  appears to be another e-mail exchange that you
4  had with Riverside Police Department
5  Representative Lisa Johnson in December of 2008.
6          Let me ask you to take a look at it,
7  and see if you can identify it for me.
8          (Document submitted.)
9      A.   I recall this.
10     Q.   Do you recognize Exhibit 543,
11 Ms. Nazario?
12     A.   I do.
13     Q.   Is this an e-mail exchange that you
14 had with Lisa Johnson?
15     A.   Yes.
16     Q.   In conjunction with this e-mail
17 exchange with Lisa Johnson, in December of 2008,
18 at any time did you tell Ms. Johnson in any of
19 the information previously provided to her either
20 in the Sullivan County Court documents or your
21 telephone conversations with her was inaccurate?
22     A.   No.
23          (Defendant's Exhibit 544, e-mail,
24      dated Sunday, December 28, 2008, to Lisa
25      Johnson from Jose, Bates City 0013491, was

78

Diette Nazario

1    marked for identification.)

2         (Document submitted.)

3    Q.    Let me show you another document

4 which appears to be an e-mail exchange you had

5 with Lisa Johnson in or about December of 2008.

6 I have marked it as Defendant's Exhibit 544.

7         Let me ask you to take a look at it

8 and see if you recognize it.

9         (Document submitted.)

10    A.    Yes.

11    Q.    Do you recognize Exhibit 544,

12 Ms. Nazario?

13    A.    Yes.

14    Q.    And -- and what is it?

15    A.    She -- she wanted a follow-up

16 indicating if anything had changed.  And I told

17 her that everything was still the same.

18    Q.    And that the Restraining Order was

19 extended until October of 2010?

20    A.    Yeah.  It was actually extended to

21 December 31st, 2 -- 'cause I think we were

22 getting the dates wrong, so, yeah.

23    Q.    The earlier document, the --

24    A.    Yeah.

79

Diette Nazario

1   Q.   -- Final Order of Protection

2   indicated that the Order expired on October 10,

3   2010; correct?

4   A.   Right.  Um, she's thinking about

5   probably custody for G██████.  That expires

6   December 31st, 2010.

7   Q.   At any point in time, Ms. Nazario,

8   did Mr. Nazario indicate to you in any way that

9   he had been disqualified or not been able to get

10   his job back at the Riverside Police Department?

11   ***

12   MR. PREIS:   Objection, relevance,

13        marital communications.

14   Q.   Did Mr. Nazario?

15   ***

16   MR. PREIS:   Same objections.

17   A.   We -- we spoke sporadically.  He

18   indicated that, you know, because of me he

19   couldn't get his job back.

20   Q.   Do you recall when that conversation

21   with Mr. Nazario occurred?

22   A.   We were --

23   ***

24   MR. PREIS:  Same objections.

80

Diette Nazario

2     A.    -- preparing for our divorce, and
3  during those conversations we were supposed to be
4  talking about, you know, the divorce, things of
5  that nature, and he would throw that in to advise
6  me of the situation.
7     Q.    Was this sometime in 2009?
8     A.    Yes.
9     Q.    Do you recall the month?
10    A.    I don't.
11          (Defendant's Exhibit 545, Order,
12          PLTF 038, was marked for identification.)
13    Q.    Let me show you another document
14  which has been marked as Defendant's Exhibit 545.
15  It appears to be an Order issued by the Family
16  Court of the State of New York, County of
17  Sullivan, on November 17, 2009, by Judge Mark M.
18  Meddaugh.
19          Let me ask you to take a look at it,
20  and see if you recognize it?
21          (Document submitted.)
22    A.    I do.
23    Q.    And what is this document,
24  Ms. Nazario?
25    A.    To suspend the Order of Protection.

81

Diette Nazario

1

2     Q.     Did you petition the Court to

3     suspend the Order of Protection?

4         A.     I did.

5         Q.     Sometime in November of 2009?

6         A.     Yes.

7         Q.     And why did you do so?

8         A.     Jose said that he was having

9     problems getting any type of jobs via law

10    enforcement, correctional jobs, anything that

11    dealt with law.  He said that he couldn't find a

12    job, and he wanted to be able to provide

13    financial support for G█████ and I, but the

14    Restraining Order was hindering him.  So he asked

15    me if I could drop it.  And after going back and

16    forth, I decided to -- to drop it.  He said he

17    wanted to -- to contribute.

18        Q.     Up to that point in time, in or

19    about November 2009, had Mr. Nazario provided any

20    financial support to you and G█████?

21        A.     No.

22    ***

23              MR. PREIS:   Objection, irrelevant.

24        A.     He -- he -- he would send -- I

25    recall him sending $100 here at -- at one point

Rockland & Orange Reporting (845) 634-4200

Exhibit D
Page 302

82

Diette Nazario

1  in -- and during the process of us getting

2  divorced, you know, he would buy food and stuff

3  like that, but other than the events that led up

4  to that, you know, prior to this he wasn't

5  providing any support.

6  
7          Q.   Now, Defendant's Exhibit 545, the

8  Order that I showed you, this was the Order, it's

9  your understanding, the Order issued by the

10  Family Court suspending the Order of Protection?

11         A.   Yes.

12         Q.   Ms. Nazario, during the time that

13  Mr. Nazario lived with you in New York State,

14  after his employment with the City of Riverside

15  Police Department terminated, do you know whether

16  or not Mr. Nazario looked for jobs?

17  ***

18         MR. PREIS:   Objection, relevance.

19         A.   I just know what he said; that he

20  was looking for employment, but he -- he couldn't

21  because of the Restraining Order.

22  ***

23         MR. PREIS:   Interpose an objection

24         prior to the answer of it calls for

25         disclosure of marital communications.

101

Diette Nazario

1   again, to kind of finalize the divorce and -- and

2   we were trying to be amicable for the sake of our

3   child, because we weren't speaking or anything,

4   we -- we said we would try.  You know, he had

5   this conversation with me.  He said that he was

6   changed.  He was different.  And all these things

7   that we'll be better.  And that came into play

8   with him wanting to, you know, provide and -- and

9   him saying that he couldn't do anything unless

10  the Restraining Order was dropped, because he

11  couldn't move forward in getting a job, and he

12  only wanted to do law enforcement.  So, um...

13      Q.   Let me cut you off there, 'cause I

14  think that's well beyond the scope of the

15  question.

16          Let's -- let's take the Restraining

17  Order.  With respect to your decision to go and

18  petition the Court to remove the Restraining

19  Order, it was your testimony that you did that in

20  response to Jose telling you he couldn't get a

21  job and that he wanted to be able to support --

22      A.   Right.

23      Q.   -- you and G███████?

24      A.   Yes.

102

Diette Nazario

1
2    Q.   Is that a yes?
3    A.   That's correct.
4    Q.   Okay.  The home that you owned
5  together.  Were you able to sell that home?
6    A.   We did a short sale.
7    Q.   Was your husband's signature
8  required in order to sell that home?
9    A.   I had a Power of Attorney, so, no,
10  it was not.
11    Q.   So you did not get your husband's
12  signature in order to sell that home?
13    A.   Well, we attempted to.  He wasn't
14  being cooperative, so I -- I used a Power of
15  Attorney that we had.  But he was okay with that.
16  ***
17       MR. PREIS:  Well, move to strike as
18       nonresponsive.
19    Q.   Let me ask it this way:  It's your
20  testimony that you sold the home without your
21  husband's signature; correct?
22    A.   I did it with the Power of Attorney.
23  ***
24       MR. PREIS:  Okay.  Move to strike as
25       nonresponsive.

103

Diette Nazario

1    Q.    You sold the home without your

2

3    husband's signature; correct?

4    ***

5         MR. ROTH:   Object.   Objection.

6         Lacks foundation.   And, frankly, a

7         misunderstanding of what a Power of

8         Attorney is.

9    Q.    Okay.   Are you represented by

10   counsel here today?

11   A.    No.

12   Q.    Okay.   When you sold your house,

13   the house that you owned jointly with

14   Mr. Nazario, did you obtain his signature in

15   connection with the sale of that home; yes or no?

16   A.    No.

17   Q.    Okay.   Now, with respect to removing

18   the Protective Order, did your husband ever tell

19   you that he would sign off on selling the home if

20   you removed the Protective Order?

21   A.    Yeah.

22   Q.    Okay.

23   A.    It was -- it was, you do this for

24   me, and I do this for you.

25   Q.    Okay.   And that's something that you

104

Diette Nazario

1    wanted; correct?

2        A.   I'm sorry?

3        Q.   Selling the home, that's something

4    that you wanted; correct?

5        A.   It's something we both wanted.

6        Q.   Okay.  Well, --

7        A.   I told him --

8        Q.   How do you know we both wanted that?

9        A.   Well, because when we had spoke I

10   said, you can have the house.  I'll leave.  He

11   was like, well, I don't want the house.  I'm

12   moving back to California.  And I said, well, I

13   can't keep the house.  There's no way we can

14   afford  it.  My mother was paying the bills.  She

15   covered our mortgage up for a year.  And my job

16   covered the utilities.

17       Jose expressed many times, even when

18   he was still on trial, that he didn't want the

19   house.  He didn't want to live there.  And we

20   were gonna give up the house anyway.  Was -- as

21   a matter of fact when he was on trial it was on

22   the market.  So we wanted to give it up.

23       When he left, he said he didn't want

24   anything to do with it.  And I took the

105

```
 1                    Diette Nazario
 2   initiative to -- to sell the home.
 3        Q.    Let me ask you this:  Have you seen
 4   your husband in person since the sale of the
 5   home, prior to today?
 6        A.    Through mediation and when we --
 7   when we would meet sporadically so he could see
 8   G█████.
 9        Q.    Okay.  And when -- when was the
10   mediation?
11        A.    The medication was last year.
12        Q.    Do you remember a month?
13        A.    It had to be sometime in the fall,
14   'cause that's when we were kind of moving forward
15   with the divorce, to kind of get our lives back
16   on track.
17        Q.    Fall of 2009?
18        A.    Yeah.
19        Q.    Okay.  Now, when you had the
20   medication in fall of 2009, is it your testimony
21   that that's the last time that you were sexually
22   intimate with your husband, your former husband?
23        A.    Yeah.
24        Q.    So were you fearful of him then?
25        A.    Well, we were -- well, no, because
```

106

Diette Nazario

1  he -- we were -- we were meeting and he was

2  amicable.  And he was -- like when he had

3  first -- when I had first saw him again, he was

4  like, you know, come here, girl.  I miss you.

5  You look great.  And he was kind of like on me,

6  and it seemed like he was trying to rekindle

7  something.  I was like, no.  No.  But then when

8  we were -- when we initially saw each other,

9  he -- he expressed to me that he had missed me

10  and everything, and next thing I know we were

11  having relations.  It was very quick.

12      Q.   Okay.  Do me a favor, take a look at

13  Defense Exhibit 532, which should be in front of

14  you.  I believe it was either the first or second

15  exhibit Mr. Roth gave you this morning.

16           Okay.  I'd ask you to take a look at

17  the second page.  Now, you had previously

18  testified today that that is your handwriting

19  contained on the second page --

20      A.   Yes.

21      Q.   -- Exhibit 532; correct?

22      A.   Yes.

23      Q.   All right.  With respect to the

24  first question, appears to read:  How long have

107

Diette Nazario

1  

2 you known the applicant?  Do you see that?

3      A.   Uh-huh.

4      Q.   Can you read the response?

5      A.   You mean question one?

6      Q.   Yes.

7      A.   Eight years.

8      Q.   That's an eight?

9      A.   That is correct.

10     Q.   Is that a truthful statement?

11     A.   Well, when we meet we knew each for

12 other nine days and we were married thereafter.

13 So we were married nine days after we met.

14     Q.   Okay.

15     A.   So, yeah, eight years.

16     Q.   I understand that.

17        When you wrote eight years on this

18 form, at the time you wrote it, was that a

19 truthful answer?

20     A.   Well, yeah.

21     Q.   Okay.

22     A.   2001, 2008.

23     Q.   Okay.

24     A.   In -- in eight is eight years, so...

25     Q.   So that's a yes?

108

1                         Diette Nazario

2          A.    Yeah.

3          Q.    Okay.  And with respect to the

4    second question, appears to read:  What type of

5    association have you had with the applicant?

6                Do you see that?

7          A.    Uh-huh.

8          Q.    Can you read the response?

9          A.    He's my spouse.

10         Q.    Okay.  Was that a truthful response

11   at the time you made it?

12         A.    Yeah, he was my spouse at the time.

13         Q.    I appreciate that.

14               Third question says:  What faults,

15   if any, does the applicant have that would

16   conflict with the duties and responsibilities in

17   a law enforcement agency?

18               Do you see that?

19         A.    Yes.

20         Q.    Do you see your response?

21         A.    Yes.

22         Q.    What's your response?

23         A.    None.

24         Q.    Was that a truthful response at the

25   time you made it?

Rockland & Orange Reporting (845) 634-4200

Exhibit D
Page 311

109

Diette Nazario

1

2    A.   No.

3    Q.   Was it not a truthful response?

4    A.   No.

5    Q.   Okay.  Let's move on.  Number four

6  appears to say:  To your knowledge has the

7  applicant been involved in any illegal or

8  questionable conduct?

9       Do you see that?

10    A.   Yes.

11    Q.   Do you see your response?

12    A.   Yes.

13    Q.   What's your response?

14    A.   No.

15    Q.   Was that a truthful response at the

16  time you made it?

17    A.   No.

18    Q.   It was not?

19    A.   He -- he wanted to get his job back,

20  so I tailored it to what he wanted me to so he

21  could get his job back.

22    Q.   And so is it your testimony that

23  your responses on the second page of Exhibit 532

24  are untruthful?

25    A.   What I'm saying was he wanted to get

110

1                    Diette Nazario

2   his job back, and I tailored it so it wouldn't

3   jeopardize him getting his job back.

4   ***

5                    MR. PREIS:  Okay.  Move to strike as

6         nonresponsive.

7         Q.   With respect to the second page of

8   Exhibit 532, which is in front of you, which

9   you've already testified contains your

10  handwriting?

11        A.   Correct.

12        Q.   And that's also your signature at

13  the bottom?

14        A.   That is correct.

15        Q.    Is it your testimony that certain

16  responses that you wrote on this sheet were, in

17  fact, not truthful responses at the time you made

18  them; is that your testimony?

19                (Whereupon, G█████ N██████ was at

20        the deposition room door.)

21        A.   I'm -- I'm -- I'm sorry.  I was

22  distracted.

23                MR. ROTH:  Could we go off the

24        record.

25                THE VIDEO OPERATOR:  Off the record

111

Diette Nazario

1    at 3:42.

2          (Whereupon, there was a recess

3    taken.)

4          THE VIDEO OPERATOR:  We are back on

5    the record at 3:44.

6          MR. PREIS:  Okay.  Madame Reporter,

7    would you please re-read the last question

8    prior to the break.

9          THE COURT REPORTER:  Is it your

10   testimony that certain responses that you

11   wrote on this sheet were, in fact, not

12   truthful responses at the time you made

13   them; is that your testimony?

14   A.    Yes.

15   Q.    Okay.  Now, can you identify by

16   number, and when I say number, I mean number of

17   question, and we have a one through thirteen on

18   the left-hand side on of the second page of

19   Exhibit 532, can you identify by what number

20   which of your questions you're now claiming or

21   which of your responses you're now claiming were

22   not truthful at the time you made them?

23   A.    Four.  Ten.  Eleven.  Yeah.

24   Q.    Is that all?

112

Diette Nazario

1

2      A.    Yes.

3      Q.    Okay.  So, again, just to be

4  succinct on the record, it's your testimony that

5  the second page of 532, which is titled

6  Confidential Personal Reference Inquiry, which

7  you've previously testified contains your

8  handwriting and your signature and your

9  responses, it's now your testimony that your

10  response to question four, ten and eleven were

11  not truthful at the time that you made them;

12  correct?

13      A.    Correct.

14      Q.    All right.  With respect to number

15  four -- well, let me ask you this:  With respect

16  to the other questions then, being one, two,

17  three, five, six, seven, eight, nine, twelve, and

18  thirteen, were those responseful -- responses

19  truthful at the time that you made them?

20      A.    Yes, 'cause they were indicative to

21  the job, yeah.

22  ***

23          MR. PREIS:  Okay.  Move to strike

24      everything after yes as nonresponsive.

25      Q.    With respect to question number

113

Diette Nazario

1  four, it's your testimony that your response to

2  question number four was not truthful at the time

3  that you made it?

4      A.   It was not truthful because of our

5  marital problems.

6      Q.   Okay.  So with respect to the

7  question, it asks you if the applicant's been

8  involved in illegal or questionable conduct?  And

9  you say, no.  Was the -- was the no that you now

10  say wasn't truthful, was that as to illegal

11  conduct or questionable conduct?

12      A.   Well, it was to his abusive

13  behavior.  I would say that that is questionable.

14      Q.   Okay.

15      A.   Wouldn't you agree?

16      Q.   I'm not being deposed today, ma'am.

17      So with respect to your response to

18  number four, what you're now saying was not

19  truthful at the time you made it, if it was

20  truthful, your answer would have concerned the

21  alleged abusive conduct; correct?

22      A.   Everything that I said that -- that

23  I'm different from, was because of what we were

24  going on within our marriage.  As of what was

25

Rockland & Orange Reporting (845) 634-4200

Exhibit D
Page 317

114

Diette Nazario

1  going on in the marriage.  Obviously, the -- the

2  marital disputes and the -- the -- the verbal and

3  the physical confrontation that we had, that

4  wasn't truthful.  I mean, that -- that's the --

5  obviously, in my opinion, that would be a

6  conflict with what I'm saying.

7

8          Q.   All right.  Did you ever yell at

9  your husband prior to September 12th, 2008?

10         A.   We yelled at each other.

11         Q.   Is that a yes?

12         A.   Yes.

13         Q.   Did you ever use foul language in

14  front of your husband prior to September 12th,

15  2008?

16         A.   We both used foul language.

17         Q.   Is that a yes?

18         A.   Yes.

19         Q.   Did you ever touch your husband in

20  an offensive manner prior to September 12th,

21  2008?

22         A.   To get him away from me or off of

23  me, yes.

24         Q.   Did you ever throw anything at him?

25         A.   Yes.

115

Diette Nazario

1   Q.   What'd you throw at him?

2   A.   I remember running away from him and
3   I threw a pot at him.

4   Q.   Threw a pot at your husband?

5   A.   Well, not a pot.  Like a -- like
6   a -- like a very light little pottery that you
7   put trinkets in.  It was like a décor piece.  I
8   wanted him to -- I wanted to stop his speed.

9   Q.   Did you ever throw a large candle
10  stick and candles -- candle and candlestick
11  holder at your husband in the presence of your
12  father?

13  A.   In the presence of my father?

14  Q.   Presence of your father.

15  A.   My father was living upstairs with
16  us, and he never witnessed anything.  And he --
17  according to him, he never heard anything.

18  Q.   When you say, according to him, he
19  never heard anything, when did you ask him that
20  question?

21  A.   Well, when I had came up -- when
22  I -- when Jose and I was downstairs, we were
23  fighting, and I -- I threw something at him,
24  to -- to get him away from me, and I went

116

Diette Nazario

1  upstairs.  And, you know, my dad's like -- I

2  knocked on the door.  And he said, what happened?

3  And he was like, Fred, De De threw this at me.  I

4  said, well, I threw it at him, because this is

5  what was going on.  And I'm like, you didn't hear

6  any of this?  And he's like, no.  But he had the

7  t.v. up.

8      Q.    I --

9      A.    My dad's deaf.

10     Q.    -- appreciate that response.

11           Why did you throw it at him?  What

12  was going on?

13     A.    We were fighting at the time.

14     Q.    What does that mean exactly?

15     A.    We were having a dispute where I

16  felt like I had to protect myself.

17     Q.    Was he hitting you?

18     A.    We -- we were at that point, yeah.

19     Q.    Was he hitting you prior to you

20  throwing the candle and the candlestick holder at

21  him?

22     A.    Well, he was coming at me, so I -- I

23  wanted to stop his speed.

24     Q.    Okay.

117

Diette Nazario

1

2  A.    Like he dove into me or he was

3  lunging at me.

4  Q.    Did you ever throw any ketchup or

5  mustard bottles at him?

6  A.    Ketchup or mustard bottles...   I

7  don't recall.

8  Q.    Well, let me backup.   This -- this

9  incident with the candle and candlestick holder

10  when your husband -- when your father was

11  present, was that before --

12  A.    He wasn't present.   He was upstairs.

13  Q.    Well, please don't interrupt my

14  question again.

15        Was that situation before or after

16  you called the police on or about October 7th of

17  2008?

18  A.    It was before.

19  Q.    Okay.   Do you recall an incident

20  where you threw a ketchup bottle at your husband

21  and it broke and exploded all over the kitchen?

22  A.    I recall him throwing a ketchup

23  bottle at me and it broke and exploded all over

24  the kitchen.

25  Q.    Okay.   So it's your testimony that

118

1                       Diette Nazario

2      he threw the ketchup bottle at you?

3           A.    Yeah.

4           Q.    When did that happen?

5           A.    He didn't want me to eat in the car,

6      and I wanted to eat in the car, and I was

7      getting some --

8      ***

9                 MR. PREIS:  Well, move to strike as

10               nonresponsive.

11          Q.    I'm asking you for a date.  When did

12     that happen?

13          A.    I don't know the dates.  The -- it

14     had to be when we were together.

15          Q.    Well, let me see if I can help you

16     out.  Would that have been before or after you

17     called the police on October 7th of 2008?

18          A.    Before.

19          Q.    Okay.  Do you recall an incident

20     where you put a knife at your husband's throat?

21          A.    I recall an incident where he put a

22     knife at my throat.

23          Q.    Okay.  When did that occur?

24          A.    It occurred many times.

25          Q.    That he put a knife against your

119

Diette Nazario

1   throat?

2

3        A.    Or where he would chase me around
4   the house with a knife.

5        Q.    And did this occur before or after
6   you called the police on or about October 7th --

7        A.    Before.

8              MR. PREIS:  Please let me finish my
9        question.  We need to get a clear record.

10       Q.    Did that -- your allegation now of
11  your husband putting a knife at your throat, did
12  that happen before or after you calling the
13  police on October 7th of 2008?

14       A.    Before.

15       Q.    Did that occur before or after you
16  filled out the second page of Exhibit 532 on or
17  about September 12th of 2008?

18       A.    The knife incident was after.

19             The ketchup incident, I do not
20  remember.

21       Q.    So as you sit here today, it's your
22  testimony that the knife incident, where now
23  you're claiming your husband put a knife to your
24  throat, occurred some --

25       A.    I'm not claiming it.  It was true.

120

Diette Nazario

2          MR. PREIS:  Please don't interrupt

3     my question again.

4          Q.   It's now your testimony, where

5     you're alleging your husband put a knife to your

6     throat, that incident occurred sometime between

7     September 12th of 2008 and October 7th of 2008;

8     is that your testimony?

9          A.   It -- I -- I do know that incident,

10    where it -- it -- it was in the span of that

11    October week, when we were -- where it got really

12    bad be -- before I had filed for the Restraining

13    Order.  That night in -- that knife incident, at

14    that particular incident was in that -- was in

15    that -- in between that particular week, where,

16    you know, that -- before I went to the Court,

17    it's like it -- it had built up to that, 'cause

18    that's was a really, really bad fight throughout

19    that entire week, and -- and the week prior.

20         Q.   I see.  Okay.  I just want to be

21    clear.

22              Did the knife incident occur before

23    or after the police came to your home on

24    October 7th of 2008?

25         A.   The knife incident was before the

121

                    Diette Nazario

1

2  police came to my home.

3       Q.   All right.

4       A.   Before me filing.

5       Q.   Okay.

6       A.   But I thought you indicated after

7  this.  (Indicating).  This paperwork.

8       Q.   Well, with respect to the last

9  question, I was asking you whether or not the

10  knife incident occurred before or after

11  October 7th of 2008.

12            And your answer is yes; correct?

13       A.   The -- I'm sorry, the knife

14  incident?

15       Q.   Yes.

16       A.   It -- it occurred that week before

17  I -- before I did the filing of the papers.

18       Q.   Okay.  But it also occurred before

19  you called the police out to the home; correct?

20       A.   Yes.

21       Q.   Okay.  Now, to clarify your

22  question, my understanding is your testimony was

23  that the knife incident occurred after

24  September 12th of 2008; is that correct?

25       A.   Yeah, the knife incident did occur

122

Diette Nazario

1    after.  It occurred after this.  (Indicating).

2    Q.    Okay.  So your answer is yes?

3    A.    Yeah, it -- because that -- that

4    week, before I had filed and before everything

5    had really gotten escalated, was when we had that

6    knife incident, where he was chasing me around

7    the house with a knife.

8    Q.    Did you call the police when your

9    husband chased you around with the knife?

10   A.    No.  I didn't want to get any law

11   enforcement involved, because he said he was

12   going back to California to get his job back,

13   and he wanted me to wait.  For -- you know, and,

14   you know, he was like, I'm leaving anyway.  I'm

15   leaving anyway.   There was no need to call the

16   police.

17   What prompted me to call the police,

18   to get them involved, was when G████ got hurt

19   when he had pulled the chair back on both of us

20   was sitting there.  I was gonna continue to take

21   it because I knew he was leaving to get his job

22   back.  I didn't want to jeopardize him getting

23   his job back, because he said he was leaving.

132

Diette Nazario

1    marriage.

2         Q.    Now, at any time after

3    September 12th of 2008 until today has anyone

4    from the Riverside Police Department revisited

5    this questionnaire with you and asked you similar

6    type of questions that I'm asking you today?

7         A.    Prior to this date?

8         Q.    No, after this date.  Prior to

9    today.

10        A.    No, after date,  no.

11        Q.    Okay.  So you --

12        A.    Well, -- well, -- well, what I would

13   like to say was the reason why I had gave all

14   that information to Lisa, because I said, hey,

15   I -- I told her that I had lied on the

16   questionnaire, and I didn't want to be in

17   trouble, because, you know, I basically lied for

18   him to get his job back.  But these are my

19   reasons why.  And then she had asked for that --

20   all that paperwork.

21        Q.    So it's your testimony that sometime

22   after September 12th of 2008 you, in fact, did

23   tell Lisa Johnson that you had lied on the

24   Confidential Personal Reference Inquiry, which is

133

1                    Diette Nazario

2    Page 2 of Exhibit 532?

3         A.    Right, 'cause I told her that I

4    wanted him to get his job back, but I told her

5    that to me money and, you know, having that --

6    having his support wasn't worth it.  I just

7    wanted to be safe.

8         Q.    It's also your testimony, though,

9    that right around this same time Jose was leaving

10   to go back to California; correct?

11        A.    At this particular time?

12        Q.    No.  The time when you told Lisa

13   that this was a lie.

14        A.    Yeah, he was making plans to go back

15   to California, but he --

16        Q.    Okay.

17        A.    -- didn't -- yeah, but he wanted me

18   to tell her that I was coming too.  And I told

19   her that I was gonna stay in New York.  She said,

20   are you coming back to California?  I said, well,

21   I don't know.   And I remember him saying, don't

22   say that.

23              MR. PREIS:  All right.  24?

24              MR. BROWN:  For yours, I don't know.

25              MR. ROTH:  I believe it's 25.

145

Diette Nazario

1    Q.    Well, a couple things.    Number one,

2  when I say, alleged, that's not a knock on you,

3  but there's been no conviction of abuse.    That's

4  why I say alleged.    I'm not calling you a liar.

5  It's just simply how we talk as lawyers.

6        And so what I'm asking you is:    You

7  had previously testified that you did not want to

8  tell Lisa Johnson about the alleged abuse;

9  correct?

10    A.    Right.

11    Q.    Okay.    Then at some point something

12  happened, and you decided you were going to tell

13  Lisa Johnson about the alleged abuse; correct?

14    A.    Yes.

15    Q.    Okay.    So what caused you to decide

16  to call Lisa Johnson, to tell her about the

17  alleged abuse?

18  ***

19        MR. ROTH:    Objection, misstates

20        testimony.    Counsel, it was an e-mail.

21        MR. PREIS:    Well, that --that

22        probably wasn't appropriate, Rich.

23    Q.    But, go ahead, you can respond.

24    A.    What's going on?

Rockland & Orange Reporting (845) 634-4200

146

Diette Nazario

1

2      Q.   No.  You can answer the question.

3      A.   Well, I figured that the documents

4  will get pulled if they're doing a background on

5  him, and they would find out about my information

6  anyway, so I told her, to kind of get a jump,

7  saying, hey, I just wanted to let you know what's

8  going on, because I testified and said this to

9  you, and it's really this.

10     Q.   Okay.  Let me ask you to take a look

11  at Exhibit 534, which is a series of e-mails

12  previously introduced.

13     A.   544.

14     Q.   5-3-4.   I'd like to direct your

15  attention to the very top, where it says, from

16  Diette Nazario.

17          Do you see that?

18     A.   Yes.

19     Q.   You see the e-mail address that

20  appears to read, diette under score nazario at

21  live.com?

22     A.   Yes.

23     Q.   Is that your e-mail address on or

24  about October 6th of 2008?

25     A.   Yes.

<u>C E R T I F I C A T I O N</u>

I, Jacqueline Padilla, a Certified Shorthand Reporter and Notary Public within and for the State of New York, hereby certify:

That the witness whose examination is hereinbefore set forth was duly sworn by a Notary Public and that the transcript of said examination is a true record of the testimony given by said witness; and

That I am not related to any of the parties to this action by blood or marriage, and I am in no way interested in the outcome of this matter.

*Jacqueline Padilla, CSR*

_____
Jacqueline Padilla, CSR



Police
Department

## CONFIDENTIAL PERSONAL
## REFERENCE INQUIRY

**Diette Nazario**

**September 4, 2008**



Dear Diette:

**Jose Nazario** is an applicant for employment with the City of Riverside Police Department as a **Police Officer**.

This position requires a person with good moral character who is honest and industrious. All applicants must undergo an extensive and thorough background examination before they can be considered for employment.

Your name has been referred to us as a person who would have knowledge of the applicant's character, qualifications and fitness for the position. The department places a great deal of weight on information furnished by reliable citizens who are interested in the proper selection of personnel.

*The information given by you will be treated as confidential as set forth by the California Evidence Code, Section 1040.*

Please complete the questions on the reverse of this letter and return it to me as soon as possible. It is important that you complete and send this form as soon as possible to expedite the applicant's background examination. For your convenience, we enclose a self addressed, pre-paid envelope. Your cooperation and assistance in this inquiry is greatly appreciated.

Sincerely,

Russ Leach
CHIEF OF POLICE

Lisa Johnson
Background Investigator
(951) 826-5867



DEFENDANT'S
EXHIBIT
53Z
0.23.10

53-
Exhibit
Page

 

Rec'd 9/18/08
to.

## CONFIDENTIAL PERSONAL REFERENCE INQUIRY

1. How long have you known the applicant? _____ 8 yrs

2. What type of association have you had with the applicant?
   (examples: casual acquaintance, close friend, neighbor, etc.) _____ Spouse

3. What faults, if any, does the applicant have that would conflict with the duties and responsibilities in a law enforcement agency? _____ none

4. To your knowledge has the applicant been involved in any illegal or questionable conduct? _____ no

5. Have you observed the applicant display prejudice based on race, gender, sexual orientation or AIDS/HIV infection? _____ no

6. To what degree does the applicant use alcohol? _____ Social drinker
   To what degree does the applicant use illegal drugs? _____ none

7. To your knowledge, has the applicant ever been discharged from any employment? _____ no
   If yes, please list the name and address of the company and the reason for discharge.

8. Describe the applicant's home / family life. _____ great father, great dad great provider

9. Are you aware of any neighborhood problems and/or suspicious activity involving the applicant? _____ no

10. Have you ever seen the applicant in a stressful situation? Explain: _____ no

11. Does the applicant lose their temper easily? Explain: _____ no

12. Is the applicant honest? _____ yes. Reliable? _____ yes Of Good Moral Character? _____ yes
    Additional Comments: _____ great person

13. Please list the names and addresses of other persons who may have some knowledge of the applicant's qualifications:
    1. ▮▮▮▮▮▮▮▮                                2. _____

Print Name: Diette Nazario     Signature: 9/12/08 _____
Occupation and/or Title: Broad Band info tech     Date: 9/12/08

Page 1 of 3



# Johnson, Lisa K.

**From:** Diette Nazario [diette_nazario@live.com]
**Sent:** Monday, October 06, 2008 9:32 PM
**To:** Johnson, Lisa K.
**Subject:** RE: Background information

---

From: joseanddiette15@msn.com
To: diette_nazario@live.com
Subject: FW: Background information
Date: Tue, 7 Oct 2008 00:24:11 -0400

Hello Lisa,

I'm writing you this letter tolet you know that JOse has been physically abusive to me as well as verballt. I have held off in contacting the copy because I didn't want to jeopordize him getting his job back but unfortunatiey..the abuse is now coming to often where I have contacted sullivan county police regarding his violent behavior. I just wanted to make you aware of this matter. SHould you need to contact ▪▪▪▪▪▪▪▪

---

Subject: RE: Background information
Date: Sun, 5 Oct 2008 15:16:06 -0700
From: LKJohnson@riversideca.gov
To: joseanddiette15@msn.com
CC: AFLORES@riversideca.gov; GANDERS@riversideca.gov

Jose,

I don't think you have to the physical agility.  If you do, we can do it at the same time you fly back for your poly so don't worry about this Friday.  Sgt. Flores or George can you advise if has to do the PAT?

---

From: diette Nazario [mailto:joseanddiette15@msn.com]
Sent: Sat 10/4/2008 3:18 PM
To: Johnson, Lisa K.
Subject: RE: Background information

Hey Lisa, I got an email about a physical test schedualed for Oct 10th. Will anything else in the process occur at that time? I ask because I'm trying to avoid travel costs of going back and forth. Besides a poly, what else will I need to be flying back to california for? Thanks again for your help.
Jose.

10/9/2008

City0013482



Exhibit D
Page 334
534



**Subject:** RE: Background information
**Date:** Thu, 2 Oct 2008 08:52:59 -0700
**From:** LKJohnson@riversideca.gov
**To:** joseanddiette15@msn.com

Thank you. I mailed the letters out today. I saw that your registration for your Chrysler expired September 8, 2008. You can just bring your renewal in when you come in for your polygraph. Thanks!

**From:** diette Nazario [mailto:joseanddiette15@msn.com]
**Sent:** Monday, September 29, 2008 9:59 AM
**To:** Johnson, Lisa K.
**Subject:** RE: Background information

Hey Lisa,
Hope you had a great weekend. My neighbor information is as follows.



Thanks for working to get me back on. If you need anything else don't hesitate to ask.
Jose.

**Subject:** RE: Background information
**Date:** Wed, 24 Sep 2008 10:55:31 -0700
**From:** LKJohnson@riversideca.gov
**To:** joseanddiette15@msn.com

Thanks for getting back to me. I want to get everything done as quickly as possible!

**From:** diette Nazario [mailto:joseanddiette15@msn.com]
**Sent:** Monday, September 22, 2008 10:04 AM
**To:** Johnson, Lisa K.
**Subject:** RE: Background information

Hey Lisa,

10/9/2008

Exhibit D
Page 335




I just sent you a fax with my tax return and vehicle information.



(This is Officer ████'s parent's information. I resided in their home during my trial dates.)

My neighbor information will be sent in my next e-mail. Thanks again for all the work you are and have been doing. Contact me on my cell ████████ if you need anything else.

---

Subject: Background information
Date: Thu, 18 Sep 2008 16:02:25 -0700
From: LKJohnson@riversideca.gov
To: joseanddiette15@msn.com

Jose,

I hope all is well in New York. As a reminder, I still need your updated car insurance and registration for all vehicles you own. Also, I need Michael Bucy's parents' names, address, and phone numbers to send a reference letter as well as the names, addresses, and phone numbers of at least 3 of your neighbors. When you get an opportunity, please email, fax or mail the information to me. The fax number is 951-826-2544. The address to Orange Station is 4102 Orange St, Riverside CA 92501. Thank you.

Sincerely,

Officer Lisa Johnson
Personnel Services
Riverside Police Department
951-826-5867

---

Stay up to date on your PC, the Web, and your mobile phone with Windows Live. See Now

---

See how Windows Mobile brings your life together—at home, work, or on the go. See Now

---

See how Windows Mobile brings your life together—at home, work, or on the go. See Now

---

Get more out of the Web. Learn 10 hidden secrets of Windows Live. Learn Now

---

See how Windows Mobile brings your life together—at home, work, or on the go. See Now

09/29/2008  00:17   8457965821                DIETTE                    PAGE  06

F.C.A. §§ 812, 818, 821                                    Form 8-2
                                                     (Family Offense Petition)
                                                           (7/2008)

FAMILY COURT OF THE STATE OF NEW YORK
COUNTY OF
.................                                    FF# 13198

Petitioner  *Diette Sonya Nazario* Docket No. *O-02191-08*

-against                                           FAMILY OFFENSE
                                                   PETITION

*Jose Luis Nazario Jr*      Respondent

                                                   RECEIVED OCT - 7 2008

TO THE FAMILY COURT:

        The undersigned Petitioner respectfully states that: :

        1. a.  I reside at [specify address unless
        confidential]:¹ b.  The Respondent resides at
        [specify]:

                                                     *12775*

        2. a. ☐ The Respondent and I are related as follows [check applicable box(es)]:
        ☑ we are married                    ☐ we were married
        ☐ we have a child in common          ☐ we are parent & child ☐
        we are related by blood or marriage [specify how]:
        ☐ other intimate relationship (NOT casual social or business acquaintances)
        [describe]:

        b: ☐ I am a peace officer.

        3. The Respondent committed the following family offense(s) against me and/or
        my children, which constitute ☐ attempted assault ☐ assault ☐ aggravated harassment
        ☑ harassment ☑ disorderly conduct ☑ menacing ☐ reckless endangerment ☐ stalking
        ☐ criminal mischief ☐ other [specify]: *endangering welfare of a child*
        [State date, time and place of most recent incident, specify if anyone was injured (how
        seriously) and if any weapons were used.  If there were earlier incidents as well, describe
        them in additional paragraphs. Use additional sheets where necessary]:

                        *See attached hereof made a part herein*

                                                   DEFENDANT'S
                                                   EXHIBIT
                                                   535
                                                   10-23-10

¹
        If your health, safety or liberty or that of your child or children would be put at risk by disclosure of
your address or other identifying information, you may apply to the Court for an address confidentiality
order by submitting General Form GF-21. This form is available on-line at www.nycourts.gov .

                                                   Exhibit D
                                                   Page 33 *535*

4. I ☐ have ☒ have not  filed a criminal complaint concerning these incident(s) [If so, please indicate status].

5. [Delete if inapplicable]:  The Respondent has acted in a way I consider dangerous or threatening to me, my children or any member of your family, in addition to the incident described in question 3, as follows [describe]: *See attached letter made a part herein*

6. [Delete if inapplicable]: The Respondent was found to have  violated an Order of Protection issued on behalf of me or members of my family or household as follows [describe]: *NO*

7. [Delete if inapplicable]: The Respondent owns or has access to guns as follows [describe]: *NO*

8. [Delete if inapplicable]:
   a. The Respondent has a gun license or pistol permit for the following gun(s) as follows [describe]: *NO*

   b. The Respondent has a gun license or permit application pending as follows [describe]: *I don't know*
   c. The Respondent carries a gun on his or her job as follows [describe]:

9. [Delete if inapplicable]:
   a.  The Respondent threatened ☐ me ☐ my child or children [specify]: ☐ a member or members of my household [specify]: *NO*
   with a gun or dangerous instrument or object as follows [specify]:

   b.  There is a substantial risk that Respondent would use or threaten to use a firearm or dangerous instrument or object against me, my child(ren) or member of your household on the basis of the following facts and for the following reasons [describe]: *I don't know*

10. [Delete if inapplicable]: The following court cases are pending between me and the Respondent [specify court, docket or index number, nature of action and status, if known]: *NO*

11. [Delete if inapplicable]: The Respondent has the following any criminal convictions [specify, including date, crime, sentence and court, if known]:

Exhibit D
Page 338

09/29/2008   00:17   8457965821                    DIETTE                          PAGE   08

12. [Delete if inapplicable]:
    a.  The following children live in my household:

NAME    DATE OF BIRTH   LIVES WITH RELATION TO  ME   RELATION TO RESPONDENT

G███  m  10███  me Diette S Nazaric Biological

    b. The Respondent committed family offenses against the following child or children

*Au attached Lerory made a part huni*

as follows [describe including name(s) of child or children, nature of offense(s) and date(s)] [2]

13. [Delete if inapplicable]:
    a. The following pets live in my house [specify name(s) and type(s)]: *NO*

    b.  The Respondent  injured or tried or threatened to injure pets in my household
          as follows [describe]:

14.  I have not made any previous application to any court or judge for the relief requested in this petition, [except [specify the relief, if any, granted and the date of such relief; delete if inapplicable]: *NO*

WHEREFORE, Petitioner respectfully requests this Court to:

    a. adjudge  the Respondent to have committed the family offense(s) alleged;
    b. enter an order of protection, specifying conditions of behavior to be observed by the Respondent in accordance with Section 842 of the Family Court Act;
    c. enter a finding of aggravated circumstances [delete if inapplicable];
    d. enter a temporary order of child support in accordance with Family Court Act §828(4) [delete if inapplicable];
    e.211` order such other and further relief as to the Court seems just and proper.

Dated: *10/07/08*

---

[2]    Family offenses include the crimes of  assault or attempted assault,  aggravated harassment or harassment,  disorderly conduct, menacing, reckless endangerment, stalking or criminal mischief.

Diette S. Nazario
_____   _____
Petitioner ( print or type name )              Signature

_____   _____
Petitioner's Attorney, if any ( print or type name)    Signature

_____
Address and telephone number of Attorney, if any

## VERIFICATION

STATE OF NEW YORK                    )
                                                            :ss.:
COUNTY OF) Sullivan

Diette Nazario
being duly sworn, says that (he)(she) is the Petitioner(s) in the above-named proceeding and that the foregoing petition is true to (his)(her) own knowledge, except as to matters stated to be alleged

                                                                Form 8-2   Page 4

on information and belief and as to those matters (he)(she) believe(s) them to be true.

Diette Nazario
_____   _____
Petitioner: type or print name                  Signature

Sworn to before me
this day of October, 2008

_____
(Deputy)Clerk of the Court
Notary Public

## **Victim Statement**

Upon information and belief, on October 5, 2008, at the shared residence, the Respondent committed an act or acts, which constitute disorderly conduct, harassment in the second degree, menacing in the third degree, assault in the third degree and endangering the welfare of a child towards Diette Nazario who is the spouse of said Respondent, in that a verbal altercation with Petitioner which turned into a physical altercation in that the Respondent grabbed Petitioner in a choke hold Petitioner states she was unable to breath and began to scratch and try to bite Respondent's arm so he would let Petitioner go. Petitioner states their son G_____ who is 2 ½ yrs old began to cry and scream "Mommy, Mommy no"! Petitioner states Respondent let her go and Petitioner grabbed the child ran upstairs to her bedroom and called her girlfriend to defuse the Respondents behavior. Petitioner states Respondent chased Petitioner into the bedroom noticed she was already on the telephone and went back downstairs. Petitioner states when she was finished w/the telephone call she went downstairs into the kitchen in which the physical altercation continued in which the Respondent grabbed Petitioner with one hand around her throat lifting Petitioner off the floor and with the other hand on her torso and slammed Petitioner down onto the ground causing Petitioner to have bruises and a small gash in her right knee and a few small scratches on her right arm, hip and upper lip all on her right side. Petitioner states she is finding it hard to swallow and continuously has to clear her throat.

Petitioner states on October 6, 2008 a verbal altercation began which turned physical in which Respondent open hand pushed Petitioner out of the car by Petitioner's forehead and stated to Petitioner "Get out of the car bitch"! Petitioner states Respondent went to pick up Petitioner after her shift from work and had to get her car at the repair station at 11:14pm. Petitioner states both parties were arguing back and forth in reference to who was going to drive the other vehicle when Respondent got out of his vehicle ran over to Petitioner's truck grabbed the keys out of the ignition of the truck when Petitioner was getting their son out of the car seat of Respondent's vehicle. Respondent just drove off with the keys. Petitioner states she began to scream at Respondent asking him if he was going to just leave their son and her stranded in the cold and in a dark parking lot she was calling the police in which Respondent drove back and threw the truck keys in the air. Petitioner states she was able to locate the keys and in route to home called the police in fear of what Respondent may do next. Petitioner states when she arrived at home she was going onto the computer to transfer financial funds over to separate accounts since both parties are beginning the process of a divorce in which the Respondent still heated proceeded to flip the chair in which Petitioner was sitting on holding their son. Petitioner states she once again called 911 in which the Sheriff's Department arrived spoke to the Respondent and Respondent agreed to leave for the night. Petitioner gave her statement and was issued a DIR report (attached). Petitioner states when she woke up the Respondent were sleeping on the couch.

09/29/2008   00:17   8457955821                   DIETTE                        PAGE   11

Petitioner states that there is an extensive history of abuse by the Respondent that stretches throughout their 7 and ½ yr marriage, and takes place in front of the child. Petitioner states Respondent is getting worse since the conversation of getting a divorce and him loosing his employment as a Police Officer in California. Petitioner states Respondent was accused of a War Crime while he was stationed in Iraq and states he has been acquitted of this crime but is not looking for a job here in Sullivan County and blames Petitioner for their money problems. Petitioner states Respondent has thrown food at her on many occasions as well as various small household items. Petitioner states the physical abuse began while she was pregnant and even slept in the garage several times due to chemical fumes which made Petitioner sick and was told by her doctor not to be inhaling. Petitioner states the Respondent was aware of this and would not stop using the chemicals in the residence.

Petitioner is requesting an order of protection with a removal of the Respondent from the residence with the following stipulations:

- **Stay away from Petitioner and her children**
- **Stay away from Petitioner's residence**
- **Stay away from place of employment, children's school, and place of day care**
- **Refrain from communication**
- **Refrain from harassment or any act which constitute a violation of the penal law**
- **Temporary custody awarded to Petitioner with visitation suspended until further order of the court.**

Exhibit D
Page 342

FCA §§ 467, 549, 651, 652, 654;  DRL §240



DEFENDANT'S
EXHIBIT
536
10.23.10 SA

General Form 17
(Petition-Custody,
Visitation)
9/2007

FAMILY COURT OF THE STATE OF NEW YORK
COUNTY OF

In The Matter of a Proceeding for
☐Custody ☐Visitation  under Article ☐4 ☐5 ☐6
of the Family Court Act[1] or Section 240
of the Domestic Relations Law

Diette Nazario
                    Petitioner

-against-

Jose Luis Nazario Jr
                    Respondent

FF#13198

Docket No. V-02198-08
PETITION
☑CUSTODY
☐ VISITATION

TO THE FAMILY COURT:

The Petitioner respectfully alleges upon information and belief that:

1. Petitioner, Diette Nazario , [check applicable box]: ☑resides ☐ is located at [specify address or indicate if ordered to be kept confidential pursuant to Family Court Act §154-b(2) or Domestic Relations Law §254]: ███████████████████

Petitioner is [specify relationship to child; if foster parent, agency,  institution or other relationship, so state]: Biological mother

Jose Luis Nazario Jr.

2. Respondent , , [check applicable box]: ☐ resides ☐ is located at [specify address or indicate if ordered to be confidential, pursuant to Family Court Act §154-b(2) or Domestic Relations Law §254]: ███████████████████

Respondent is [specify relationship to child; if foster parent, agency,  institution or other relationship, so state]: Biological Father

3. [Delete if inapplicable]:  An order was issued by                    Court,                    County, State of.                    , referring the issue of ☐custody ☐ visitation to the Family Court of the State of New York in and for the County of [specify]:

---

1 Note:  If a custody or visitation proceeding is pending or an order of custody or visitation has been issued by a court outside of the State of New York, the custody/visitation petition for proceedings under the *Uniform Child Custody Jurisdiction and Enforcement Act,* Form UCCJEA-1 should be utilized instead of this form.  If a prior order of custody or visitation had been entered by a Court of this State, the petition for modification or enforcement, General Forms 40 or 41, should be used instead of this form.

City0013468

General Form 17   Page 2

4.  The name, present address and  date of birth of each child who is the subject of this proceeding are as follows [specify address or indicate if ordered to be kept confidential pursuant to Family Court Act §154-b(2) or Domestic Relations Law §254]:

| Name | Address | Date of Birth |
|------|---------|---------------|
| 6███████ M. M███ | ██████████ | 2/19/06 |

5.  (Upon information and belief) During the last five years, each child who is the subject of this proceeding resided at:

| Name of Child | Address Child[2] Resided at | Duration (from/to) | Name of Person Child Resided With | Current Address of the Person Child Resided With |
|---------------|----------------------------|---------------------|-----------------------------------|-------------------------------------------------|
| G███████ m L███ | (1) ████████████ | 7/06-Present | Diette Nazario ~~Jose Nazario~~ | ████████████ |
| | (2) ████████████ | 2/18/06 - 05/06 | Diette y Jose Nazario | |

6.  [Check applicable box(es).  Delete inapplicable provisions]:
a.  ☐ The father of the child(ren) who (is)(are) the subject(s) of this proceeding is [specify]:

   ☑ The father was married to the child(ren)'s mother at the time of the conception or birth.
   ☐ An order of filiation was made on [specify date and court and attach true copy]:
   ☐ An acknowledgment of paternity was signed on [specify date]:                      by
      [specify who signed and attach a true copy]:
   ☐ The father is deceased.

b.  ☐ The father of the child(ren) who (is)(are) the subject(s) of this proceeding has not been
      legally established.

c.  ☐ A paternity agreement or compromise was approved by the Family Court of
      County on                              , concerning [name parties to agreement or compromise
      and child(ren)]:                              A true copy of the agreement or compromise
is annexed hereto.

7.  [Applicable to cases in which mother is not a party]: The name and address of the mother is [indicate if deceased or if address ordered to be kept confidential pursuant to Family Court Act §154-b(2) or Domestic Relations Law §254]:

---

2 Specify address or indicate if ordered to be kept confidential pursuant to Family Court Act §154-b(2) or Domestic Relations Law §254.

Exhibit D
Page 344

General Form 17   Page 3

8. [Delete if inapplicable]: Petitioner has participated as a ☐ party ☐ witness ☐ other capacity [specify]:                        in other litigation concerning the custody of the same children in   ☐ New York State   ☐ Other jurisdiction [specify]:
If so, specify type of case, capacity of participation, court, location and status of case.

9. A custody or visitation proceeding concerning the same child(ren) ☐ is ☑ is not pending in New York State. [If pending, give court docket number and status of case].

10. The custody or visitation of the child(ren) has been agreed upon in the following custody, separation or guardianship agreement, dated [specify, and attach copy]:

11. ☐ Petitioner ☐ Respondent obtained custody of the child(ren) on [specify date]:
, as follows:

12. It would be in the best interests of the child(ren) to have ☒ custody ☐ visitation awarded to the Petitioner for the following reasons:

13. An Order of Protection or Temporary Order of Protection was issued [check applicable box(es)]: ☐ against Respondent ☐ against me in the following criminal, matrimonial or Family Court proceeding(s) [specify the court, docket or index number, date of order, next court date and status of case, if available]:

The ☐ Order of Protection ☐ Temporary Order of Protection expired or will expire on [specify date ]:

14. Petitioner requests a Temporary Order of Protection pursuant to Family Court Act §655 because [specify]: *See attached here of made a part herein*

15. The subject child(ren) ☐ are ☑ are not Native-American child(ren) subject to the Indian Child Welfare Act of 1978 (25 U.S.C. §§ 1901-1963).

16. No previous application has been made to any court or judge for the relief herein requested, (except [specify; delete if inapplicable]:                                        )

Exhibit D
Page 345

General Form  17    Page  4

WHEREFORE, Petitioner requests an order awarding ☐ custody ☐ visitation of the child(ren) to the Petitioner and for such other and further relief as the Court may determine.

Dated: *October 7, 2008*

x *Diette S. Nazario*
_____
Petitioner

_____
Print or Type Name

_____
Signature of Attorney, if any

_____
Attorney's Name (print or type)

_____
Attorney's Address and Telephone Number

VERIFICATION

STATE OF NEW YORK )
                              ) :ss:
COUNTY OF *Sullivan* )

*Diette Nazario*

being duly sworn, says that (s)he is the Petitioner in the above-named proceeding and that the foregoing petition is true to (his)(her) own knowledge, except as to matters therein stated to be alleged on information and belief and as to those matters (s)he believes it to be true.

x *Diette S. Nazario*
_____
Petitioner

Sworn to before me this *7th* day of *October, 2008*

_____
(Deputy) Clerk of the Court
Notary Public

## Victim Statement

Upon information and belief, on October 5, 2008, at the shared residence, the Respondent committed an act or acts, which constitute disorderly conduct, harassment in the second degree, menacing in the third degree, assault in the third degree and endangering the welfare of a child towards Diette Nazario who is the spouse of said Respondent, in that a verbal altercation with Petitioner which turned into a physical altercation in that the Respondent grabbed Petitioner in a choke hold Petitioner states she was unable to breath and began to scratch and try to bite Respondent's arm so he would let Petitioner go.  Petitioner states their son G████ who is 2 ½ yrs old began to cry and scream "**Mommy, Mommy no**"! Petitioner states Respondent let her go and Petitioner grabbed the child ran upstairs to her bedroom and called her girlfriend to defuse the Respondents behavior.  Petitioner states Respondent chased Petitioner into the bedroom noticed she was already on the telephone and went back downstairs.  Petitioner states when she was finished w/the telephone call she went downstairs into the kitchen in which the physical altercation continued in which the Respondent grabbed Petitioner with one hand around her throat lifting Petitioner off the floor and with the other hand on her torso and slammed Petitioner down onto the ground causing Petitioner to have bruises and a small gash in her right knee and a few small scratches on her right arm, hip and upper lip all on her right side.  Petitioner states she is finding it hard to swallow and continuously has to clear her throat.

Petitioner states on October 6, 2008 a verbal altercation began which turned physical in which Respondent open hand pushed Petitioner out of the car by Petitioner's forehead and stated to Petitioner **"Get out of the car bitch"**! Petitioner states Respondent went to pick up Petitioner after her shift from work and take her to get her car at the repair station at 11:14pm.  Petitioner states both parties were arguing back and forth in reference to who was going to drive the other vehicle when Respondent got out of his vehicle ran over to Petitioner's truck grabbed the keys out of the ignition of the truck when Petitioner was getting their son out of the car seat of Respondent's vehicle.  Respondent just drove off with the keys.  Petitioner states she began to scream at Respondent asking him if he was going to just leave their son and her stranded in the cold and in a dark parking lot she was calling the police in which Respondent drove back and threw the truck keys in the air.  Petitioner states she was able to locate the keys and in route to home called the police in fear of what Respondent may do next.  Petitioner states when she arrived at home she was going onto the computer to transfer financial funds over to separate accounts since both parties are beginning the process of a divorce in which the Respondent still heated proceeded to flip the chair in which Petitioner was sitting on holding their son.  Petitioner states she once again called 911 in which the Sheriff's Department arrived spoke to the Respondent and Respondent agreed to leave for the night.  Petitioner gave her statement and was issued a DIR report (attached). Petitioner states when she woke up the Respondent were sleeping on the couch.

Petitioner states that there is an extensive history of abuse by the Respondent that stretches throughout their 7 and ½ yr marriage, and takes place in front of the child. Petitioner states Respondent is getting worse since the conversation of getting a divorce and him loosing his employment as a Police Officer in California. Petitioner states Respondent was accused of a War Crime while he was stationed in Iraq and states he has been acquitted of this crime but is not looking for a job here in Sullivan County and blames Petitioner for their money problems. Petitioner states Respondent has thrown food at her on many occasions as well as various small household items. Petitioner states the physical abuse began while she was pregnant and even slept in the garage several times due to chemical fumes which made Petitioner sick and was told by her doctor not to be inhaling. Petitioner states the Respondent was aware of this and would not stop using the chemicals in the residence.

Petitioner is requesting an order of protection with a removal of the Respondent from the residence with the following stipulations:

- **Stay away from Petitioner and her children**
- **Stay away from Petitioner's residence**
- **Stay away from place of employment, children's school, and place of day care**
- **Refrain from communication**
- **Refrain from harassment or any act which constitute a violation of the penal law**
- **Temporary custody awarded to Petitioner with visitation suspended until further order of the court.**

Exhibit D
Page 348

**Agency** SCSO    **ORI** NY0520000    **Sprint # (NYC)**    **Incident #**

| Month | Day | Year | Time (24 hr) | Address of Occurrence | APT # | Precinct/agency CTV | Aided # (NYC) | Complaint # |
|-------|-----|------|--------------|----------------------|-------|---------------------|---------------|-------------|
| 10 | 08 | 08 | 2330 | | | | | |

| Month | Day | Year | How can we safely contact you? (e.g. Name, Phone) | | ○ Officer-Initiated  ● Radio Run  ○ Walk-In |
| 10 | 07 | 08 | 0000 | | |

**VICTIM/PARTY 1 (P1)**
Name: Last, First, M.I.) (include aliases)  Nazario  Dietta  S
Street & City
APT #    DOB  Month Day Year   Age 51   ○ Male ● Female
If non-English, language: ○ Spanish ○ Chinese ○ Other:

Injured? ● No ○ Yes   Removed to Hospital? ● No ○ Yes If yes, what hospital? ___
○ White ● Black ○ Asian ○ Hispanic ● Non-Hispanic ○ Native American ○ Unknown ○ Other:
Notes (e.g. special needs, disability, request):
Describe:

**SUSPECT / PARTY 2 (P2)**
Name: Last, First, M.I.) (include aliases)  Nazario  Jose L JR
Street & Zip
APT & Zip   DOB Month Day Year   Age 28   ● Male ○ Female
If non-English, language: ● Spanish ○ Chinese ○ Other:

Injured? ○ No ● Yes   Removed to Hospital? ● No ○ Yes If yes, what hospital? ___
Describe: scratches on arm
○ White ● Black ○ Asian ○ Hispanic ● Non-Hispanic ○ Native American ○ Unknown ○ Other:

Prior DV History? ○ Yes ● No
Prior DV police report? ○ Yes ● No
Victim fearful? ○ Yes ● No
Access to weapons? ○ Yes ● No
Suspect: Drug/Alc History? ○ Yes ● No
Suspect: Hx suicide threat? ○ Yes ● No
Suspect: Probation/Parole? ○ Yes ● No

**SUSPECT/P2 present?** ○ Yes ● No

**LIVING SITUATION**
Do parties currently live together? ● Yes ○ No
IF NO, have they lived together in the past? ○ Yes ○ No
Do the parties have a child-in-common? ● Yes ○ No

**RELATIONSHIP:** (SUSPECT / P2 to VICTIM / PI)
● Married ○ Formerly Married
○ Intimate Partner/Dating ○ Former Intimate/Dating
○ Child of victim/party 1 ○ Parent of victim/party 1
○ Relative: ___

**ASSOCIATED PERSONS**
1. Name    Phone    DOB  Month   Relationship to victim / P.I.  Son
2.

**SUSPECT ACTIONS**
(Check all that apply)
○ Biting ○ Impaired Alcohol/Drugs ● Pushing ○ Threw Items ○ Threats: (specify) ● Threat with weapon
○ Destroyed Property ○ Injury to Child ○ Sexual Assault ○ Unwanted Contact ○ Injure/Kill Persons ● Weapons used: (specify)
  (Estimated $___) ○ Injury to Other Persons ○ Shooting ○ Verbal Abuse ○ Injure/Kill Self ○ Blunt Object
○ Forced Entry ○ Injury to Pet/Animal ○ Slapping ○ Violated Visitation/ ○ Injure/Kill Pet/Animal ○ Gun
○ Forcible Restraint ○ Interference with Phone ○ Slamming Body   Custody Conditions ○ Take Child ○ Motor Vehicle
○ Hair Pulling ○ Intimidation/Coercion ○ Stabbing ○ OTHER Suspect Actions: ○ Destroy/Take Property ○ Sharp Instrument
○ Homicide ○ Kicking ○ Strangulation/"Choking" ○ Other: ___
  ○ Punching ○ Suicide or Attempt ○ Other:

**ARREST**
Arrest Made? ○ Yes ● No
Reasons arrest not made on-scene: ○ No Offense Committed ○ No Probable Cause ○ Suspect Off-Scene
○ Warrant/Criminal Summons to be requested ● Violation level: not in police presence (no citizen's arrest) ○ Other: ___

**OFFENSES & OP**

| Offenses | Law (e.g. PL) | Section (Sub) |
|----------|---------------|---------------|
| Harassment 2nd | PL | 240.26 |

Offenses Involved: (check all that apply) ○ Felony ○ Misdemeanor ● Violation ○ Other (specify)
Registry Checked? ● Yes ○ No
Order of Protection? ○ Yes ● No
Stay Away Order? ○ Yes ● No
Order Violated? ○ Yes ● No
Any PRIOR orders? ○ Yes ● No
OP Court Name:
○ Family ○ Criminal ○ Supreme ○ Out of State ○ Tribal
Expiration Date  Month  Day  Year

**STOP**
Photos Taken? ○ Yes ● No   IF YES, photos taken of: ○ Victim Injuries ○ Suspect Injuries ○ Scene ○ Damaged Property ○ Other:
Other evidence collected? ○ Yes ● No  IF YES, describe:
Results of investigation and basis of action taken. (Here excited utterances, spontaneous admissions or spontaneous statements made? ○ Yes ○ No   (Complete 710.30 or other form when applicable.)

Both parties are divorcing, argument escalated into a physical, no injuries requiring medical attention (P2 has scratches on his arm) no injuries visible on P1. Parties separated for the night P2 leaving residence. Referred to family court

**OTHER AGENCIES** involved with the parties or incident:

Is there reasonable cause to suspect a child may be the victim of abuse, neglect, maltreatment or mistreatment? If yes, the report to the NYS CHILD ABUSE HOTLINE REGISTRY is required.
○ Guns in House ○ Guns Seized ○ Has Permit ○ Permit Seized  Issuing County:
Permit #(s):    Name on Permit(s):

**CONTACTS INITIATED BY POLICE** ○ Adult Protective Services ○ Child Protective Services (or ACS) ○ Domestic Violence Services ○ Firearms Licensing ○ Mental Health ○ Parole ○ Probation ○ Rape Crisis ○ Other Agency: ___   Whom contacted?    Notified by (initials):

Officer's Signature & Rank: Deputy ___ PA C080   (PRINT and SIGN) I.D. 350  Month 10 Day 08 Year 08  If box gives was the victim offered a copy of this form? ○ Yes ○ No  Page 1

09/29/2008  00:17  8457965821                DIETTE                                PAGE  03

GFS 2002

F.C.A §§ 430, 550, 655, 828, 1029

ORI No: NY052023J
Order No: 2008-000482
NYSID No: _____

At a term of the Family Court of the State of New York, held in and for the County of Sullivan, at Government Center 100 North St., Monticello, NY 12701, on October 07, 2008

PRESENT: Honorable Mark M. Meddaugh

In the Matter of a FAMILY OFFENSE Proceeding

Diette S Nazario (DOB: ████████),
                                 Petitioner,

- against -

Jose L Nazario Jr (DOB: ████████),
                                 Respondent.

File #      13198
Docket#   O-02197-08

Temporary Order Of Protection

Ex Parte

**NOTICE: YOUR FAILURE TO OBEY THIS ORDER MAY SUBJECT YOU TO MANDATORY ARREST AND CRIMINAL PROSECUTION, WHICH MAY RESULT IN YOUR INCARCERATION FOR UP TO SEVEN YEARS FOR CRIMINAL CONTEMPT, AND/OR MAY SUBJECT YOU TO FAMILY COURT PROSECUTION AND INCARCERATION FOR UP TO SIX MONTHS FOR CONTEMPT OF COURT. IF YOU FAIL TO APPEAR IN COURT WHEN YOU ARE REQUIRED TO DO SO, THIS ORDER MAY BE EXTENDED IN YOUR ABSENCE AND CONTINUE IN EFFECT UNTIL YOU APPEAR IN COURT.**

A petition under Article 8 of the Family Court Act, having been filed on October 07, 2008 in this Court and good cause having been shown, and Jose L Nazario Jr having not been present in Court,

Now, therefore, it is hereby ordered that Jose L Nazario Jr (DOB: ████████) observe the following conditions of behavior:

[01] Stay away from:
   [A]   Diette S Nazario (DOB: ████████) and G███ M N████ (DOB: ████████);
   [B]   the home of Diette S Nazario (DOB: ████████) and G███ M N████ (DOB: ████████) and stay away from the child's day care;
   [E]   the place of employment of Diette S Nazario (DOB: ████████);

[14] Refrain from communication or any other contact by mail, telephone, e-mail, voice-mail or other means with Diette S Nazario (DOB: ████████) and G████████ (DOB: ████████);

DEFENDANT'S EXHIBIT 537

Exhibit D
Page 350

09/29/2008   00:17   8457965821                DIETTE                        PAGE   04

Page: 2
Docket No: O-02197-08
GF5 2002

[02]    Refrain from assault, stalking, harassment, aggravated harassment, menacing, reckless endangerment, disorderly conduct, intimidation, criminal mischief, threats or any criminal offense against Diette S Nazario (DOB: ████████) and G████ N████ (DOB: ████████);

[11]    Permit Jose L Nazario Jr (DOB: ████████) to enter the residence at ████████████████████ during: respondent may enter the residence with police assistance to remove personal belongings not in issue in litigation: personal belongings;

[07]    Temporary Custody of G████ N████ (DOB: ████████) shall be awarded to Diette S Nazario (DOB: ████████) under the following terms and conditions: pending further court order and all visitation between respondent and the child is suspended pending further order;

[99]    Observe such other conditions as are necessary to further the purposes of protection: any police agency shall assist in removing respondent from the residence;

It is further ordered that this Temporary Order Of Protection shall remain in effect up to and including December 31, 2008;

The Family Court Act provides that presentation of a copy of this order of protection to any police officer or peace officer acting pursuant to his or her special duties shall authorize, and sometimes requires, such officer to arrest a person who is alleged to have violated its terms and to bring him or her before the court to face penalties authorized by law.

Federal law requires that this order must be honored and enforced by state and tribal courts, including courts of a state, the District of Columbia, a commonwealth, territory or possession of the United States, if the person against whom the order is sought is an intimate partner of the protected party and has or will be afforded reasonable notice and opportunity to be heard in accordance with state law sufficient to protect that person's rights (18 U.S.C. §§2265, 2266).

It is a federal offense to:  cross state lines to violate an order of protection; cross state lines to engage in stalking, harassment or domestic violence against an intimate partner or family member; possess, purchase, ship, transfer or receive a handgun, rifle, shotgun, or other firearm or ammunition following a conviction of a domestic violence misdemeanor involving the use or attempted use of physical force or a deadly weapon; or (except for military or law enforcement officers while on duty) possess, purchase, ship, transfer or receive a handgun, rifle, shotgun or other firearm or ammunition while an order of protection, issued after notice and an opportunity to be heard, that protects an intimate partner against assault, harassment, threatening and/or stalking, remains in effect  (18 U.S.C. §§922(g)(8), 922(g)(9), 2261, 2261A, 2262).

Exhibit D
Page 351

09/29/2008   00:17   8457965821                DIETTE                        PAGE  05

Page 3
Docket No: O-02197-08
GFS 2002

PURSUANT TO SECTION 1113 OF THE FAMILY COURT ACT, AN APPEAL FROM THIS ORDER MUST BE TAKEN
WITHIN 30 DAYS OF RECEIPT OF THE ORDER BY APPELLANT IN COURT, 35 DAYS FROM THE DATE OF
MAILING OF THE ORDER TO APPELLANT BY THE CLERK OF COURT, OR 30 DAYS AFTER SERVICE BY A
PARTY OR THE LAW GUARDIAN UPON THE APPELLANT, WHICHEVER IS EARLIEST.

Dated:     October 07, 2008                              ENTER

                                          _____
                                          Honorable Mark M. Meddaugh

Next Appearance Date: 11/05/2008 at 10:30 AM - Honorable Mark M. Meddaugh, Part 1

Check Applicable Box(es):

[ ]    Party against whom order was issued was advised in Court of issuance and contents of Order

[ ]    Order personally served in Court upon party against whom order was issued

[X]    Service directed by Police Service

[ ]    [Modifications or extensions only]: Order mailed on [specify date and to whom mailed]: _____

[ ]    Warrant issued for party against whom order was issued [specify date]: _____

Exhibit D
Page 352

10/01/2008   22:54   8457965821                     DIETTE                                PAGE  02

RECEIVED
14 2008
BY:

GF5a 2002

F.C.A §§ 446, 551, 656, 842 & 1056

ORI No: NY052023J
Order No: 2008-000486
NYSID No: _____

At a term of the Family Court of the State of New York, held in and for the County of Sullivan, at Government Center 100 North St., Monticello, NY 12701, on October 10, 2008

PRESENT: Honorable Mark M. Meddaugh

In the Matter of a FAMILY OFFENSE Proceeding

Diette S Nazario (DOB: ███████),
                                    Petitioner,

- against -

Jose L Nazario Jr (DOB: ███████),
                                    Respondent.

File #      13198
Docket#   O-02197-08

Order Of Protection

Both parties present in court

NOTICE: YOUR WILLFUL FAILURE TO OBEY THIS ORDER MAY SUBJECT YOU TO MANDATORY ARREST AND CRIMINAL PROSECUTION, WHICH MAY RESULT IN YOUR INCARCERATION FOR UP TO SEVEN YEARS FOR CRIMINAL CONTEMPT, AND/OR MAY SUBJECT YOU TO FAMILY COURT PROSECUTION AND INCARCERATION FOR UP TO SIX MONTHS FOR CONTEMPT OF COURT.

A petition under Article 8 of the Family Court Act, having been filed on October 07, 2008 in this Court and on consent, and Jose L Nazario Jr having been present in Court and advised of the issuance and contents of this Order,

Now, therefore, it is hereby ordered that Jose L Nazario Jr (DOB: ███████) observe the following conditions of behavior:

[01] Stay away from:
    [A]    Diette S Nazario (DOB: ███████);
    [B]    the home of Diette S Nazario (DOB: ███████);
    [E]    the place of employment of Diette S Nazario (DOB: ███████);

[14]    Refrain from communication or any other contact by mail, telephone, e-mail, voice-mail or other means with Diette S Nazario (DOB: ███████) except for the purpose of discussing the health, safety, and well being of the child G███ N███, dob ███████ and any issues dealing with marital bills, or starting divorce proceedings;

DEFENDANT'S
EXHIBIT
541
10.2340

Exhibit D
Page 353

10/01/2008   22:54   8457965821                    DIETTE                              PAGE   03

Page: 2
Docket No: O-02197-08
GPSa

[02]   Refrain from assault, stalking, harassment, aggravated harassment, menacing, reckless endangerment, disorderly conduct, intimidation, criminal mischief, threats or any criminal offense against Diette S Nazario (DOB: ▮▮▮▮ and G▮▮▮▮ N▮▮▮▮ (DOB: ▮▮▮▮);

[11]   Permit Jose L Nazario Jr (DOB: ▮▮▮▮) to enter the residence at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ during: respondent may enter the residence with police assistance to remove personal belongings not in issue in litigation: personal belongings;

[99]   Observe such other conditions as are necessary to further the purposes of protection: Diette S. Nazario Jose L Nazario Jr (DOB: ▮▮▮▮ will agree to foward any mail;

It is further ordered that this Order Of Protection shall remain in effect up to and including October 10, 2010;

Dated:     October 10, 2008                          ENTER

Honorable Mark M. Meddaugh

The Family Court Act provides that presentation of a copy of this order of protection to any police officer or peace officer acting pursuant to his or her special duties shall authorize, and sometimes requires, such officer to arrest a person who is alleged to have violated its terms and to bring him or her before the court to face penalties authorized by law.

Federal law requires that this order must be honored and enforced by state and tribal courts, including courts of a state, the District of Columbia, a commonwealth, territory or possession of the United States, if the person against whom the order is sought is an intimate partner of the protected party and has or will be afforded reasonable notice and opportunity to be heard in accordance with state law sufficient to protect that person's rights (18 U.S.C. §§2265, 2266).

It is a federal offense to:  cross state lines to violate an order of protection; cross state lines to engage in stalking, harassment or domestic violence against an intimate partner or family member; possess, purchase, ship, transfer or receive a handgun, rifle, shotgun, or other firearm or ammunition following a conviction of a domestic violence misdemeanor involving the use or attempted use of physical force or a deadly weapon; or (except for military or law enforcement officers while on duty) possess, purchase, ship, transfer or receive a handgun, rifle, shotgun or other firearm or ammunition while an order of protection, issued after notice and an opportunity to be heard, that protects an intimate partner against assault, harassment, threatening and/or stalking, remains in effect  (18 U.S.C. §§922(g)(8), 922(g)(9), 2261, 2261A, 2262).

PURSUANT TO SECTION 1113 OF THE FAMILY COURT ACT, AN APPEAL FROM THIS ORDER MUST BE TAKEN WITHIN 30 DAYS OF RECEIPT OF THE ORDER BY APPELLANT IN COURT, 35 DAYS FROM THE DATE OF MAILING OF THE ORDER TO APPELLANT BY THE CLERK OF COURT, OR 30 DAYS AFTER SERVICE BY A PARTY OR THE LAW GUARDIAN UPON THE APPELLANT, WHICHEVER IS EARLIEST.

Exhibit D
Page 354

Page: 3
Docket No: O-02197-08
GF5A

**Check Applicable Box(es):**

[X]    Party against whom order was issued was advised in Court of issuance and contents of Order

[X]    Order personally served in Court upon party against whom order was issued

[ ]    Service directed by other means [specify]: _____

[ ]    [Modifications or extensions only]: Order mailed on [specify date and to whom mailed]:_____

[ ]    Warrant issued for party against whom order was issued [specify date]:_____

## Johnson, Lisa K.

**From:**    Johnson, Lisa K.
**Sent:**    Monday, October 13, 2008 8:44 PM
**To:**      Diette Nazario
**Subject:** RE: fax

Diette,

Hello.  Yes I received your fax.  Thank you.  If you could fax the other documents, I would appreciate it. What happened on October 10?

Thank you so much for keeping me updated.

Lisa

---

**From:** Diette Nazario [mailto:diette_nazario@live.com]
**Sent:** Sat 10/11/2008 5:04 PM
**To:** Johnson, Lisa K.
**Subject:** fax

Hello Lisa,

Just following up, per our conversation, I am just confirming you received my faxed. I also got additional papers regarding the order of protection at court Oct 10. If you would like me to fax that information to you as well I can.

Diette

---

See how Windows connects the people, information, and fun that are part of your life. See Now

DEFENDANT'S
EXHIBIT
542
10·23·10
PENGAD 800·631·6989

11/12/2008

## Johnson, Lisa K.

**From:**   Johnson, Lisa K.
**Sent:**   Monday, October 13, 2008 8:44 PM
**To:**   Diette Nazario
**Subject:** RE: fax

Diette,

Hello.  Yes I received your fax.  Thank you.  If you could fax the other documents, I would appreciate it. What happened on October 10?

Thank you so much for keeping me updated.

Lisa

---

**From:** Diette Nazario [mailto:diette_nazario@live.com]
**Sent:** Sat 10/11/2008 5:04 PM
**To:** Johnson, Lisa K.
**Subject:** fax

Hello Lisa,

Just following up, per our conversation, I am just confirming you received my faxed. I also got additional papers regarding the order of protection at court Oct 10. If you would like me to fax that information to you as well I can.

Diette

---

See how Windows connects the people, information, and fun that are part of your life. See Now

DEFENDANT'S EXHIBIT
5 d z
10.23.10

11/12/2008



Page 1 of 1

## Johnson, Lisa K.

**From:** jose [joseanddiette15@msn.com]
**Sent:** Sunday, December 28, 2008 3:07 PM
**To:** Johnson, Lisa K.
**Subject:** RE: updated information

Lisa fyi..the restraining order has been extended until Oct 2010 not December 2008. Per our last conversation, I had faxed you over paperwork indicating documents.

Diette

---

Subject: updated information
Date: Fri, 19 Dec 2008 08:55:49 -0800
From: LKJohnson@riversideca.gov
To: joseanddiette15@msn.com

Diette,

I hope you are doing well.

I am writing my report on Jose and wanted to know if there were any new developments since I last spoke with you.  I know the Restraining Order is in effect until 12/31.  Have there been any violations on his part and do you plan to extend it?

I know it's a busy time of year, but any information you can provide would be greatly appreciated.

Sincerely,

Officer Lisa Johnson
Personnel Services
Riverside Police Department
951-826-5867

---

Send e-mail anywhere. No map, no compass. Get your Hotmail® account now.

DEFENDANT'S EXHIBIT 544 10-23-10

Exhibit D
Page 358   544

City0013491

NOTICE OF ENTRY
PLEASE TAKE NOTICE that the within
is a true copy of an order entered in the
office of the Clerk of the Family Court of
the State of New York in the County
of Sullivan on November 19, 2009

(Deputy) Chief Clerk of the Court

At a term of the Family Court of the
State of New York, held in and for
the County of Sullivan, at
Government Center, 100 North St.,
Monticello, NY 12701, on
November 17, 2009

**PRESENT:**  Hon. Mark M. Meddaugh

In the Matter of a **Family Offense** Proceeding

**Diette Sonya Nazario,**

Petitioner,

- against -

**Jose Luis Nazario Jr,**

Respondent.

**File #:**     13198
**Docket #:**  O-02197-08/09B

**ORDER**

PURSUANT TO SECTION 1113 OF THE FAMILY COURT ACT, AN APPEAL FROM THIS ORDER MUST BE TAKEN WITHIN 30 DAYS OF RECEIPT OF THE ORDER BY APPELLANT IN COURT, 35 DAYS FROM THE DATE OF MAILING OF THE ORDER TO APPELLANT BY THE CLERK OF COURT, OR 30 DAYS AFTER SERVICE BY A PARTY OR THE LAW GUARDIAN UPON THE APPELLANT, WHICHEVER IS EARLIEST.

Diette Sonya Nzario having filed a modification petition with this Court seeking to vacate the Order of Protection and both parties having appeared in Court; it is hereby

ORDERED that the modification petition filed by the Petitioner, Diette Sonya Nazario is hereby granted and the Order of Protection which was signed on October 10, 2008 and in effect until October 10, 2010 is hereby vacated.

**Dated:** November 18, 2009                **ENTER**

Hon. Mark M. Meddaugh

Check applicable box:
☒ Order mailed on [specify date(s) and to whom mailed]: 11/19/09
☐ Order received in court on [specify date(s) and to whom given]: _____

CC:   Jose Luis Nazario Jr, Respondent
      Diette Sonya Nazario, Petitioner



DEFENDANT'S EXHIBIT 545

Exhibit D
PLTF0369    545

**Exhibit E**

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | | |
|---|---|---|
| JOSE LUIS NAZARIO, Jr., an Individual, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) ) | No. CV10-1731 VAP (DTBx) |
| CITY OF RIVERSIDE; and DOES 1 - 10, | ) ) ) | |
| Defendants. | ) ) | |

ORIGINAL

DEPOSITION OF MICHAEL J. BLAKELY

WEDNESDAY, DECEMBER 22, 2010

RIVERSIDE, CALIFORNIA

Reported by:

CARA JACOBSEN

CSR No. 13053

File No. 101222CJA

1

```
 1        RIVERSIDE, CALIFORNIA; WEDNESDAY, DECEMBER 22, 2010

 2                          9:33 A.M.

 3

 4                     MICHAEL J. BLAKELY,

 5              called as a witness by and on behalf of

 6              the Plaintiff, being first

 7              duly sworn, was examined and testified

 8              as follows:

 9

10                        EXAMINATION

11     BY MR. PREIS:

12         Q.    Good morning.

13         A.    Good morning.

14         Q.    Can I simply refer to you as Chief Blakely,

15     is that appropriate?

16         A.    Sure.

17         Q.    Please state and spell your name for the

18     record.

19         A.    My name is Michael Blakely, B-l-a-k-e-l-y,

20     and the spelling of my last name is B-l-a-k-e-l-y.

21         Q.    Thank you.

22              You understand that I represent

23     Jose Luis Nazario in his lawsuit against the City of

24     Riverside, correct?

25         A.    Yes, I do.
```

                                                                    7

1        Q.    Though the setting here today is informal,

2   you understand that the oath that you've just taken

3   is the same oath that you would take if you were in a

4   court of law, correct?

5        A.    Yes.

6        Q.    As such, you're under the same obligation to

7   tell the truth.

8              Do you understand that?

9        A.    Yes, I do.

10       Q.    You are also subject to the same penalty of

11  perjury as if you were testifying in court.

12             Do you understand that?

13       A.    Yes, I do.

14       Q.    Have you ever gone by any other names?

15       A.    No.

16       Q.    Have you taken any medications in the past

17  24 hours that affect in any way your memory or

18  ability to testify?

19       A.    No, sir.

20       Q.    Have you ingested alcohol or any other drugs

21  during the last 48 hours that in any way impairs your

22  ability to testify here today?

23       A.    No, sir.

24       Q.    Is there any reason why, physically,

25  emotionally, or otherwise, you cannot give your best

8

1    spoke with him, that's correct.

2          MR. PREIS:  All right.  If we could take a

3    brief timeout, we're just about there.

4          MR. ROTH:  That's fine.

5          (Recess taken from 4:18 p.m. to

6          4:27 p.m.)

7          MR. PREIS:  All right.  Back on the record.

8    Q.    Chief Blakely, you testified that the -- and

9    again, not putting words in your mouth, but one of

10   the major considerations or the major consideration

11   in the determination not to rehire Nazario was the

12   restraining order, correct?

13   A.    Yes, sir.

14   Q.    Why was that such a major determination or

15   consideration?

16   A.    It is in our policies or practices -- not

17   policies so much as practices with our department, it

18   is a major issue for consideration under POST

19   guidelines, it fits in those criteria.  And the

20   condition of the temporary restraining order has

21   potential limitations to being able to carry a

22   firearm, owning and possessing a firearm, all those

23   issues of -- for those types of matters clearly

24   impede with your ability to be a peace officer.  And

25   until you get that thing resolved, you know, we

                                                      282

1    really can't deal with you as a peace officer.

2         So if an applicant applying for a position

3    with a TRO, Temporary Restraining Order, against

4    them, then the impact of that to us in those areas

5    pretty much eliminates him as -- for consideration

6    until that matter is resolved.

7    Q.   Did you say that was an RPD in addition to

8    being a POST policy?

9    A.   It's just more a practice for us, it's

10   just -- I've been looking at these since August of

11   '06.   Nobody with an active TR- -- Temporary

12   Restraining Order has been processed through.   We

13   stop right there.   It's -- that's a reason to tell

14   them we'll -- you know, let us know if there's a

15   change in your status there.   We wouldn't even pursue

16   to the extent that we've done here in Jose's part of

17   going in and underlying, getting the information in

18   the court sytem; all we would get is validation that

19   there was one in place, then that would be the end of

20   us.   We're not going to be, you know, pursuing you;

21   we'd go to the other candidates who don't have such a

22   precluder [sic] for us, a factor that would be a

23   disqualifying factor on its own.

24   Q.   The RPD practice or policy that you just

25   described, is that written down anywhere, concerning

283

1    TRO's?

2        A.    No, it's just -- just a practice.  We have

3    policies dealing with temporary restraining orders

4    from officers and how they handle it in the field and

5    things of that nature, and then I have my experience

6    in dealing with individuals that we have, is our

7    employee who have TRO's applied against them.

8        Q.    Do you recall reading this specific TRO

9    concerning Nazario?

10       A.    It's long time ago, yes.  I believe that,

11   quite frankly, I'm -- I just -- the part that stuck

12   for me was that the judge had extended it for a

13   two-year period up through -- I think it was, like,

14   December of 2010.  So it wasn't what we call as a --

15   sometimes it's a temporary one, you know, as you say,

16   you know, an emergency one where you get until the --

17   you only have one side till the other side gets into

18   the hearing and hears -- puts her position on.  Well,

19   it's beyond that when the judge takes that, has that

20   opportunity, and extends it to a two-year period.

21   It's not a temporary restraining order, you know, at

22   that point in my view.  And that's -- that's what

23   focused -- that's what my memory is.

24       Q.    And you recall that the TRO with respect to

25   Nazario was issued by a judge in the State of

284

1    New York, correct?

2         A.    A magistrate or something.  Yeah.

3         Q.    Yeah, it might have been a magistrate.

4               Do you recall reading language in that TRO

5    that specifically excluded military members and

6    police officers from the prohibition of carrying a

7    firearm while on duty?

8         A.    I don't -- like I said, I don't really have

9    a recall now of reading the actual restraining order

10   at this moment, so I can't -- I can't answer that

11   question for you at this time.

12        Q.    Do you recall the time frame that you read

13   the TRO?

14        A.    I'm telling you, I don't have a recall of

15   actually reading the actual TRO, so I can't tell you

16   when the time frame is for that.  It would have

17   been -- my consideration was primarily based on the

18   information I got in the summary of the report

19   dealing with that; that's what I remember today, that

20   it extended to -- I believe it was December of 2010

21   by the magistrate.

22        Q.    And you said something to the effect of --

23   I'm not putting words in your mouth, but something to

24   the effect of -- and these are my words -- usually

25   when somebody gets a TRO and they're an applicant

285

```
1    it's a deal killer?

2        A.   It's -- we don't want to pursue further work

3    on the case until that thing is resolved.  And for

4    most of the application process you -- you look only

5    for is this something that is a -- prior to -- you

6    know, the emergency TRO, so to speak, which is only

7    one party or do you wait until the court -- in most

8    cases we wait until the judge has had a chance at the

9    end of the hearing, and then depending on what

10   happens there, we either get it resolved or we move

11   forward.  But if that judge then upholds that after

12   that hearing, for us that's -- that's a deal breaker

13   and that's the end of an applicant at that point.

14        But we oftentimes might wait where somebody

15   goes, Wait, something happened, I just had something

16   happen, I'm going through a divorce, I told you, told

17   the background investigator, and now my wife has put

18   a TRO against me.  Well, oftentimes we'll say, Well,

19   let's see what happens, but -- when you have your

20   chance before the magistrate or the judge.

21        But if the judge enacts that and carries it

22   forward, then that usually is the end of us -- of

23   the -- us working on that case, because we -- in my

24   experience of being directly involved in that since

25   August of '06, nobody with a active TRO was continued
```

286

1    through the background process for hiring.

2         Q.    And in the time frame that we're talking

3    here, which is the end of '08, the beginning of '09,

4    was it RPD's understanding that Mr. Nazario was, in

5    fact, going through a divorce?

6         A.    Yes, we learned that.

7         Q.    And in this particular case, RPD did

8    continue its background investigation after receiving

9    the TRO, correct?

10        A.    Yes.

11        Q.    Why?

12        A.    Because -- why?  Because there were the

13   other factors that were involved that we were still

14   had done work on gathering that information.  The

15   information we gathered now just needed to be

16   collated, reported, and put into a synopsis, so yes.

17   I felt that was important.

18        Q.    Just for clarity, those "other factors"

19   you're referring to were what we've been calling "the

20   Nelson tapes" and Fallujah, correct?

21        A.    Correct.  And there could have been other

22   things.  I remember I told you there were other --

23   other things that come out of there that we might

24   have pursued had there not been the TRO, you know, to

25   where we would have -- we generally call the

287

1    applicants and sit them down and go, Hey, this is

2    what we've learned, you know.  You get a response

3    from them, and then that response could be adequate

4    or not.  And if it's adequate, we move them down the

5    process.

6              MR. PREIS:  How deep into the ten minutes

7    are we?

8              THE WITNESS:  Not that I'm counting.

9              MR. BROWN:  About eight-and-a-half.

10             THE WITNESS:  Yeah, not that I'm counting,

11   but --

12             MR. PREIS:  You got anything, Rich?

13             MR. ROTH:  No.

14             MR. PREIS:  Why don't we go off the record

15   for a minute.

16             (Pause in the proceedings.)

17             MR. PREIS:  Go back on the record.

18             Propose that we relieve the court reporter

19   of her duties; propose that the original transcript

20   be sent to Riverside's counsel, Mr. Roth, who will

21   then forward it to the deponent, who in turn shall

22   have 14 days to review the transcript, make changes,

23   and return it to his counsel, who will then notify my

24   office of any changes within five days thereafter.

25             Riverside counsel shall maintain the

288

1   original of the transcript and agrees to make it

2   available at the time of trial or any other pre-trial

3   proceeding.  If for some reason the original is lost

4   or misplaced, the parties may use a certified copy of

5   the transcript at the time of the trial or any other

6   proceeding as though it were the original.

7        MR. ROTH:  So stipulated.

8        MR. BROWN:  So stipulated.

9        MR. PREIS:  So stipulated.

10       Thanks for your time.

11       (The deposition was concluded at

12       4:36 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

                                              289

```
1

2

3

4

5    STATE OF CALIFORNIA        )
                                )   ss.
6    COUNTY OF LOS ANGELES      )

7

8           I, MICHAEL J. BLAKELY, having appeared for

9    my deposition on Wednesday, December 22, 2010, do

10   this date declare under penalty of perjury that I

11   have read the foregoing deposition, I have made any

12   corrections, additions or deletions that I was

13   desirous of making in order to render the within

14   transcript true and correct.

15          IN WITNESS WHEREOF, I have hereunto

16   subscribed my name this  21  day of JANUARY      ,

17   2011.

18

19

20

21

22

23                        W I T N E S S

24

25
                                                      290
```

```
 1    STATE OF CALIFORNIA        )
                                 )   ss.
 2    COUNTY OF LOS ANGELES      )

 3

 4         I, CARA JACOBSEN, CSR No. 13053, a court

 5    reporter for the County of Los Angeles, State of

 6    California, do hereby certify;

 7         That prior to being examined, MICHAEL J.

 8    BLAKELY, the witness named in the foregoing

 9    deposition, was by me duly sworn to testify the

10    truth, the whole truth, and nothing but the truth;

11         That said deposition was taken before me at

12    the time and place herein set forth, and was taken by

13    me in shorthand and thereafter transcribed into

14    typewriting under my direction and supervision, and I

15    hereby certify that the said deposition is a full,

16    true and correct transcript of my shorthand notes so

17    taken;

18         I further certify that I am neither counsel

19    for nor related to any party to said action, nor in

20    any way interested in the outcome thereof.

21         IN WITNESS WHEREOF, I hereto subscribe my

22    name this 6th day of January, 2011.

23

24         _____
           Certified Shorthand Reporter in and for the
25         County of Los Angeles, State of California
```

291