**Exhibit E**

# CITY OF RIVERSIDE
## POLICE OFFICER ORAL INTERVIEW

**TOTAL SCORE**

*84.28*

APPLICANT NAME : *Jose Nazario*

INSTRUCTIONS : Rate each job dimension with a numeric score. You will find helpful hints and questions to each job dimension in the questionnaire. Use all of the questions to arrive at an overall score for the listed job dimension. You will find helpful hints to American with Disabilities Act (ADA) issues in the back of the folder containing the applications.

### SCORING SCALE :

| UNQUALIFIED 0-65 | QUALIFIED 70-79 | WELL QUALIFIED 80-89 | SUPERIOR 90-100 |
|---|---|---|---|

### SELF-PREPARATION / JOB INTEREST

APPS: _____ On hdle along learned the route.

BKDS: Oceanside – San Diego – RSO 7 yr – Start to bottom aid from with the last two years.

DQ's: Can work alone & with a team.

SCORE: (80)

N.Y – Marine Corp – Sniper marksmanship weapons. Instructed recruits, worked with English riot along after Kenpo– memorized Code of Ethics, Riot Control, military. Best physical shape.

How did you hear about our opening? Website. Career fair in San Diego.

### CONDUCT / LEGAL BEHAVIOR / INTEGRITY CHECK LIST

If "yes" check box and write comments below :

Marijuana 1995/96

DRUGS: ☑   ARRESTS: ☑   TRO'S ☑   CIVIL SUITS: ☑   CITES: ☑   GANGS: ☑

POOR CREDIT: ☑   MILITARY: ☑   FIRED/ ASKED TO RESIGN: ☑   FIGHTS ☑   1995 – jumped by other guys in High School

Detained 2 hrs  Brooklyn P.D. @ 14/15 yo old – 1995.

SCORE: (80)

Pay off for haircut in marines

### SCORING SCALE:

Exhibit E
Page 105

2

| UNQUALIFIED | QUALIFIED | WELL QUALIFIED | SUPERIOR |
|---|---|---|---|
| 0-65 | 70-79 | 80-89 | 90-100 |

## DEPENDABILITY

JOB STABILITY: ⬭ good   ⬭ poor                SCORE: ⑧⓪

Page 11 - in military for improper haircut.
Fired from Albertsons, was prepare for deployment to
Iraq was unable to report to work as scheduled @ Albertsons

## JUDGEMENT UNDER PRESSURE / PROBLEM SOLVING

(Decisions made during the situational problems) What situationals were used?

SITUATION B : ⬭ good   fair ⬭   poor ⬭
SITUATION 4 : ⬭ good   fair ⬭   poor ⬭                SCORE: ⑩⓪
SITUATION ___ : ⬭ good   fair ⬭   poor ⬭

would report the FTO would not jeopordize his job,
would let the suspect get a hand distance from
the crime scene and take the shot.

## TECHNICAL ABILITY

Showed steady or acceptable improvement: ⬭                SCORE: ⑦⓪
Computer Knowledge:
⬜ good            ⬜ fair            ⬜ poor

No Computer experience.

SCORING SCALE:

| UNQUALIFIED | QUALIFIED | WELL QUALIFIED | SUPERIOR |
|---|---|---|---|
| 0-65 | 70-79 | 80-89 | 90-100 |

City0011465

Exhibit E
Page 106

3

## COMMUNICATION SKILLS/INTERPERSONAL SKILLS

SCORE: 90

Verbal: _Good, articulate_

Written: _Good_

Interpersonal: _Good_

## BOARD MEMBER CONCLUSIONS

SCORE: 90

_Excellent Candidate. Military experience has_
_prepared him for law enforcement. Excellent_
_athletic under pressure skills._

RATER'S SIGNATURE: _____      TOTAL SCORE: 590

PRINT NAME: _____      AVERAGE: 84.28

DATE: _____      (Total score divided by 7)

### SCORING SCALE:

| UNQUALIFIED | QUALIFIED | WELL QUALIFIED | SUPERIOR |
|---|---|---|---|
| 0-65 | 70-79 | 80-89 | 90-100 |

# CITY OF RIVERSIDE
## POLICE OFFICER ORAL INTERVIEW

**TOTAL SCORE**

2y.57

APPLICANT NAME : Jose   Nazaro

INSTRUCTIONS : Rate each job dimension with a numeric score. You will find helpful hints and questions to each job dimension in the questionnaire. Use all of the questions to arrive at an overall score for the listed job dimension. You will find helpful hints to American with Disabilities Act (ADA) issues in the back of the folder containing the applications.

### SCORING SCALE :

| UNQUALIFIED 0-65 | QUALIFIED 70-79 | WELL QUALIFIED 80-89 | SUPERIOR 90-100 |
|---|---|---|---|

### SELF-PREPARATION / JOB INTEREST

APPS: _____    BKDS: _____    DQ's: _____

NEW YORK RAISED

**SCORE:** 85

SNIPER  MARINES , TAUGHT  BOOT CAMP   WEARING   ENGLISH
COLLEGE COURSES, RIDE ALONG   CAMP. CODE ETHICS, ALPHABET
- NO  KNOWLEDGE  OF  CITY —  STARS  BOTTOM  AND  GROW.
- SMOOTH   TRANSITION

How did you hear about our opening? ON - LINE

### CONDUCT / LEGAL BEHAVIOR / INTEGRITY CHECK LIST

*If "yes" check box and write comments below :*

**DRUGS:** ◯   **ARRESTS:** ◯   **TRO'S** ◯   **CIVIL SUITS:** ◯   **CITES:** ◯   **GANGS:** ◯

**POOR CREDIT:** ◯   **MILITARY:** ◯   **FIRED/ ASKED TO RESIGN:** ✓   **FIGHTS** ◯

MARIJUANA  195.96

**SCORE:** 85

- FAMILY  PROBLEM  DETENTION       R 93
NONE
- WRITTEN  REPRIMAND.

### SCORING SCALE:

Exhibit E
Page 108

2

| UNQUALIFIED 0-65 | QUALIFIED 70-79 | WELL QUALIFIED 80-89 | SUPERIOR 90-100 |
|---|---|---|---|

## DEPENDABILITY

JOB STABILITY: ☑ good    ☐ poor                    SCORE: (89)

8 YEARS.

## JUDGEMENT UNDER PRESSURE / PROBLEM SOLVING

(Decisions made during the situational problems) What situationals were used?

SITUATION _B_:  ☑ good    fair ☐    poor ☐
SITUATION _S_:  ☑ good    fair ☐    poor ☐            SCORE: (99)
SITUATION ___:  ☐ good    fair ☐    poor ☐

REPORT HIM  WON'T JEPORIDIZDED SELF/ FAMILY. RIGHT THINK
DISTANCS SHOOT HIM. HOSTAGE SITUATION CALL FOR HELP.

## TECHNICAL ABILITY

Showed steady or acceptable improvement: ☐            SCORE: (69)
Computer Knowledge:
☐ good              ☐ fair              ☑ poor

### SCORING SCALE:

| UNQUALIFIED 0-65 | QUALIFIED 70-79 | WELL QUALIFIED 80-89 | SUPERIOR 90-100 |
|---|---|---|---|

3

## COMMUNICATION SKILLS /INTERPERSONAL SKILLS

SCORE: (85)

Verbal: _WELL_

Written: _WELL_

Interpersonal: _WELL_

## BOARD MEMBER CONCLUSIONS

SCORE: (90)

_WELL SPOKEN_

RATER'S SIGNATURE: _____    TOTAL SCORE: [59?]

PRINT NAME: _GIOVANNI  (L)_    AVERAGE: [84.57]

DATE: _09/30/05_    (Total score divided by 7)

SCORING SCALE:

| UNQUALIFIED | QUALIFIED | WELL QUALIFIED | SUPERIOR |
|---|---|---|---|
| 0-65 | 70-79 | 80-89 | 90-100 |

# CITY OF RIVERSIDE
## POLICE OFFICER ORAL INTERVIEW

**TOTAL SCORE**

_9042_

APPLICANT NAME : _Jose Nazario_

INSTRUCTIONS : Rate each job dimension with a numeric score. You will find helpful hints and questions to each job dimension in the questionnaire. Use all of the questions to arrive at an overall score for the listed job dimension. You will find helpful hints to American with Disabilities Act (ADA) issues in the back of the folder containing the applications.

### SCORING SCALE :

| UNQUALIFIED | QUALIFIED | WELL QUALIFIED | SUPERIOR |
|---|---|---|---|
| 0-65 | 70-79 | 80-89 | 90-100 |

### SELF-PREPARATION / JOB INTEREST

APPS: _Sgt List_ _____  BKDS: _____  DQ's: _____

**SCORE:** _89_

_Marine Corps Snpol - Criminal Justice Student - Served in Iraq - Prepared for a job in law enforcement - not much about department_

How did you hear about our opening? _Internet_

### CONDUCT / LEGAL BEHAVIOR / INTEGRITY CHECK LIST :

If "yes" check box and write comments below :

**DRUGS:** ◯   **ARRESTS:** ✗   **TRO'S** ◯   **CIVIL SUITS:** ◯   **CITES:** ◯   **GANGS:** ◯

**POOR CREDIT:** ◯   **MILITARY:** ✗   **FIRED/ ASKED TO RESIGN:** ◯   **FIGHTS** ✗

**SCORE:** _90_

_Marijuana - H.S 95/96 - Family problem  NYPD - Detention - 95_
_8 years in military - no problems_
_High school fight_

### SCORING SCALE:

**2**

| UNQUALIFIED | QUALIFIED | WELL QUALIFIED | SUPERIOR |
|---|---|---|---|
| 0-65 | 70-79 | 80-89 | 90-100 |

## DEPENDABILITY

JOB STABILITY: ⊘ good    ▢ poor                    SCORE: ⟨95⟩

WORKING SECOND JOB AT AUGERSONS TO PURCHASE HOME
AUGERSON FIRED HIM FOR TARDINESS BECAUSE HE WAS
LEAVING CAMP PENDLETON LATE. I DON'T SEE A PROBLEM.

## JUDGEMENT UNDER PRESSURE / PROBLEM SOLVING

(Decisions made during the situational problems) What situationals were used?

SITUATION B :   ⊘ good    fair ▢    poor ▢

SITUATION C :   ⊘ good    fair ▢    poor ▢        SCORE: ⟨95⟩

SITUATION ___ :   ▢ good    fair ▢    poor ▢

B) WOULD REQUEST PARTNER TO C/SUPERVISION
C) WOULD CALL/REQUEST BACK UP FOR HELP

## TECHNICAL ABILITY

Showed steady or acceptable improvement: ▢        SCORE: ⟨80⟩
Computer Knowledge:
▢ good              ✓ fair              ▢ poor

| SCORING SCALE: | | | |
|---|---|---|---|
| UNQUALIFIED | QUALIFIED | WELL QUALIFIED | SUPERIOR |
| 0-65 | 70-79 | 80-89 | 90-100 |

City0011471

Exhibit E
Page 112

3

## COMMUNICATION SKILLS /INTERPERSONAL SKILLS

SCORE: 89

Verbal: _Good_

Written: _Good_

Interpersonal: _Good_

## BOARD MEMBER CONCLUSIONS

SCORE: 95

THIS IS THE KIND of GUY WE WANT WORKING FOR
OUR DEPARTMENT

RATER'S SIGNATURE: _DLR_          TOTAL SCORE: 633

PRINT NAME: _DANIEL L ROSSEN_          AVERAGE: 90.42

DATE: _9-30-05_          (Total score divided by 7)

### SCORING SCALE:

| UNQUALIFIED | QUALIFIED | WELL QUALIFIED | SUPERIOR |
|-------------|-----------|----------------|----------|
| 0-66 | 70-79 | 80-89 | 90-100 |

**Exhibit F**

**THE COUNSELING TEAM INTERNATIONAL**
KATHLEEN D. WELLBROCK, PH.D.
LICENSED CLINICAL PSYCHOLOGIST
1881 Business Center Drive, Suite 11
San Bernardino, California 92408
(909) 884-0133

**PSYCHOLOGICAL EVALUATION:** Nazario Jr., Jose L.
DOB ▮▮▮▮▮▮▮

**REFERRING AGENCY:** Riverside Police Department

**REFERRAL QUESTION:** FITNESS FOR HIRE AS A Police Officer

**DATE OF EXAMINATION:** 11/03/05     **INTERVIEW:** 11/03/05

**INSTRUMENTATION:** Minnesota Multiphasic Personality Inventory-revised (MMPI-2), Sixteen Personality Factors (16PF), Wide Range Achievement Test (WRAT), Shipley IQ test (SHIP), Applicant Information Form, Sentence Completion Test (SCT), Autobiography, Structured Interview.

**PERSONAL & BACKGROUND INFORMATION:** The applicant Jose Nazario (JN) is a 26 year old married male. JN is applying for the position of Deputy Sheriff with the San Bernardino Count Sheriff's Department. JN reports that his wife and family support his decision to pursue a career in law enforcement.



City0011400

Exhibit F
Page 115



When asked to describe the most traumatic experience, he states that it was the loss of his friends in combat. He has never had a stressful event followed by features of Acute Stress Disorder or Posttraumatic Stress Disorder.



He claims that no one presently or historically would describe him as a bad-tempered, temperamental, or moody person. He denies being prone to temper tantrums as a child when he did not get his way. He never developed a pattern of property destruction in response to anger. When asked to describe his behavior when angry, the applicant states that he does not get angry easily but when he does he is able to calm himself down. He has never threatened to kill anyone or cause significant bodily injury when he has been angry. He has never initiated physically aggressive contact with a dating or romantic partner when angry. No law enforcement agency has ever responded to a domestic violence call involving this applicant. The applicant reports that he has never

been named on a restrain█g order. The applicant does not o██ any firearms.  He has never applied for a concealed weapons permit. When asked to describe the angriest he has ever felt in his life, he states that he cannot recall a specific incident.   The most aggressive thing he has done when he was angry was raising his voice.



The applicant served in the United States Marine Corp for over 8 years. He was in combat in Iraq and he had two personal friends killed and 33 in his platoon were killed. H denies any residual form this experience.

Exhibit F
Page 117



**AUTOBIOGRAPHY:** Score is based on language, relevance and sincerity. The applicant highlighted his military training and experience. He demonstrated the ability to communicate effectively in a written format. Psychological problems were absent.

**ORAL PRESENTATION:** Interviewer's overall impression is based on ability to handle stress, sincerity, and evidence of practical common sense. The applicant presented as professional and polite. He sees himself as a perfectionist and at times he may take on too much. He believes that he is athletic and in good physical shape to so this type of work. His military experience has prepared him mentally to deal effectively with the situations that are presented to a law enforcement officer.

## POST PERSONALITY DIMENSIONS

<u>**Findings:**</u>    **3.0 = No Problem**       **2.0 = Problem – see adjoining comment**

**COMMUNICATION SKILLS:** ██████

**PROBLEM SOLVING ABILITIES:** ██████

**LEARNING ABILITIES:** ██████

**JUDGMENT UNDER PRESSURE:** ██████

**OBSERVATIONAL SKILLS:** ██████

**WILLINGNESS TO CONFRONT PROBLEMS:** ██████

**INTEREST IN PEOPLE:** ██████

**INTERPERSONAL SENSITIVITY:** ██████

**DESIRE FOR SELF-IMPROVEMENT:** ██████

**APPEARANCE:** ██████

**DEPENDABILITY:** ██████

**PHYSICAL ABILITY:** ██████

**INTEGRITY:** ██████

**OPERATION OF A MOTOR VEHICLE:** ██████

**CREDIBILITY AS A WITNESS IN A COURT OF LAW:** ██████

**SUMMARY:**  The applicant appears to be psychologically fit to serve as a peace officer. The test results suggest that the applicant is free from any mental or emotional conditions that would adversely affect his ability to perform the duties of a peace officer in a safe and effective manner. The applicant is confident and well-informed. He is enthusiastic about working in a para-military organization. His military training and experience will be an asset to the Department. The applicant's leadership potential is high. The above personality traits and characteristics of interest have been highlighted for your review and should be monitored during his probationary period.

Exhibit F
Page 119

**RECOMMENDATION:**   **Hire**, Score 3.0

*Kathleen D. Wellbrock, Ph.D.*

KATHLEEN D. WELLBROCK, PH.D.
License Number PSY 17906

Exhibit F
Page 120



Police
Department

## POLYGRAPH REPORT

PF05-74
**Name:** Jose L. Nazario
**Position:** Police Officer-Trainee          **DOB:** ███████
**Background Investigator:** Don Bender
**Examiner:** Detective Mike Eveland

**Details:** Nazario arrived at the Orange Street Station of the Riverside Police Department for his pre-employment polygraph examination. He brought his completed questionnaire and I reviewed it with him. Nazario had no new information to add after our review.

I prepared and administered a Calibration Test and two Exploratory Tests that contained the following relevant questions:

1. Since the age of 18, have you intentionally abused anyone physically?

2. Have you used any illegal drugs since your 18th birthday?

3. Since your 18th birthday, have you bought or sold any illegal drugs?

4. Since the age of 18, have you stolen anything valued over $25?

5. Since your 18th birthday, have you committed a serious or undetected felony crime?

6. Since the age of 18, have you engaged in any illegal sexual activities?

7. Since you've been married, have you struck or otherwise assaulted your wife?

8. Since your 18th birthday, have you driven a vehicle while intoxicated?

**Results:** Nazario's charts were consistent with those that are truthful and no deception is indicated.

**Comments:** Nazario read and signed the RPD Polygraph Consent and Waiver form prior to the administration of the examination

Examiner: _____

Date and Time of Examination: ___11/1/05 @___ 1030 HRS – 1130 HRS

**Exhibit G**



Exhibit G
Page 124

**Exhibit H**



Police Department

Office of the Chief

**TO:**    Jose Nazario
          Police Officer

**DATE: AUGUST 7, 2007**

**FROM:**  Russ Leach
          Chief of Police

**SUBJECT:   NOTICE OF SEPARATION**

This memorandum is to notify you that, effective August 7, 2007, you failed to pass your probationary period as a Police Officer with the City of Riverside Police Department.

There is no administrative appeal to this action.  However; you may request a "Liberty Interest" hearing.  You must schedule this hearing with Captain Michael J. Blakely within thirty (30) days of receipt of this notice. Failure to schedule the hearing will be deemed as a waiver of your rights pursuant to *Lubey v. San Francisco* (1979) 98 Cal. App. 3d 340.

Upon conclusion of the hearing, you will be notified if this action is reversed.

*John DeLaroso*                    ASSISTANT CHIEF OF POLICE
for
Russ Leach
Chief of Police

RL/EB/dm

**I acknowledge receipt of this memorandum**

_____        02-07-07
**Employee Signature**          **Date**

**Witnessed by:**

_____        8-7-07
Michael J. Blakely, Captain     **Date**

Exhibit H
Page 126

**Exhibit I**

Exhibit I
Page 127



Police
Department

**CONFIDENTIAL**

**TO:**        Lieutenant Michael A. Perea, Personnel Services

**FROM:**    Lisa Johnson, Police Officer - Background Investigator

**DATE:**     January 6, 2009

**SUBJECT:**  Background Investigation Report – Possible Disqualification
          **Nazario, Jose L.:**  Police Officer Entry

A pre-employment suitability background investigation was initiated on the Applicant. The investigation covered the recommended areas of inquiry as established by the Commission on Peace Officer Standards and Training (P.O.S.T) and Riverside Police Department.  It should be noted that all people queried were assured of confidentiality to their responses to inquiries pursuant to Section 47 of the California Civil Code.

**PERSONAL**

The following personal identifying information pertaining to the Applicant is provided:

**Name:**      Jose Luis Nazario, Jr.

**DOB:**       ███████████

**Address:**   ████████████████████

**Telephone:** C:████████████

**SSN:**       ██████████

**CDL:**       ███████████

**HT:** 6'2"   **WT:** 190   **HAIR:** Black   **EYES:** Brown

Applicant's birth and citizenship have been demonstrated by the presentation and inclusion of the following certified document:  **Certified copy of his birth record.**

Applicant's social security number has been verified by:  **Photocopy of his Social Security Card Stub.**

Administrative Review

4102 Orange Street • Riverside, CA 92501 • 1.866.WORKRPD • www.rpdonline.org

Exhibit I
Page 128

**Preliminary Background Investigation:  Nazario, Jose L.**
**Page 2**

**Synopsis:** The background investigation at this point has developed information that indicates that the Applicant may not be qualified for the position of Police Officer Entry. The areas of concern are *integrity, credibility, interpersonal skills and impulse/anger control*.  The applicant was previously employed by the Riverside Police Department from November 14, 2005 through August 7, 2007 as a Police Officer before he was separated.  This background covers the time from August 8, 2007 to present.

I met with the applicant on September 2, 2008 after he had submitted an application for a Police Officer Entry position.  The applicant was terminated from employment during his probationary period following his arrest for War Crimes-Manslaughter (See Officer Anderson's appended report for detailed case information).  On August 29, 2008, the applicant was acquitted of all charges.  Following his acquittal, the applicant sought employment with this agency and was advised he would need to undergo the standard hiring process, including an oral interview, updated background investigation, polygraph, psychological testing, and medical screening.

The applicant reviewed and signed the standard background forms including an "Authorization to Release Information."  The applicant also completed an autobiography. I provided the applicant with the Personal History Statement (PHS) and requested he complete the PHS with updated information covering the time period following his termination from employment at the Riverside Police Department to present.   The applicant completed the PHS in the office.

I reviewed the applicant's PHS with him.  The applicant told me that following his arrest, he moved to Rock Hill, New York to a house he had purchased several months prior to his termination.  The applicant explained he had sold his townhome in Murrieta to buy the house in New York because it was "cheap property" and a good investment. The applicant stated he had no intentions of leaving the Riverside Police Department. The applicant moved in with his father-in-law, ███████ in a Riverside apartment so he could continue to live and work in the city. The applicant's wife, Diette, and his son moved to the new home in New York because she had been unhappy living in California.  Diette was a new "stay-at-home" mother and wanted to live closer to her family in New York.  They lived apart for approximately 15 months.

A credit check revealed the mortgage on the Murrieta home was closed in June, 2006. Another mortgage account was opened in July, 2006 covering the purchase of the new property in New York.

After the applicant was arrested in August, 2007, he moved in with his wife and son in New York.  The applicant flew back to California for court appearances and stayed with

2

Administrative Review

Exhibit I
Page 129

**Preliminary Background Investigation:  Nazario, Jose L.**
**Page 3**

███████████████ the parents of RPD Officer ███████████████.  The applicant applied for several security jobs, but was not selected due to his pending manslaughter case.  The applicant said he gave up hope of attaining any employment and stayed at home caring for his son.   The applicant earned approximately $450 per week in unemployment benefits while Diette worked full-time for a cable company.

Following his acquittal, the applicant immediately applied to the Riverside Police Department and told me he had no intentions of applying anywhere else.  The applicant said he wanted to move back to Riverside as soon as possible and resume the life he had before his arrest.  The applicant admitted he was having marital problems and was unsure whether Diette would move back with him.   He said that regardless of her decision, he wanted to live and work in Riverside.  If she did not want to leave New York, they would likely divorce.

The applicant did not have his vehicle registration, proof of insurance, 2006 tax return, and reference information for his neighbors in New York.  The applicant said he would send this information to me immediately upon his return to New York.

Two weeks after my initial interview with the applicant, I still had not received the information I had requested from the applicant.  On September 18th, I sent an email to the applicant reminding him of the information I needed.  On September 22nd, the applicant responded and faxed me a copy of his tax return, vehicle registration, and proof of insurance.  The vehicle registration for one of his vehicles (2006 Chrysler) had expired on September 8, 2008.  On September 29, the applicant emailed me the names and addresses of his neighbors in New York.  I requested a copy of his updated vehicle registration.  To date, I have yet to receive his updated and valid registration.

## RELATIVES AND REFERENCES

**Synopsis:**          *Possible disqualifying information was developed.*  **The applicant's wife currently has a domestic violence restraining order issued against him in the state of New York which is valid until October, 2010.  This order stemmed from a domestic violence incident prompting a police response to the applicant's residence in Rock Hill, New York.  A police report was taken listing the applicant as a suspect of "harassment."  The applicant was not arrested, and criminal charges were not filed.**

**Marital Status:**     The applicant is married to Diette Nazario.  They have one child together, ███████████.   During the course of the background investigation, the couple has initiated divorce proceedings.  The restraining order also included temporary child custody arrangements.  Diette temporarily has full custody of their son.

3

Administrative Review

Exhibit I
Page 130

**Preliminary Background Investigation:  Nazario, Jose L.**
**Page 4**

I initially spoke to Diette Nazario by phone on September 24, 2008.  She has been living in New York since July, 2006.  She explained they purchased the home to move back to New York together, not as an investment property as the applicant had told me.  Diette agreed to move back first to find employment.  They agreed the applicant would move back once she was settled there.

Since the acquittal, Diette knew the applicant wanted to be work for Riverside PD again.  She supports his decision, but said she would not move back to California.  She made no negative comments about him. At the time of our conversation, the applicant was home.  I provided her with my contact information in the event she wanted to speak to me when the applicant was not present.

See appended memo for additional information.

On October 7th, I received an email from Diette advising me the applicant had been physically abusive toward her and that she had reported the incident to the Sullivan County Sheriff's Department.  I called her on October 8th and spoke to her at length.  Diette told me the following:

Diette did not want to jeopardize the applicant's chances of being hired by Riverside PD.  Diette acknowledged that speaking candidly to me may ultimately affect her financial welfare.  If the applicant remains unemployed, she would have little hope of obtaining any financial support from him.  However, when the applicant's abuse escalated to the point where their two year old son's welfare was in jeopardy, she could no longer stay quiet.

Diette told me the applicant first became abusive toward her following his return from Iraq.  He became very controlling and verbally abusive.  Following the birth of their son, he wanted her to stay home and quit her job.  This eventually led to financial strain and frequent arguments about money.  Diette was unhappy in California and they decided it would be best for their marriage to move back to New York.  They sold their home in Murrieta and purchased property in New York.  Diette agreed to move back first and find work with the understanding the applicant would continue to work at Riverside PD until he could secure employment in New York.

When the applicant was arrested, he moved to New York.  Due to the loss of his income coupled with the stress of the trial, their marriage deteriorated.  Once they made the decision to divorce, the applicant became physically abusive during arguments regarding child support.  Diette estimated the applicant became physical with her six or seven times.  The last two incidents occurred on October 5 and 6, 2008.  During the first incident, the applicant put her in a "headlock" and told her he was going to kill her.  She was able to free herself for a moment before he picked her up by the neck and threw

4

Administrative Review

Exhibit I
Page 131

**Preliminary Background Investigation:  Nazario, Jose L.**
**Page 5**

her back down to the floor.  Diette complained of pain and redness to her throat.  She
also said she had difficulty swallowing.

During the second incident, the applicant pushed her from a chair while she was holding
their son. Although they were not hurt, Diette feared the applicant's aggressive behavior
would continue to escalate and endanger their son's welfare.  The police responded to
the scene when she dialed 911 and the applicant agreed to leave that night.  The
incident was documented in a report and the police referred Diette to Family Services.
Diette obtained a temporary restraining order prohibiting the applicant from contacting
███████ or her at home and at her place of employment.  The restraining order was initially
set to expire on December 31, 2008.  Due to  the fact the applicant did not want to
return to New York for further Court dates, the order has since been extended and is
now in effect until October, 2010.

See appended memo (Second Spouse Interview) for additional details.  Copies of
Police and Court documentation which Diette provided are also appended.

On October 7th, I also received an email from the applicant informing me the police had
responded to his residence the previous evening.  He explained that they were in the
process of divorce and his wife "made up this whole story" of how he had been beating
her.  The applicant said Diette did not want him to get his job back because he was
happy in California and she wants to take that away.  She made up the story of abuse
because she knew he could not be a police officer with domestic violence charges.  The
applicant said she is "bitter" and "wants full custody."  He left the house to avoid any
further "drama."  The applicant said Diette hid. his phone charger, but he would contact
me when he could use his cell phone. I left the applicant a message for him to call me
at his convenience.

The applicant called me on October 14th regarding the incident.  He told me Diette lied
about the incident and he hoped this would not affect his background process.  He also
faxed me a copy of the paperwork he obtained from the Sullivan County Sheriff's
Department.  The one page document identified Diette Nazario as the victim (P1) and
the applicant as the suspect (P2) of violation 240.26 of the New York Penal Code.  It
was checked as a "violation" level, not a felony or a misdemeanor.  The narrative
section was short and indicated the couple was divorcing.  An argument escalated into
"a physical" and while Diette had no physical injuries, the applicant had scratches on his
arm.  The applicant left the residence for the evening and Diette was referred to Family
Court.  (See appended document).  Charges were not filed against the applicant.

I asked the applicant if he went to Family Court.  He told me he went to obtain a
restraining order against Diette "too," but he let it go because it required another Court
appearance.  Since he had not mentioned anything to me about a restraining order, I
asked him if he was the subject of a restraining order.  He admitted Diette had a

5

Administrative Review

Exhibit I
Page 132

**Preliminary Background Investigation:** Nazario, Jose L.
**Page 6**

restraining order issued against him. They had an appointment with a mediator on October 16th and he would see her that day. I requested he notify me of any changes in this matter and he agreed to contact me following the appointment (See appended memo to file – Applicant Phone Contact).

The applicant did not contact me until October 28th. He called me and advised he had moved back to Riverside and was now living with his █████████. He agreed to sign everything over to Diette and they were following through with the divorce. The restraining order against him was still in effect. **He also told me he had a restraining order issued against Diette as well, but that he requested it be withdrawn because he did not want any pending Court dates in New York.** I asked him to provide documentation from the Court regarding the restraining order that was granted against his wife, and he agreed to fax it.

That afternoon, the applicant arrived at the Orange Street Station with paperwork which Officer Anderson retrieved. **The applicant *did not provide* any documentation that a restraining order was ever issued against Diette on his behalf. To date, he has not provided any documentation supporting his claim.**

**References:** Rita Bucy, the mother of RPD Officer Mike Bucy, returned a personal reference inquiry letter. The applicant frequently stayed at her residence during his trial. She described the applicant as a responsible father and husband who is well-liked. She also noted the applicant "loves his country and truly loved his job as a police officer."

## EDUCATION

**High School Education:** The applicant graduated from John Jay High School August, 1997 with a grade average of 67.89%.

**Post Secondary Education:** None.

**POST Certified Training:** The applicant graduated from the Riverside County Sheriff's Department Academy Class #167 on April 25, 2006. The applicant successfully completed the Riverside Police Department Field Training Officer Program in November, 2006.

## RESIDENCES

Following the applicant's arrest in August, 2007, he moved from his ████████ apartment in Riverside to the home he had purchased in June, 2006 located in Rock Hill, New York. I sent inquiries to three of the applicant's neighbors. I have yet to receive responses from any of his neighbors.

6

Administrative Review

Exhibit I
Page 133

**Preliminary Background Investigation: Nazario, Jose L.**
**Page 7**



I attempted to contact all listed neighbor references by phone on January 2, 2009. I
called ▮▮▮▮▮▮▮▮ at the phone number the applicant provided. I spoke to a female
who answered the phone. However, she hung up the phone after I identified myself as
a Police Officer. The number the applicant provided for ▮▮▮▮▮▮▮▮ had been
disconnected.

I spoke to ▮▮▮▮▮▮▮▮ who has lived across the street from him since May, 2007. Mr.
▮▮▮▮ described the applicant as a "good neighbor" who was willing to help out when
necessary. He did not know the applicant well, but they spoke at times when they were
both outside. Mr. ▮▮▮▮ said he frequently travels due to work, so his time spent at
home is limited. Mr. ▮▮▮▮ was unaware of any issues the applicant had with any
other neighbors and to his knowledge, the applicant was never the source of any
disturbances in the neighborhood.

On October 14, 2008, the applicant advised he moved back to Riverside to move back
in with his ▮▮▮▮▮▮▮▮. He reported his new address to be ▮▮▮▮▮▮▮▮

### EXPERIENCE AND EMPLOYMENT

The applicant was hired by the Riverside Police Department on November 14, 2005.
Prior to his separation, the applicant was working as a probationary patrol officer.

### Riverside Police Department Internal Affairs File Review

On December 23, 2008, I reviewed the applicant's Internal Affairs file located at
Fairmount Avenue, Riverside where all records pertaining to Internal Affairs are located.
I obtained the following information:

- **Pursuit Critique P07-060-041**: On April 20, 2007, the applicant and partner
  Officer Koehler attempted to stop a vehicle for a traffic violation. The vehicle
  failed to yield and a pursuit was initiated. When the pursuit terminated, the
  applicant and Officer Koehler "rushed" the suspect vehicle. The suspect was not
  compliant and the officers smashed the right front passenger window to unlock
  the door and pull the suspect out of the vehicle. Following a minor use of force,
  the suspect was arrested. The applicant was found within policy. However, two
  training issues were identified: failure to conduct a felony stop upon termination
  of the pursuit and unclear radio transmissions during the pursuit which assisting
  officers and Dispatch found confusing.

7

Administrative Review

Exhibit I
Page 134

Preliminary Background Investigation: Nazario, Jose L.
Page 8

- **Traffic Collision P07-093-541:** On June 16, 2007, the applicant was involved in an on duty traffic collision with another patrol unit. The Police Department Collision Review Board of Inquiry found the applicant was not at fault and determined the collision was non-preventable.

## Riverside Police Department Personnel File Review

On December 30, 2008, I reviewed the applicant's Personnel file located at 4102 Orange Street. The file contained the following information:

- Third Probationary Performance Evaluation from 11/05/06 to 05/05/07. The applicant was assigned to swing shift in the Central NPC under the supervision of Sgt. Marco Quesada. He received an overall rating of "Meets Standards." The applicant's strong points were identified to be his personal appearance / physical fitness, initiative / loyalty, and cooperativeness / attitude. Sgt. Quesada noted the applicant takes constructive criticism well and learns from his mistakes. The applicant's areas of improvement were identified to be investigations and report writing. He suggested the applicant continued "to work on his investigative techniques and interview skills." Sgt. Quesada specifically noted the applicant's lack of DUI and 11550 H&S investigations.

- Second Probationary Performance Evaluation from 08/05/06 to 11/05/06. The applicant was in his final phase of the Field Training Program and was under the supervision of FTO Sgt. Ron Ruddy. He received an overall rating of "Meets Standards." Sgt. Ruddy noted the applicant has a "very positive attitude" and was "eager to learn." The applicant displayed a high level of command presence and was not intimidated by uncooperative suspects. Sgt. Ruddy noted the applicant's weakness was report writing and navigation of the city, but added that these areas are common for an officer with the applicant's level of experience.

- First Probationary Performance Evaluation from 05/05/06 to 08/05/06. The applicant had completed his first and second phase of the Field Training Program. He received an overall rating of "Meets Standards" and was progressing at an "acceptable pace" through training. His report writing, radio communications, city navigation, and vehicle operations were all noted as areas for improvement. Sgt. Ruddy noted the applicant took longer than should be required to complete basic reports, frequently missed his call sign over the radio, and became lost while responding to calls. The applicant's strong areas were command presence, attitude / cooperativeness, and uniform appearance.

8

Administrative Review

Exhibit I
Page 135

**Preliminary Background Investigation: Nazario, Jose L.**
**Page 9**

## MILITARY SERVICE

**Active Military Service:**  The applicant served in the Marine Corps as a Rifleman in the Infantry Division.  He attained the rank of Sergeant and was honorably discharged on October 11, 2005.

The applicant served a deployment in Fallujah, Iraq where he was involved in combat missions.  NCIS alleged the applicant committed war crimes and conducted an investigation.  See Officer Anderson's report for further details.

## FINANCIAL HISTORY

**Credit History:**  The applicant's credit history, as reported in the Personal History Statement and Transunion Credit Report, disclosed the following information:

- There were no collection accounts.
- There were no current negative accounts.
- There were no previous negative accounts.
- There was no previous time negative account information documented.
- There were no late payments documented on his credit report.
- The applicant has only one open mortgage account and no credit card accounts.

**Tax Records:**  A review of the applicant's tax records for 2007 did not disclose any irregularities. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Liens and Delinquencies:**  A check with the County Recorder's Office using the public database system "Faces of the Nation" disclosed no record.  A copy of the report is included.

## LEGAL HISTORY

**Local Agency Check Results:**  Criminal History Checks with Riverside Sheriff's Department and the New York State Police did not reveal any negative contacts.  Local warrants and records checks were also negative.

Upon notification from both the applicant and his spouse of a police response to their residence for an alleged domestic violence incident on 10/6/08, Officer Anderson contacted the Sullivan County Sheriff's Department and received a copy of the criminal

9



Exhibit I
Page 136

**Preliminary Background Investigation: Nazario, Jose L.**
**Page 10**

report #20082146.  The report stated the deputies received a 911 call from a female who was on her way home and was afraid of what may happen to her if her husband was home.  Upon their arrival, Dispatch received a second 911 call from the residence and the deputies were advised a domestic violence incident was in progress.  The report did not contain any specific information regarding their investigation once inside the residence.  The report stated, "Verbal altercation escalated into a minor physical dispute, female subject had not sought any medical attention up to the time of officers arrival, and there were no visible signs of injury."  The applicant agreed to leave the residence for the evening.  The deputy later contacted the applicant's wife by phone and advised her to change the pass code to the security system and disable to the garage so the applicant could not come inside should he decide to return.  The case was "closed by investigation."

An incident report #36959 was taken on 10/07/08, at approximately 2009 hours, when the applicant responded to the station and was served the domestic violence restraining order by Sgt. John Watson.

**Arrest, Detention, and Conviction(s):**  See Officer Anderson's Report for detailed information regarding applicant's arrest by NCIS for War Crimes – Manslaughter.

**Civil Action(s):**  None.

## MOTOR VEHICLE OPERATION

**Driver License Status:**  Applicant posses a valid New York non commercial license that expires on October 8, 2011.

**Driving Record:**  The applicant has not received any moving violations from August 7, 2007 to present.

**Traffic Collision(s):**  The applicant's New York driving record show he has not been involved in any traffic collisions.

**Insurance:**  The applicant has valid insurance with the United States Automobile Association under Policy# ███████████ valid through January 25, 2009 for a ██████████████████ and for a ███████████

## GENERAL TOPICS

**Controlled Substance Use:**  The applicant stated he has not used any controlled substances since he experimented with Marijuana in High School in 1996.

10



Exhibit I
Page 137

Preliminary Background Investigation:  Nazario, Jose L.
Page 11

**Background File Review-Riverside Sheriff's Department File#37602P08-01:**  On December 1, 2008, an article in the Press Enterprise reported the applicant was in the background process with the Riverside Sheriff's Department.  I contacted the Riverside Sheriff's Department Personnel Bureau and confirmed the applicant applied with RSO on November 13, 2008.  **The applicant did not disclose this information to me.**  Investigator ████████ was assigned the file and disqualified the applicant on December 22, 2008.

On December 31, 2008, I reviewed the background file at the RSO Personnel Bureau.  The applicant was disqualified for issues related to impulse control / attention to safety, substance abuse or other risk taking behavior, interpersonal skills, and decision making and judgment.  The disqualification was based on the domestic violence report and issuance of a domestic violence restraining order against the applicant.

The applicant also indicated a different address to RSO.  He listed his address as ████ ████████████.  **The applicant did not provide his updated address to me.**

After the applicant was notified, he sent an email to Investigator Lodes asking why he was disqualified.  When Investigator Lodes advised he could not disclose any details and wished him good luck, the applicant replied as follows:

"After everything I have been through, I cant even get an answer why? I've lost so much, and all anyone can do is wish me good luck. People always complain about how messed up the world is, and how cruel others can be. But when it's their turn to do the right thing, they end up being cruel as well. But hey, as long as they wsh me good luck, they are all the good guys of the world." (Email is appended).

## SUMMARY

The background investigation into the suitability of **Jose Luis Nazario** for the position of **Police Officer Entry** revealed that he may not meet the minimum standards as established by P.O.S.T. and the Riverside Police Department.  Disqualifying information was discovered which would reflect negatively on his ability to be a **Police Officer - Entry.**

11

Administrative Review

Exhibit I
Page 138

**Preliminary Background Investigation: Nazario, Jose L.**
**Page 12**

Investigated By:

_____     1-06-09
Lisa Johnson, Background Investigator          Date

Reviewed By:

_____     1/20/2009
Sergeant Andy Flores, Support Services - Personnel     Date

**Recommend:**

1. _____ Meets Standards.

2. _____ More qualified applicants, applicant Not Selected.

3. __X__ Does not meet POST or Department standards, applicant disqualified.

4. _____ Further investigation:_____

5. _____ Suspend _____ months with instructions as follows: _____

6. _____ Withdraw.

Approved By:

_____     1. 20 - 09
Michael A. Perea, Lieutenant - Support Services - Personnel     Date

Approved By:

_____     1-26-09
Michael J. Blakely, Captain - Support Services - Personnel     Date

Approved By:

_____     01-26-09
John DeLaRosa, Assistant Chief          Date

Approved By:

_____     1-26-09
Russ Leach, Chief of Police          Date

12

Administrative Review

Exhibit I
Page 139

**Exhibit J**



Police
Department

CITY OF
RIVERSIDE

## CONFIDENTIAL

**TO:**        Michael A. Perea, Lieutenant - Support Services

**FROM:**    George Anderson, Police Officer / Background Investigator

**DATE:**     January 7, 2009

**SUBJECT:** **Case Synopsis / Preliminary Report Supplement**
- United States District Court Central District of California
  - Eastern Division
- Case No. ED CR 07-127 SGL
- Case No.: 5:07-mj-00244-DUTY-1 (Magistrate judge case number)


<u>**NAZARIO Jr., Jose L.:**</u> Police Officer - Entry

### PERSONAL

The following personal identifying information pertaining to the applicant is provided:

| | |
|---|---|
| **Name:** | Jose Luis Nazario Jr. |
| **Alias:** | Joe |
| **DOB:** | ████████ |
| **Address:** | ███████████████ |
| **Telephone:** | C ████████████ |
| **SSN:** | ██████████ |
| **CDL:** | █████████ (Old)     **NYDL:** ██████████ (Current) |
| **HT:** 6'00"    **WT:** 190    **HAIR:** Black    **EYES:** Brown |

Case Synopsis / Preliminary Report Supplement: NAZARIO, Jose L.
Page #2

**History:**      Jose Nazario Jr. is a former Marine sergeant who pleaded not guilty to voluntary manslaughter charges in the killing of unarmed prisoners in Iraq in 2004. Nazario appeared in a U.S. District Court in Riverside, accused of killing two unarmed men in Fallujah on Nov. 9, 2004, during a battle to clear the city of insurgents. "'I'd just like to say that I'm a United States Marine who fought honorably for my country and I'm innocent of these charges," Nazario said. The criminal complaint against him stated, "Defendant Jose Luis Nazario Jr., in the heat of passion caused by adequate provocation, unlawfully and intentionally killed two unarmed male human beings, without malice."

**Defense:**

Emery Brett Ledger - *Law Offices of Ledger & Associates, P.C.*
800-300-0001

Joseph M Preis - *Pepper Hamilton LLP*
949-567-3515 / Email: preisj@pepperlaw.com

Kevin B McDermott - *Kevin B McDermott Law Offices*
714-731-5297 / Email: warlawyer@aol.com

Vincent John La Barbera, Jr - *Law Office of Vincent J. LaBarbera*
714-541-9558 / Email: vlb@labarberalaw.com

**Plaintiff:**

**The United States of America**
represented by **Jerry A Behnke** AUSA - Office of US Attorney
951-276-6210
Email: usacac.rvcriminal@usdoj.gov

Exhibit J
Page 142

Case Synopsis / Preliminary Report Supplement: NAZARIO, Jr., Jose L.
Page #3

**Synopsis:**   The Supplemental Investigation, at this point, has developed information that indicates that the Applicant may not be qualified for the position of Police Officer Entry. The areas of concern *are integrity, accepting responsibility for mistakes, impulse/anger control, stress tolerance, decision-making and judgment.* Based on Public Record documents the Applicant was untruthful during his Polygraph with the Riverside Police Department prior to his employment in 2005.  The Applicant had a conversation recorded by NCIS in which he stated he would help a Marine pass a polygraph while being deceptive. The Applicant, based on witness statements that were not admissible in court, executed two male Iraqi's without provocation.   The Applicant not disclose marijuana use as he indicated on his Personal History Staten

*did*

**September 23, 2008 - Conversation with Jerry Behnke at his (**

On September 23, 2008 at approximately 1000 hours, I met Jer
with the United States District Court Central District of Califorr
Riverside.  Mr. Behnke and I had previously sent e-mails regard
was sent a docket list. I confirmed that the docket list was comple
was, even though there was no docket # 1.  Mr. Behnke did not know why the docket
was missing, but he was able to confirm the docket only contained numbers 2 through
100, inclusive.   I had located and printed all public record documents that were
contained within the docket.   I confirmed with Mr. Behnke that the documents in my
possession were the only documents available and that the dockets that are sealed are
procedural in nature and would not aid the Riverside Police Department's background
investigation.

**December 10, 2008 - Conversation with Mark Fox in San Clemente, CA**

Mark Fox is a Special Agent and lead investigator with the Naval Criminal Investigative
Service that investigated the Fallujah incident involving applicant Jose Nazario.

On Wednesday, December 10, 2008, at approximately 12:00 hours, I met with S.A. Fox
in San Clemente, California.  Mr. Fox flew out for the trial of USMC Sgt. Nelson and was
able to meet with me for approximately two hours.  During our conversation, Mr. Fox
provided me with several documents, which I saved onto my flash-drive.  When I
returned to Riverside I was able to print and review the documents.  There are several
"Weemer" transcripts that are virtually identical that are included, only because they
were provided by Mr. Fox.

When asked if the investigation would have been conducted in a different manner if the
men were armed, Mr. Fox said he "wouldn't have investigated if the insurgents were
armed or a threat of any kind."

Exhibit J
Page 143

Case Synopsis / Preliminary Report Supplement: NAZARIO Jr., Jose L.
Page #4

**Information regarding the Fallujah timeline and information from the investigation conducted by NCIS, were compiled and sequenced as follows:**

### November 2004

- Population estimates for Fallujah were 250,000-300,000
- Leaflets of pending invasion dropped days before operation began
- Estimated 80-90% of population fled

### November 8, 2004

- Operation Phantom Fury commenced
- Rules of Engagement (Excerpts below - Complete ROE located in Grey Casebook, ROE tab):

  1. **Enemy military and paramilitary forces may be attacked subject to the following instructions:**
  b. **Do not engage anyone who has surrendered or cannot fight due to sickness or wounds.**
  c. **Do not target or strike any of the following except in self-defense to protect yourself, your unit, friendly forces, and designated persons and property under your control:**
  - **Civilians**

  2. **You may use force, including deadly force, to defend yourself from persons who commit or are about to commit hostile acts against you. You may use the same level of force to protect the following:**
  - **Enemy prisoners or war and detainees**

### November 9, 2004

- Elements of RCT-1 moved south from north of Fallujah rail yard
- Included 3rd Squad (Nazario's), 3rd Platoon, Kilo Company, 3rd Battalion, 1st Marine Regiment
- Military personnel terms used are listed below:

| Name | Number of Personnel | Subordinates |
|---|---|---|
| Regiment | 2K – 3 K | 2 + Battalions |
| Battalion | 300–1K | 2–6 Companies |
| Company | 70–250 | 2–8 Platoons |
| Platoon | 25–60 | 2+ Squads |
| Squad | 8–16 | 2+ Fireteams |
| Fireteam | 4–5 | Individual Personnel |

Exhibit J
Page 144

Case Synopsis / Preliminary Report Supplement: NAZARIO, Jr., Jose L.
Page #5

**0600 - 0700 hours**

- 3rd Platoon dismounted from Humvees at north border of the city and proceeded south on foot

- Each squad on parallel streets on swath of four streets running north-south
  - 1st Squad left flank - SSgt Chandler (Platoon Sgt)
  - 2nd Squad main effort – 1$^{st}$Lt Jesse Grapes (Platoon Commander)
    - Occupied one of two streets in middle
  - 3rd Squad right flank - Sgt Pruitt (Platoon Guide)

**0925 hours**

- Lance Corporal Juan Segura, 3rd Squad, shot by insurgent sniper
- Segura loved by all in the Platoon-Weemer's "best friend"
- Segura medivacked; however, died en route

**1030 - 1200 hours**

- Enemy (or friendly) mortar fire received
  - Flattens tires of Humvees accompanying 3rd Squad
  - Squad takes cover in abandoned house
  - Squad members learn of Juan Segura's death

- Enemy fire suppressed (or friendly fire ceases)
  - Nazario told by Platoon Guide to search house across the street
  - One witness (Prentice) stated incoming small-arms fire had been received from the house

- Nazario, approached house accompanied by:
  - Weemer (Fire Team Leader)
  - Nelson (Wpn Platoon member attached to 3rd Squad)
  - Lance Corporal Pedro Garcia (Wpn Platoon member attached to 3rd Squad)
  - Lance Corporal Cory Carlisle (member of Weemer's Fire Team)
  - PFC James Prentice (member of Weemer's Fire Team)

- Front exterior gate locked
  - Lock breached by Lance Corporal Garcia

- Nazario, goes to front door, finds it locked and Garcia attempts to breach it

- Weemer goes around back and finds door open

- Nazario enters back door, accompanied by:
  - Weemer
  - Nelson
  - Lance Corporal Carlisle
  - Lance Corporal Prentice

Exhibit J
Page 145

Case Synopsis / Preliminary Report Supplement: NAZARIO, Jose L.
Page #6

- Lance Corporal  Garcia returns to truck to replenish supply of explosives

- Upon entering, Nazario and others encounter 4-fighting age Iraqi males sitting against walls in a large, central room
   o 2 against one wall & 2 against another wall

- All 4-males are ordered to sit on floor in a row against one wall

- Carlisle & Prentice are ordered to secure the home's 1st and 2nd floors
   o They depart main room to search for any other occupants

- Nazario asks 4-males if any speak English
   o One speaks broken English

- Nazario asks if there are any weapons in house
   o Male responds, "No weapons, no weapons."

- After securing home, Carlisle & Prentice ordered to search residence for weapons & ordnance
   o One AK-47 found in "office"
   o Other AK-47's & loaded magazines possibly found upstairs
   o Prentice claims barrel of AK-47 found upstairs was warm
   o Number of weapons found varies among witnesses

- Nazario kicks English speaker in the groin, then butt-strokes him in the head, knocking him back against the wall and cutting his ear

- Nelson argues with Nazario and bandages Iraqi's bleeding ear

- Nazario calls unidentified Marine on PRR or PRC-148 radio and explains that 4-insurgents have been encountered and detained
   o Nazario repeats what's been said to him for the benefit of the others-"Are they dead yet?"
   o Nazario asks, "Come again?"
   o Nazario again repeats, "Are they dead yet?"

- Nazario gets off radio and asks, "Who wants some of this?"

- Weemer argues with Nazario about killing the males

- Nelson claims to argue with Nazario as well

- Prentice volunteers to kill one; however, is stopped by Carlisle

Exhibit J
Page 146

Case Synopsis / Preliminary Report Supplement: NAZARIO Jr., Jose L.
Page #7

- Nazario took the oldest male into "bedroom" and shoots him in the eye with his M-16
  - Witnessed by:
    - Nelson
    - Prentice
    - Carlisle
    - Presumably Weemer, although he never mentions it

- Weemer grabbed the 2nd male, pulled him into "kitchen" and shot him twice in chest
  - Said he "knew" the man was dead
  - Witnessed by:
    - Nelson
    - Prentice
    - Carlisle
    - Presumably Nazario

- Weemer grabbed Prentice and Carlisle and told them, "We're getting the hell out of here."
  - They departed the house
  - Weemer stated he later returned and saw 3-5 bodies
  - Weemer never implicates Nazario, even though Nazario killed the first detainee
  - Upon exiting the house, Carlisle encountered a friend from 2nd Squad, Lance Corporal  Sam Severtgaart, and told him what happened

- Nelson, afraid of what might happen to him if he disobeyed, shot the last detainee in the back of the head in the "living room"
  - Presumably witnessed by Nazario
  - No other witnesses

- Garcia enters the house and saw one body in the "kitchen," as well as a pile of 5-6 AK-47s and loaded magazines
  - He detonates safe found in "office" but destroys contents in the process

- Nazario, Nelson, & Garcia exit the house
  - Nelson saw Nazario approach Sergeant Christopher Pruitt, Platoon Guide, who waited on the street outside, and heard Pruitt ask Nazario, "Did you take care of that?" which Nazario acknowledges he did
  - Garcia stopped at the home's exterior gate, which he breached, and had an unidentified Marine take a photograph of him standing at the gate
    - Garcia later sent the undeveloped disposable camera to his mother
    - His mother later provides the photograph to Agent Mark Fox, which was seized as "best evidence"

- PFC Severtsgaart entered the house through the back door
  - He observed 4 dead bodies on first floor
  - He observed pile of dismantled AK-47s

Exhibit J
Page 147

Case Synopsis / Preliminary Report Supplement: NAZARIO, Jr., Jose L.
Page #8

- That evening

  o Nelson stated after bivouacking in a sugar storage warehouse, he was approached at separate times by Sgt Pruitt, an unknown white Marine, and possibly PFC Rene Rodriguez, who taunt him for bandaging the ear of the detainee wounded by Nazario

  o Nelson told his "brother," William Nowlin, another Marine assigned to a different unit, what happened
    - When telephonically interviewed, Nowlin states Nelson was not in Iraq the same time Nelson was
    - He denied any knowledge of what Nelson was talking about

**October 2006**

United States Secret Service, Special Agent, Steve Dezeeuw conducted a pre-polygraph interview with Ryan Weemer on October 3, 2006.  During the interview, Weemer disclosed the events that occurred in November, 2004 (See White Casebook, Corrected Weemer USSS Excerpt for details).  Special Agent Dezeeuw asked:

*"Special Agent Dezeeuw:  Now granted if a person is a law enforcement officer or if they're in the military and they take somebody down a back alley and shoot them in the back of the head, I can't justify that, you know.  I mean that-that flat out rises above self defense and it rises to the level of a criminal offense.  Whether it's a law enforcement officer doing that, even if the guy's a scumbag and he's a dope dealer and he's selling to, you know, elementary school kids a police officer would have no right to take him in that alley and shoot him in head that's flat out homicide, you know, and uhm, nor would a person in the military have a right even if a person is a bad guy to have him be disarmed and take him in an alley and shoot him in the back of the head, you know, so are we talking about incidents like that where that happened?*

*Ryan Weemer:  That actually did happen to be honest.*

*Special Agent Dezeeuw:  Wow."*

The question shed light onto the events of November 9, 2004 for the first time (Page 3 Line 24).

Weemer went on to describe the event and stated the men that were killed were unarmed.

**January 2007**

- A series of telephone calls between Nelson and Nazario, were recorded
  o During one call, Nazario acknowledged he gave the order to kill the 4-detainees
  o Nazario identified Platoon Commander Jesse Grapes as the person from which the order originated

Exhibit J
Page 148

Case Synopsis / Preliminary Report Supplement: NAZARIO Jr., Jose L.
Page #9

- o Nazario additionally stated the items below that directly impact RPD:
  - ▪ implied he lied on his RPD polygraph (Blue Casebook/Tab 44/PG 10)
  - ▪ he stole cars while in Iraq (Blue Casebook /Tab 44/pg 12)
  - ▪ smoked weed "like, fifty times" (Blue Casebook /Tab 44/Pg 12) while his PHS indicates 3 times and the last time in 1996
  - ▪ On more than one occasion he states he will move to New York

- • Based on information stated by Agent Mark Fox, former 1st Lt Jesse Grapes was interrogated:
  - o He denied issuing the implied order to kill the 4-detainees
  - o He denied having heard anyone on the radio issue the implied order
  - o He traced the movements of his Platoon on a map
  - o He estimated the location at which the incoming mortar fire was received

**April - May 2007**

- • Lance Corporal Garcia's mother provided the photo taken of her son at the exterior gate of the house in question

- • The photograph, along with a copy of the map annotated by Jesse Grapes, was forwarded to NCISRA Iraq

**May - June 2007**

- • Utilizing the Marine Police Transition Team, Special Agent Mark Albo identified a house very similar in appearance to the house in Lance Corporal Garcia's photograph

- • The house is located approximately 4-5 blocks east of the area circled by 1st Lt Grapes

- • Special Agent's interview of the home's occupants and a preliminary crime scene examination confirmed the residence's location

**Statements provided implicated the following:**

- ▪ **Weemer Statement**
  - o Weemer admitted killing one unarmed Iraqi male in late 2004, in Fallujah, during a pre-polygraph interrogation conducted by USSS Special Agent Steve Dezeo on October 3, 2006.
    - ▪ The admission was made following rights advisement
    - ▪ The admission was tape recorded (recording is not available)
  - o Weemer implicated himself during a November 9, 2006 interrogation, which was conducted following rights advisement
    - ▪ The admission was tape recorded (recording is not available)
- ▪ **Carlisle Statement**
  - o Witnessed Weemer kill one Iraqi
  - o Witnessed Nazario kill one Iraqi

Exhibit J
Page 149

Case Synopsis / Preliminary Report Supplement: NAZARIO, Jr., Jose L.
Page #10

- o He heard third and fourth gunshots; however, he did not see who fired the shots
  - **Prentice Statement**
    - o Witnessed Weemer kill one detainee
    - o Witnessed Nazario kill one detainee
    - o He heard third and fourth gunshots; however, he didn't see who fired the shots
  - **Nelson Statement (identified as Source GCPF-0130)**
    - o Witnessed Weemer kill one detainee
    - o Witnessed Nazario kill two detainees
    - o Implicated himself in killing one detainee
  - **Garcia Statement**
    - o Observed one body but did not witness any killings
  - **Severtsgaart Statement**
    - o Corroborated Carlisle's statement
    - o Observed four bodies

## NCIS Negative Leads

The NCIS interviewed 1st Lieutenant and Platoon Commander Jesse Grapes, Staff Sergeant - Platoon Sergeant Jon M. Chandler, Private 1st Class (Platoon Radio Operator) James Crossan and Sergeant (2nd Squad Leader) R.J. Mitchell none of whom heard the implied order on the radio. NCIS reviewed all of the historical situation reports, after-action reports, unit chronologies, etc., and failed to surface any mention of the mortar attack or the incident itself. Nazario would not agree to an interview without legal counsel, attempts to re-contact him were unproductive. Weemer retained legal counsel who would not allow his re-interview. Staff Sergeant Christopher Pruitt, a likely suspect for issuing the implied order, refused to be interviewed without legal counsel and had not been interviewed prior to Nazario's court case.

## Transcript Information

In January 2007, NCIS conducted twelve pre-text telephone calls between Jose Nazario and U.S. Marine Sergeant Nelson (identified as "Source GCPF – 0130" on transcript records). On January 8, 2007, Jose Nazario spoke to Jermaine Nelson on the telephone (Docket # 44-6 – Blue Casebook or "Wire Intercept #3 – 08 JAN 07 (Talk)" – Grey Casebook). Of all the recorded conversations this conversation identified the largest number of issues for the background of Jose Nazario. Due to various defense challenges, only limited portions of transcripts were admitted into court since the witnesses requested protection under the Fifth Amendment. Since the witnesses were not able to be cross examined, the transcripts were not allowed to be used.

"Wire Intercept #3 – 08 JAN 07 (Talk)" is the original transcript that was provided by NCIS Special Agent Mark Fox, whereas the Docket 44-6 was the item used in court and contains additional court briefs. The first issue identified in the document is Nazario telling Nelson what may be a bravado statement. Nazario said, "I'm listening to it on the radio too, I'm going to show up, like three other guys are going to show up, and we just go in somebody's house like five, six, seven deep and beat the shit out of this motherfucker and find a reason to take him to jail." The second issue was that Nazario was going to re-locate to New York, an issue that is validated by Nazario's purchase of

Exhibit J
Page 150

**Case Synopsis / Preliminary Report Supplement: NAZARIO Jr., Jose L.**
**Page #11**

a home in New York in 2006.  The third issue and possibly the biggest issue identified was Nazario's amazement regarding Nelson's fear of the polygraph and the possibility that Nazario could pass a Polygraph while being deceptive.

### Nazario's and Nelson's portion of that topic are as follows:

*"NELSON:  You didn't have to do no polygraph test, son?  'Cause I was reading about that.*

*MR. NAZARIO:  Yeah, you do a polygraph test, and they ask you shit like that, but --*

*NELSON: Dog, I don't know, no nigger, I don't know about that polygraph test though, son.*

*MR. NAZARIO: I could -- you don't know how to lie through a polygraph?*

*NELSON: No, nigger, all right.  All right, what if we go to the polygraph test, right?*

*MR. NAZARIO: Oh, you haven't been a sniper Dog, I got to school you.  I got to tell you how to pass that shit.*

*NELSON: Yeah.  If these niggers was like, all right, what's the worse thing you've ever done, you know what I'm saying?  What if they ask me if I ever killed somebody, nigger, what do I say?*

*MR. NAZARIO: I told them yeah, I told them I killed a lot of people in Iraq."*

Nazario continued with statements of "...they ask me something like, have I -- how many times have I smoked weed when I was a minor, or whatever.  You know, I put down like, fifty times, and I write that shit."  His original PHS submitted indicated he has smoked Marijuana 3 times and last used in 1996 (Original Background file, PHS page 21, #95).

### When the conversation turned toward killing people, the following was discussed:

*"NELSON: Nigger, but yo, this is my main concern, nigger.  This can't go anywhere between me and you, all right?*

*MR. NAZARIO: Yeah.*

*NELSON: Yo, what if they ask if you ever murdered somebody, nigger?*

*MR. NAZARIO: If you murdered somebody?  Just be like, yeah, I was in combat.  And they waive all that shit. 'Cause like a lot of the shit that they put on that test, on that polygraph --*

*NELSON: Yeah.*

*MR. NAZARIO: -- you do a lot of that shit in combat.  Like they ask you, have you ever stole somebody's car?  And I was like, yeah, Dog, we fucking stole cars all the time in Iraq.  They was like, okay, fucking -- and they move onto the next shit.*

*NELSON: So that murder shit, that's fine -- they ain't going to ask me nothing like that, nigger, you're sure?*

*MR. NAZARIO: Yeah, well, no, they're going to ask you have you ever freaking killed somebody.*
*NELSON: Yeah.*

*MR. NAZARIO: I was, yeah, I killed a lot of people."*

Nazario also stated he liked to work on the police department because "You can fuck around with people too."

Exhibit J
Page 151

**Case Synopsis / Preliminary Report Supplement: NAZARIO Jr., Jose L.**
**Page #12**

## Summary

Due to the nature of this Supplemental Investigation, I did not attempt to contact the
Applicant regarding any of his statements, nor did I attempt to interview Sgt. Nelson or
Lance Corporal Weemer due to their pending court cases.  This Investigation into the
suitability of Jose L. Nazario Jr. for the position of Police Officer – Entry revealed that
applicant Nazario shot and killed two Iraqi men in Fallujah, Iraq on November 9, 2004.
Nazario was later acquitted of criminal charges for the same incident.

Exhibit J
Page 152

Case Synopsis / Preliminary Report Supplement: NAZARIO, Jr., Jose L.
Page #13

Investigated By:

_____     1-7-09
George Anderson, Police Officer/Background Investigator     Date

Reviewed By:

_____     1/20/2009
Sergeant Andy Flores, Personnel Services     Date

Reviewed By:

_____     1 - 20 - 09
Michael A. Perea, Lieutenant - Personnel Services     Date

Reviewed By:

_____     1 - 26 - 09
Michael J. Blakely, Captain - Personnel Services     Date

Reviewed By:

_____     01-26-09
John DeLaRosa, Assistant Chief     Date

Reviewed By:

_____     1-26-09
Russ Leach, Chief of Police     Date

Exhibit J
Page 153

**Exhibit K**



Police Department

4102 Orange Street
Riverside, CA 92501

RWLWL\\ 925
92501@3671

NIXIE      923   CE 1     DE 01/30/09
           RETURN TO SENDER
           ATTEMPTED - NOT KNOWN
           UNABLE TO FORWARD
BC: 92501367199     *1977-07677-30-38

3165000

Administrative Review



Police
Department

Monday, January 26, 2009

Jose Luis Nazario

Riverside, CA 92504

RE: Application for employment for Police Officer Trainee

Dear Mr. Nazario,

The Riverside Police Department has a significant number of qualified applicants for the position of Police Officer Trainee.  At this time the department has decided to pursue more qualified applicants, therefore, you are no longer being considered for the position.  As previously discussed with you, the Department will not release any additional information regarding your background investigation.

Thank you for your interest in the Riverside Police Department and good luck in all your future efforts.

Sincerely,

Russ Leach
Chief of Police

Michael A. Perea, Lieutenant
Support Services
Riverside Police Department

GEA/gea

Administrative Review

4102 Orange Street • Riverside, CA 92501 • 1.866.WORKRPD • www.rpdonline.org

City0014026



Exhibit K
Page 156

**Exhibit L**

Exhibit L
Page 157



Police
Department

December 1, 2009

Jose Nazario

Bronx, New York, 10462

RE:  **Application for Employment**

Dear Mr. Nazario:

I regret to inform you that we have terminated your background investigation and that you are no longer being considered for the position of **Police Officer** with the City of Riverside Police Department. As previously discussed with you, the Department will not release any additional information regarding your background investigation.

Thank you for your interest in the Riverside Police Department and good luck in all your future efforts.

Sincerely,

Russ Leach
Chief of Police

Michael J. Blakely, Captain
Support Services Division

RL/MJB

Exhibit
Page 158