1            UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3            EASTERN DIVISION-RIVERSIDE

4                     - - -

5      HONORABLE VIRGINIA A. PHILLIPS, JUDGE PRESIDING

6                     - - -

7  JOSE LUIS NAZARIO, JR.,          )
   AN INDIVIDUAL,                   )
8                                   )
                        Plaintiff,  )
9                                   )
              vs.                   )   No. EDCV 10-1731 VAP
10                                  )
                                    )
11 CITY OF RIVERSIDE; AND DOES 1-10,)
                                    )
12                     Defendant.   )
   _____)
13

14

15            REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                  Riverside, California

17                 Monday, March 21, 2011

18                     2:03 P.M.

19

20

21

22            PHYLLIS A. PRESTON, CSR 8701
              Federal Official Court Reporter
23            United States District Court
              3470 Twelfth Street
24            Riverside, California 92501
              (951) 205-7959
25            stenojag@aol.com

```
 1   APPEARANCES:

 2

 3   For the Plaintiff:

 4                           GODES & PREIS LLP
                             BY:  JOSEPH M. PREIS
 5                                ROBERT F. MUTH
                             8001 Irvine Center Drive, Suite 1420
 6                           Irvine, California 92618

 7

 8                           KEVIN BARRY MCDERMOTT
                             Attorney at Law
 9                           8001 Irvine Center Drive, Suite 1420
                             Irvine, California 92618
10

11

12   For the Defendant:

13                           GREINES, MARTIN, STEIN & RICHLAND
                             BY:  JEFFREY E. RASKIN
14                           5900 Wilshire Boulevard, Twelfth Floor
                             Los Angeles, California 90038
15

16                           ROTH CARNEY
                             BY:  RICHARD D. ROTH
17                           1650 Spruce Street, Suite 104
                             Riverside, California 92507
18

19                           OFFICE OF THE CITY ATTORNEY
                             BY:  JAMES E. BROWN
20                           3900 Main Street
                             Riverside, California 92522
21

22

23

24

25
```

```
 1              Monday, March 21, 2011; Riverside, California

 2                            2:03 P.M.

 3                             -oOo-

 4          THE CLERK:  Item No. 9, CV 10-1731 VAP,

 5   Jose Luis Nazario, Jr., v. City of Riverside.                  02:03

 6   Counsel, please state your appearance.

 7          MR. PREIS:  Good afternoon, Your Honor.

 8          Joe Preis on behalf of plaintiff Jose Luis Nazario.

 9   I'm joined from my office by Mr. Bob Muth and Kevin McDermott.

10   And also plaintiff Jose Nazario is present.                    02:03

11          THE COURT:  Thank you.  Good afternoon.

12          MR. RASKIN:  Good afternoon, Your Honor.

13          Jeffrey Raskin from Greines, Martin, Stein & Richland

14   on behalf of the City of Riverside.

15          THE COURT:  Thank you.                                  02:04

16          MR. ROTH:  Good afternoon, Your Honor.

17          Richard Roth of Roth Carney for defendant.

18          MR. BROWN:  Good afternoon, Your Honor.

19          Jeb Brown, Riverside City Attorney's Office, also on

20   behalf of defendant City of Riverside.                        02:04

21          THE COURT:  Thank you.  Good afternoon.

22          You've all had a chance to review briefly the Court's

23   tentative ruling?

24          MR. PREIS:  Very briefly, yes, Your Honor.

25          MR. RASKIN:  Yes.                                       02:04
```

```
 1              THE COURT:  Mr. Preis, do you wish to be heard?
 2              MR. PREIS:  I do, Your Honor.  Thank you.
 3              Would it be possible at all to get a half-an-hour
 4   continuance to be able to fully digest the Court's tentative?
 5              THE COURT:  Oh, certainly.  Absolutely.  Then we will   02:04
 6   reconvene --
 7              Are the attorneys here on the Navarro case?
 8              MR. HAFIF:  The plaintiffs are right here, and I
 9   believe we saw defendant and counsel in the hallway.
10              THE COURT:  All right.  Then we'll begin, at least on   02:04
11   the pretrial conference on that matter, while you take the time
12   that you need to review the tentative ruling, which I know is
13   lengthy.
14              MR. PREIS:  Thank you, Your Honor.
15              THE COURT:  You're welcome.                            02:05
16              MR. BROWN:  Thank you, Your Honor.
17              THE COURT:  And it probably will take us more than a
18   half an hour to do that pretrial conference, so we'll let you
19   know when we're ready.
20              MR. PREIS:  Thank you, Your Honor.                     02:05
21              THE COURT:  You're welcome.
22                        (Recess)
23              THE CLERK:  Item No. 9, CV 10-1731 VAP,
24   Jose Luis Nazario, Jr., v. City of Riverside.
25              Counsel, please state your appearance.                02:32
```

1        MR. PREIS:  Good afternoon, Your Honor.

2        Joe Preis on behalf of plaintiff Jose Luis Nazario,

3   once again joined by Robert Muth of my office, plaintiff

4   Jose Luis Nazario, and Kevin McDermott.

5        THE COURT:  Thank you.

6        MR. ROTH:  Good afternoon, Your Honor.

7        Richard Roth of Roth Carney for defendant.

8        MR. RASKIN:  Jeffrey Raskin of Greines, Martin, Stein

9   & Richland on behalf of defendant City of Riverside.

10       MR. BROWN:  Jeb Brown, Your Honor, also on behalf of

11  City of Riverside.

12       THE COURT:  Thank you.

13       All right.  Mr. Preis, you may argue the tentative.

14       MR. PREIS:  Thank you, Your Honor.

15       And, Your Honor, we do appreciate the extra time the

16  Court afforded us to look through the tentative and digest it,

17  as best we can, so I want to stick with the major issues that I

18  saw jump out at me, Your Honor.  I appreciate it.

19       THE COURT:  That's fine.  Actually, before you begin,

20  let me just remind both sides -- and it really matters in a

21  motion or motions like these where the papers are so

22  voluminous -- neither side tabbed your exhibits on the

23  chamber's copies.  And ordinarily what I would have done is to

24  have my assistant call the parties and return them and have you

25  resubmit them with everything tabbed, but in the interest of

1   time, I didn't do it because we would have had to reset the

2   motions.  And so in the interest of time, I didn't do that.

3   There were very few tabs on all of the documents, and it really

4   makes it difficult for me to refer back and find the exhibits

5   properly, especially when there were as many exhibits as there          02:33

6   were.  So in the future please be aware of that.  Don't be

7   surprised if you get a call telling you to resubmit your papers

8   if you don't have your exhibits tabbed.  But I have read

9   everything, reviewed all of the exhibits on everything that

10  both sides have filed.  Just in the future, please remember to          02:34

11  tab everything.

12          MR. PREIS:  We will do, Your Honor, and we apologize

13  for that.

14          THE COURT:  Thank you.  That's fine.

15          MR. PREIS:  May I be heard?                                      02:34

16          THE COURT:  Go ahead.

17          MR. PREIS:  Your Honor, again, we appreciate the

18  indulgence and the extra time.  Here's what I'm getting out of

19  the tentative; here's what I saw:

20          The Court appears to believe that the allegations               02:34

21  against my client, of the alleged criminal activity, are true

22  and that the events actually occurred.  I would submit that --

23          THE COURT:  Excuse me for interrupting you, but the

24  tentative ruling has been very carefully -- I've written it

25  very carefully that the Court doesn't need to reach that                02:34

1    decision.  The Court does not need to resolve that.  And I'm

2    very well aware of the jury's verdict in the criminal case, but

3    the key to the resolution of these motions, and in particular,

4    in the defendant's motion -- but in most of the motions that

5    come before the Court -- is the burden of proof, or the burden          02:35

6    of production.  And in this case, that's why it's reiterated

7    throughout, you can see it in the headings.  It's not identical

8    to McDonnell Douglas framework, but the Supreme Court has laid

9    out very clearly what the burden-shifting mechanism is when the

10   Court considers a case in the USERRA framework.  And the burden         02:35

11   here, in the first instance, is on the plaintiff.  So the Court

12   need not resolve the truth of the allegations of what, for

13   convenience sake, or for shorthand sake, I have referred to as

14   the Fallujah event.  The burden in the first instance, in order

15   to come within the protections afforded by USERRA, the                  02:36

16   plaintiff has the burden of producing evidence, and that's what

17   the plaintiff has failed to do in this case.

18            MR. PREIS:  I appreciate that clarification, and I'm

19   not trying to put words in the Court's mouth and read something

20   into the tentative ruling.  The reason I made that comment is,          02:36

21   I'm looking to a particular portion of the tentative ruling

22   where the Court appears to ask Mr. Nazario to prove that he was

23   acting under competent military authority.

24            THE COURT:  Exactly.  That's what he has the

25   burden -- under the case law from the Supreme Court and the             02:36

1   other cases that have been cited, he has that initial burden

2   under the framework.

3        MR. PREIS:  Specifically, though, I'm just making --

4   the Court can help me out here.  I don't know how I can prove

5   he was acting under competent military authority in that

6   specific moment he was alleged to have engaged in criminal

7   misconduct, when the criminal misconduct didn't occur.  The

8   Court, for example, mentioned that I didn't have a declaration

9   stating who gave the order on the radio.  Because the position

10   that Mr. Nazario has maintained since entering his not guilty

11   plea is none of that occurred, and it appears as though I'm

12   being an advocate to prove a negative.

13        THE COURT:  Then wouldn't he have to put in a

14   declaration to the effect that none of that occurred?

15        And in his deposition, he asserted his rights under

16   the Fifth Amendment to certain questions of that nature,

17   correct, which he -- that's what he did during discovery in

18   this matter.  But now he's a plaintiff.  So while he has the

19   right to assert his Fifth Amendment rights, which the defense

20   didn't challenge in this case, he then turned around and sued

21   as a plaintiff.

22        MR. PREIS:  Right.

23        THE COURT:  He can't on the one hand assert his

24   Fifth Amendment rights and not answer certain questions when

25   he's deposed, and then turn around and affirmatively seek

1  relief, in this case under USERRA, having used the Fifth

2  Amendment as a shield, and apparently, as the saying goes, try

3  to use it as a sword as well.  He still has to meet his initial

4  burden, in other words.

5          MR. PREIS:  Yes, Your Honor.  And I just want to        02:38

6  address the Court's concerns on that issue very briefly but

7  thoroughly.

8          My client did assert his Fifth Amendment privilege

9  when he was asked at deposition in this case whether or not he

10  did it.  The Court will recall that he was accused of killing    02:38

11  two unknown John Does.  And my client was an infantry marine in

12  Fallujah.  My client, as he admitted to Riverside when he

13  applied there initially, killed a lot of people in Fallujah.

14  However, the dynamic changed because we had a government that

15  will now prosecute him for killing alleged Does.  If he         02:38

16  admitted to killing anyone at deposition in this case, there

17  would be nothing that would stop the prosecutor from trying to

18  prosecute him for John Doe No. 3 or 4 or 15.

19          But, specifically, if we pull that curtain back, what

20  he's really accused of here is, he was fired based on an        02:39

21  allegation, not based on conduct, based on an allegation of

22  misconduct.  He proved he was acting under competent military

23  authority, because he was honorably discharged from active

24  duty.  The case is different --

25          THE COURT:  But the problem is, as I've pointed out      02:39

1    in the tentative, the honorable discharge came about before the

2    facts regarding the Fallujah events were uncovered.

3            MR. PREIS:  There's no evidence that that's true,

4    Your Honor.  Absolutely none.  There's no evidence that the

5    marine corps did not know about this event prior to him getting          02:39

6    out, because there's no event.  These are allegations.  I can't

7    prove the marine corps knew or didn't know about something that

8    did not occur.  My client made the most strenuous statement

9    that one could make in this context.  He entered a not guilty

10   plea in federal court and said, I didn't do this.  And they             02:40

11   were unable to prove he did.

12           So what this is placing him and other combat veterans

13   in the place of is, can a mere allegation, a mere allegation of

14   misconduct while you're on active duty, be used by a subsequent

15   civilian employer to Monday-morning quarterback what you                02:40

16   allegedly did or did not do on active duty?  And USERRA

17   provides no basis for a subsequent civilian employer to do

18   that.  The inquiry begins and ends with the honorable

19   discharge.

20           Here, we had an added layer of protection.  We had             02:40

21   MEJA.  So, to address the Court's concerns, if the conduct was

22   truly found out, or the alleged conduct was found out, after he

23   got out, which there's no evidence that that's true, but if

24   that was true, we have MEJA, the Military Extraterritorial

25   Jurisdiction Act.  The federal government prosecuted him under          02:40

1    MEJA, which he could not have been prosecuted under unless he

2    was serving in the marine corps in Iraq at the time.  They

3    prosecuted him; they were unable to convict him.  That's the

4    added layer of protection.  I would not be before you today,

5    Your Honor, had he been convicted.  But this falls back to,

6    this was a mere allegation of misconduct, in the heat of

7    battle, on active duty, that's never been proven in any court.

8    It's an allegation.

9            The way I'm reading this tentative ruling, it would

10   appear as though, if anybody alleges that a combat veteran did

11   anything that a subsequent civilian employer took issue with,

12   that subsequent civilian employer could use that allegation as

13   the basis to terminate that veteran's employment.  And that's

14   not what USERRA provides.  USERRA begins and ends the inquiry

15   with the honorable discharge.

16           THE COURT:  Mr. Raskin, are you arguing on behalf of

17   the defense?

18           MR. RASKIN:  Yes.

19           THE COURT:  Go ahead.

20           MR. RASKIN:  I'll be brief because the tentative is

21   so thorough, but the analysis does not begin and end with

22   whether there was an honorable discharge.  As the Court points

23   out, that entitles a veteran to eligibility, but the question

24   remains, eligible for what, and whether someone has been

25   discriminated against based on performance of service.

1          And Your Honor has pointed out in this discussion

2     that, you know, this does turn on that burden of production.

3     But another facet of this is, the question here is not just

4     whether or not he did it.  The question is, what was the City

5     of Riverside's motivation?  That is the sole question.          02:42

6          And here, it's undisputed that the motivation was the

7     allegations.  And those allegations do not constitute

8     performance of service.  And if NCIS was wrong, if the U.S.

9     attorney was wrong, and these events did not actually happen,

10    it doesn't change the fact that the motivation was not          02:42

11    discrimination based on service, but based on an erroneous

12    understanding of what Mr. Nazario did, and based on something

13    that, if it were true, would not constitute performance of

14    service.

15         And I'll leave it at that.                                 02:43

16         THE COURT:  But that would be if the Court reached

17    the next step and considered motivation.

18         MR. RASKIN:  I'm sorry.  Your Honor is talking about

19    in the multistep analysis of --

20         THE COURT:  Yes.                                           02:43

21         MR. RASKIN:  I believe that the first step the Court

22    has to consider is whether or not service was a motivating

23    factor, and the second would be whether, despite it being a

24    motivating factor, we would nonetheless have done it.  So I

25    believe this is wrapped into the first prong as well.          02:43

1    THE COURT:  Because the argument that you make in

2    your motion is that the motion should be resolved at the first

3    stage because Mr. Nazario doesn't meet the definitions,

4    performance of duty and acting under lawful authority.

5        MR. RASKIN:  Correct.                                    02:43

6        THE COURT:  All right.

7        Mr. Preis.

8        MR. PREIS:  Two things, Your Honor.

9        Counsel makes a good point, but once again, he

10   changes the story.  He just said that the sole motivating     02:44

11   factor were the allegations of misconduct.  But let's back up

12   behind that.

13       Who is saying that my client wasn't acting under

14   competent military authority at the time he did something he

15   was alleged to have done?  How do you get down in the dirt that  02:44

16   low and say, you know, what somebody accused you of doing at

17   that particular moment, you weren't acting under competent

18   military authority?

19       There's nobody I can bring into court, there's no

20   declaration I can get that will say, I ordered him to do      02:44

21   something he didn't do.  So the bigger policy issue is, again,

22   once again, who gets to decide the minute-by-minute

23   play-by-play of a combat veteran, in what the City of Riverside

24   has even admitted was the most brutal ground combat the

25   marine corps has seen since Hue City?  Who gets to decide what  02:44

1   he did?

2          USERRA says the military gets to decide.  The

3   military honorably discharged him.  Riverside brought no

4   evidence that the military wasn't aware of this prior to

5   discharging him.  There's no evidence that that's true.  Quite          02:45

6   the contrary.  If the judge looks a little bit further, you'll

7   see that the people that were still in the military that were

8   tried by court-martial for the same event were found not guilty

9   and were honorably discharged.

10         THE COURT:  Excuse me.  You need to slow down.          02:45

11         MR. PREIS:  I apologize, Your Honor.

12         THE COURT:  But that evidence is not before the Court

13   either.

14         MR. PREIS:  And there is no evidence before the Court

15   that the military did not know of this.  There is no evidence          02:45

16   before the Court that this happened.  This is an allegation.

17   If somebody accuses me of killing somebody in Somalia 17 years

18   ago, does that mean my employer can fire me?  Because that's

19   what happened here.  That's what happened here.  They don't

20   like the way he allegedly killed somebody.  It was his job to          02:45

21   kill people in Fallujah.  Nobody has been able to prove that he

22   did anything wrong in Fallujah, and the Secretary of the Navy

23   said he was a war hero.  So this war hero, by this subsequent

24   civilian employer, was second-guessed, was Monday-morning

25   quarterbacked 6,000 miles and six years removed, and they said,          02:45

1    you know what, we don't like what they said you did.

2           That's not enough under our system of jurisprudence.

3    What USERRA says is, if you have an honorable discharge, they

4    can't look into your conduct.  Period.  If you're honorably

5    discharged --                                                    02:46

6           THE COURT:  No.  No.  Because -- I'm glad this is in

7    the tentative.  At first, I thought it was -- well, at first, I

8    thought maybe it didn't need to be there because it seemed sort

9    of elementary.  But the honorable discharge, that just sets the

10   stage for the very first level of eligibility.  And I explain    02:46

11   that, partly for my own benefit, because these cases don't come

12   before the Court every week.  USERRA lists three bases, and you

13   have to have an honorable discharge for the first level of

14   eligibility, but that's not the end-all and be-all of the

15   inquiry.                                                         02:47

16          MR. PREIS:  I don't necessarily disagree with what

17   the Court has said.  In order to be entitled to the protections

18   of USERRA, you have to have had a discharge that's

19   characterized as honorable.  If he was dishonorably discharged,

20   we wouldn't be here today.                                       02:47

21          Congress inserted that as the only gatekeeper to

22   USERRA, particularly with respect to 4311.  So let's look at

23   what that means.  You had to have been honorably discharged.

24   Only the military can honorably discharge.

25          THE COURT:  If you look at page 28 of the tentative       02:47

1   ruling, it sets forth the four bases for a service member's

2   entitlement to USERRA benefits.

3        MR. PREIS:  Right.  And Mr. Nazario meets that

4   qualification.  He was honorably discharged.  You're

5   discharged -- your characterization at discharge in the         02:47

6   military is based on your conduct.  If you have bad conduct,

7   you don't get a good discharge.

8        The Court seems to be basing its decision, in part at

9   least, on the fact that Riverside argued that had the military

10  known, they clearly wouldn't have given him an honorable        02:48

11  discharge.  Riverside put no admissible evidence in front of

12  the Court that that's true.

13       THE COURT:  That's because the issue is, as set forth

14  in some detail here, that the plaintiff has the burden in the

15  first instance to show that he meets the requirements of        02:48

16  showing that his actions, the actions that he's claiming, were

17  the basis for Riverside's decision to terminate his employment

18  and then not to reemploy him, were based on actions that were

19  taken under lawful authority and were in the performance of his

20  duties.  And he has the burden in the first instance, under     02:48

21  Supreme Court authority, of showing that.  He has produced no

22  evidence in support of that.

23       MR. PREIS:  I understand what the Court is saying,

24  and I respectfully disagree, and I'll briefly explain why.

25       He has proven that he was honorably discharged.  They      02:49

1  have not proven that he engaged in conduct which they now find

2  distasteful while he was serving on active duty.  How do we

3  disprove a negative?

4          THE COURT:  The point is that an honorable discharge

5  does not satisfy that initial burden.  And that's, I think, the          02:49

6  point of disagreement.  Your argument seems to be today that

7  the fact of an honorable discharge is enough to show that he

8  meets that initial burden.  But none of the cases that we have

9  discussed, that the parties brought up in their papers and that

10  I discussed at length in the tentative ruling, hold that.          02:49

11  There's no case that says simply an honorable discharge is

12  sufficient to meet the plaintiff's initial burden.

13          MR. PREIS:  And, Your Honor, there's no case that

14  says the negative of that.  The cases that they rely on --

15          THE COURT:  For example, the Leisek case, that's the          02:50

16  hot air balloon case.  It talks about how the service member in

17  that case, who was serving in the national guard, took an

18  action that was not under lawful authority, because he didn't

19  have specific orders to go to the event in Colorado.

20          MR. PREIS:  Can I explain that briefly, Your Honor?          02:50

21          THE COURT:  Go ahead.  But I've read an awful lot

22  about it.  That's a case where both sides' versions of the

23  case -- but the point is  -- even though that wasn't a case

24  where it was a former service member; they wouldn't be talking

25  about an honorable discharge -- there's no authority that you          02:50

1    have cited to me, and none that I have found, that says that

2    the inquiry stops with an honorable discharge.

3           MR. PREIS:  I want to explain Leisek briefly, because

4    I think the Court has a misinterpretation of how Leisek would

5    be applied to the issue here.                                    02:50

6           In Leisek, it was not an active-duty service member;

7    it was a reserve service member.

8           THE COURT:  I'm aware of that.

9           MR. PREIS:  On the particular weekend -- and I'm not

10   suggesting the Court is not aware of this; I'm just explaining  02:51

11   it from our point of view -- on the particular weekend at

12   issue, when reservist -- my associate is a reservist; he's not

13   on active duty right now, but he can be ordered to active duty

14   for weekends, for two weeks, or for longer.  In the case in

15   Leisek, the national guardsman, on his own, without any orders,  02:51

16   went and flew his hot air balloon.  That would be akin to

17   Mr. Nazario showing up in Fallujah on his own and just joining

18   the fight.  That wasn't the issue.  Mr. Nazario was under

19   active military duty orders when he was ordered to insult into

20   the City of Fallujah.  It's not an issue of he wasn't acting    02:51

21   under competent military authority.

22          And if you look at the cases they cite to, other than

23   Leisek, all the other cases are military cases where you have a

24   convicted service member who has not yet been discharged, and

25   they're not USERRA cases.  Leisek has nothing to do with these  02:51

1  facts factually, because we're comparing a reservist national

2  guardsman, who was not under military orders, not even military

3  authority.  He wasn't under military orders on the weekend at

4  issue.

5      Then you have Mr. Nazario, who was handed a rifle and    02:52

6  told to insult through the city.  He wasn't there on his own

7  accord.  He was ordered to Iraq.  He could not have been

8  arrested for these allegations had he not been serving in Iraq.

9  He never would have been alleged to have committed this conduct

10 if he wasn't serving in Iraq.                                   02:52

11     But what we're talking about right now is his alleged

12 performance of service while on active duty.  There's

13 absolutely no evidence that these allegations are true.  We're

14 basing the decision to end a man's career on allegations, mere

15 allegations.  He cannot prove that he didn't do something he    02:52

16 didn't do.  He cannot get somebody to testify that they ordered

17 him to do something he didn't do.  He entered a not guilty

18 plea.  He was found not guilty.  He asked for his job back, and

19 they didn't give him his job back.

20     But, more importantly, for purposes of this               02:53

21 discussion, in January of 2007, they were told of an

22 investigation.  They begged for facts on a monthly basis until

23 July 19th, and then they were told the facts and immediately

24 decided to terminate him.  It's not just that they terminated

25 him based on performance of service; they terminated him based  02:53

1    on the alleged performance of service.

2              THE COURT:  Well, that, of course, is overlooking the

3    other information that they had at that time.

4              MR. PREIS:  What else did they have at that time,

5    Your Honor?                                                    02:53

6              THE COURT:  At the time that they decided -- are you

7    talking about the point when they decided not to reemploy him?

8              MR. PREIS:  I'm sorry.  I'm still talking about the

9    termination.  I apologize.

10             THE COURT:  I'm sorry.  Go ahead.                    02:53

11             MR. PREIS:  At the time they decided to terminate

12   him, they've now, again, said -- it's undisputed; I wrote it

13   down -- the sole motivation were the allegations.  The

14   allegations were the sole motivation.

15             How can an alleged anything be the basis for taking  02:53

16   an action that would prohibit you from taking the action if

17   what you were alleged to do was the conduct that you did?

18             It's such a twisted argument.  There's no proof he

19   did what he was alleged to have done, but that's what they base

20   their decision on.  And the things that he was alleged to have  02:54

21   done allegedly occurred while he was on active duty, in the

22   middle of a battle.  And the policy considerations here are, is

23   that going to be enough for future employers to simply say, you

24   know, we think you did this, and because we think you did this,

25   we're going to terminate your employment, with no factual       02:54

1  finding that that ever occurred?

2          THE COURT:  I have to ask you to slow down.

3          MR. PREIS:  I'm sorry.  I had some Red Bull earlier

4  today.  It messes me up.  I apologize.

5          THE COURT:  Well, it's going to be difficult for the          02:54

6  court reporter to make an accurate record, and I'm sure that

7  you want one.

8          MR. PREIS:  I do apologize.

9          THE COURT:  That's all right.  Go ahead.

10          MR. PREIS:  The issue I'm having is, is the specific          02:54

11  quote in the tentative.  I don't know how I could get a

12  declaration from anybody that said they didn't order

13  Mr. Nazario to do something he didn't do.

14          THE COURT:  You could have had a declaration from

15  your client, which you don't have.  And if you did have one, at          02:54

16  this point, in light of the fact that your client didn't answer

17  questions at a deposition, invoking his Fifth Amendment

18  privilege, that would be a problem, because one can hardly

19  invoke the Fifth Amendment for purposes of answering deposition

20  questions and then, in order to avoid summary judgment, give          02:55

21  the same information.  But that's kind of neither here nor

22  there, because we don't have that -- you don't have a

23  declaration at this point.

24          Mr. Raskin, do you wish to respond?

25          MR. RASKIN:  I'm not certain that I can really help          02:55

1    the Court any further.  If the Court has questions, I'm happy

2    to answer them.

3              THE COURT:  I'm going to take the matter under

4    submission.

5              MR. PREIS:  May I just be heard and make a record on    02:55

6    the second claim, Your Honor?

7              THE COURT:  Oh, yes.  Go ahead.

8              MR. PREIS:  I apologize.

9              On the second claim, the failure to rehire, it is

10   undisputed that Riverside investigated his service, not only    02:55

11   his alleged service, but his service as well.  It's undisputed

12   that Riverside considered that service and alleged service when

13   making the decision.  It's undisputed that, with respect to

14   this restraining order, that Riverside did not believe the

15   allegations that caused the restraining order.  It's undisputed    02:56

16   that Riverside testified that this temporary restraining order

17   was, quote, deal killer, and once that happened, that was it,

18   they weren't going to rehire him.  But it's also undisputed

19   that when that restraining order came out, they continued to

20   investigate his military service and alleged military service.    02:56

21   And it's undisputed that they did not make their decision until

22   after they considered all of that information.  At a minimum,

23   there is a triable issue of fact as to what they considered

24   when they made the decision not to rehire him.

25             THE COURT:  That they considered -- in other words,    02:56

```
 1   if I understand your argument correctly, your argument is that
 2   it's undisputed that they considered the military service, as
 3   well as the domestic violence -- well, there was a TRO and
 4   then, I believe they call it a permanent injunction in New
 5   York, but what we would here call a permanent injunction, as        02:57
 6   well as the statements on the wire intercepts.
 7           MR. PREIS:  That's actually not my argument.  I think
 8   it is disputed whether or not they considered the TRO, because
 9   they admit they didn't believe the allegations behind -- I
10   think it is disputed whether or not they considered the wire       02:57
11   transfers, because they admitted they did not believe what he
12   is alleged to have said.  It is undisputed, undisputed, that
13   they investigated his military service.  Motivating factor
14   doesn't have to be the sole reason.  It's a reason that --
15           THE COURT:  I agree that the case law is clear, it         02:57
16   doesn't have to be the sole factor, but I don't think it's
17   undisputed here that they considered those other things.  It's
18   not -- I think the parties dispute -- well, the plaintiff
19   certainly disputes the extent to which, if any, the defense
20   considered the domestic violence case in New York.                 02:58
21           MR. PREIS:  Correct.
22           THE COURT:  So that's a dispute.
23           MR. PREIS:  Correct.
24           THE COURT:  So when you say it's undisputed,
25   that's -- I mean, it's not undisputed.                             02:58
```

1          MR. PREIS:  You know, it is the Red Bull again.

2          It is not undisputed that they considered that.  We

3    dispute that they considered that in making a decision.  When I

4    say "that," the temporary restraining order.  We dispute the

5    fact that they considered that in making their decision.  But          02:58

6    we don't have to prove that they didn't consider it.  We just

7    have to demonstrate that they also considered his service.  And

8    did the court in Petty look at the single line in an e-mail?

9    Here, we have a 13-page report that talks about nothing other

10   than his military service, including the alleged activities          02:58

11   that they claim he did while in the service.  And they

12   considered those events in making the decision not to reemploy

13   him.

14          THE COURT:  Mr. Raskin?

15          MR. RASKIN:  Yes, please.          02:58

16          As an initial matter, Your Honor did correctly point

17   out in the tentative that regardless of where we go with the

18   wire intercepts and regardless of where we go with the domestic

19   violence restraining order, if the only consideration had been

20   the allegations, that that still would not constitute          02:59

21   performance of service, for all the reasons stated in the

22   opinion.  But in addition to that, I point out -- and these are

23   addressed in the reply brief.  But going through what counsel

24   has talked about, in terms of the restraining order, the

25   testimony was not that the City of Riverside disbelieved the          02:59

1   allegations of domestic violence, but merely that we

2   disbelieved it at the time that the allegations were made.

3   That is before the actual -- what you would call a permanent

4   restraining order was issued.  And it is undisputed that, yes,

5   we did entertain some doubt, as we often do in a marital          03:00

6   dispute, as to whether or not this alleged domestic violence

7   occurred; and then they, therefore, waited and waited until the

8   opportunity came up for Mr. Nazario to be heard by a court and

9   a permanent restraining order was issued.

10          With regard to the wire intercepts, yes,                  03:00

11   Chief Blakely did testify that he did not believe that

12   Mr. Nazario had, in fact, beaten up people and came up with

13   reasons to take them to jail during his probationary period.

14          THE COURT:  But that's not what's on the wire

15   intercepts.                                                      03:00

16          MR. RASKIN:  I'm sorry?

17          THE COURT:  What's on the wire intercepts, it seems

18   to me, is not that he said -- I mean, the reasonably -- a very

19   reasonable interpretation of the wire intercepts is not that he

20   had done that in the past, but his motivation for becoming a     03:01

21   police officer.

22          MR. RASKIN:  Precisely.  That's exactly where I was

23   going.  So the fact that we don't know or don't even believe

24   that he had, in fact, done this in the past is not the

25   motivating factor that comes from the wire intercepts, as        03:01

1   Your Honor is pointing out.

2          And then, so we're clear, yes, certainly an

3   investigation into the Fallujah event did occur, and certainly

4   it was testified that it was considered along with everything

5   else, but it's also undisputed that it was considered and          03:01

6   rejected.  And this is the key, that if something is considered

7   and rejected and other reasons are the motivating factor, then

8   the rejected reason cannot be a motivating factor for the

9   adverse employment decision.

10          THE COURT:  Well, that's the framework under, say,          03:01

11   McDonnell Douglas.  In light of the most recent Supreme Court

12   authority, that's not really the framework of the summary

13   judgment stage anymore under USERRA.

14          MR. RASKIN:  I beg to differ.  And I do point it out

15   in the reply brief, where the court, in this recent -- in the     03:02

16   very, very recent decision, ends up analyzing this from kind of

17   a proximate cause.  And that's the language it uses.  And it

18   actually says that if an investigation is launched because of

19   one person's anti-military bias, and the employer ultimately

20   makes a decision based on some other issue, then they're not      03:02

21   liable.  Because the underlying anti-military bias was not the

22   proximate cause; it wasn't a motivating factor.

23          THE COURT:  But doesn't that opinion really stand for

24   the proposition that that's a triable issue of fact for a jury

25   and that precludes summary judgment, that the existence of        03:02

1  conflicting evidence regarding motivation precludes summary

2  judgment?

3          MR. RASKIN:  Well, it certainly does not address that

4  issue as to summary judgment.  What it says is, if a different

5  reason was -- if a different reason was the motivating factor,          03:03

6  that cuts off the old instigation of the investigation itself.

7  And I guess the question here is, is there a dispute of fact

8  when all of the evidence shows, yes, we considered everything

9  in the file, and then we rejected the Fallujah event as having

10 anything to do -- as being a motivation for our decision; we          03:03

11 will not make a determination on that; we will not decide that

12 issue; we do not have to, because we only need to look at the

13 wire intercepts and the domestic violence restraining order.

14         THE COURT:  All right.  We're talking about the same

15 case, right, the Staub case that was just decided on March 1st          03:03

16 of this year?

17         MR. RASKIN:  Yes, Your Honor.

18         If I may, Your Honor?

19         THE COURT:  Go ahead.

20         MR. RASKIN:  If you need some time --          03:04

21         THE COURT:  Go ahead.

22         MR. RASKIN:  Thank you.

23         In the Staub case, the issue was, the investigation

24 was motivated by a mid-level supervisor's

25 anti-discriminatory -- anti-military animus.  That's what          03:05

1  prompted a write-up.  The supervisor's supervisor, the

2  decisionmaker, was not aware of the underlying animus and

3  relied on that -- relied on the write-up to make the

4  termination decision.  And what the court decides is, in that

5  instance, even though the decisionmaker does not, in fact, know          03:05

6  of the anti-military animus, it was the anti-military animus

7  that is the proximate cause for the decision.

8          THE COURT:  Because of the deception, which is what

9  the court holds --

10          MR. RASKIN:  Correct.  But the court does go on to          03:05

11  say that if the employer's investigation results in an adverse

12  action for reasons unrelated to the supervisor's original

13  biased action, then the employer will not be liable under

14  USERRA.

15          And, yes, that was not the situation that the Staub          03:06

16  court was addressing, but that is the line that they're drawing

17  in terms of, when is it that someone's underlying anti-military

18  bias is or is not the proximate cause?  It remains the

19  proximate cause even if the decisionmaker is not aware that

20  that is the motivation behind the write-up that it is relying          03:06

21  on.  But when the decisionmaker considers that and rejects that

22  and relies on something else, something other than the original

23  biased action, then the employer is not liable, because the

24  biased motivation is no longer the proximate cause.

25          And it is theoretically possible that there could be          03:06

1   a dispute of fact in some case, but in this case, it is

2   undisputed that, yes, everything in the file was considered,

3   and that includes an investigation report on the Fallujah

4   incident, but it's also undisputed that all three decision

5   makers rejected that, said, we don't need to decide this; we do          03:07

6   not need to discuss it with Mr. Nazario; we do not need to

7   flush out this information any further; we do not need to

8   decide one way or the other whether he committed this conduct;

9   we are going to rely exclusively on these other issues.  And if

10  that's the case, then those other issues, not the rejected          03:07

11  question, are the sole motivating factors.  You can't be

12  motivated by something -- by a reason that you reject.

13          THE COURT:  All right.

14          Mr. Preis.

15          MR. PREIS:  Your Honor, counsel's argument would hold          03:07

16  water if they found out about the permanent injunction, the

17  permanent restraining order, and they made their decision then.

18  That's not what happened.  They found out about it, and they

19  continued to investigate his military service; they found out

20  about the wire intercepts, and they continued to investigate          03:08

21  his military service, which at a minimum creates a triable

22  issue of fact as to what they based their decision on.  Just

23  because they say they rejected it doesn't mean they rejected

24  it.  The facts demonstrate that they continued to investigate

25  it, and if this permanent order of restraint or these wire          03:08

1    intercepts were the deal killers that counsel wants you to

2    believe, the decision would have been made right then and there

3    to no longer consider him for reemployment.  But they continued

4    to investigate his military service for several months

5    thereafter before making their decision.                          03:08

6            THE COURT:  All right.  Thank you very much.

7            Please return your copies of the tentative to the

8    clerk.

9            MR. PREIS:  Thank you, Your Honor.

10           Your Honor, I apologize, I did write on mine.           03:08

11           THE COURT:  She shreds them.

12           MR. PREIS:  I didn't say anything bad about the

13   Court.

14           THE COURT:  I never see it, good or bad.

15           MR. BROWN:  Thank you, Your Honor.                      03:09

16           THE COURT:  Thank you.

17           What date is your pretrial conference?

18           MR. ROTH:  Your Honor, we have a memo of contentions

19   of law and fact.  We have deadlines next Monday that things

20   need to be filed.  The pretrial conference, I believe, is on    03:10

21   April 18th.

22           THE COURT:  So your deadline is Monday for the

23   contentions?

24           MR. PREIS:  Yes, Your Honor.

25           THE COURT:  I'm going to extend that for one week.  I   03:10

1    think I'll probably have the final ruling out by the end of

2    this week.  So at this point let me -- that deadline is -- I'll

3    extend that for one week, so you don't need to do any work on

4    it this week.  If I don't have the ruling out by the end of

5    this week, my clerk will notify you.                          03:10

6              MR. PREIS:  Thank you, Your Honor.

7              THE COURT:  Thank you for bringing that to my

8    attention.

9              May I bring up one more housekeeping matter?

10             THE COURT:  Certainly.                              03:10

11             MR. PREIS:  If the Court is inclined to grant summary

12   judgment as to the first claim and reverses itself on the

13   second, which would mean there would still be issues for a

14   trial, we'd respectfully request that the Court certify the

15   question as to the first so that we can expeditiously resolve  03:11

16   the entire matter.  We can take an appeal up on the first

17   before just kind of bifurcating the trial.

18             THE COURT:  I'm unlikely to do that, but I'll give

19   you -- I mean, I'm unlikely to certify half, to do that, but I

20   will give you -- if I do, if I reverse on one claim, I will    03:11

21   give you the opportunity to argue -- give both sides the

22   opportunity to present their positions on it.

23             MR. PREIS:  Thank you, Your Honor.

24             MR. ROTH:  Thank you, Your Honor.

25                        ---o0o---

```
 1              C E R T I F I C A T E

 2

 3            DOCKET NO. EDCV 10-1731

 4

 5        I hereby certify that pursuant to Section 753,
     Title 28, United States Code, the foregoing is a true and
     accurate transcript of the stenographically reported
 6   proceedings held in the above-entitled matter and that the
     transcript page format is in conformance with the regulations
 7   of the Judicial Conference of the United States.

 8

 9

10

11    /S/ Phyllis A. Preston        DATED:  March 31, 2011

12   Federal Official Court Reporter

13   License No. 8701

14

15

16

17

18

19

20

21

22

23

24

25
```